IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PARALLEL NETWORKS LICENSING, )
LLC, )
 )
   Plaintiff, )
 )  Civil Action No. 13-2073(KAJ)
  v. )
 )  JURY TRIAL DEMANDED
MICROSOFT CORPORATION, )  **FILED UNDER SEAL**
 )
   Defendants. )

_____

MEMORANDUM OPINION

_____

Adam W. Poff, Esq., Pilar G. Kraman, Esq., Young Conaway Stargatt & Taylor, 1000 N. King Street, Wilmington, DE 19801, *Counsel for Plaintiffs*
 Of Counsel: Douglas A. Cawley, Esq., Christopher T. Bovenkamp, Esq., Eric S.
    Hansen, Esq., Avery R. Williams, Esq., Justin W. Allen, Esq., McKool
    Smith, PC, 300 Crescent Court – Ste, 1500, Dallas, TX 75201
    Angela M. Vorpahl, Esq., McKool Smith, PC, 1 Bryant Park – 47th Fl.,
    New York, NY 10036
    John B. Campbell, Esq., Leah Bhimani Buratti, Esq., Kevin P. Hess, Esq.,
    McKool Smith, PC, 300 W. 6th Street – Ste. 1700, Austin, TX 78701

Martina Tyreus Hufnal, Esq., Nitika Gupta, Esq., Ronald P. Golden, III, Esq., Fish & Richardson PC, 222 Delaware Avenue, 17th Fl., Wilmington, DE 19801
Juanita R. Brooks, Esq., Jason W. Wolff, Esq., Joanna M. Fuller, Esq., Fish & Richardson PC, 12390 El Camino Real, San Diego, CA 92130
Stephen A. Marshall, Esq., Fish & Richardson PC, 1425 K Street, N.W., 11th Fl., Washington, DC 20005, *Counsel for Defendants*

_____

February 22, 2017
Wilmington, Delaware



JORDAN, Circuit Judge, sitting by designation

## I.   Background

Microsoft has filed a motion in this patent infringement case to exclude evidence related to a survey conducted by Dr. Bruce Isaacson.  (Docket Item ("D.I.") 281.)  Based on the briefing and oral argument, I will grant the motion.

Plaintiff Parallel Networks filed this action on December 20, 2013, alleging that Microsoft infringed U.S. Patent Nos. 5,894,554 ("the '554 patent") and 6,415,335 ("the '335 patent").  (D.I. 1.)  The asserted claims generally disclose methods for load-balancing dynamic web requests across multiple page-servers in an Internet-based system.[1]

Parallel Networks accuses Microsoft of infringing, both directly and indirectly, six independent claims and twelve dependent claims of the patents-in-suit.  (D.I. 288 at 9 n.4.)  Parallel Networks' theory of indirect infringement focuses on two accused products – (1) Microsoft's Windows Server, when running with Internet Information Services (IIS), Application Request Routing (ARR), and URL Rewrite, and (2) SharePoint 2013, when used with Request Manager.  (D.I. 312 at 3.)  In order to support its theory of indirect infringement, Parallel Networks hired Dr. Bruce Isaacson to conduct a survey that sought to determine how Microsoft customers use the accused products.  (D.I. 283

---

[1] I discuss the procedural history of the patents-in-suit, as well as representative claim language, in the memorandum opinion on summary judgment filed contemporaneously with this opinion.

Ex. 1 ("Isaacson Report").)  After reviewing Dr. Isaacson's survey and the accompanying

report, Microsoft filed this motion, arguing that the survey and all testimony that relies on

the survey should be deemed inadmissible under Federal Rule of Evidence 702.[2]

## II.   Legal Standards

The admissibility of expert testimony is governed by Federal Rule of Evidence

702.  Under that rule, expert testimony is admissible only if it "will help the trier of fact

to understand the evidence[,] ... is based on sufficient facts or data[,] ... is the product of

reliable principles and methods[,] ... [and] reliably applie[s] the principles and methods to

the facts of the case."  Fed. R. Evid. 702.  The role of the district court is to serve as a

"gatekeeper" – to protect the jury from evidence that is unreliable, confusing, or unduly

prejudicial.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145, 147-48 (1999);

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993).  In order for expert

evidence to be reliable, there must be an adequate "fit" between the offered evidence and

the subject matter at issue in the case.  *Daubert*, 509 U.S. at 591.  "Expert testimony

which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.*

at 591 (quoting 3 Weinstein & Berger ¶ 702).  Similarly, expert conclusions that do not

have an adequate analytical connection to the proffered evidence are excludable.  *See*

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered.");

---

[2] Included with Microsoft's motion is a rebuttal expert report authored by Dr.
Jeffery A. Stec, who was retained by Microsoft to evaluate Dr. Isaacson's survey. (D.I.
283 Ex. 7 ("Stec Report").)  No one will be surprised to learn that the rebuttal report says
the survey is unreliable.

