IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PARALLEL NETWORKS LICENSING, LLC,

        Plaintiff,

v.

MICROSOFT CORPORATION,

        Defendants.

Civil Action No. 13-2073(KAJ)

JURY TRIAL DEMANDED
**FILED UNDER SEAL**

## MEMORANDUM OPINION

Adam W. Poff, Esq., Pilar G. Kraman, Esq., Young Conaway Stargatt & Taylor, 1000 N. King Street, Wilmington, DE 19801, *Counsel for Plaintiffs*
    Of Counsel:    Douglas A. Cawley, Esq., Christopher T. Bovenkamp, Esq., Eric S. Hansen, Esq., Avery R. Williams, Esq., Justin W. Allen, Esq., McKool Smith, PC, 300 Crescent Court – Ste, 1500, Dallas, TX 75201
Angela M. Vorpahl, Esq., McKool Smith, PC, 1 Bryant Park – 47th Fl., New York, NY 10036
John B. Campbell, Esq., Leah Bhimani Buratti, Esq., Kevin P. Hess, Esq., McKool Smith, PC, 300 W. 6th Street – Ste. 1700, Austin, TX 78701

Martina Tyreus Hufnal, Esq., Nitika Gupta, Esq., Ronald P. Golden, III, Esq., Fish & Richardson PC, 222 Delaware Avenue, 17th Fl., Wilmington, DE 19801
Juanita R. Brooks, Esq., Jason W. Wolff, Esq., Joanna M. Fuller, Esq., Fish & Richardson PC, 12390 El Camino Real, San Diego, CA 92130
Stephen A. Marshall, Esq., Fish & Richardson PC, 1425 K Street, N.W., 11th Fl., Washington, DC 20005, *Counsel for Defendants*

April 10, 2017
Wilmington, Delaware


JORDAN, Circuit Judge, sitting by designation

## I. Introduction

On February 22, 2017, I entered an order excluding a survey conducted by one of Parallel Networks' experts, Dr. Bruce Isaacson. (Docket Item ["D.I."] 356.) Because Parallel Networks' theory of indirect infringement relied on Dr. Isaacson's testimony, I also entered a summary judgment order excluding Parallel Networks' theory of indirect infringement. (D.I. 361.) Shortly after I entered my order, Parallel Networks filed a motion for leave to supplement the report of its damages expert, Mr. John R. Bone. (D.I. 366.) Parallel Networks sought to update the report to account for the fact that the Isaacson survey had been excluded. On March 13, 2017, I held a pre-trial conference. (D.I. 386.) At the conference, I granted Parallel Networks' motion to supplement the Bone report (D.I. 386 at 10.) During the conference, however, Microsoft argued that Mr. Bone's supplemental report did not merely update Mr. Bone's damages analysis, but instead introduced an entirely new damages theory based on an entirely new theory of direct infringement. (*Id.* at 40 ("What was never disclosed or ... articulated by [Parallel Networks'] expert was ... [that] the relevant infringement theory is based on Microsoft's making of Windows Server and [Application Request Routing (ARR)].")

Because the dispute between the parties did not become clear until the pre-trial conference, I ordered an additional round of briefing to give the parties the opportunity to address (1) whether Parallel Networks' direct infringement theory was new to the case, (2) whether Microsoft was entitled to summary judgment on Parallel Networks' direct

2

infringement theory, and (3) whether Mr. Bone's opinion relating to Parallel Networks' direct infringement theory satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. (*Id.* at 63-64.)

Having reviewed the record in light of the supplemental briefing, I conclude that Parallel Networks' theory of direct infringement considered in Mr. Bone's supplemental report is new and untimely. I further conclude that, even if the theory were timely, it is without adequate foundation, and thus that Microsoft is entitled to summary judgment with respect to that theory.