*Daubert*, 509 U.S. at 591 (explaining that a study of the phases of the moon may help the trier of fact determine whether a certain night was dark, but that it "will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night").

Pursuant to Federal Rule of Evidence 104, the burden of proof with respect to reliability under Rule 702 lies on the party attempting to offer the expert evidence. *See* Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." (citing *Bourjaily v. United States*, 483 U.S. 171 (1987))).

## III.    Discussion

The standards articulated in *Daubert* and its progeny apply to survey evidence, *e.g.*, *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009); *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 118 (3d Cir. 2004), and the Isaacson survey and accompanying expert report fail to meet those standards. Parallel Networks has not shown, by a preponderance of the evidence, that the survey is admissible under Rule 702. Instead, it appears that the survey suffers from major analytical and methodological flaws that render its results unreliable and therefore unfairly prejudicial.

### A.    The Survey Is Not Adequately Linked to the Asserted Claims

First and foremost, the survey is not adequately linked to the asserted claims. While the survey generally relates to the accused products, it does not support Parallel

4

Networks' assertion that survey respondents used the accused products in an infringing manner. The survey's deficiencies on this issue include the following: the asserted claims require that a web server be used to manage requests for dynamic Web pages, yet the survey did not ask respondents if they use the accused products to manage requests for dynamic Web pages; the claims require the web server to "concurrently process[]" multiple requests, yet the survey did not ask respondents if they use the accused product to concurrently process requests; the claims require the use of a page server to dynamically generate a web page, yet the survey did not ask respondents if they use the accused product to dynamically generate anything, let alone a web page; the claims require the use of a dynamic load balancing algorithm to determine which page server should be used to serve the request, yet the survey did not ask the SharePoint respondents whether they used a static or dynamic load balancing algorithm (D.I. 306 Ex. 8 at 163 (report from Parallel Networks' expert).).[3] Those omissions are substantial – it appears that the survey failed to address even a single limitation of the asserted claims.

---

[3] Parallel Networks contends that the survey can be used to figure out whether Microsoft customers use the accused products to generate dynamic web pages. That is incorrect. Parallel Networks cites two questions. Question H asked respondents to indicate "the total number of requests for dynamically generated web pages processed in a typical day by all servers at your employer/client?" (Isaacson Report, Ex. 2 at 3.) This question, however, is insufficient. It did not limit responses to the accused products, but instead directed respondents to answer with respect to *all* servers. Question 6 asked respondents to identify the extensions that are used to "distribute web (*e.g.*, HTTP) requests to application servers." But the term "web (*e.g.*, HTTP) requests" covers far more than just dynamic web page requests. It also covers requests for, among other things, static web pages, FTPs, and information on a local network. (*See* D.I. 283 Ex. 2 ("Dr. Long's expert report") at 32.)

The omissions are even more significant when one considers that the accused products can be used for a variety of non-infringing purposes. IIS can be used to manage File Transfer Protocol (FTP) requests, serve requests for static content, and manage requests for intranet resources. (*See* D.I. 289 at 32 ("IIS can be used in manners that do not infringe, serving content on an intranet, not serving dynamic Web pages at all, functioning as an FTP server, or functioning as part of an overall system that includes many different products.").) Likewise, SharePoint, the other accused product, can be used on an intranet, can be used to host content other than dynamic web pages (*e.g.*, Word and PowerPoint documents), and can be used with a static load balancing algorithm. (*Id.* at 33.)

In attempting to downplay the survey's deficiencies, Parallel Networks says that survey evidence "need not establish the ultimate question of infringement to be relevant and admissible," (D.I. 313 at 7 (quoting *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, 2016 WL 6123526 (E.D. Mich. Oct. 20, 2016)) and argues that the survey established predicate facts upon which its expert, Dr. Mark Jones, relied to conclude that survey respondents likely infringed the asserted claims. While it is true that a survey need not *prove* infringement, to be admissible, the survey must, at the very least, be *relevant*. *See Vita-Mix Corp.*, 581 F.3d at 1326. But Dr. Isaacon's survey, which Parallel Networks offers to support its infringement allegations, does not address *any* limitation of the asserted claims, either directly or by discernible implication. *Daubert* requires an adequate "fit" between expert evidence and the purpose for which that evidence is offered. *See Daubert*, 509 U.S. at 591. In light of the survey's deficiencies, the only

6

evidence tying the survey results to the asserted claims is Dr. Jones' naked assertion that he "found sufficient evidence that both Microsoft and its IIS/ARR and SharePoint customers directly infringe the [asserted claims]." (D.I. 306 at 163.)[4] But that opinion itself fails to satisfy *Daubert*'s requirements. Dr. Jones did not explain how he reached his conclusion. He did not cite any statistics, did not reference any journal articles or secondary sources, and did not show that his conclusion is grounded in any verifiable, widely accepted principles. Instead, he simply stated his conclusion as fact. That is insufficient.[5] "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146 (1997).[6]

---

[4] Dr. Jones also opined that "[a]ppropriate answers to survey questions ... provide evidence that the respondent has configured and is using the relevant product in an infringing manner." (*Id.* at 162.)