## II. Legal Standards

### A. Adequate Disclosure

Federal Rule of Civil Procedure 16 grants the Court broad discretion to issue sanctions if a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C) ("On motion or on its own, the court may issue any just orders ... if a party or its attorney ... fails to obey a scheduling order or other pretrial order."). In patent cases, courts have used that authority to strike untimely infringement contentions. *02 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006) ("The court may impose any 'just' sanction for the failure to obey a scheduling order, including 'refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that part from introducing designated matters in evidence.'" (quoting Fed. R. Civ. P. 16(f) and Fed. R. Civ. P. 37(b)(2)(B)); *see also Clear With Computers, LLC v. Hyundai Motor America*, 2011 WL 11562328, at *2 (E.D. Tex. July

3

5, 2011) ("Having chosen not to disclose this theory that it has been aware of for several months, HMA is therefore precluded from using the theory at trial.").

B.  **Expert Evidence**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Under that rule, expert testimony is admissible only if it "will help the trier of fact to understand the evidence[,] ... is based on sufficient facts or data[,] ... is the product of reliable principles and methods[,] and ... reliably applie[s] the principles and methods to the facts of the case." Fed. R. Evid. 702. The role of the district court is to serve as a "gatekeeper" – to protect the jury from evidence that is unreliable, confusing, or unduly prejudicial. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145, 147-48 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92 (1993). There must, in that regard, be both reliable methodology in the analysis and an adequate "fit" between the offered expert opinion and the facts at issue in the case. *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Expert conclusions that do not have an adequate analytical connection to the facts are excludable. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Pursuant to Federal Rule of Evidence 104, the burden of proof with respect to fit and reliability under Rule 702 lies on the party attempting to offer the expert evidence. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under

4

that rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

C.  **Summary Judgment**

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998). "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) (original emphasis)). The court will "view the evidence in a light most favorable to the non-movant, and draw all reasonable inferences in its favor." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045 (Fed. Cir. 2001). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a reasonable jury to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving

5

party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

#### A. Parallel Networks' Theory of Direct Infringement Is New and Untimely[1]

On March 13, 2015, a scheduling order was entered in this case requiring Parallel Networks to submit its final infringement contentions by no later than May 15, 2015. (D.I. 133.) Microsoft now argues that Parallel Networks has articulated a new infringement theory in connection with the pre-trial conference held on March 13, 2017 – nearly two years past the deadline. Parallel Networks disagrees and argues that it has "repeatedly and consistently disclosed [the infringement theory in question] to Microsoft from the start of this case." (D.I. 397 at 9.) I agree with Microsoft and conclude that Parallel Networks did not timely disclose the theory in question.[2]

The thrust of the theory that Parallel describes in its supplemental briefing is that Microsoft has, on its servers, two pieces of software, Windows Server (with IIS) and

---

[1] Because the facts in this section will be relevant to my summary judgment analysis, I rely exclusively on facts that are not in dispute. Each of the propositions in this section is supported directly by Parallel Networks (through its expert report) and by Microsoft (which relied on the same facts in its briefing, *see* D.I. 390 at 2-6).

[2] I recognize that the question of timeliness is one of degree – a disclosure that is made one week past the deadline is less problematic than a disclosure made years past the deadline. That means I am, in effect, considering two questions. First, whether Parallel Networks complied with the Court's scheduling order, and second, if Parallel Networks did not comply with the scheduling order, what sanction, if any, is appropriate. As a result, I do not limit my analysis to the portions of the record that came before the May 15, 2015 deadline.

ARR that, when combined and configured, infringe the machine readable claims" of U.S. Patent No. 5,894,554 (the '554 patent).[3] Parallel argues that the two pieces of software are, in fact, two components of a single product, and that Microsoft infringes the asserted claims by storing the two components, uncombined and unconfigured, on its servers. Parallel further argues that Microsoft makes and sells the product by instructing its customers to obtain, install, and configure both components in an infringing manner.