[5] Parallel Networks attempts to downplay the deficiencies in Dr. Jones' opinion by characterizing the opinion as a "battle of the experts" between Dr. Jones and Dr. Stec (Microsoft's expert). (*See* D.I. 304 at 16.) That characterization is faulty. I need not rely on (and do not rely on) Dr. Stec's report to conclude that the Isaacson survey fails to address the asserted claims. Likewise, I need not rely (and do not rely) on Dr. Stec's report to conclude that Dr. Jones did not adequately explain how he used the survey to reach his conclusions regarding infringement.

[6] In *Vita-Mix*, the Federal Circuit concluded that a survey was admissible, despite the fact that the survey failed to speak to every limitation of the asserted claims. *Vita-Mix*, 581 F.3d at 1326. What distinguishes this case from *Vita-Mix* is that the plaintiff in *Vita-Mix* supplemented its survey with additional reliable evidence that addressed the claim limitations not considered by the survey. *See id.* There is no such additional evidence here.

**B.     The Survey Respondents Were Not Representative of the Sample
Population**

The lack of fit between the survey and the asserted claims is, in and of itself,

sufficient to exclude the survey as unreliable and prejudicial under *Daubert*.

Nevertheless, there are additional problems with the survey that warrant discussion and

that further support my decision to grant Microsoft's motion.

The survey suffers from serious methodological flaws relating to the selection of

respondents.  In order for a survey to be reliable, the survey respondents must reflect a

representative sample of the target population.  (*See* Stec Report at 19-20 ("If a

researcher would like to generalize ... the results from a sample ... to the target

population, it is important that the sampling frame 'cover' the target population as closely

as possible.") (citing Fed. Judicial Ctr., Nat. Res. Council, *Reference Manual on*

*Scientific Evidence* 377 (3d ed 2011)).)  For the Isaacson survey, the target population

appears to be network technicians who work for companies that use the accused products.

(*See* Isaacson Report at 1 ("[T]he survey measured usage and configuration patterns

among customers of Microsoft [IIS] software and Microsoft SharePoint Server Software.

... My survey interviewed respondents qualified as working in a position where they

would likely be knowledgeable about computer software used by their companies to route

web (*e.g.*, HTTP ) requests to application servers.").)  The problem is that Dr. Isaacson

does not consider whether the survey respondents reflected a representative sample of the

desired population.

According to Dr. Isaacson, survey respondents were recruited through an internet survey panel organized by Survey Sampling International ("SSI"). (*Id.* at 13.) But Dr. Isaacson does not provide any details on the particular panel he used for the survey. It is not clear if the panel drew from a representative sample of the United States population, of IT professionals, or from some other group. (*See id*; *see also* Stec Report at 20-22.) Without additional information, it is impossible to know whether the participants of the underlying panel deviate in some meaningful way from the target population. For example, it could be the case that some of Microsoft's customers are frugal and wish to save money – motivating them to hire less experienced IT professionals and to optimize their network configuration based on cost – while other customers are more interested in network performance – motivating them to hire experienced IT professionals and to configure their networks to minimize service times. If the SSI panel used for the survey screened individuals based on income, then the survey results could systematically over represent one set of Microsoft customers while under representing another.

Similarly, Dr. Isaacson did not account for the fact that there is an analytical gap between what he sought to determine (how *companies* use the accused products) and the population he used to reach his conclusions (*employees* of companies who use the accused products). This analytical gap risks introducing error into his results. For example, it could well be that some Microsoft customers employ a larger number of IT professionals than others. Even if one were to assume that the survey reflected a representative sample of IT professionals, the companies' different personnel policies would likely result in some companies being over-represented in the results. The survey

did not account for that possibility, and, from the information provided, it is impossible to know whether any of the respondents worked for the same employer.[7]

Dr. Isaacson's failure to identify the population from which the panel was drawn, and to consider whether there were any relevant differences between the survey's population frame and the target population, runs afoul of well established statistics principles and renders the survey unreliable and inadmissible. *See Citizens Fin. Grp.*, 383 F.3d at 121 (3d Cir. 2004) ("A survey of the wrong 'universe' will be of little probative value in litigation."); Stec Report at 19-23. In the face of those methodological problems, I cannot conclude that the survey results reliably reflect the practices of Microsoft's customers.

## IV.    Conclusion

For the reasons stated above, I will grant Microsoft's motion to exclude Dr. Isaacson's survey, as well as any expert testimony that relies on it.

---

[7] Dr. Stec offers a persuasive critique of non-probability based samples of the kind used by SSI for Dr. Isaacon's survey. (*See* Stec Report at 29-32 (citing *Standards and Best Practices for Survey and Public Opinion Research*, Am. Ass'n for Pub. Op. ("Virtually all surveys taken seriously by social scientists, policy makers, and the informed media use some form of *random or probability sampling*, the methods of which are well grounded in statistical theory and the theory of probability.")).)