A review of the record shows that Parallel Networks' direct infringement theory is new. Prior to the pre-trial conference, there was no indication in the record that Parallel Networks intended to argue that Microsoft infringed the asserted claims simply by having two pieces of software stored on its servers. Likewise, there was no indication that Parallel Networks intended to argue that Microsoft directly infringed the asserted claims by selling a unified Windows Server product, in modular form, to its customers.

In arguing otherwise, Parallel Networks claims that it articulated its infringement theory "through its disclosures, discovery requests, briefing, and attorney statements." (D.I. 397 at 9.) A review of the cited documents shows that claim is not well founded. The examples cited by Parallel Networks fall into two categories – documents showing

---

[3] Parallel Networks' infringement theory implicates claims 20, 41, 46, and 48-49 of the '554 patent. IIS stands for "Internet Information Services." Parallel alleges that IIS was included with some versions of the Windows Server product. (D.I. 289 at 144.) ARR stands for Application Request Routing. (D.I. 289 Ex. 10 at 2.) ARR uses load balancing algorithms to route network server requests. (*Id.* at 17.) ARR is not included with the Windows Server software. (D.I. 289 Ex. 9 at 30.) Instead, it is an optional plug-in that can be downloaded and installed by end-users. (*Id.*) In order to use ARR, an end-user must download the ARR program (*id.*), download a helper program (URL Rewrite) (*id.*), and manually configure the software so that it knows when and where to route requests. (*Id.* at 30-32.)

that Parallel Networks viewed Windows Server with IIS and ARR as a single accused product (as opposed to two products, or one product with an optional plug-in), and documents showing that Parallel Networks accused Microsoft of directly infringing by "generat[ing]," "stor[ing]," "mak[ing]," "manufactur[ing]," and "distribut[ing]" the accused products. (*See* D.I. 397 at 9-12.)

A significant problem with the present attempt to identify the new infringement theory in the record is that Parallel Networks does not – evidently because it cannot – point to any place in the record where it explains how Microsoft "stored," "generat[ed]," or "made" the accused products.[4] A general allegation that Microsoft made or stored the accused product is much less informative than a specific allegation would have been that Microsoft made or stored the accused product by storing the product's two component parts, in isolation, on its servers. (Again, *see supra* n.4, I am accepting for purposes of this argument that the separate functionality of Widows Server with IIS and of ARR constitutes two components of a single product.) And none of the cited documents distinguish the infringement theory at issue now from Parallel Networks' other direct infringement theory, i.e., that Microsoft infringed the asserted claims by using the Windows Server product (with IIS and ARR), in its fully assembled form, to host several

---

[4] While the document Parallel Networks cites supports the proposition that Parallel Networks viewed Windows Server with IIS and ARR as a single product (*see* D.I. 398 Ex. 11 at 2 n.2 ("Windows Server [is] understood to include [IIS] ... and [ARR]"), other places in the record indicate that view was inconsistent (*see* D.I. 398 Ex. 2 at 146-48 (explaining how the Windows Server product is distributed, while explicitly noting that ARR is not distributed in that way).). Because my conclusion on this issue does not hinge on the validity of Parallel Networks' statement, I will ignore that inconsistency and will assume Parallel Networks' assertion is correct.

8

of its websites. That Microsoft could reasonably have understood Parallel Networks' infringement theory to refer solely to the operation of Micosoft's own website strongly indicates that Parallel Networks' disclosure was inadequate.[5] Similarly, there is nothing in the cited documents supporting the theory that Microsoft "distributed" the accused product by making its separate components available to customers and instructing its customers to configure the components in an infringing manner.

Because I cannot locate the newly described infringement theory anywhere in the record prior to the pre-trial conference, I conclude that it is untimely and should be excluded. As explained above, Parallel Networks was required to submit its final infringement contentions no later than May 15, 2015. The attempt to introduce and describe an infringement theory now, over 23 months after the deadline and with less than a month to go before trial, is a dramatic departure from the scheduling order.

---

[5] Parallel Networks' expert, Dr. Mark Jones, elides the difference between Parallel Networks' various infringement theories by grouping all of the theories and products together in one mass statement: "Microsoft directly infringes based on its operation *and/or* sales of Windows Server (including IIS/ARR component), Microsoft Azure Web Apps, Bing, MSN, and Microsoft websites ... and SharePoint Server 2013; making of the accused products; and Microsoft's testing of the above products. (D.I. 398 Ex. 1 at 1 (emphasis added).) That statement, and statements like it throughout the report, does not explain which infringing action (operation or sale) applies to which accused product (Windows Server, SharePoint Server 2013, etc.). In its final infringement contentions, Parallel Networks is slightly more specific, alleging that Microsoft "codes, stores, and distributes [Windows Server and Client ([ARR]). (D.I. 398 Ex. 17 at 21.) But as explained above, that allegation is insufficient because it does not explain *how* Microsoft distributes the product. In fact, if one accepts Parallel Networks' claim that the "Windows Server" product contains Windows Server with ARR, then the natural reading of Parallel Networks' allegation would be that Microsoft distributes the Windows Server Product as a whole, with ARR included. That reading of the infringement contention, however, is at odds with the infringement theory at issue here.

Allowing Parallel Networks to assert this new theory would place a heavy and unfair burden on Microsoft, which did not address the theory during discovery and would have to prepare to meet it at the imminent trial. As a result, I will exercise my authority under Rule 16 to strike Parallel Networks' new theory of direct infringement.[6]

**B.    Microsoft Is Entitled to Summary Judgment of Non-Infringement**

My conclusion that Parallel Networks did not adequately disclose its infringement theory is dispositive on the point. But, even if I were not persuaded of the inadequacy of the claimed disclosure, I would still exclude the theory by granting Microsoft's motion for summary judgment.

In order to prove infringement, a plaintiff must show that "an accused product or method meets every claim limitation[.]" *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). "[I]t is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010); *see also ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the ... patent."). Based on that law, Parallel Networks cannot succeed on its new direct infringement theory unless it can

---

[6] I also exercise my authority under Rule 26 to exclude Mr. Bone's supplemental damages report, as it is inextricably linked to Parallel Networks' untimely infringement theory.

prove that the Windows Server product[7] has "data representing sequences of instructions, which when executed by a computer system, cause said computer system to perform" each of the limitations contained in the asserted claims. (D.I. 398 Ex.2 at 133.)

Microsoft is entitled to summary judgment of no direct infringement because there is no dispute that the Windows Server software, as sold, does not have "data representing sequences of instructions" that, when executed, would perform each of the steps in the asserted claims. Instead, the Windows Server product, as stored on Microsoft's servers and as sold to Microsoft's customers, must be configured before it can be used. (D.I. 289 Ex. 9 at 30-31 ("[Y]ou have to prov[ide] a configuration for ARR.").) In order to configure the product, a user must indicate that he wants to use the load-balancing functionality, must select a load-balancing algorithm, and must provide a mapping between different servers/server groups and the various Web pages one is hosting. (D.I. 289 Ex. 8 at 10-11, 13; D.I 398 Ex. 5 at 8-9.) In effect, that means that the "sequences of instructions" included in the Windows Server product do not have the potential to perform each of the limitations in the asserted claims until they are supplemented with additional information or instructions from the user.[8] That means that the Windows

---

[7] For the purposes of this discussion, I adopt Parallel Networks' conception of the accused product. As a result, my discussion of the "Windows Server product" relates to the Windows Server software, with IIS and the ARR plug-in.

[8] Not all configurations of the Windows Server product would infringe the asserted claims. (*E.g.* D.I. 289 Ex. 8 at 32; Ex. 9 at 26-31; *see also* D.I. 398 Ex. 2 at 14-15 (acknowledging modular nature of IIS and AAR.).) As a result, even if I were to view "configuration" as an irrelevant step, akin to simply activating a pre-configured software module, *Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010), it appears that, based on the undisputed facts, Parallel Networks cannot prove that the

Server product, as stored on Microsoft's servers and sold to Microsoft's customers does not infringe. *See Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) (concluding that a software product infringed a software claim because the accused product contained all of the accused functionality off-the-shelf, as purchased).

While that is enough to defeat Parallel Networks' infringement theory, there is another independent reason why the infringement theory fails: in order for the Windows Server software to contain an infringing "sequence[] of instructions," a user must take the additional steps of creating a dynamic Web page and at least two "page servers." ('554 Patent, Cl. 20. (requiring a "plurality of page servers") .)

Because Parallel Networks' new infringement claim fails as a matter of fact, I do not need to address the flaws in its underlying legal theory. Nevertheless, I note that the claim is questionable, even if my factual analysis were incorrect. Parallel Networks asserts that a party directly infringes a patent simply by storing two component parts of an infringing product. Parallel Networks further contends that a party can directly infringe a patent if the party (1) sells a self-standing product that is also a component of an infringing product and (2) makes available the second component of the infringing product as an optional extension to the first component. Applied to the facts of this case, Parallel Networks contends that Microsoft infringed the asserted claims by storing (separately and in different locations) the Windows Server software and ARR plug-in on its severs and by selling its Windows Server software to customers while also making its optional ARR plug-in available for download.

---

Windows Server product necessarily infringes the asserted claims.

That infringement theory is problematic in light of the Supreme Court's decision in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526-29 (1972). In that case, the Supreme Court recognized that "if anything is settled in patent law, it is that ... patent[s] cover[] only the totality of the elements in the claim and that no element, separately viewed, is within the grant." *Id.* at 528 (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961)). The Court further explained that a patent "does not cover the manufacture or sale of separate elements capable of being, but never actually, associated to form the invention." *Id.* at 529 (quoting *Radio Corp. of America v. Andrea*, 79 F.2d 626, 628 (2d Cir. 1935). *Deepsouth* is still good law. *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n.2 (Fed. Cir. 2000) ("*Deepsouth* remains good law: one may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention."). But contrary to the decision in *Deepsouth*, Parallel Networks argues that Microsoft directly infringed the asserted claims even though, under this theory, Microsoft did not assemble the software components into the accused product.

In attempting to defend its infringement theory, Parallel Networks hangs its hat on *Paper Converting Machine Company v. Magna-Graphics Corp.*, 745 F.2d 11 (Fed. Cir. 1984). That case does not provide the support that Parallel Networks wishes it did. Most importantly, the facts of *Paper Converting* are readily distinguishable from those at issue here. The components under discussion in that case had no practical use on their own, independent of the infringing product. In this case, however, there is no dispute that one component of Microsoft's product (Windows Server with IIS) can be used in a non-

13

infringing manner, without using the other component (ARR). (*See* D.I. 398 Ex. 2 at 15 (explaining that ARR and IIS "work together" to engage in load balancing); *id.* at 6 (showing AAR deployed only on severs at Tier 1 and not Tiers 2 and 3 suggesting that ARR is an optional extension.); D.I. 398 Ex. 26 at 30-31 (discussing multiple possible server configurations, including non-infringing ones).)[9]

## IV. Conclusion

For the foregoing reasons I will grant Microsoft's motion to exclude the supplemental expert report of John R. Bone and its motion for summary judgment of no direct infringement by Windows Server (D.I. 389).

---

[9] In addition to being distinguishable on the facts, a basic assumption in *Paper Converting* may no longer hold. The Court relied in that case on the proposition that the holding in *Deepsouth* was "applicable only to the issue of extraterritorial effect of American patent law." 745 F.2d at 17. But the Federal Circuit has since seemed to indicate a broader interpretation of *Deepsouth*. *See Rotec Indus.*, 215 F.3d at 1252 ("In *Deepsouth,* the Supreme Court considered the related question of whether 'making' or 'selling' less than the complete invention in the United States constitutes an act of infringement under § 271(a). ... We discern no reason to hold that an 'offer to sell' under § 271(a) should be any different ... .").