IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


PARALLEL NETWORKS LICENSING, LLC,)
                                 ) VOLUME 1
          Plaintiff,             )
                                 ) Civil Action
v.                               ) 13-2073-KAJ
                                 )
MICROSOFT CORPORATION,           )
                                 )
          Defendant.             )


                    ----


              Monday, May 8, 2017
              9:00 a.m.
              Courtroom 4A

              844 King Street
              Wilmington, Delaware


BEFORE:  THE HONORABLE KENT A. JORDAN, U.S.C.C.J.


APPEARANCES:

          YOUNG CONAWAY STARGATT & TAYLOR

          BY: ADAM POFF, ESQ.

                 -and-

          McKOOL SMITH, P.C.
          BY: DOUGLAS A. CAWLEY, ESQ.
          BY: CHRISTOPHER BOVENKAMP, ESQ.
          BY: JUSTIN ALLEN, ESQ.
          BY: ANGELA VORPAHL, ESQ.
          BY: JOHN CAMPBELL, ESQ.
          BY: KEVIN HESS, ESQ.
          BY: LEAH BURATTI, ESQ.

                 Counsel for the Plaintiff

```
 1      APPEARANCES CONTINUED:

 2


 3                 FISH & RICHARDSON
 4                 BY: JUANITA BROOKS, ESQ.
                   BY: MARTINA TYREUS HUFNAL, ESQ.
 5

 6                      Counsel for the Defendants
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1              THE COURT:  Good morning.  Please

2   be seated.  We're scheduled to begin jury

3   selection at 9:30 and I got the word that you

4   folks have some issues you'd like to address

5   first.  So what brings us in this early?

6              MR. BOVENKAMP:  Your Honor, may I

7   approach?

8              THE COURT:  Yes.

9              MR. BOVENKAMP:  Your Honor, there

10  are three additional housekeeping matters that

11  are agreed between the parties but we just want

12  to get on the same page with Your Honor to

13  streamline the way the case proceeds so we can

14  go through those really quickly.

15             The first is regarding exhibits

16  that are going to be used today with the

17  witnesses today.  There's been an agreement by

18  the parties that there's a set of exhibits that

19  there's no objections to with respect to the

20  witnesses testifying today using them.

21             We propose that we pre admit those

22  exhibits so we don't have to go through the

23  process for the witnesses to identify themselves

24  before putting them up on the screen, et cetera,

```
1    so we can streamline the presentation.

2              I know Your Honor has said he

3    hasn't done that before, but we think basically

4    with the parties today going forward that will

5    allow things to go more smoothly and we will

6    submit a list of those particular exhibits that

7    are agreed between the parties.

8              THE COURT:  All right.

9    Ms. Brooks?

10             MS. BROOKS:  Your Honor, we defer

11   entirely to the Court and what the Court thinks

12   is the most appropriate.  I know there's concern

13   for the record that we haven't formally admitted

14   them in front of the jury so we defer to the

15   Court on that.

16             THE COURT:  Well, that isn't the

17   way I'm accustomed to doing this for a reason

18   I've got an eye on it for the Appellate Court.

19   But how many exhibits are we talking about?

20             MR. BOVENKAMP:  Well, I have the

21   list here, Your Honor.  With one witness

22   approximately six and with the other, there's

23   approximately 10 to 15.

24             THE COURT:  All right.  Here's
```

```
 1     what I'll ask you to do:  I suspect that part of

 2     this is time saving to keep you from having to

 3     burn part of your clock time, and that's okay if

 4     you guys have worked that out.  But I do want

 5     the jury to hear the exhibits that are coming

 6     in.  So when the jury is in the box, the witness

 7     takes the stand, you can simply say to me on the

 8     record in front of the juror, Your Honor, we've

 9     got agreement on the following exhibits being

10     admitted.  With the witness sworn in on the

11     stand, it will only take you a moment and that

12     way that witness is in the transcript and it

13     will have the record and the jury will hear it.

14     All right?

15               MR. BOVENKAMP:  Yes, Your Honor,

16     that's absolutely fine.

17               THE COURT:  All right.

18               MR. BOVENKAMP:  Two other

19     housekeeping matters for Parallel Networks.  One

20     is with regards to offer of proof.  There are

21     some summary judgment motions rulings and

22     Daubert motions and something earlier in the

23     case that occurred regarding certificate of

24     correction that we would like to make an offer
```

```
 1    of proof for, but we would propose submitting
 2    that in paper and identifying the evidence in
 3    the proof, et cetera, that goes along with that.
 4    Rather than doing it live with some witnesses or
 5    some other procedure, we want to make sure Your
 6    Honor was okay with that procedure.
 7              THE COURT:  Well, again, I'm a
 8    little reluctant to say, yes, I'm fine with that
 9    because I don't know and I'm not meaning to
10    imply you're pulling a fast one, but I don't
11    know what pig is in that poke so it would be
12    helpful for me to know what is the offer of
13    proof you're talking about.
14              If you want to do that outside of
15    the hearing of the jury, then I think that's the
16    right thing to do obviously, but I mean without
17    them in the box I don't want to do side bars for
18    the trial management order.  So if you want to
19    make an offer of proof and you want to
20    supplement it with a paper just so you've got
21    what you want in the record for appeal purposes,
22    I don't have a problem with that, but I'd like
23    to know at least in summary fashion what your
24    offer of proof is so I know what you're making a
```

1    record of, because the likelihood of I'm not in

2    the midst of all that, reading that document but

3    I still want to know what your proof of offer

4    is.

5              Do you understand that?

6              MR. BOVENKAMP:  Understood, Your

7    Honor.  I propose that we would submit to the

8    Court to file as our offer of proof so we know

9    what we're doing before we do it and if we're on

10   the same page, that's okay.  Otherwise, we can

11   do what Your Honor suggested.

12             THE COURT:  What I'm asking you to

13   do is if you know what your offer of proof is in

14   a session like this, give it to me.  You don't

15   have to cover everything.  You can say this is a

16   summary of what we want to file.  Now, that will

17   make sense to me if it's a decent summary, if

18   it's two minutes to cover a 25-page paper, that

19   won't do it.

20             What I'm telling you is, no, I

21   want to hear what your offer of proof is because

22   I want to know what it is you're going to be

23   pointing to for the Court of Appeals because if

24   there's a problem and I can deal with it, I want

```
 1        to deal with it.

 2                    MR. BOVENKAMP:  Understood.  We

 3        will do that, Your Honor.  The last housekeeping

 4        matters we have is a couple of objections in

 5        regards to demonstratives and the last

 6        housekeeping matter is with regard to

 7        communications with witnesses when they're off

 8        the stand.  We understand the rules in this

 9        court if they are on the stand in the midst of

10        their testimony, we're not talking substantively

11        about their testimony whether it's Cross or not.

12        The question is, for example --

13                    THE COURT:  Well, hold on.  Let me

14        make sure we're clear on that.  The rule here as

15        I understand it, as I've enforced it, if they're

16        on the stand under Cross, you can't speak to

17        them.  If they are under Direct and you're on

18        break and you want to say we didn't cover that

19        or we didn't cover it the way I'd like to,

20        you're free to talk to your witness off the

21        stand while that witness is on Direct.

22                    Once cross begins, you don't get

23        to talk to him about substance of his testimony

24        at all until Cross is concluded.  That's the way
```

```
 1     I've always understood the Delaware rules.  I

 2     like it and I'm enforcing it, just so we're on

 3     the same page.

 4                MR. BOVENKAMP:  Thank you, Your

 5     Honor, for that clarification.  I wasn't aware

 6     of the nuance to it.  The follow-up question to

 7     that, and I think you may have answered the

 8     question, just so we're all on the same page, we

 9     have an expert that does his Direct, gets

10     through Cross and gets through Redirect and is

11     going to go up for rebuttal.  It's our

12     understanding we may talk to him about the

13     rebuttal prior to it coming up.

14                THE COURT:  The answer is yes.

15     Now, we're not going to be breaking the trial in

16     order for you to have a conference with your

17     client or with your witnesses.  So hopefully,

18     there I'm not trying to introduce gamesmanship

19     into this either, that somebody has a severe

20     headache and we have to take a break.

21                MR. BOVENKAMP:  Just ordinary

22     course is what I'm talking about.

23                THE COURT:  The answer is ordinary

24     course.  The rule is when they're on Cross
```

```
1     you're not speaking to them on breaks.  When

2     they're off Cross, they're your witness.

3               MR. BOVENKAMP:  Understood, Your

4     Honor.  Thank you for that clarification.  We

5     have a few objections to demonstratives,

6     exhibits that we have exchanged the night

7     before.  We've met and conferred and haven't

8     been able to reach agreement on that.  We would

9     propose to taking it up with Your Honor now if

10    that's okay.

11              THE COURT:  Sure.

12              MR. BOVENKAMP:  So the first has

13    to do with a slide from the -- it will be easier

14    if I just pass this up to Your Honor.

15              THE COURT:  Sure.

16              MR. BOVENKAMP:  A slide that was

17    provided to us that's going to be used for

18    animation in Microsoft's opening statement.  The

19    first -- and basically to make a long story

20    short, we believe that they're raising a

21    noninfringement argument with regard to the

22    dynamic generation web pages and application

23    server that was not disclosed in the expert

24    report that allows them to present this argument
```

    1    to the jury.  It's going to cause Parallel

    2    Networks prejudice.

    3                    THE COURT:  All right.

    4                    MR. BOVENKAMP:  Let me briefly

    5    outline it for Your Honor.  The very first page

    6    is a screen shot of their animation and you can

    7    see the representation of the web page, the page

    8    server.

    9                    THE COURT:  Okay.

   10                    MR. BOVENKAMP:  The next slide

   11    shows for their Bing system the process of a web

   12    page being generated and if you turn two slides

   13    forward, what they're showing is their depiction

   14    of a web page occurring at the FrontDoor cert.

   15    So the suggestion at least from these slides,

   16    and we talked this morning about this with

   17    Microsoft, and I think it's consistent with what

   18    I'm saying is we're going to tell the jury that

   19    web pages are generated at the FrontDoor server,

   20    not the application server.

   21                    They confirmed to us that

   22    Dr. Long, their technical expert, is not going

   23    to opine that that's a basis for noninfringement

   24    but there's little tension there because there's

1   obviously an argument they intend to make,

2   whether it's through their expert but it doesn't

3   appear to be through their expert, but

4   otherwise, there's some significance to the fact

5   that the web page that they allege is generated

6   at the FrontDoor server which is equivalent to

7   the web page mentioned, not the web server so we

8   think that slide is misleading.

9              Their expert is not going to talk

10  about that as a noninfringement position so we

11  don't think that should be shown particularly to

12  the jury upfront.

13              THE COURT:  Ms. Brooks?

14              MS. BROOKS:  Yes, Your Honor.  I

15  think the animation, we want to be precisely and

16  technically accurate.  What Dr. Long said in his

17  expert report as far as web pages are

18  constructed within the Microsoft web server and

19  specifically by FrontDoor, he said the same

20  module meaning FrontDoor is also responsible for

21  interface rendering (called hydration) when the

22  response is constructed.

23              And so what happens in our system,

24  Your Honor, is that the data comes from the page

1    server and we might have more than one page

2    server.  If Your Honor did a search for pizza,

3    it would know you're searching from Delaware and

4    you would end up getting a page that would show

5    images of pizza plus the various pizza places

6    near you and a map of Delaware, and that

7    information comes from various application

8    servers that data is gathered together and sent

9    to FrontDoor where it's called rehydrated.

10                   It's put together essentially, so

11   technically the page itself is not formally

12   constructed until that happens.  But because

13   there's no construction as to what it means to

14   generate a web page, we're not arguing that,

15   therefore, they call page servers what we call

16   application servers are not generating the web

17   page because they are indeed putting all that

18   information together, but it doesn't get

19   technically rehydrated until it's in FrontDoor.

20                   So if we did it the way they want

21   us to do it, it would not be an accurate

22   representation of how our system does it nor how

23   Dr. Long says it does it.

24                   THE COURT:  What you just read to

1    me, that's from Dr. Long's report?

2              MS. BROOKS:  Yes, Your Honor, at

3    Paragraph 96.

4              THE COURT:  All right.  Their

5    concern obviously is even if Dr. Long doesn't

6    say it's not infringing, it will sure show an

7    argument for noninfringement, that basis for

8    that concern.  Are you going to be making even

9    by implication asserting to this jury that they

10   look at this all happening here and it's not

11   infringing?

12             MS. BROOKS:  Absolutely not, Your

13   Honor.  In fact, what my plan is even in opening

14   to have the claim and to cross out which parts

15   of the claim we do not meet and that isn't one

16   of the parts.

17             THE COURT:  All right.  Well, let

18   me hear from, Mr. Bovenkamp.

19             MR. BOVENKAMP:  Your Honor, so

20   while I'm very happy to hear it's not going to

21   be an argument, but the problem remains if you

22   look at that slide and look at how they're going

23   to contrast our invention with Figure 4 of that

24   representation of what is clearly a web page

1    that comes into the existence of a page server

2    versus what they do with Bing, what they

3    represent as the web page clearly comes into

4    existence for the first time at the FrontDoor

5    server that is misleading.

6              Setting aside what Ms. Brooks is

7    going to say, that has potential for causing

8    confusion with the jury, particularly then down

9    the road when their fact witnesses start talking

10   about it.

11             THE COURT:  I got you.  I'm going

12   to grant Mr. Bovenkamp's application.  Just take

13   those slides out.  It's not going to hurt you

14   that much.  Don't show it to them.  That doesn't

15   mean you can't show the thing from the patent,

16   right?  The figure from the patents clearly you

17   can show that.  Nobody has a basis for argument

18   against that and you can speak factually and

19   accurately of what the system does.  I'm not

20   suggesting you can't do that.  Indeed I'm

21   grateful that you're at pain to make sure what

22   the jury hears of how the system actually works,

23   so leave the slides out.

24             MS. BROOKS:  We don't have a

```
1      problem, Your Honor.  If I can seek

2      clarification?

3                   THE COURT:  Go ahead.

4                   MS. BROOKS:  It's actually an

5      animation.  So if we remove that one part of

6      when the pages come together, can we show the

7      animation because that's their only objection,

8      that one part of the animation?

9                   THE COURT:  I'm looking at a

10     static page so it's a page shot.  Just get it

11     out, whatever that page shot is.

12                  MS. BROOKS:  Will do, Your Honor.

13     Thank you.

14                  THE COURT:  Mr. Bovenkamp?

15                  MR. BOVENKAMP:  One other issue

16     with regard to the opening slide of Microsoft.

17     I was able to figure out the camera and put this

18     up on the screen.  This is from their opening

19     slide and it's talking about Microsoft's Early

20     Solution.  As the Court knows from the summary

21     judgment briefing, the primary reference that

22     they're relying upon is the MSN 1.0 system as it

23     existed on August 24, 1995.

24                       It's an obviousness case.  It's
```

1        not an anticipation case.  We resolved that at

2        summary judgment.  We believe that this slide

3        going from the 1993 date in timeline form to an

4        MSN spec to an MSN patent to more patents being

5        filed in timeline form to finally this Windows

6        95 box and then contrasted with filing of our

7        patent application suggests to the jury that

8        each one of those things is potentially

9        invalidated and what clearly is the case,

10       acknowledged by their expert, he explained by

11       that they refer to as the MSN spec or MSN

12       patents as prior art.

13                   He unequivocally says all I'm

14       relying upon is August 24, 1995, that system.

15       That's it.  And so it's to suggest to the jury

16       up front these other patents and other documents

17       have some date significance with regards to our

18       invention, risks injecting 102(a) type arguments

19       whether they're explicitly made or not, Your

20       Honor.

21                   THE COURT:  Understood, I get your

22       argument.

23                   MS. BROOKS:  Thank you, Your

24       Honor.

```
1              Once again, since the Elmo is on,
2    before we get into that, we show the jury this,
3    which is our fact witness, Bill Griffin, and we
4    explain who he is.  And that he will then
5    describe for the jury our early work -- sorry,
6    Your Honor, I should use my own PowerPoint's
7    here.
8              It's our early work on -- I have
9    the wrong slide deck.  It just has the
10   demonstratives.  It shows that the Marvel
11   specification.  What Mr. Griffin is going to
12   talk about, he was one of the authors of that
13   specification, and that's when at this time
14   frame -- let me put the timeline back up.  At
15   this time frame, and our expert does discuss the
16   specification, in fact, has information from it
17   that does help inform his opinion.  He is not
18   saying it's invalidating prior art, but the
19   information in here shows that as early as
20   October 1994, Microsoft recognized the problem
21   and the need to do load balancing.  It's just
22   part of the story.
23              If you note, our title isn't
24   anything about invalidity, our title is this is
```

1        Microsoft's early solution to load balancing and

2        we're telling the story through Mr. Griffin.

3                    THE COURT:  Why don't you remind

4        me, Ms. Brooks, about what Mr. Long said.

5        Mr. Bovenkamp said that he explicitly disclaims

6        any reliance on those other things as prior art.

7                    MS. BROOKS:  I disagree with that,

8        Your Honor.  He, in fact, discusses them at

9        length, most of his analysis comes from the

10       information that's in the specification and in

11       the patent where it talks about -- so the

12       specification identifies the problem to be

13       solved and then the patent describes how it was

14       solved, but the system itself is what he's using

15       as the invalidating prior art.

16                   But he certainly doesn't say I am

17       not looking at or relying on the specification

18       or the patent, he uses it and actually cites it

19       quite a bit.  But what his invalidity analysis

20       is here is the system and he does an

21       element-by-element analysis based on what's in

22       the system.

23                   THE COURT:  Okay.  I understand

24       your position.

```
 1                    Mr. Bovenkamp, I'll give you a
 2       chance to respond.
 3                    MR. BOVENKAMP:  Just briefly.
 4       I'll show you places in the report that I was
 5       referring to just so we're clear.  I apologize
 6       for my marks on it.
 7                    If you look, for example, at
 8       paragraph 77, this is in Dr. Long's rebuttal,
 9       his opening invalidity report, he refers to the
10       MSN patents which is one of the documents that
11       was shown up there, he says my analysis does not
12       use them as separate prior art references in
13       their own right, but rather as a properation for
14       what the MSN system does.
15                    Likewise in 78, I use the
16       Microsoft internal documents in the same way to
17       flesh out the MSN systems.  We're not disputing
18       he can talk about those documents presented at
19       trial, all we are disputing is the way he can
20       use them in a timeline.
21                    THE COURT:  Thanks for putting
22       that up.  I have had a chance to read that off
23       the Elmo and I'll deny that application.  You'll
24       have a chance -- I understand that they're not
```

1      going to be saying that they're prior art,

2      they're going to be telling a story how they get

3      to the invalidating reference, I think it's fair

4      for them to be able to go ahead and put that up

5      and let the jury see it.  To the extent you're

6      worried about confusion, you'll have a chance to

7      make sure that is not confusing by your

8      examination.

9                    MR. BOVENKAMP:  Thank you, Your

10     Honor.

11                   Last matter, thankfully.

12                   There had been discussion before

13     in the context of the Mills and the precharge

14     comps in terms of Microsoft's use of orders from

15     previous cases, I think even the last comps that

16     we had there was a reference to them.

17                   We have been advised by Microsoft

18     that they're going to refer in opening to

19     various claim construction orders and other

20     proceedings that occurred in other cases.  We

21     believe that reference, at least the claim

22     construction orders and the significance of

23     those is going to be confusing given that the

24     jury is also going to have a claim construction

```
 1    order from this Court that they're going to

 2    apply and that there is no reason whatsoever for

 3    that to come in.

 4              The only basis that we're aware of

 5    Microsoft is asserting those are relevant is for

 6    wilfulness.  Willfulness is based upon their

 7    subjective mindset and they haven't put a

 8    witness forward that said he or she relied upon

 9    that particular claim construction issue that

10    we're aware of that was provided in the

11    discovery.  So we think that there is no

12    relevance to any, you know, claim construction

13    orders or proceedings based on those and that

14    would do nothing but confuse the jury in this

15    case.  We want to bring that to the Court so we

16    can potentially address that now.

17              THE COURT:  Got you.

18              Ms. Brooks.

19              MS. BROOKS:  Thank you, Your

20    Honor.  As the Court may recall, we had brought

21    a motion to phase willfulness and our argument

22    was if we didn't do that, our defense about

23    wilfulness is how we never believed we

24    infringed.  And there was a case in Delaware
```

```
 1    where we sued them and then they transferred it

 2    to Texas and then they sued us in Texas and

 3    there was a claim construction in Texas where

 4    they got concerned that their patents might get

 5    invalidated so they dismissed in Texas and how

 6    they sued us in Delaware and now here we are.

 7                    And Your Honor said we might like

 8    to get that in, and I said yes.  I'm concerned

 9    the jury might also think we're trying to avoid

10    letting them have their day in court, but Your

11    Honor said, you denied the motion for phasing,

12    and said it's fair game if that's the defense,

13    if that's the kind of Pandora's box that's going

14    to get opened by their wilfulness, so be it.

15                    Depending on what they say in

16    opening, I don't know what they're going to say

17    in wilfulness, I do have a couple of blowouts

18    from the other proceeding saying that we brought

19    the declaratory judgment on --

20                    THE COURT:  What is it that you

21    are going to put in front of the jury?

22                    MS. BROOKS:  I will show you, Your

23    Honor.  They're quite benign.

24                    This is one, this is just showing
```

```
 1    our declaratory judgment being filed on November

 2    19, 2008.  This is the case in Texas getting

 3    dismissed in August of 2012.  And then this is

 4    the deposition testimony of Mr. Fokas explaining

 5    why they decided to dismiss it.  And that's it,

 6    Your Honor.  But I don't use it, it really

 7    depends on what they say on that issue.

 8                 THE COURT:  Okay.  Thanks.  Do you

 9    have anything to say, Mr. Bovenkamp?

10                 MR. BOVENKAMP:  I have nothing

11    else to say, Your Honor.

12                 THE COURT:  Your application is

13    denied.  If you're making a willfulness case, I

14    think they're entitled to give the history of

15    the litigation between the parties and argue

16    it's not willful.  You make the charge and they

17    get to put in their proof of why it isn't.

18                 Okay.  And is there anything from

19    your side of the table?

20                 MS. BROOKS:  Just one, Your Honor.

21                 There were very few demonstratives

22    we got from Parallel Networks, but this is one

23    of them, and we are argued that it's

24    argumentative and doesn't belong in an opening.
```

```
 1                    MR. BOVENKAMP:  Your Honor, we're

 2        withdrawing that.

 3                    MS. BROOKS:  I'm sorry, nobody

 4        told me.

 5                    MR. BOVENKAMP:  Sorry.

 6                    THE COURT:  No, that's the best

 7        kind right there, you worked it out.

 8                    All right.  Well, I have something

 9        I want to make sure that I'm squared away on.  I

10        got a revised preliminary jury instruction set

11        that was delivered to me this morning.

12        Apparently it was submitted over the weekend.

13                    We generated a red line so that we

14        could see what was the difference and as an

15        aside, let me just say, it will always help me

16        if you're giving me another version of a

17        document if you folks will tell me, hey, this is

18        the only difference or these are the differences

19        and here is a red line demonstrating that, then

20        we don't have to do what we had to scramble to

21        do this morning which is get ahold of the

22        electronic copy, the old one and run it against

23        the electronic copy of the new one, generate the

24        red line and understand what's going on.
```

```
 1              It looks like from our compare
 2      from the two documents that the only changes in
 3      the listing of the patent claims at issue, is
 4      that correct?  Did we figure that out right?
 5              MR. BOVENKAMP:  I think that's
 6      correct, Your Honor.
 7              MS. HUFNAL:  Yes, Your Honor.
 8              THE COURT:  Okay.  Thanks for
 9      verifying that.
10              All right.  And I also wanted to
11      note that with respect to the revised proposed
12      voir dire questions, there was a question
13      submitted by Microsoft, I think in their new one
14      -- there was a significant -- it was basically a
15      rephrasing of the question that I told you you
16      couldn't have before in the former version, the
17      way it had been framed was I think in a dispute
18      between a big company and a small company, are
19      you inclined to favor the little company.  And
20      the revised one, do you have negative
21      impressions or distrust of a large corporation
22      or any other belief causing favor of a small
23      corporation over a large corporation.  I'm not
24      giving that.  So I'm not going to ask that
```

```
 1    question.

 2                    Otherwise, I will be -- and that

 3    was question 11.

 4                    Otherwise, I will be using the

 5    submission of March 15, 2017 as the version from

 6    which I read.  If that's not the latest and last

 7    version, you need to let me know because that's

 8    what I thought was the latest and last version,

 9    and that's what I'll be using.  Okay?

10                    All right.  If there is nothing

11    else, I'll go ahead and leave the bench here and

12    we'll be ready to bring the veneer in and begin

13    jury selection.  You all good?  Anything else we

14    need to cover?

15                    MR. BOVENKAMP:  Nothing else, Your

16    Honor.

17                    THE COURT:  Then we'll recess for

18    the veneer.

19                    (A brief recess was taken.)

20                    THE COURT:  Good morning, ladies

21    and gentlemen.  Thanks for being here.  Please

22    be seated.

23                    I appreciate everybody being here.

24    My name is Kent Jordan, and as the court deputy
```

1    said, and I'm going to be presiding over the

2    trial for which we will be picking a jury this

3    morning.

4              The name of the case is Parallel

5    Networks Licensing, LLC, plaintiff versus

6    Microsoft Corporation as the defendant.  And I'm

7    going to refer to these parties as Parallel

8    Networks and Microsoft for short.

9              This trial may last up to five

10   days.  I timed the trials, that is each side has

11   a certain number of hours within which they can

12   present their evidence and arguments.  And the

13   attorneys have to complete those presentations

14   within those time limits, however, the jury

15   deliberations may require you to be present

16   longer than the scheduled five days, just

17   depends on how the jury deliberations go.

18             The trial days typically run from

19   9:00 a.m. to 4:30 p.m.  I'm telling you all this

20   because I'm about to ask you a series of

21   questions.  The purpose of which is first to

22   enable me to determine whether or not any of you

23   as prospective jurors should be excused for

24   cause, and the second is to enable the counsel

```
 1    for the parties to exercise their individual

 2    judgment with respect to preemptory challenges,

 3    that is challenges for which reason need be

 4    given by counsel for which someone ought not

 5    serve on the jury.

 6              If you answer yes to any of the

 7    questions that I'm going to ask, what I want you

 8    to do is just keep that yes in your mind, all

 9    right, I'll ask all the questions you keep track

10    in your mind whether you had an affirmative

11    answer to one or more of the questions.  When I

12    finish reading that, I'm going to ask for a show

13    of hand for anybody that had an affirmative

14    answer to any of my questions.

15              When I've done that, I'm going to

16    call any of you who had an affirmative answer to

17    any of these questions up to the bench

18    individually one at a time where I can speak

19    with you with counsel present about those

20    particular questions as to which you had an

21    affirmative response.  Okay?

22              All right.  First I'm going to ask

23    the courtroom deputy clerk to administer the

24    oath to the panel.
```

```
1                    THE CLERK:  Members of the jury

2        panel, please rise and raise your right hands.

3                         You and each of you do solemnly

4        swear, those of you who swear, and you and each

5        of you do affirm, those of you who affirm, that

6        you will true answer make to such questions that

7        may be asked you touching the matter now before

8        the court, so help you God, those of who do

9        swear, and you do so affirm, those of you who

10       affirm.

11                       The appropriate response is I do.

12                       THE JURY:  I do.

13                       THE CLERK:  Thank you.  You may be

14       seated.

15                       THE COURT:  Here are the

16       questions.  Bear with me.

17                        Do you have any personal knowledge

18       of this case or have you read or heard it

19       discussed or have an opinion about this case?

20                        Number two.  You have been given a

21       list of companies involved in this case.  At

22       least I hope you have.  I just gave you the name

23       of the two companies involved in the case so you

24       know who they are.
```

```
 1                    Have you, a family member or a

 2        close friend ever worked for either of these

 3        companies?

 4                    Are you personally acquainted with

 5        any officer, director or employee of any of

 6        these companies?

 7                    Have you ever owned any stocks or

 8        bonds in any of these companies or relied

 9        financially in any way on any of those

10        companies?

11                    You have been given a list of the

12        attorneys and law firms involved in this

13        litigation.  I haven't introduced them to you,

14        but beforehand, you should have received that

15        information.

16                    And I'm slightly off script here,

17        but I'm going to just make sure you have this

18        information.  I'm going to have each side

19        introduce the people at counsel table.

20        Mr. Cawley, would you mind doing that on behalf

21        of your team --

22                    MR. CAWLEY:  Of course, Your

23        Honor.

24                    THE COURT:  -- for the benefit of
```

```
 1        the panel.

 2                    MR. CAWLEY:  Mr. Adam Poff.

 3        Angela Vorpahl.  Christopher Bovenkamp.  And my

 4        name is Douglas Cawley.

 5                    THE COURT:  Thank you very much,

 6        sir.  These are the attorneys for Parallel

 7        Networks.

 8                    Ms. Brooks, can I ask do you the

 9        same for Microsoft.

10                    MS. BROOKS:  Thank you, Your

11        Honor.  Good morning.  My name is Juanita

12        Brooks.  And this is my colleague, Martina

13        Hufnal and we're from the law firm of Fish &

14        Richardson.

15                    THE COURT:  Thank you very much.

16                    All right.  Are you related to or

17        personally acquainted with any of these

18        attorneys?

19                    Have you ever been represented by

20        any of these attorneys or other associates or

21        members of the listed law firms?  And the law

22        firms again are for Parallel Networks, McKool

23        Smith, and also for Parallel Networks Young,

24        Conaway.  And for Microsoft, Fish & Richardson.
```

```
 1                   So I'll repeat, have you ever been

 2     represented by any of these attorneys or other

 3     associates or members of their law firms who are

 4     involved in this case, whether in this case or

 5     in another case where these firms have

 6     represented another party?

 7                   Third, have you been -- you have

 8     been given a list of individuals who might

 9     appear as witnesses in this case.  Are you

10     related to or personally acquainted with any of

11     those individuals?

12                   Fourth, have you or any member of

13     your household ever been educated, employed,

14     trained or had any experience in computer

15     hardware, computer software or electronics

16     engineering?

17                   Fifth.  Are you unwilling or

18     uncomfortable deciding a case involving such

19     technology if chosen to be a juror in this case?

20                   Six.  Have you ever worked for a

21     company that had patented products or processes?

22                   Seven.  Do you have any knowledge

23     about or experience with patents including

24     applying for a patent?
```

```
 1              Eight.  Have you ever been

 2     involved in the development of a new product or

 3     process or applied for a patent?

 4              Nine.  Have you, a family member

 5     or a close friend had any dealings with the

 6     United States Patent and Trademark Office?

 7              Ten.  Do you have strong opinions

 8     about the United States patent system or about a

 9     patent granting exclusive rights to the

10     inventors or their employer?

11              Eleven.  Have you ever served as a

12     juror in a civil lawsuit or a criminal action?

13              Twelve.  Have you ever been a

14     plaintiff, a defendant, or a witness in a civil

15     lawsuit or criminal action?

16              Thirteen.  Do you have, or do you

17     know anyone else in the courtroom today?

18              Fourteen.  Do you know of any

19     reason whatsoever why you could not sit as a

20     trial juror with absolute impartiality to the

21     parties in this case?

22              Fifteen.  Now that I have told you

23     the trial schedule, is anyone unable to serve on

24     this jury for five days or more if necessary?
```

```
 1                    Sixteen.  Do you have any special
 2        disability, medical condition or other problem
 3        that would make serving as a member of the jury
 4        difficult or impossible?
 5                    That was sixteen.  Seventeen.  Is
 6        if -- is anyone not proficient in reading,
 7        writing or understanding English?
 8                    Eighteen.  Does anyone have child
 9        care or other responsibilities that will make it
10        difficult or impossible to serve on this jury
11        during the trial schedule?
12                    Nineteen.  Do you know of any
13        other matter which you believe should be called
14        to the Court's attention as having some bearing
15        on your qualifications or ability to sit as a
16        juror or which you think may prevent you from
17        rendering a fair and impartial verdict based
18        solely on the evidence and my instructions to
19        you on the law?
20                    Twenty, does anyone not use a
21        computer or the internet on a regular basis?
22                    Twenty-one.  Do you or anyone
23        close to you work for a computer software or
24        hardware company or have a family member or
```

1          close friend who does?

2                    Twenty-two.  Has anyone ever set

3          up a computer network or website at home, at

4          work or both?

5                    Twenty-three.  Does anyone have

6          any education or training in accounting,

7          economics or actuarial sciences?

8                    Twenty-four.  Do you or anyone

9          close to you work for a law firm, legal aid

10         society, state or federal court, department of

11         justice or regulatory legal body?

12                   Twenty-five.  Have you or a member

13         of your immediate family or anyone close to you

14         ever invented, developed or patented an

15         invention whether part of employment or outside

16         of work that you, a family member or someone

17         close to you believed was deserving of patent

18         protection from the US government?

19                   Okay.  Those are the questions.

20         Can I see by show of hands those of you that had

21         a yes to one or more of those questions for any

22         reason whatsoever.  All right.  Thanks.

23                   Here is what we're going to do.

24         We'll proceed front row toward the back, moving

1    from the aisle to the wall and just bring you

2    up, one at a time, ask you to please be patient,

3    bear with us, the process takes a little time,

4    but that's what we need to do in order to get a

5    jury picked that can be fair and impartial and

6    can serve.

7                    I'll see counsel at side-bar.

8                    We're just going to -- we're going

9    to put on a little white noise in background so

10   that our conversations up here with you are

11   going to be private.  Okay.  In case anybody has

12   got something they want to say that they would

13   rather not have everyone in the courtroom hear.

14             (Side-bar.)

15                    THE COURT:  First let me ask, is

16   there any issue with the voir dire presentation

17   and questions as given to the jury?  Mr. Cawley?

18             MR. CAWLEY:  No.

19             MS. BROOKS:  No, Your Honor.

20                    THE COURT:  All right.  Okay.

21   Then I will ask, we'll part the red sea.  From

22   the first row, the first individual who had a

23   yes to any one of my questions, if you raised

24   your hand, please come forward, ma'am.

```
1                     Come right in.  It's sort of like
2        walking in the lions den.  Don't be afraid.  I
3        need you to state your name for the record.
4                     JUROR:  Lindsay DiSabatino.
5                     THE COURT:  Do you have a juror
6        number?  Do you remember that.
7                     THE CLERK:  11.
8                     THE COURT:  Number 11.
9        Ms. DiSabatino, you said yes to one or more of
10       my questions.  Can you tell me.
11                    JUROR:  I have a couple.  I work
12       for Extensor which is a global consulting firm
13       and Microsoft is one of our alliance partners.
14                    I also am computer literate and I
15       do have a patent pending.  We submitted it last
16       year.  It's an algorithm.  I have a global
17       workshop conference which I'm hosting.  We have
18       people from India, so they're key stakeholders,
19       and they would like for me to be in attendance.
20                    THE COURT:  When is that going to
21       be?
22                    JUROR:  It starts Wednesday.
23                    THE COURT:  This Wednesday.  Let's
24       go through each of those things, Ms. DiSabatino.
```

```
 1                    First, the fact that Extensor has

 2        got a business relationship, and apparently a

 3        strong one with Microsoft, would that make it

 4        difficult for you to just decide a case

 5        involving Microsoft on the evidence here or

 6        would you feel like --

 7                    JUROR:  I think I would be

 8        knowledgeable and being in the consulting

 9        industry, I don't think it would make me bias.

10                    THE COURT:  That's the question.

11                    That's the first question.

12                    JUROR:  I'll be informed.

13                    THE COURT:  You would be informed,

14        but could you say look, if the evidence is

15        against Microsoft, I'm finding against

16        Microsoft?

17                    JUROR:  No, it doesn't influence

18        my paycheck, so I could be objective.

19                    THE COURT:  Now, you are

20        knowledgeable and you say you actually do some,

21        computer literate and you work with computers.

22        Would you be able to hear the evidence in this

23        case on the basis of the evidence as it's

24        presented, and do you think you could be fair in
```

```
1    assessing that evidence in light of your own

2    experience?

3              JUROR:  Yes.

4              THE COURT:  All right.  Tell me

5    about this conference that you have got people

6    coming in for, if you don't mind.  How many

7    people are involved?  What's your role in it?

8              JUROR:  Sure.  It's twelve people

9    and I am actually the lead of this algorithm and

10   we're trying to get our India delivery center so

11   we have key stakeholders that are flying in for

12   it.

13             THE COURT:  And the patent that

14   you're working on, is that through Extensor with

15   colleagues?

16             JUROR:  Yes, there is about six of

17   us that have names on it.  I don't know if it

18   will be approved for another four years.

19             THE COURT:  Have you had any

20   experience with the patent system that would

21   bias you for or against patentholders?

22             JUROR:  No.  But I filled out the

23   application and I'm familiar with patents.

24             THE COURT:  Thank you very much.
```

```
 1        Mr. Cawley, anything from you?

 2                    MR. CAWLEY:  I don't have anything

 3        further.

 4                    MS. BROOKS:  One question since

 5        you do have a patent pending and Parallel

 6        Networks is the patentholder in this case

 7        asserting the patent against Microsoft, do you

 8        think that might bias you in any way in favor of

 9        Parallel Networks and against Microsoft?

10                    JUROR:  I missed the question.

11                    MS. BROOKS:  I know, that was a

12        really bad question.  I'll try it again.  So the

13        fact that you have a patent pending --

14                    JUROR:  Yes.

15                    MS. BROOKS:  -- in this case,

16        Parallel Networks is the patentholder, and

17        they're asserting their patents against us.  The

18        fact that you may potentially become a

19        patentholder, do you think that might cause you

20        to favor Parallel Networks over Microsoft?

21                    JUROR:  I mean, I don't know.  I

22        would have to hear it, the facts in the case.

23                    MS. BROOKS:  Thank you.

24                    THE COURT:  Thank you so much,
```

```
1      Ms. DiSabatino.  Please take your seat.

2                  Applications, any applications to

3      strike for cause?

4                  MR. CAWLEY:  I don't hear cause

5      there, Your Honor.  We have no objection to

6      striking her since she's got this conference

7      going on, and probably is a hardship in that

8      sense.

9                  MS. BROOKS:  No application, Your

10     Honor.

11                 THE COURT:  All right.  Here is

12     what we're going to do, we're going to keep her

13     in the pool for now.  I'm inclined to strike her

14     for cause because I think she's got people

15     flying in from around the world, and it does

16     occur to me since she is actually leading the

17     team it would be a hardship for her to sit.  I

18     may have to ask her, I should have thought to

19     ask her if there are people who can fill in and

20     take control for her.  If we get jammed up on

21     the people we have got left, we may have to ask

22     her another question or two.  We'll leave her in

23     the pool, but the likelihood is on my own

24     application we'll strike her for cause.
```

```
1                     All right.  The next gentleman,

2       please come forward.

3                     And I'm counting on all of you to

4       help remember the thing I just said.

5                     Hi.  Thanks for coming forward,

6       sir.  Can I have your name for the record,

7       please?

8                     JUROR:  Michael Molitor.

9                     THE COURT:  Mr. Molitor, do you

10      remember your juror number?

11                    JUROR:  26.

12                    THE COURT:  26.  Thank you.

13                    Okay.  Mr. Molitor, you said yes

14      to one or more of my questions.  Can you tell us

15      about that, please.

16                    JUROR:  Yeah, I worked with

17      DuPont.  I worked at the experimental station.

18      I run a research facility and I have got four

19      patents awarded in my name.

20                    THE COURT:  Right.

21                    JUROR:  Just to bring it up.

22                    THE COURT:  That's important for

23      us to know.  Any other questions you said yes

24      to?
```

```
1                    JUROR:  No.
2                    THE COURT:  Let's inquire about
3       that a little bit.  First the fact that -- and
4       congratulations you have got a few patents
5       awarded in your name.  Is there anything in your
6       experience with the US patent system that would
7       bias you for or against a patentholder?
8                    JUROR:  I don't think so.
9                    THE COURT:  Okay.  And the point
10      of my question is just this, the fact that you
11      hold a patent, would that prevent you from
12      looking dispassionately, that is fairly, at the
13      evidence that both sides present to decide the
14      issues in this case which deal with infringement
15      and invalidity, could you look at that and be
16      fair to both the patentholder in this case,
17      Parallel Networks, and the person challenging
18      the patent, Microsoft, do you think you could do
19      that fairly?
20                   JUROR:  Yes, I think I can, you
21      know.  I have got a couple -- I have seen how
22      close they are to one another, how do they all
23      come out like that anyway, because there is
24      really not much difference in some of the work
```

1    I'm doing.  And I'm how can I have so many

2    patents out there, because somebody took an

3    envelope and flipped it this way, and then

4    somebody got a patent for it.

5                  THE COURT:  You would be open to

6    the idea that some patent could rightly be

7    challenged is what you're saying?

8                  JUROR:  Yeah.

9                  THE COURT:  But the same token,

10   you're also open to the idea that patents are a

11   grant from the government which a party has a

12   right to assert and they have a right to be

13   heard on that?

14                 JUROR:  Oh, yeah.

15                 THE COURT:  So the bottom line is,

16   you're open to hearing both sides of that

17   question and dealing with it fairly?

18                 JUROR:  Yes, I think so.

19                 THE COURT:  All right.

20                 Mr. Cawley, anything further?

21                 MR. CAWLEY:  Thank you, Judge.

22   Mr. Malitor, do you own your patents or did you

23   assigned them to DuPont?

24                 JUROR:  DuPont gets everything.

```
 1     Okay.  Yeah, I got a paycheck.

 2               MR. CAWLEY:  And forgive me if you

 3     may have said this already, but I missed it if

 4     you did.  What is it that your patents cover?

 5               JUROR:  Polymers.

 6               MR. CAWLEY:  Polymers.

 7               JUROR:  Or the process.

 8               MR. CAWLEY:  You did say that.

 9               JUROR:  One of the processes I

10     designed, with a couple of colleagues.

11               MR. CAWLEY:  Okay.  Thank you.

12     That's all the questions I have.

13               THE COURT:  Ms. Brooks.

14               MS. BROOKS:  Thank you.  So the

15     fact that you are a patentholder, in this case,

16     Parallel Networks is asserting their patents

17     against Microsoft.  Do you think the fact that

18     you're a patentholder might cause you to favor

19     Parallel Networks over Microsoft?

20               JUROR:  I don't know.  I don't

21     think so.  I don't think so.

22               MS. BROOKS:  And one of the

23     defenses that Microsoft has in this case is that

24     Parallel Networks's patent is invalid, that it
```

```
 1    should not have been granted.  The fact that
 2    you're a patentholder, do you think you might
 3    have difficulty, without hearing the facts, just
 4    the concept of it, would you have problems with
 5    that?
 6              JUROR:  I guess you would have to
 7    prove they are invalid.  Right?
 8              THE COURT:  That's the point.  And
 9    that's what I was trying to ask.  You'll hear
10    evidence.  I don't think counsel here is trying
11    to get you to say that right now which side you
12    would come down on, but that you'll hear it and
13    be fair, that's the question.
14              JUROR:  Yes.  Yes.
15              THE COURT:  All right.  Anything
16    else?
17              MS. BROOKS:  No, thank you.
18              THE COURT:  Thank you very much,
19    Mr. Molitor.
20              Applications.
21              MR. CAWLEY:  No, Your Honor.
22              MS. BROOKS:  Yes, Your Honor.  He
23    hesitated a really, really long time when I
24    asked if he would favor Parallel Networks, a
```

```
 1      really long time.
 2                  THE COURT:  Well, I'll take a
 3      little issue with that.  I'm not sure he
 4      hesitated a really long time, although he did
 5      hesitate.  And I don't know whether that's
 6      because he didn't understand the question or
 7      because there is really a doubt in his mind.  So
 8      I'm not striking him for cause.  I think he can
 9      do just what he said, be fair and impartial.
10                  All right.  Next person on that
11      row who had a yes to one or more of my
12      questions, please come forward.
13                  Come right up, please.  Thank you,
14      sir.  First I need your name for the record,
15      sir.
16                  JUROR:  Herschel Moore.
17                  THE COURT:  Mr. Moore, your juror
18      number.
19                  JUROR:  27.
20                  THE COURT:  Mr. Moore, you had a
21      yes to one or more of the things I asked.  Can
22      you tell me about that.
23                  JUROR:  One of the main things is
24      my work schedule.  It's my busy time of the
```

1    year, maintenance at a campground, so I probably

2    won't have a job if I have to take five days

3    off.

4                    THE COURT:  Okay.  Well, we'll

5    talk to you about that a little bit more in a

6    moment.  Were there anymore questions that you

7    had a yes to?

8                    JUROR:  Yeah, I have like 80

9    percent hearing loss in this ear, and I have a

10   very hard time hearing you guys.

11                   THE COURT:  Your other ear is

12   good?

13                   JUROR:  It's fair.

14                   THE COURT:  Does that cover all

15   the affirmative answers you had?

16                   JUROR:  Yes.

17                   THE COURT:  As to that first one

18   you're concerned about work.  Do you work for a

19   company or do you contract?

20                   JUROR:  For a company.

21                   THE COURT:  Who do you work for?

22                   JUROR:  Tall Pines Campground.

23                   THE COURT:  And you have a concern

24   that if you take five days off, your employment

```
 1      will be at risk?

 2                     JUROR:  Yes.

 3                     THE COURT:  Without wanting to get

 4      too far into it, do you have people who work

 5      with you who also work on the maintenance?

 6                     JUROR:  Yes, we're like two guys

 7      short right now.

 8                     THE COURT:  You're a salary?

 9                     JUROR:  No.

10                     THE COURT:  How, they pay you by

11      the hour?

12                     JUROR:  Yes.

13                     THE COURT:  And with your hearing

14      issue, with amplified sound, can you hear

15      reasonably well?

16                     JUROR:  Fair.

17                     THE COURT:  Okay.  All right.

18      That's helpful.  Thank you.

19                     Mr. Cawley.

20                     MR. CAWLEY:  I have no questions

21      of this juror.

22                     MS. BROOKS:  No questions.

23                     THE COURT:  Thank you, Mr. Moore.

24      I appreciate it.
```

```
 1                    Mr. Cawley, applications?

 2               MR. CAWLEY:  No, Your Honor.

 3               MS. BROOKS:  I ask that he be

 4    excused, Your Honor, because of a combination of

 5    being worried that he's going to loose his job

 6    and he certainly isn't going to get paid because

 7    he gets paid by the hour, and the hearing I

 8    think makes him significantly less than an

 9    optimum juror.

10               THE COURT:  I'm inclined to agree.

11    I'm concerned about his obvious concern about

12    his employment.  Not a big employer apparently,

13    isn't able to absorb the loss of an employee,

14    I'll excuse him for cause.

15               All right.  Anybody else on that

16    first row that had a yes to one or more of my

17    questions?

18               Okay.  Next row back, beginning at

19    the aisle, first person that had a yes to one or

20    more of my questions, please come forward.

21               Good morning, sir.  Come right in.

22    Can you give me your name for the record.

23               JUROR:  Jason Barber.

24               THE COURT:  Jason Barber.
```

```
 1                    JUROR:  Correct.

 2                    THE COURT:  Mr. Barber, do you

 3        remember what your jury number was?

 4                    JUROR:  Four.

 5                    THE COURT:  You answered yes to

 6        one or more of my questions.  Please tell me.

 7                    JUROR:  The first question was

 8        have you ever had any training in computers?  I

 9        went to school for it.  I was a network

10        administrator, built computers.  And the second

11        one was, have you ever built or been on a

12        website.  I run one at the moment.  The third

13        question, is there any hardships.

14                    Well, my wife being on workman's

15        comp, it's really tough.  And like I said, I got

16        a few bucks in my bank account and I'm also an

17        emergency dispatch operator with Security

18        Instrument.  We're also short staffed.  That

19        would cause a workplace issue as well, so there

20        is quite a few things.

21                    THE COURT:  Is there anything

22        else, not that those are aren't important, but I

23        want to make sure I have the full universe

24        before I start asking.
```

```
 1                    JUROR:  No, that's correct.

 2                    THE COURT:  First as to your

 3    personal knowledge about computers and how

 4    computers work and how websites work, this is a

 5    patent case.  Parallel Networks owns some

 6    patents about websites and Microsoft is accused

 7    of infringing.  They have got defenses against

 8    infringement that they want to tell the jury

 9    about.  And they also have an affirmative

10    defense about invalidity, that the patent is not

11    valid.  That's sort of the lay of the land that

12    the jury is going to be asked to take a look at

13    and make some judgements about.

14                    Does the fact that you have

15    training and know about computers, do you think

16    that would keep you from being fair and

17    impartial if you were selected, could you hear

18    both sides?

19                    JUROR:  I could, yeah.

20                    THE COURT:  Nobody would be asking

21    you to forget what you know, but what they would

22    be asking to you do is to be open minded and

23    fair about the arguments and the evidence they

24    want to put in.
```

```
1                    JUROR:  I could do that.
2                    THE COURT:  Now, as to your --
3       let's talk about first your personal financial
4       situation.  Don't worry, I won't get into it
5       personally, but you said your wife is on
6       worker's comp?
7                    JUROR:  Yeah.
8                    THE COURT:  And you said that
9       could be hard.
10                   JUROR:  She's only getting 80
11      percent of her pay at the moment, and we were
12      barely making it when she had a hundred percent,
13      so I'm working overtime once a week just to make
14      it.
15                   THE COURT:  And your work is as an
16      emergency dispatcher?
17                   JUROR:  Yes, that's correct.
18                   THE COURT:  And would your
19      workplace cover you or pay --
20                   JUROR:  No.
21                   THE COURT:  -- pay you your salary
22      regardless?
23                   JUROR:  No.
24                   THE COURT:  Who do you work for?
```

```
 1                    JUROR:  Security Instrument.  It's

 2       like ADT.  When somebody breaks into the house,

 3       we call the police and stuff like that.

 4                    THE COURT:  And there is no paid

 5       leave?

 6                    JUROR:  No.

 7                    THE COURT:  Okay.  And then I

 8       think you also mentioned that the company is

 9       short staffed.

10                    JUROR:  Correct, they are short

11       staffed.  We're supposed to have four, we have

12       three currently.

13                    THE COURT:  Okay.  Mr. Cawley,

14       questions?

15                    MR. CAWLEY:  Sure.  Mr. Barber,

16       you said you used Microsoft products?

17                    JUROR:  Uh-huh.

18                    MR. CAWLEY:  What sort of level of

19       familiarity do you have with those?

20                    JUROR:  I have used everything

21       from Windows 3.1 to Windows 10, you name it,

22       Microsoft Excel, the whole gamut.

23                    MR. CAWLEY:  In addition to those,

24       the application, do you work on servers, for
```

1    example?

2                   JUROR:  Yeah, I have built

3    computers, servers.  I used Microsoft for that.

4    Microsoft motherboards and stuff like that.

5                   MR. CAWLEY:  Do you have good

6    experience with Microsoft?

7                   JUROR:  Yeah, Microsoft has been

8    fine.  I have never had a problem with them,

9    really.

10                   MR. CAWLEY:  Do you think that the

11    experience that you have might influence you in

12    thinking about how -- I asked him if he thought

13    that his familiarity and use of Microsoft

14    products might cause him to think that Microsoft

15    was innovative and might he have a difficult

16    time being objective about that?

17                   JUROR:  I would hope not.

18                   MR. CAWLEY:  Thank you.

19                   THE COURT:  Ms. Brooks.

20                   MS. BROOKS:  Good morning.  My one

21    question is do you think that because you have

22    such a concern about your work, that while this

23    trial is going on you might be so preoccupied

24    with that that you might have trouble listening

1    to the evidence?

2                    JUROR:  I would hope not.  I would

3    try not to.

4                    MS. BROOKS:  Thank you.

5                    THE COURT:  Thank you very much.

6                    Applications.

7                    MR. CAWLEY:  We move that he be

8    stricken for cause, Your Honor.  I think he -- I

9    might have missed this, but I think that he

10   teared up when he was describing his financial

11   difficulties.  And I'm afraid that's going to be

12   a real hardship on him.

13                   THE COURT:  Okay.  Ms. Brooks?

14                   MS. BROOKS:  That's why I asked

15   the question I did because I wasn't sure if he

16   had a cold or he really was becoming very

17   emotional, but I think since neither Mr. Cawley

18   or I are am sure about that.  I join in the

19   request.

20                   THE COURT:  Okay.  You know, this

21   is actually sort of a tough call for me because

22   on the one hand, I didn't pick up the emotional

23   piece the way you did.  What I did see is that

24   he said -- he came across to me as pretty

```
 1    earnest, and I am concerned about the financial
 2    part.  But I was very impressed with just how
 3    straightforward he was in his answers.
 4                We're kind of early in the
 5    process.  I think we're going to be okay, so I'm
 6    inclined to strike him just because of the
 7    concerns that the two of you have expressed,
 8    although I think he could serve, that's one I'll
 9    keep a note by.  I do think he could serve.  If
10    we are pressed I may hold on to him in the pool.
11                All right.  Next person on that
12    row had a yes to one or more of my questions.
13    Thank you.  Please come forward, sir.  Good
14    morning.
15                JUROR:  Shark tank here.
16                THE COURT:  It's a little scary,
17    isn't it?  I need your name for the record.
18                JUROR:  Jack Crystal.
19                THE COURT:  Mr. Crystal, do you
20    remember your juror number?
21                JUROR:  Ten.
22                THE COURT:  You had a yes to one
23    or more of my questions, Mr. Crystal.
24                JUROR:  Yes.
```

```
 1                    THE COURT:  Tell me about that.

 2                    JUROR:  I manage a physicians

 3      office and it's difficult for me to be out more

 4      than five days, five days or more.  I do not

 5      take week-long vacations.  I do have Microsoft

 6      as part of my portfolio.

 7                    THE COURT:  When you say part of

 8      your portfolio, what do you mean?

 9                    JUROR:  Mutual fund.  And I have a

10      good friend who owns an IT company called

11      Reliable Computer Services.  That's about it.

12                    THE COURT:  As to the first thing,

13      your work schedule, are there other people who

14      can cover for you if you need to be out?

15                    JUROR:  No, sir.  I'm the only one

16      that does my job, unfortunately.

17                    THE COURT:  What's the size of the

18      practice?

19                    JUROR:  Ten.

20                    THE COURT:  Ten what?

21                    JUROR:  Ten employees.

22                    THE COURT:  How many physicians?

23                    JUROR:  Three physicians.

24                    THE COURT:  Okay.  You managed the
```

1    business.

2                    JUROR:  Yes.

3                    THE COURT:  And Microsoft is part

4    of your portfolio.  Is this an investment on

5    your part or is this just part of a mutual fund

6    that invest?

7                    JUROR:  Mutual fund.

8                    THE COURT:  And it invest

9    generally in technology companies?

10                   JUROR:  Yes.

11                   THE COURT:  And you're aware of

12   that Microsoft is a part of that mix?

13                   JUROR:  Yes.

14                   THE COURT:  Okay.  The last thing

15   that you had, I apologize, was?

16                   JUROR:  I have a good friend that

17   owns an IT company called Reliable Computer

18   Services.  I have known him for over twelve

19   years.

20                   THE COURT:  All right.  Okay.

21                   Now, let's take those last two

22   things.  Does the fact that the mutual fund you

23   invest in has an interest in Microsoft, is that

24   a financial interest of the sort that would

```
 1      prevent you from being fair and impartial if you

 2      were called upon to decide this?

 3                      JUROR:  I don't think so, no.

 4                      THE COURT:  The fact that you know

 5      somebody who works in the IT field, would that

 6      prevent you from looking at both sides's

 7      evidence and arguments in this patent case

 8      fairly and impartially?

 9                      JUROR:  That's a tough question to

10      be honest.  I mean, he does business on his own

11      and also does business with a couple companies.

12      I don't know for certain.  I can't say yes or

13      no.

14                      THE COURT:  Okay.  Now, the

15      question I'm trying to ask is not whether you

16      would -- not how you would end up deciding the

17      case, obviously nobody knows that, the argument

18      isn't it, it's your capacity to be open minded,

19      can you hear both sides and hear what they say,

20      and without worrying about what your friend

21      thought of you whether you decided for a

22      patentholder or against the patentholder, could

23      you just hear the evidence and give the parties

24      a fair shake, that's the bottom line?
```

```
 1                    JUROR:  Yes.

 2                    THE COURT:  All right.  Thanks

 3       very much.

 4                    Mr. Cawley.

 5                    MR. CAWLEY:  I was a little bit

 6       confused.  I understand that you said that you

 7       think you can hear the evidence and are fair,

 8       but I also thought that you said that it was a

 9       tough call about how your decision might be

10       influenced by the experience.  Can you talk a

11       little more about that?

12                    JUROR:  Again, he's been in the

13       business, and I rely on him heavily for a lot of

14       things.  And if I have a question about software

15       or whatever it may be, I defer to him and ask

16       him if he thinks it's worthwhile for me to

17       either invest in it or download it.  So he's my

18       sort of go to guy for everything.  And I don't

19       make a move on software nor download without

20       asking him first.

21                    MR. CAWLEY:  Okay.  But if Judge

22       Jordan told you that you shouldn't talk to him

23       about it while this trial is --

24                    JUROR:  I won't do that.
```

```
 1                    MR. CAWLEY:  Okay.  But is there
 2       some way -- I understand what you said, is there
 3       some way in which your friendship with him or
 4       your reliance on him you think might influence
 5       your decision in this case?
 6                    JUROR:  No, I don't think so.
 7                    MR. CAWLEY:  Okay.
 8                    THE COURT:  Thanks, Mr. Cawley.
 9                    Ms. Brooks.
10                    MS. BROOKS:  Do you know, does
11       your friend hold any patents?
12                    JUROR:  I do not know.
13                    MS. BROOKS:  You don't know
14       whether he's ever been involved in patent
15       litigation himself?
16                    JUROR:  I do not know.
17                    MS. BROOKS:  And lastly, has he
18       ever had any negative experience with Microsoft
19       products that he's passed on to you?  You can
20       tell, it's okay.
21                    JUROR:  Haven't we all?  No.  No,
22       he's never said anything outright, no.
23                    MS. BROOKS:  In other words, what
24       I'm trying to get out when you say haven't we
```

1    all, is there anything in your own experience or

2    with your friend about his experience with

3    Microsoft products that might cause you to favor

4    Parallel Networks a little bit more over

5    Microsoft?

6                    JUROR:  I do not believe so, no.

7                    MS. BROOKS:  Thank you so much.  I

8    appreciate it.

9                    THE COURT:  Mr. Cawley?

10                    MR. CAWLEY:  We have no motion,

11   Your Honor.

12                    THE COURT:  Ms. Brooks?

13                    MS. BROOKS:  No application.

14   Thank you, Your Honor.

15                    THE COURT:  Thank you.

16                    Next person on that row who had a

17   yes to one or more of my questions.

18                    Hi.  Come right on in.  Thanks.

19   Ma'am, I need your name for the record.

20                    JUROR:  Abigail Manuel.

21                    THE COURT:  Ms. Manuel, do you

22   remember your juror number?

23                    JUROR:  23.

24                    THE COURT:  Ms. Manuel, you had a

1      yes to one or more of my questions.  Can you

2      tell me about that, please?

3                    JUROR:  I work in the accounting

4      department at Discover Bank.

5                    THE COURT:  And so you have got

6      some accounting and economic experience?

7                    JUROR:  Yeah, I have been there

8      for -- I have been banking for over fifteen

9      years, but I have been in the accounting

10     department for about two.

11                   THE COURT:  We'll come back to

12     that in just a minute.  Were there any other

13     questions that I asked that you had a yes to?

14                   JUROR:  The schedule was going to

15     be a little bit tight.

16                   THE COURT:  Nobody wants to give

17     up five days, but if you could, could you do it?

18                   JUROR:  Yeah, but that's more of

19     my concern, we work with the products, so that

20     would be my only issue.

21                   THE COURT:  And that issue, if it

22     came to it, there are people who could cover and

23     you could manage through that?

24                   JUROR:  I mean, yes.

```
 1              THE COURT:  I note the hesitation
 2    in your voice.  I think everybody -- it's a call
 3    on every citizen's time to be here, so nobody is
 4    eager to do it.  I shouldn't say it, once in a
 5    while there is somebody that's eager to do it,
 6    but usually that's not the case.  That's very
 7    understandable.
 8              But you wouldn't be in dire
 9    straights nor would your employer if you were
10    picked and had to serve, am I hearing you
11    correctly?
12              JUROR:  It wouldn't be their
13    preference, but obviously, they can't say no.
14              THE COURT:  Okay.  Now as to your
15    personal skill level and understanding, as part
16    of this case, it's a patent case.  Parallel
17    Networks owns a patent.  They say that Microsoft
18    infringes or trespasses on their rights
19    associated with that patent.  Microsoft says no,
20    we don't.  And besides that, your patent is
21    invalid.  It's not a good patent.  That's the
22    basis of the fight that's going on here.
23              In the course of them putting
24    forth evidence about those issues, they'll also
```

```
1     be putting forth evidence about what the damages

2     alleged are, that is if a jury that's impanelled

3     here were to decide that the patent is a good

4     patent, and that in fact Microsoft infringes it,

5     if those two things, which are not decided yet,

6     but if they were decided for Parallel Networks,

7     then the next question for the jury would be,

8     how much were they hurt and how would you figure

9     out the damages.  How would you calculate and

10    figure that out.  And both sides will have

11    experts that they bring in to talk about this

12    stuff.

13              In your own personal experience

14    and the things that you have learned working in

15    the banking field, you probably learned some

16    things about accounting, et cetera, would that

17    prevent you from being able to listen fairly and

18    impartially to the evidence both sides would put

19    on about damages?  In short, could you be fair

20    and impartial?

21              JUROR:  I think so.

22              THE COURT:  Okay.  Mr. Cawley, do

23    you have any questions?

24              MR. CAWLEY:  No questions.  Thank
```

1    you.

2              MS. BROOKS:  I have one.  You said

3    you work with the products?

4              JUROR:  I work with Microsoft.

5    It's one of our systems, actually several of our

6    systems.

7              MS. BROOKS:  Has there been

8    anything -- I know they're not perfect.  Has

9    there been anything in your experience with

10   Microsoft products that would cause you to favor

11   Parallel Networks over Microsoft?

12             JUROR:  No.

13             MS. BROOKS:  Thank you.

14             JUROR:  You're welcome.

15             THE COURT:  Thank you very much,

16   Ms. Manuel.  Please take your seat.

17             And I appreciate your follow-up

18   questions, Ms. Brooks.  When she said product, I

19   thought she was talking about the bank's

20   products and services, not about Microsoft, so

21   I'm glad you brought that up.

22             Do you have any applications,

23   Mr. Cawley?

24             MR. CAWLEY:  No.

```
 1                    THE COURT:  Ms. Brooks?

 2                    MS. BROOKS:  No.

 3                    THE COURT:  Thanks.  She stays in

 4       the pool.

 5                    Next person on the row that had a

 6       yes to one or more of my questions, please come

 7       forward.

 8                    Good morning, sir.  Can I get your

 9       name for the record?

10                    JUROR:  Frank Thomas.

11                    THE COURT:  Mr. Thomas, do you

12       remember your juror number.

13                    JUROR:  42.

14                    THE COURT:  Mr. Thomas, you had a

15       yes to one or more of my questions.  Can you

16       tell me about that?

17                    JUROR:  Exsensor, I am a system

18       administrator.  And we are kind of Microsoft

19       because they provide our education and training.

20       I have a two person staff.  I am the technical

21       side and I have a manager, so those are the

22       reasons.

23                    THE COURT:  Was there a yes to any

24       other questions?  We are going to come back and
```

```
 1        talk about this.  I want to make sure we got

 2        everything on the table.

 3                     JUROR:  That pretty much covers

 4        it.

 5                     THE COURT:  As to the first one, I

 6        take it that those concerns are -- or the yeses

 7        were yes, you have some affiliation with

 8        Microsoft through Exsensor?

 9                     JUROR:  Yes.

10                     THE COURT:  And second, work

11        related that you're a part of two-person team?

12                     JUROR:  Correct, Your Honor,

13        two-person team, manager and a technical side is

14        me, that's pretty much the office.  And my

15        education comes through Microsoft.

16                     THE COURT:  Through Microsoft.

17        Okay.  I'll ask the bottom line question first,

18        which is very important.  You're receiving a

19        benefit through Exsensor which is funded or

20        given by Microsoft?

21                     JUROR:  Correct.

22                     THE COURT:  And you're working

23        regularly with I guess Microsoft products?

24                     JUROR:  Correct.
```

```
 1                    THE COURT:  Could you in this

 2     dispute about the patent rights, could you hear

 3     both sides, including Parallel Network's

 4     evidence which they're going to be bringing

 5     against Microsoft, as well as Microsoft's

 6     evidence which they're going to be bringing,

 7     could you hear both sides and set aside your

 8     work, including benefits, the education benefit

 9     and be fair to both sides in the case, or would

10     the fact that you get those benefits prevent you

11     from hearing both sides?

12                    JUROR:  I know how to be non

13     biased.

14                    THE COURT:  So you could be

15     unbiased?

16                    JUROR:  Yes, I could be.

17                    THE COURT:  You could set that

18     aside and you could just decide the case to the

19     evidence that's here in the courtroom; right?

20                    JUROR:  I could.  The only thing

21     would be work hours, my schedule, since there

22     are two individuals that run an office.

23                    THE COURT:  Okay.  On that point,

24     it's not ideal for anybody to be away from work
```

```
 1    for five days, we understand that.  To the

 2    extent you would be able, would the company be

 3    able to cover for you for that period of time?

 4                    JUROR:  I wouldn't be the person

 5    to make that decision.  My manager would have to

 6    -- I know we have other sides that are two hours

 7    away or more away, I don't know what their

 8    workload is to be able do what I do.  I couldn't

 9    give a definite answer for that question.

10                    THE COURT:  If you were called to

11    serve and you told your manager look, I'm

12    obligated to be in court, would you be worried

13    about that?  Would it prevent you from being

14    able to pay attention to the evidence or could

15    you?

16                    JUROR:  No, if I had approval from

17    management and they said there is time available

18    for me to serve, that would be their call.

19                    THE COURT:  Okay.  Last but not

20    least, you say you work on the technical side.

21    What exactly do you do, sir.

22                    JUROR:  I'm in the middle of

23    migration from 2008 to 2012.  I have open DNS, a

24    slew of other we have got like five or six
```

```
 1        projects going on right now.
 2                    THE COURT:  And that includes
 3        working with Microsoft products?
 4                    JUROR:  They are the core.  We
 5        first build a host and we build virtuals on top
 6        of that, 99 percent is Microsoft.
 7                    THE COURT:  Okay.  Mr. Cawley, any
 8        questions for Mr. Thomas?
 9                    MR. CAWLEY:  Just a couple.
10                    Mr. Thomas, now, you said that you
11        and your people have received training from
12        Microsoft?
13                    JUROR:  Yes.
14                    MR. CAWLEY:  Tell us a little more
15        about that.
16                    JUROR:  Pretty much we have a
17        person that handles are education.  We have
18        yearly educational requirements.  And through
19        our education provider we receive vouchers to
20        which training we need.  And me personally, I'm
21        certified Microsoft 2008, now we're working on
22        our 2012 training, working on their virtual
23        training, anything that basically we have built,
24        we build different locations out and everything
```

1    we do, VM ware, the host, everything on top of

2    that is Microsoft related.

3                    MR. CAWLEY:  And then would

4    Microsoft provide personnel to help with that

5    training?

6                    JUROR:  No, we do online or in

7    class.

8                    MR. CAWLEY:  Does Microsoft make

9    any of that available?

10                   JUROR:  I only know about they

11   provide our vouchers for our training.

12                   MR. CAWLEY:  Let's suppose you

13   heard the evidence in this case, and the result

14   was the jury decided to give Parallel Networks a

15   lot of money from Microsoft, would that cause

16   you any embarrassment at work?

17                   JUROR:  No, I'm just there for the

18   training.

19                   MR. CAWLEY:  Thank you.

20                   JUROR:  You're welcome.

21                   THE COURT:  Hold on just a minute.

22   We got to give Ms. Brooks a chance.

23                   JUROR:  I apologize.

24                   MS. BROOKS:  Did you say you're

```
 1        going from 2008 to 2012?

 2                     JUROR:  Yes.

 3                     MS. BROOKS:  So it would come as

 4        no surprise to you that 2008 hasn't been the

 5        most popular version?

 6                     JUROR:  It's worked fine for us.

 7                     MS. BROOKS:  What I want to make

 8        sure is you haven't had the negative experience

 9        with 2008 that you might favor Parallel Networks

10        over Microsoft as a result of your experience?

11                     JUROR:  I have done RFPs, decide

12        what they want to buy and we move forward

13        according to what their choices are.

14                     MS. BROOKS:  Thank you.

15                     THE COURT:  Thank you very much.

16        I appreciate it.

17                     Mr. Cawley, any applications?

18                     MR. CAWLEY:  No, we don't have an

19        application.

20                     MS. BROOKS:  No application, Your

21        Honor.

22                     THE COURT:  Okay.  He stays in the

23        pool.

24                     Next person on that row who had a
```

1    yes to one or more of my questions.  Come right

2    in.  It's a little intimidating.

3                    Can I have your name for the

4    record?

5                    JUROR:  Sherry Myers.

6                    THE COURT:  Ms. Myers, do you

7    remember your juror number?

8                    JUROR:  30.

9                    THE COURT:  30.

10                   Ms. Myers, you had a yes to one or

11   more of the questions.

12                   JUROR:  Yes.  One is daycare.

13                   THE COURT:  Daycare.

14                   JUROR:  Yes, I don't have anybody

15   for daycare.

16                   THE COURT:  Any other questions.

17                   JUROR:  My dad worked for a

18   business similar.

19                   THE COURT:  A business similar.

20                   JUROR:  To Microsoft.

21                   THE COURT:  What business is that?

22                   JUROR:  Excel.

23                   THE COURT:  Excel Business.  We'll

24   go back and talk about this.  Any other

```
1    questions you had a yes to?

2              JUROR:  No.

3              THE COURT:  First, and most

4    important, family, how many little ones do you

5    have?

6              JUROR:  Three.

7              THE COURT:  Three.  They're all in

8    daycare.

9              JUROR:  One is in daycare, the

10   other two are in school.

11             THE COURT:  And do you work?

12             JUROR:  I work during the day.

13             THE COURT:  But your work schedule

14   is -- if you ever have to work late or something

15   like that, what kind of arrangements do you

16   make?

17             JUROR:  I would have to find

18   somebody.

19             THE COURT:  Have you -- is there

20   family members or neighbors that you have called

21   on in the past for help?

22             JUROR:  Just family members, if

23   they were able to.

24             THE COURT:  Do you have some
```

```
 1      family members right in the area who somehow

 2      help with that?

 3                      JUROR:  Sometimes.

 4                      THE COURT:  Who -- I know it seems

 5      a little noisy, but I really am trying to get a

 6      scope and understanding of what your support

 7      network is, because this is -- to be called to

 8      serve on a jury is simultaneously a burden and a

 9      responsibility and an honor, and also people

10      would just as soon do away with the honor and

11      with the burden.  But if you needed to do it,

12      who is in the area that could help you?

13                      JUROR:  My sister, but she doesn't

14      get off until 5:00.

15                      THE COURT:  Okay.  Anybody else?

16                      JUROR:  She's the only one.

17                      THE COURT:  Okay.  And as for your

18      dad's work, does the fact that your dad works in

19      a field that deals with technology.

20                      JUROR:  Computers.

21                      THE COURT:  Computers, would that

22      prevent you from being fair and listening to

23      both sides in a case that's about technology?

24      Could you hear the evidence in both sides and
```

```
 1        treat the parties fairly?

 2                    JUROR:  Uh-huh.

 3                    THE COURT:  You're saying yes,

 4        yes, you could be fair?

 5                    JUROR:  Yes.

 6                    THE COURT:  Great.  Mr. Cawley,

 7        any questions?

 8                    MR. CAWLEY:  Just one.  Ms. Myers,

 9        I couldn't hear you completely.  What did you

10        say about Excel?

11                    JUROR:  My dad works for Excel

12        Business.

13                    MR. CAWLEY:  That's the name of

14        his company?

15                    JUROR:  Uh-huh.

16                    MR. CAWLEY:  Okay.  And could you

17        tell us just a little bit more about what they

18        do.

19                    JUROR:  They fix computers and

20        copiers.

21                    MR. CAWLEY:  Great.  That's all

22        the questions I have.  Thank you.

23                    THE COURT:  Ms. Brooks.

24                    MS. BROOKS:  One quick question.
```

```
 1    Do you think the child care situation, that if

 2    you were picked as a juror you might have

 3    trouble really focusing on the evidence if you

 4    were very concerned about your kid, do you think

 5    that's a possibility?

 6                  JUROR:  Yes.

 7                  MS. BROOKS:  Thank you.

 8                  THE COURT:  Thanks very much.

 9                  Applications?

10                  MR. CAWLEY:  No, Your Honor.

11                  MS. BROOKS:  Your Honor, having

12    been a mother myself, I would think she would

13    really feel, really have trouble focusing when

14    she's worried who is going to pick up her

15    children and the arrangements she would have to

16    make.

17                  THE COURT:  Well, I'm inclined to

18    agree.  And I'm putting her in our maybe bucket

19    because she does have some family support here,

20    but I am concerned, unless she could verify

21    that, she would have trouble, so I think that's

22    a high likelihood we'll strike her for cause.

23    If it looks like we may be shorthanded, I'll

24    want to ask her a few questions and press her
```

```
 1        and give her a chance to check with her sister

 2        and see if she could get covered.

 3                        Anybody else on that second row

 4        who had a yes to one or more of my questions?

 5                        Good morning, ma'am.  Come right

 6        in.  Can I have your name for the record,

 7        please?

 8                        JUROR:  Alexis Kelly.

 9                        THE COURT:  Ms. Kelly, you had a

10        yes to one or more of my questions.

11                        JUROR:  Multiple questions.  I've

12        had Microsoft stock for years.  I got various

13        Microsoft certifications, including CPlus.  I

14        can rebuild and computer from scratch, hardware,

15        software, all internal parts.  I have been doing

16        that technical stuff for years.  I have

17        knowledge of this case, the lawsuit itself.  It

18        has to do with dynamic web page refresher;

19        correct?

20                        THE COURT:  Yes.

21                        JUROR:  Yes.

22                        THE COURT:  Were there any other

23        questions you had a yes to?

24                        JUROR:  I don't think so.
```

```
 1                    THE COURT:  Okay.  Let's move
 2          through those one at a time.
 3                         First, you have had Microsoft
 4          stock for years.  Without revealing numbers, the
 5          important question is, does the fact that you
 6          have an investment in Microsoft, is that
 7          something that would prevent you from hearing
 8          both sides in this case?
 9                    JUROR:  Absolutely.  I think
10          they're a reputable company.
11                    THE COURT:  So Parallel Networks
12          put on its evidence, you wouldn't be able to
13          hear what they had to say how that applies to
14          Microsoft?
15                    JUROR:  I don't believe so, no.
16          Also my affiliation with my company would
17          probably prevent me from.
18                    THE COURT:  Who are you affiliated
19          with?
20                    JUROR:  Verizon.
21                    THE COURT:  You work for Verizon?
22                    JUROR:  Yes.
23                    THE COURT:  What's the
24          affiliations?
```

1              JUROR:  We work with Microsoft on

2     various different levels and different parties

3     and different systems and things throughout the

4     years, so that's a pretty good -- it's to my

5     best interest that they continue forward.

6              THE COURT:  All right.

7              Mr. Cawley, any questions?

8              MR. CAWLEY:  No.

9              MS. BROOKS:  Thank you.

10             THE COURT:  Thanks, Ms. Kelly.

11             Applications.

12             MR. CAWLEY:  I think I do apply

13    that she be stricken for cause, Your Honor.

14             THE COURT:  Okay.

15             MS. BROOKS:  I would point out

16    while she was talking about it, she was pretty

17    negative to Parallel Networks and the patents

18    and stuff.  Just for full disclosure for the

19    Court, there was a lot of invention and stuff

20    going around in her space.

21             THE COURT:  Okay.  We're striking

22    for cause.

23             Anybody else on that row who had a

24    yes to one or more of my questions?

```
 1                    Thank you sir.  Come right in.

 2                    JUROR:  Good morning.

 3                    THE COURT:  Can I have your name

 4        for the record?

 5                    JUROR:  William Autman.

 6                    THE COURT:  Mr. Autman, do you

 7        remember your juror number?

 8                    JUROR:  Two.

 9                    THE COURT:  Number two.

10        Mr. Autman, you had a yes to one or more of the

11        things I asked?

12                    JUROR:  Yes.

13                    THE COURT:  Tell us about that,

14        please.

15                    JUROR:  As a sales rep my job is a

16        hundred percent commission.  If I'm not at work

17        for a week or a week plus, I'm probably not

18        going to be able to pay my bills next month.

19                    My wife has a fractured ankle and

20        its happens to be her driving foot so she can't

21        drive our son to and from school.  I have also

22        done networking in my house and I have a deacon

23        class in college.

24                    THE COURT:  As for the first
```

```
 1     point, which is a pretty big point, is there --

 2     is the finance or the commission phase that you

 3     work --

 4                    JUROR:  If I don't go out and

 5     bring in business this week, it's all based on I

 6     get paid money next month.  If I'm out for a

 7     week, week-and-a-half, I can't bring in any

 8     business.

 9                    THE COURT:  What sales?

10                    JUROR:  I'm a wholesales mortgage

11     representative.  I work for Equos Lending out in

12     California.  I work with mortgage brokers and

13     get them to bring their loans into my company.

14     And I get a percentage of the volume I bring in.

15                    THE COURT:  Is that something that

16     they have defined hours on?

17                    JUROR:  There is really -- I get

18     phone calls and E-mails all day every day, so

19     there is really no set hours, but I mean, give

20     or take, I work 8:30 to 5:00, 8:30 to 6:00.

21                    THE COURT:  Do you work across

22     time zones?

23                    JUROR:  For the most part I work

24     primarily in the east.  I do work, my company is
```

```
 1     based out in California, so it does vary

 2     depending on who needs what or what time?

 3                    THE COURT:  Okay.  Now, with

 4     respect to the home situation, any --

 5                    JUROR:  A disaster, my life sucks

 6     right now.

 7                    THE COURT:  Is there any family

 8     support outside your home?

 9                    JUROR:  My mother-in-law helps

10     out, but you pull one of us out of the rotation

11     and things are going to crumble quick.

12                    THE COURT:  Okay.  But she does

13     help out?

14                    JUROR:  She does, yeah.

15                    THE COURT:  Okay.  And the

16     networking that you have done in your own home,

17     you have developed some knowledge about how to

18     manage that?

19                    JUROR:  Setting up wireless,

20     pretty basic, straightforward stuff.

21                    THE COURT:  Would it prevent you

22     -- if you ended up on the jury, would that

23     information prevent you from being fair and

24     impartial to both sides?
```

```
1              JUROR:  No, not at all.

2              THE COURT:  And it's certainly not

3    ideal, so you have to put it life is less than

4    we would like it to be, if you were selected to

5    serve the jury, could you be fair to both sides?

6              JUROR:  Absolutely.

7              THE COURT:  Okay.  That's really

8    the key question.

9              Mr. Cawley, do you have any

10   questions.

11             MR. CAWLEY:  Just a couple.  So

12   when did your wife injure her ankle?

13             JUROR:  It was about a month ago.

14   It was a compound fracture in the tibia and the

15   fibula.

16             MR. CAWLEY:  Wow.

17             JUROR:  Yeah, she did it right.

18             MR. CAWLEY:  If you were selected

19   to serve on the jury given what you have told us

20   about your wife, your kids, your mother-in-law,

21   do you think that those things would be a

22   distraction to your being able to focus on the

23   evidence?

24             JUROR:  A hundred percent.  And I
```

```
 1    only say that because I'm so stressed out right

 2    now it's not even funny.  All I think about is

 3    getting my kid there, my wife over there.  I

 4    have been here for three months, and I'm like

 5    great, I got to take a week off already, so

 6    yeah, I got a lot going.

 7                    MR. CAWLEY:  Thank you.

 8                    MS. BROOKS:  My question is if

 9    this were perhaps a year from now and you had

10    been here longer and your wife had healed, do

11    you think you would be in a much better state?

12                    JUROR:  Absolutely, but I would

13    still be concerned about my commission based

14    job.

15                    MS. BROOKS:  Sure.  I just

16    wondered, if this is sort of as bad as it gets

17    and hopefully it will get better.

18                    JUROR:  Yeah, as long as its gets

19    better, I hope a year from now I will feel

20    better.

21                    MS. BROOKS:  Thank you.

22                    THE COURT:  Thanks very much.  I

23    appreciate it.

24                    JUROR:  Thank you.
```

```
1                    THE COURT:  Applications?

2                    MR. CAWLEY:  Move to strike for

3        cause, Your Honor.  He said very emphatically he

4        didn't think he could focus on the evidence.

5                    MS. BROOKS:  I agree with him.

6                    THE COURT:  Okay.  Strike him.

7                    Next row back, and thank you very

8        much for you are patience.  We're making

9        progress, ladies and gentlemen.

10                    The next row back, first person

11       that had a yes to one or more of my questions,

12       please come forward.

13                    Hi.  Can you give me your name for

14       the record?

15                    JUROR:  Kami Beers.

16                    THE COURT:  Ms. Beers, do you

17       remember your juror number?

18                    JUROR:  Six.

19                    THE COURT:  You had a yes to one

20       of my questions.  Please tell us about that.

21                    JUROR:  I believe one of your

22       questions was have you served as a juror on a

23       civil trial before, and that is yes, it was a

24       personal injury between a tenant and a landlord
```

```
 1    and that was in January.

 2                    THE COURT:  In state court?

 3                    JUROR:  Yes.

 4                    THE COURT:  Just a few months ago.

 5    Down in Kent County?

 6                    JUROR:  Yes.

 7                    THE COURT:  How long a trial was

 8    that?

 9                    JUROR:  It was a five-day trial.

10                    THE COURT:  Now, we'll come back

11    to that.  Any other why questions that you had?

12                    JUROR:  No, that was the only one.

13                    THE COURT:  Now, does the fact

14    that you already gave five days of your life to

15    serve on a jury in the state system, would that

16    prevent you from being fair and impartial if you

17    were asked to serve on this jury?

18                    JUROR:  No.

19                    THE COURT:  And how did the trial

20    come out?  Who did the jury find for in the

21    landlord/tenant personal injury suit?

22                    JUROR:  Found for the landlord,

23    for the defendant.

24                    THE COURT:  For the defendant.
```

1      Okay.  In this case, as I already indicated,

2      it's about patents.  You have served on a jury

3      where you found for a defendant.  Would that --

4      would you have a bias toward the defendant in

5      this case just because you found for the

6      defendant in this last case?

7                     JUROR:  Not at all.

8                     THE COURT:  So you could hear both

9      sides with an open mind and make a judgment on

10     that and judge this case based solely on the

11     case?

12                    JUROR:  Yes.

13                    THE COURT:  Mr. Cawley?

14                    MR. CAWLEY:  No.

15                    MS. BROOKS:  I have one.  His

16     Honor asked do you think if it comes time for a

17     verdict and the jury is strongly leaning toward

18     the defense that you might think that I can't

19     come back with two defense verdicts in a row and

20     lean more toward the plaintiff?

21                    JUROR:  No, absolutely not.

22                    THE COURT:  Thank you so much.  I

23     appreciate it.

24                    Applications?

```
 1                    MR. CAWLEY:  None from the

 2       plaintiff, Your Honor.

 3                    MS. BROOKS:  No, Your Honor.

 4                    THE COURT:  Thanks.

 5                    The next person on that row had a

 6       yes to one or more of my questions, please come

 7       forward.

 8                    Good morning, ma'am.

 9                    JUROR:  Good morning.

10                    THE COURT:  Can you please give us

11       your name for the record?

12                    JUROR:  It's Deborah Free.

13                    THE COURT:  Ms. Free, do you

14       remember your juror number?

15                    JUROR:  Thirteen.

16                    THE COURT:  You had a yes to one

17       or more of the questions I asked.  Can you tell

18       us about that, please?

19                    JUROR:  A few.

20                    THE COURT:  Just run through all

21       of them and then we'll run --

22                    JUROR:  I think you asked if we

23       open to the idea of stock, I'm not sure, I have

24       a person that handles that.  Patents, the
```

```
 1    company that I worked for, he has at least five

 2    or six.  I work with a software engineering

 3    occasionally, so I know he writes code.  And I

 4    think you asked a civil lawsuit, I was in one

 5    once.

 6                 THE COURT:  And that covers all

 7    the yeses?

 8                 JUROR:  I think so.

 9                 THE COURT:  Let's take those one

10    at a time.  So you have some investments, but

11    you don't know whether they involve Microsoft or

12    Parallel Networks?

13                 JUROR:  No idea, I just get a

14    statement.  I don't read it.

15                 THE COURT:  Like so many of us.

16    So your finances, you wouldn't be bias for or

17    against anybody in this case?

18                 JUROR:  None at all, no.

19                 THE COURT:  Now, you know somebody

20    who does some work with software?

21                 JUROR:  Yes.

22                 THE COURT:  That wouldn't --

23    again, the real question, all the questions

24    we're asking is to try to find out could you be
```

1      fair to both sides and hear the evidence in this

2      case with an open mind without being predisposed

3      for or against either side?

4                    JUROR:  Yes.

5                    THE COURT:  So regardless of

6      knowing somebody who has some software

7      experience, you could do that?

8                    JUROR:  Yes.

9                    THE COURT:  What's the company you

10     work for?

11                   JUROR:  I work for a company that

12     does mail equipment so he has patents on

13     different things, on a machine.

14                   THE COURT:  Now, again, this case

15     involves one side, Parallel Networks saying hey,

16     we own a patent, Microsoft saying we don't

17     infringe it, we're not trespassing on your

18     rights and we don't think we have, that's a

19     bottom line dispute between the parties.

20                   Does the fact that either the

21     company you work for or the owner has patents,

22     would that prevent you from hearing again, with

23     an open mind, what both sides have to say about

24     the patent, about the defenses regarding the

```
1    patent, could you be fair and impartial despite
2    your boss holding patents?
3                    JUROR:  Absolutely, we should all
4    be fair.
5                    THE COURT:  Okay.  Very good.  And
6    I forget.
7                    JUROR:  Civil, I was in civil
8    cases.
9                    THE COURT:  Civil, right.  How
10   long ago was that?
11                   JUROR:  At least six, seven years
12   ago.
13                   THE COURT:  Can you describe for
14   me?
15                   JUROR:  Yeah, someone came to
16   paint our house and he did not complete the
17   work.  He sued us because we didn't pay them.
18   And we came out winners because he did not
19   complete it.
20                   THE COURT:  Okay.  Was that a suit
21   here in Delaware?
22                   JUROR:  It was here in one of
23   these courts and the judge favored -- gave a
24   decision in our favor.
```

```
 1                    THE COURT:  Having had that
 2      experience yourself of being a defendant, would
 3      that bias you in favor of the defense here?
 4                    JUROR:  No, no, either way.
 5                    THE COURT:  You could hear both
 6      sides?
 7                    JUROR:  Absolutely.  That's the
 8      government at work.
 9                    THE COURT:  There you go.  I'm
10      going to ask Mr. Cawley, does he have any
11      questions?
12                    MR. CAWLEY:  Just a couple.
13                    What do you do at work?
14                    JUROR:  I am customer service.  I
15      go out in the field and deal with customers and
16      make them happy.
17                    MR. CAWLEY:  Great.
18                    THE COURT:  Ms. Brooks.
19                    MS. BROOKS:  Has your employer
20      ever been in a patent litigation?
21                    JUROR:  Yes.
22                    MS. BROOKS:  Can you tell me about
23      that.
24                    JUROR:  I don't know a lot, other
```

```
 1     than he went to court, and he -- I think he's
 2     been in more than one.  I'm not really sure.  I
 3     think he might have lost, because he's been more
 4     than once.  And that was at least three or four
 5     years ago.
 6               MS. BROOKS:  Is there anything in
 7     that experience he may have mentioned to you one
 8     way or another that may cause you potentially to
 9     favor one side or the other?
10               JUROR:  No.
11               MS. BROOKS:  Thank you.
12               THE COURT:  Thanks.  I appreciate
13     it.
14               MR. POFF:  Your Honor, my firm
15     does patent representation, and we have been her
16     boss's lawyer.  I don't think she knows that,
17     but I don't want the lightbulb to go off at some
18     point.
19               THE COURT:  Maybe we should bring
20     her up and ask her about that.  Okay.
21               Ms. Free, I apologize.  I should
22     have asked the question and I didn't.  Could you
23     just come back for one more quick question.  My
24     apologies, ma'am.
```

```
 1                    Sorry to make you get that extra

 2       exercise coming back.

 3                    JUROR:  I could use it today.

 4                    THE COURT:  What's the name of

 5       your employer's business?

 6                    JUROR:  Tritech.

 7                    THE COURT:  Tritech.  If it were

 8       the case that either of these parties had any --

 9       had represented Tritech in any fashion

10       previously --

11                    JUROR:  I know he has lawyers, and

12       I'm pretty sure it's neither of these, because I

13       know who they are.

14                    THE COURT:  But if it were, would

15       that affect your ability to be fair and

16       impartial?

17                    JUROR:  No.

18                    THE COURT:  Okay.  All I need to

19       know.  Thanks so much.  All right.

20                    Applications.

21                    MR. CAWLEY:  No, Your Honor.

22                    MS. BROOKS:  No, Your Honor.

23                    THE COURT:  Thanks.  She stays in

24       the pool.  We're about halfway through the panel
```

```
1    now, so what I'm going to start doing, I don't

2    think anybody will pay any attention to this at

3    all, but I'm going to start Ms. Brooks first now

4    if she's got applications in case anybody is

5    looking and paying attention and saw me looking

6    at you first.  I'm letting you guys both know

7    why I'm changing the pattern.

8                Okay.  Anybody on that same row,

9    next one who had a yes to one or more of my

10   questions, I'll ask you to please come forward.

11               Good morning, sir.  Please come

12   right in.  Can I get your name for the record?

13               JUROR:  Steve Straneva.

14               THE COURT:  Mr. Straneva, do you

15   remember your juror number?

16               JUROR:  38.

17               THE COURT:  Now you had a yes to

18   one or more of my questions, Mr. Straneva.  Can

19   you please tell me about that?

20               JUROR:  A number.  I'll do as many

21   as I can remember.

22               First I'm a retired accountant and

23   active investor and I have been in and out of

24   Microsoft stock on numerous occasions.
```

1          THE COURT:  Are you in it now?

2          JUROR:  I'm out right now.

3          My wife was a director of

4   technology for a public school system and

5   received an online masters degree.  I think that

6   was one of the questions.

7          I have a nephew that currently is

8   a network specialist for the Department of

9   Defense as a civilian, civilian employee.  I'm

10  trying to think of the other ones.  Early in my

11  career I was involved in the startup software

12  company for community mental health center

13  systems.

14          THE COURT:  So you had some --

15  when you say start up, you were involved on the

16  technology side?

17          JUROR:  Actually I was the CFO of

18  a mental health center that helped develop and

19  test CAT software.  And I can't remember any of

20  the other ones right now.

21          Well, the other ones dealt

22  primarily with the parties, I don't know any of

23  the people here.

24          THE COURT:  Okay.  Well, let's go

```
1      through those.  Here is what's going to be the

2      bottom line question, so I'm going to be asking

3      this in various different ways.  Does anything

4      that you have told me cause you to think that

5      you can be less than fair, that you would have a

6      problem being impartial and listening to both

7      side's evidence and arguments in this case where

8      they're trying to get impartial people to help

9      us sort out their dispute?

10              JUROR:  Honestly I don't know how

11     to answer that because, you know, I have had

12     quite extensive deals with Microsoft, and

13     they've not all been good.  So I can't honestly

14     say that I can do that.

15              THE COURT:  What was your

16     experience with Microsoft that was less than

17     happy?

18              JUROR:  A lot of it, currently

19     Microsoft 10, to me it's a disaster.  And my

20     wife is hard core Apple, and so, I listen to

21     that at home all the time.

22              So I don't know how to answer

23     that.

24              THE COURT:  Well, the only way to
```

```
 1      answer it is to test your own intuition about

 2      your capacity, and set aside things -- so, for

 3      example, whether you like Microsoft 10 or not

 4      has nothing to do with whether Microsoft

 5      infringes the patent that Parallel Networks says

 6      they infringe; right?

 7                  So the question would be, in

 8      hearing that, could you say, well, I don't like

 9      Microsoft 10, but that doesn't have anything to

10      do with this, I'm going to pay attention to this

11      evidence.  That's really the gut check question

12      that I need to hear the answer to, and I'm not

13      asking you to be less than honest about it.  If

14      your answer to that is no, I couldn't be fair,

15      we need to hear that.  If your answer is, yeah,

16      I have had a less than happy experience with

17      Microsoft, but I could still be fair, I need to

18      hear that.

19                  JUROR:  I think I can be fair.  I

20      mean, I guess that's the best I can say.

21                  THE COURT:  That's pretty much all

22      that we can ask of anybody is that they do their

23      best to be fair and not let things outside the

24      courtroom invade their decision making in the
```

```
 1    courtroom.
 2                     Let's go through these that you
 3    said yes to a little more carefully.  In
 4    developing the software that you developed, did
 5    you have any experience with that that in a case
 6    involving software would bias you for or against
 7    someone who claims inventorship rights in
 8    software?
 9                     JUROR:  I can't think it would
10    bias you.
11                     THE COURT:  And because of your
12    wife's job or your nephew's job, you may hear
13    views about software, same question, could you
14    set that aside and say I'm paying attention to
15    this and I'm going to be fair?
16                     JUROR:  I think I could, because
17    there -- one is on one side, one is on the other
18    side, so I'm in the middle.
19                     THE COURT:  So balancing out the
20    family dynamic.  So you wouldn't be worried
21    about if I go home and tell my wife I found for
22    Microsoft, her being a hardcore Apple person,
23    I'm going to smell the proverbial underworld for
24    a while on that, you wouldn't be concerned about
```

```
1      that?
2                       JUROR:  No, I don't think so.
3                       THE COURT:  Okay.  And you have
4      mentioned your investments, you're not in
5      Microsoft now, so I presume that wouldn't be an
6      issue for you in deciding this case, would it?
7                       JUROR:  I don't think so.
8                       THE COURT:  Ms. Brooks.
9                       MS. BROOKS:  Thank you.  So you
10     mentioned you have been in and out of Microsoft
11     stock, right now you're out.  Is there any
12     particular reason that you decided to be out of
13     Microsoft stock.
14                      JUROR:  Because it has risen so
15     much, I had a nice profit in it, so I took the
16     profit.
17                      MS. BROOKS:  And you mentioned you
18     have some fairly hard feelings towards Windows
19     10.
20                      JUROR:  Yes.
21                      MS. BROOKS:  If at the end of this
22     case, it's a close call between whether Parallel
23     Networks is right or Microsoft is right, do you
24     think those hard feelings might cause you to
```

```
 1    favor Parallel Networks a little more than

 2    Microsoft?

 3                    JUROR:  I would like to say that

 4    it wouldn't, but I don't know.

 5                    MS. BROOKS:  Did you say you don't

 6    know?

 7                    JUROR:  I don't know.  I would

 8    like to think that I'm a better person than

 9    that.  Okay?

10                    MS. BROOKS:  Thank you, sir.  I

11    appreciate that.  Thank you.

12                    THE COURT:  Mr. Cawley?

13                    MR. CAWLEY:  Tell us a little bit

14    about your practice when you were still

15    practicing accounting.

16                    JUROR:  Well, I've worked -- first

17    I started out in public accounting, I worked for

18    CPA firms, then I went into nonprofits and spent

19    the majority of my career in nonprofits.  And

20    then I went to public education and was in

21    public education.  In all of them, I was an

22    accountant or CFO.

23                    MR. CAWLEY:  Have you had any

24    experience in determining the amount of a
```

```
 1      reasonable royalty for a patent?

 2                   JUROR:  No.

 3                   MR. CAWLEY:  Are you a programmer?

 4                   JUROR:  No.

 5                   MR. CAWLEY:  So the software

 6      development that you have done, describing to

 7      us, you were more of a financial business side

 8      than a technical side?

 9                   JUROR:  Yeah.

10                   MR. CAWLEY:  That's all the

11      questions I have, Your Honor.

12                   THE COURT:  Thank you very much,

13      sir.  I appreciate it.

14                   Any applications?

15                   MS. BROOKS:  Yes, Your Honor, I

16      would challenge for cause.  He's very candid, he

17      said he would like to be a better person than

18      that, but he really didn't know.  And we can't

19      wait for the end of the trial to make that

20      determination.

21                   THE COURT:  Mr. Cawley?

22                   MR. CAWLEY:  We oppose that.  I

23      don't think we heard anything that rises to the

24      level of cause.
```

```
 1                    THE COURT:  He was -- I'm going to
 2       deny that application.  I think his expressions
 3       were some people are more careful about
 4       assessing themselves.  I'm not prepared -- I'm
 5       prepared to give him the benefit of the doubt
 6       that he is saying I think I'm better than that,
 7       I would like to think I'm better than that.  On
 8       a few occasions in that discussion I had with
 9       him, he indicated that he thought he could set
10       aside the bad experiences that he's had with
11       Windows 10, so I'm keeping him in the pool.
12                    Next person on that row, if any,
13       who had a yes to one or more of my questions.
14                    Hi.  Ma'am, can I have your name
15       for the record?
16                    JUROR:  Dawn Hester.
17                    THE COURT:  Ms. Hester, do you
18       remember your juror number?
19                    JUROR:  Eighteen.
20                    THE COURT:  You had a yes to one
21       or more of the questions I asked.  Can you tell
22       us about that?
23                    JUROR:  I worked with a company
24       that had patent, I used to work for DuPont.  I
```

```
 1        didn't deal with patents.

 2                    THE COURT:  You didn't deal with

 3        patents?

 4                    JUROR:  Yes.

 5                    THE COURT:  You answered yes to my

 6        other questions.

 7                    JUROR:  There was questions about

 8        the household website.  My husband works in IT.

 9        There also was a question about training.

10                    THE COURT:  Training.

11                    JUROR:  So he has done multiple

12        trainings and certifications in the IT space.

13                    THE COURT:  Any other yeses?

14        We'll cover these, I just want to get it all on

15        the table first.

16                    JUROR:  Just child care restrains,

17        I need to be out of here by 4:30 daily.

18                    THE COURT:  When do you typically

19        pick your child up by child care?

20                    JUROR:  I have to get her by 5:30.

21        She's in Middletown.

22                    THE COURT:  We will be out of here

23        by 4:30 for sure.  There aren't many things in

24        my life I can control, but I can control that.
```

```
 1                     As to your husband's IT training

 2      and experience, would that prevent you from

 3      being fair and impartial in the case that

 4      involves software?

 5                     JUROR:  No.

 6                     THE COURT:  Okay.  Do you ever

 7      talk about his -- the technical aspects of his

 8      job with him?

 9                     JUROR:  Maybe at a high level.

10                     THE COURT:  So he's not chatting

11      with you about the coding when you're sitting

12      around the dinner table?

13                     JUROR:  No.  No.

14                     THE COURT:  In your experience

15      with DuPont, you have a very large company that

16      has a big patent portfolio, would that bias --

17      would the fact that you work for a company that

18      had a lot of patents, would that bias you in

19      favor or against the patentholder?

20                     JUROR:  No.

21                     THE COURT:  So you could hear both

22      sides' arguments you think?

23                     JUROR:  Yes.

24                     THE COURT:  Ms. Brooks.
```

```
1                    MS. BROOKS:  Your husband works in

2       IT, you said you might talk at a high level.

3       Has he ever complained about any performance

4       issues with Microsoft products?

5                    JUROR:  No.  I'm a Microsoft user

6       myself.

7                    MS. BROOKS:  Thank you very much.

8                    THE COURT:  Mr. Cawley.

9                    MR. CAWLEY:  Where does your

10      husband work?

11                   JUROR:  JP Morgan Chase.  I work

12      there as well.

13                   MR. CAWLEY:  And he's -- he's

14      actually in IT at JP Morgan Chase.

15                   JUROR:  Yes.

16                   MR. CAWLEY:  You're a program

17      manager.  Tell us what you do.

18                   JUROR:  I work on the credit side,

19      so I work with merchants.

20                   MR. CAWLEY:  Thank you.

21                   THE COURT:  Thanks, Ms. Hester.  I

22      appreciate it.

23                   Ms. Brooks.

24                   MS. BROOKS:  No application.
```

```
 1                  THE COURT:  Mr. Cawley.

 2                  MR. CAWLEY:  No application.

 3                  THE COURT:  She stays in the pool.

 4                  The next individual on that row

 5     who had a yes to one or more of my questions,

 6     please come forward.

 7                  Thank you, sir.  Can I have your

 8     name for the record?

 9                  JUROR:  Zachary Swan.

10                  THE COURT:  Swan.  Mr. Swan.

11                  JUROR:  Yes.

12                  THE COURT:  Mr. Swan, do you

13     remember your juror number?

14                  JUROR:  39.

15                  THE COURT:  Now, you had a yes to

16     one or more of the questions I asked.  Can you

17     tell us about that?

18                  JUROR:  Yes.  The first one was

19     the child care.  I have to watch my daughter.  I

20     watch her every day.  I don't have anybody to

21     fill in that spot for me.

22                  The other thing is I had

23     Microsoft, or the PowerPoint and all that

24     training in college, so I didn't know if that --
```

```
 1                    THE COURT:  That's important.

 2     That's one of the things we want to know.

 3     Anything else?

 4                    JUROR:  That's it.

 5                    THE COURT:  Take the last one

 6     first.  The fact that you learned some things

 7     about Microsoft products, how to operate the

 8     PowerPoint software, would that prevent you from

 9     being fair in the case for Microsoft?

10                    JUROR:  No.

11                    THE COURT:  As to the child care

12     issues, do you have any family support or other

13     network support who covers for you if for some

14     reason you're unable to pick your child up from

15     daycare?

16                    JUROR:  She doesn't go to daycare.

17                    THE COURT:  You stay home?

18                    JUROR:  Yeah, because I work -- my

19     and my wife's schedules are different.  I work

20     night shift and watch the baby during the day

21     and she works day shift.

22                    THE COURT:  I understand.  Do you

23     have any family members or other people who

24     cover for you if for some reason you're not able
```

```
 1      to watch your child during the daytime?
 2                  JUROR:  Every once in a while we
 3      get my sister-in-law, but she has a two-year-old
 4      as well, and she works from home, so trying to
 5      watch her two-year-old and work as well.
 6                  THE COURT:  Difficult.
 7                  JUROR:  Yeah.
 8                  THE COURT:  Any other family
 9      members or people who have pitched in in the
10      past?
11                  JUROR:  No, that's it.
12                  THE COURT:  Okay.  Ms. Brooks.
13                  MS. BROOKS:  Mr. Swan, what's your
14      job at night?  What is the schedule.
15                  JUROR:  11:00 p.m. to 7:00 a.m.
16                  MS. BROOKS:  I don't mean to pry,
17      but during the day when your child naps, do you
18      take an opportunity to nap?
19                  JUROR:  Yes, I try to nap at the
20      same time she does.
21                  MS. BROOKS:  So if you're in
22      trial, unfortunately you won't be able to nap,
23      are you going to be -- when are you going to
24      sleep?
```

```
 1                    JUROR:  I'll try to see if they
 2        give me time off.
 3                    MS. BROOKS:  Thank you, Mr. Swan.
 4                    JUROR:  You're welcome.
 5                    MR. CAWLEY:  Thank you, Mr. Swan.
 6        I don't have any questions.
 7                    THE COURT:  Thank you, sir.
 8                    MS. BROOKS:  I feel for him, but I
 9        don't know if it's for cause.  That's a harsh
10        schedule.
11                    THE COURT:  Yes, it is.
12                    Mr. Cawley.
13                    MR. CAWLEY:  You know, I think it
14        may rise to the level of cause, Judge, so I
15        guess I'm making an application for it.  It's
16        child care issue, but there is just a disruption
17        of bio issue that he's going to go from the
18        nighttime world to the daytime world.
19                    THE COURT:  Yeah.  And not to cast
20        aspersions, but not all patent cases are things
21        that wake you up, so it may be a challenge from
22        that perspective.  But I'm going to put him in
23        the same bucket with some of the others with
24        child care issues because I don't think the
```

```
 1      issues are much -- I mean, he's got the added

 2      problem of the schedule and that is an

 3      additional problem, but he'll be one of those

 4      ones, we'll put him in the question mark

 5      category.  Okay.

 6                  Next person on that row, if anyone

 7      who had a yes to one more of my questions.

 8                  Moving to the next row back from

 9      the aisle, moving toward the wall, first person

10      who had a yes to one or more of my questions,

11      please come forward.

12                  Good morning, sir.  Please come

13      right in, and give me your name for the record.

14                  JUROR:  Mike Long.

15                  THE COURT:  Mr. Long, do you

16      remember your juror number?

17                  JUROR:  22.

18                  THE COURT:  You had a yes to one

19      or more of the things I asked.  Can you tell us

20      about that, please.

21                  JUROR:  The biggest conflict is I

22      have work schedule conflict.  I do work for

23      Comcast Corporation, so I do engineering, so I'm

24      a little bit network, not much, most of it is
```

1    video.  Most of this my shift consist of working

2    from midnight to 8:00 in the morning, to do that

3    and to come in and do this would be difficult.

4    That's really the most conflict I have, that and

5    I have this bad toothache I need to get to the

6    dentist with.

7              THE COURT:  When did that develop?

8              JUROR:  I have had this tooth

9    thing, I had one extracted Tuesday, I think

10   there is an infection there.  The one up at the

11   top is giving me a problem.  I have to get to

12   the dentist like today, hopefully, that's a big

13   list.

14             THE COURT:  If it came to it and

15   you needed to talk to Comcast, you say your

16   current shift is a midnight to 8:00 shift?

17             JUROR:  It is, but this week and

18   all month, 8:00 a.m. to midnight we have

19   scheduled maintenance, we have to perform the

20   modification to the plant system because we got

21   the launch of the three dot system, we have all

22   this work, it's scheduled for the whole month,

23   all week, 12:00 to 6:00.

24             THE COURT:  12:00 to 6:00?

```
 1                    JUROR:  That's the window, yeah,

 2      we can shut everybody off and do our thing.

 3      Sorry.

 4                    THE COURT:  Does your knowledge

 5      about the technical side of things, would that

 6      prevent you from being fair in a case involving

 7      technology if you were selected to sit?

 8                    JUROR:  I don't think so.

 9                    THE COURT:  Thanks.

10                    Ms. Brooks.

11                    MS. BROOKS:  Yes.  Mr. Long, I

12      know when I have got a toothache, that's all I

13      can think about.

14                    JUROR:  That's all you think

15      about, yes.

16                    MS. BROOKS:  So if you got picked

17      for this jury and you weren't able to get this

18      taken care of, do you think you would be very

19      distracted?

20                    JUROR:  Yes, I have to get it

21      fixed either today or tomorrow, yes.

22                    MS. BROOKS:  Thank you so much.

23                    JUROR:  On top of trying to work

24      that shift.
```

```
 1                    THE COURT:  Mr. Cawley.

 2                    MR. CAWLEY:  Thank you, Mr. Long.

 3                    THE COURT:  Thanks very much,

 4      Mr. Long.

 5                    JUROR:  Thank you.

 6                    THE COURT:  Ms. Brooks.

 7                    MS. BROOKS:  Yes, I apply for

 8      cause, Your Honor.

 9                    MR. CAWLEY:  I don't know that it

10      rises to cause, although I would be inclined to

11      put him on the list that he already established

12      with several people on it.

13                    THE COURT:  You're a tough man,

14      Mr. Cawley.  I have had a toothache before, and

15      I just -- we just got to accept people as being

16      honest with us.  If he's concerned about an

17      infection in his mouth, that's a serious issue

18      that he really does have to attend to, so I hate

19      to let him go.  If it weren't for that, even

20      though he has got a schedule, I would keep him

21      in the mix.  I am worried about the medical side

22      of that.  So I'll excuse him.

23                    The next person on that row that

24      had a yes to one or more of my questions, please
```

```
 1        come forward.

 2                     Please come right up.

 3                     JUROR:  My biggest --

 4                     THE COURT:  Before you start, I

 5        have got to get your name.  Could you tell us

 6        your name for the record.

 7                     JUROR:  Hope Kramedas.

 8                     THE COURT:  Ms. Kramedas, do you

 9        remember your juror number?

10                     JUROR:  21.

11                     THE COURT:  You had a yes.

12                     JUROR:  So I'm a business owner,

13        so I have got a full-time business, I have a

14        gymnastics studio.  I have kids to pick up and

15        classes to do during the week.  To be here all

16        week would probably be my biggest thing.

17                     THE COURT:  The scheduling.

18                     JUROR:  Yeah.

19                     THE COURT:  Any other things you

20        had yes to?

21                     JUROR:  No.

22                     THE COURT:  Let's talk about that,

23        then.  So what's the name of your studio?

24                     JUROR:  Galaxy Gymnastics of
```

```
 1     Delaware.
 2                     THE COURT:  Just guessing.  How
 3     many folks work in your gym?
 4                     JUROR:  I have about five
 5     part-time people, and I'm the only full-time
 6     person.
 7                     THE COURT:  Now, when -- you said
 8     I have people I need to pick up.  Explain that.
 9                     JUROR:  I have kids at school.
10                     THE COURT:  Your own children?
11                     JUROR:  Yeah, besides my kid, I
12     pick up other kids, too, that come to the gym.
13                     THE COURT:  That come to the gym.
14                     JUROR:  Yeah.
15                     THE COURT:  How many days a week
16     are you picking kids up from school?
17                     JUROR:  Every day.
18                     THE COURT:  How many kids are you
19     picking up?
20                     JUROR:  Five to six.
21                     THE COURT:  And in the past when
22     you have had to make arrangements, I'm assuming
23     vacations and whatnot.
24                     JUROR:  I usually do things on the
```

```
 1        days that I don't -- Monday is actually a good

 2        day for me where I don't have to pick kids up.

 3        If I schedule anything, it's always on a Monday.

 4                    THE COURT:  Do you have family

 5        members, spouse, sibling, mother, mother-in-law,

 6        father, father-in-law, aunt, sister, anybody who

 7        covers for you when you need coverage?

 8                    JUROR:  Not with picking the kids

 9        up.  My -- my dad is seventy-five years old, his

10        car is not big enough to take -- he doesn't

11        drive my car, he drives a little car.

12                    THE COURT:  When you or your

13        family takes a vacation, do you just shut the

14        gym down?

15                    JUROR:  I do.  That's the only way

16        I do anything is when it's shut down.

17                    THE COURT:  The five part-time

18        workers, they cover for you on occasion?

19                    JUROR:  They all have jobs during

20        the day.  They usually come in at night.  I have

21        day classes, 10:00, 1:00 and 2:00 that I do by

22        myself, and my employees don't come in at 4:00,

23        they usually come in after their jobs.  I'm the

24        only daytime employee.
```

```
 1                    THE COURT:  Okay.  Now, are there

 2       other sources of income for your family besides

 3       Galaxy Gymnastics?

 4                    JUROR:  No.  I mean, my husband

 5       has a part-time, he is a DJ.

 6                    THE COURT:  All right.

 7       Ms. Brooks.

 8                    MS. BROOKS:  Ms. Kramedas, do you

 9       think that if you did get picked for the jury,

10       you would be so concerned with everything that

11       you weren't doing?

12                    JUROR:  Most likely.

13                    MS. BROOKS:  And you would have

14       trouble focusing on the evidence?

15                    JUROR:  You know, it's always in

16       the back of my mind.  It's in the back of my

17       mind right now with my kids.  And I have to go,

18       who is going to pick her up at this point.  It's

19       a huge concern.

20                    THE COURT:  It's always a concern

21       when we're off schedule.

22                    Anything else?

23                    MS. BROOKS:  No.  Thank you very

24       much.
```

1          MR. CAWLEY:  Thanks, Ms. Kramedas.

2     I have just one follow-up.  Who would be picking

3     up your child now?  Is your husband hours, is he

4     available to pick them up?  Let's take that

5     hypothetical, is it a son or daughter or both?

6          JUROR:  Daughter.

7          MR. CAWLEY:  If your daughter were

8     ill, would your husband be able to pick her up?

9          JUROR:  He would probably have to,

10    but that's not a good circumstance, especially

11    if I'm not working, that he is working and

12    losing money.

13          THE COURT:  Okay.  Here is the

14    bottom line of a key and important question.

15    Nobody wants to be picked for a jury in my

16    experience, but if you were picked for this

17    jury, could you be fair to these parties and not

18    hold it against them that you were here and not

19    at Galaxy Gymnastics?

20          JUROR:  I would have to.  That's

21    my duty.

22          THE COURT:  Could you do that

23    duty?

24          JUROR:  For five days?

```
 1                    THE COURT:  See, you have hit it
 2      exactly correct, that's exactly correct, that's
 3      the bottom line question, for five days.  If you
 4      had to sit here, could you say, I just got to
 5      listen to these parties and help them sort this
 6      out.
 7                    JUROR:  I would have if I got
 8      picked.
 9                    THE COURT:  You wouldn't want to,
10      but could you do it?
11                    JUROR:  I could.
12                    THE COURT:  Okay.  Thanks very
13      much, Ms. Kramedas.  I appreciate your time.
14                    Applications.
15                    MS. BROOKS:  Could we put her on
16      maybe?
17                    MR. CAWLEY:  That's what I would
18      do, Judge.
19                    THE COURT:  Let's put her on the
20      maybes.
21                    Next person on that row that had a
22      yes to one or more of my questions, if you could
23      please come forward.  Come right up here and
24      could I have your name, please.
```

```
 1                    JUROR:  Joy Baker.

 2                    THE COURT:  Ms. Baker, do you

 3        remember your juror number.

 4                    JUROR:  Three.

 5                    THE COURT:  You had a yes to one

 6        or more of the questions asked.  Could you tell

 7        us about that, please.

 8                    JUROR:  I have some conflicts with

 9        the amount of days, the whole beginning every

10        week, even up to four days would be okay.  I

11        have a major conflict on Friday, two major

12        conflicts on Friday.

13                    THE COURT:  Can you tell us what

14        that is without major embarrassment to yourself?

15                    JUROR:  It's not.  My daughter is

16        a dancer, and she has a dance recital, and she

17        has to be at the studio at 3:00.  And then I

18        have show tickets at 5:00.

19                    THE COURT:  Where?

20                    JUROR:  In Philadelphia, and they

21        cost a significant amount of money.

22                    THE COURT:  For what show?

23                    JUROR:  It's for a concert.

24                    THE COURT:  Who are you going to
```

```
 1      hear?

 2                      JUROR:  Metallica.

 3                      THE COURT:  Metallica.  Good for

 4      you.  That's great.

 5                      JUROR:  Just cost a lot of money.

 6                      THE COURT:  I say this, it's going

 7      to sound facetious, but it's going to sound half

 8      serious.  Is there a warm up act for Metallica?

 9                      JUROR:  There is two, but I don't

10      know much about them.

11                      THE COURT:  So you going to see

12      Metallica; right?

13                      JUROR:  Right.

14                      THE COURT:  So it wouldn't be

15      ideal to get there late, but if you missed Def

16      Leopard --

17                      JUROR:  The most important issue

18      is my daughter dances all year and it's

19      something I can't miss, and she can't miss.

20                      THE COURT:  Something she can't

21      miss.

22                      JUROR:  It's something we do

23      together.  Every other day I'm perfectly fine,

24      I'm just very concerned about Friday.
```

```
 1                    THE COURT:  Let's set the concert

 2       piece aside, if -- knowing you wouldn't want to

 3       miss, surely you wouldn't want to miss your

 4       concert, her recital, I'm sorry, but in terms of

 5       getting her there, her dad could get her there

 6       if it came to it?

 7                    JUROR:  I guess he could take her.

 8                    THE COURT:  Okay.  This is a hard

 9       question, and again it's not factitious, I ask

10       you, if you were picked and you had to make

11       those arrangements -- by the way, when is the

12       recital itself?

13                    JUROR:  She's got to be there at

14       3:00.

15                    THE COURT:  When is the recital?

16                    JUROR:  I have to pick her up at

17       2:00 because she has to be there at 3:00 at the

18       studio.

19                    THE COURT:  When does it start?

20                    JUROR:  3:00.  She has to be there

21       at 3:00.

22                    THE COURT:  The dancing starts at

23       3:00?

24                    JUROR:  Right after, yes.
```

```
 1                    THE COURT:  Would you hold it

 2      against these parties if you were picked and

 3      asked to serve and the time pushed into that,

 4      would you resent them in a way that would

 5      prevent you from being fair and impartial?

 6                    JUROR:  I don't mean to be rude,

 7      but probably yes.

 8                    THE COURT:  That's okay.  The

 9      being honest is very, very important.

10                    JUROR:  She's wanted to do this, I

11      have been coming up, I have never been picked

12      and I have -- but just it falls at a really bad

13      time.

14                    THE COURT:  Okay.  Understood.

15      Let these other folks ask questions.

16                    Ms. Brooks.

17                    MR. BROOKS:  No.  Thank you very

18      much.

19                    THE COURT:  Mr. Cawley?

20                    MR. CAWLEY:  No questions.

21                    JUROR:  Thank you.

22                    THE COURT:  Thanks so much,

23      Ms. Baker.

24                    Okay.  Applications.
```

```
 1              MS. BROOKS:  Well, actually Your
 2      Honor, I have done the math of the nine and nine
 3      hours, I think we're getting it to the jury by
 4      midday Thursday with that math, in which case --
 5              THE COURT:  We ought to be okay.
 6              MS. BROOKS:  We should be okay.
 7      And if there is -- we can consider having the
 8      jury come back Monday.
 9              THE COURT:  Actually I was
10      thinking the same thing, that the problem would
11      be the deliberations, and maybe we could break,
12      which is why I was asking when the dancing
13      starts to think about how far we could push it
14      before we let the jury go.  But Mr. Cawley.
15              MR. CAWLEY:  I agree with the
16      math, although I didn't account for the 4:30
17      stop time, so it's probably mid afternoon
18      Thursday, but I agree that that's a potential
19      solution here.
20              THE COURT:  We'll leave her in the
21      pool for now and if she is selected, we'll
22      explain to her that she's going to get -- if we
23      did that, we just would have to let her go so
24      she could get there.  Right?
```

```
 1              That would be what your clients
 2     would want given what she said, and I think
 3     that's what we all would want to clear up that
 4     commitment, which is understandable that she
 5     would want to be there for that important thing.
 6     So we'll leave her in the pool.
 7              Next person on that row, if
 8     anybody had a yes to one more of my questions,
 9     if you would come forward, please.
10              Hi.  Come forward.  Sir, could you
11     give us your name for the record.
12              JUROR:  Kevin Records.
13              THE COURT:  Mr. Records.  Do you
14     remember your juror number by the way?
15              JUROR:  32.
16              THE COURT:  You had a yes to one
17     or more of my questions.  Can you tell us about
18     that.
19              JUROR:  Because when I was younger
20     and I got sick, I have a speech problem, and
21     also I can't read.
22              THE COURT:  Okay.
23              JUROR:  I got sick and my whole
24     head, it swelled my brain.  I can't read now.
```

```
 1                    THE COURT:  Okay.

 2                    JUROR:  So -- that's about it.

 3                    THE COURT:  Can I ask you,

 4       Mr. Records, do you do something to make a

 5       living?

 6                    JUROR:  Yes.

 7                    THE COURT:  What do you do?

 8                    JUROR:  Construction worker.

 9                    THE COURT:  Construction worker.

10       All right.

11                    MS. BROOKS:  Thank you very much,

12       sir.

13                    THE COURT:  Mr. Cawley?

14                    MR. CAWLEY:  Thank you.

15                    THE COURT:  Thank you,

16       Mr. Records.  I appreciate it.

17                    Application, it would be obvious.

18                    MS. BROOKS:  Yes, Your Honor.

19                    MR. CAWLEY:  Agreed.

20                    THE COURT:  He's stricken.

21                    Okay.  The next person on that

22       row, if any, who had a yes to one or more of my

23       questions, could you come forward, please.

24                    Hi.  Come right up, please.
```

```
 1        Ma'am, can I ask you your name for the record.

 2                    JUROR:  Jennifer McKelvey -- it's

 3        Jennifer Boyd-McKelvey.

 4                    THE COURT:  Do you go by

 5        Boyd-McKelvey?

 6                    JUROR:  I go by McKelvey.

 7                    THE COURT:  Do you remember your

 8        juror number?

 9                    JUROR:  Eight.

10                    THE COURT:  You had a yes to one

11        of my questions.  Can you tell us about that,

12        please.

13                    JUROR:  There were two questions,

14        one was you asked if we had ever been a juror

15        before.  Yes, I had, twice for a criminal case.

16                    THE COURT:  How long ago was that?

17                    JUROR:  Long time ago, fifteen

18        years ago.

19                    THE COURT:  Do you remember what

20        the verdicts were that you reached in those

21        cases?

22                    JUROR:  They were both guilty.

23                    THE COURT:  Is there anything in

24        your experience with having been a juror in the
```

```
 1     state system all those many years ago that would

 2     prevent you from being fair and impartial in

 3     this case?

 4                    JUROR:  No.

 5                    THE COURT:  The other question.

 6                    JUROR:  My other concern is I'm a

 7     social studies teacher, I do teach economics,

 8     certainly not at the level that this is.  I do

 9     teach elective sociology and street law.  I

10     don't know if that's something that would make a

11     difference.

12                    THE COURT:  Well, we won't be

13     talking about -- talking with your people with

14     street law, you're talking about what sort of

15     concepts, Fourth Amendment?

16                    JUROR:  It's almost like a cursory

17     question in introduction to law, that's what

18     this is intro to law.  Most of what I do is

19     criminal, I don't do any kind of civil stuff.

20                    THE COURT:  All right.

21                    JUROR:  Just how it's different

22     from criminal?

23                    THE COURT:  So is this a case you

24     heard me describe about patents, Parallel
```

1    Networks holds a patent and they say that

2    Microsoft infringes that patents or invades the

3    rights granted by that patent and Microsoft says

4    we don't infringe or invade the rights, and

5    besides that, your patent is invalid, it's not a

6    good patent.  That's the character of the

7    dispute.

8              The economic aspect of the case

9    would come into it because both sides -- if the

10   jury that's seated hears all the evidence and

11   they, you know -- if the jury that hears all the

12   evidence decides that the patent is valid and

13   that Microsoft infringes and those two things

14   are hotly disputed, but if the jury were to

15   decide that, they would have to decide how much

16   Parallel Networks had been injured by that, and

17   whether to give them money for that called

18   damages, that's why there is some economic and

19   accounting aspects of the case.

20             .  And both sides will have

21   witnesses they'll bring in to talk about that.

22   Right.  Now, I repeat, the preliminary questions

23   are is the patent is valid, is it infringed and

24   if you get past those gates, how much money, if

```
1     you got through those gates and the evidence

2     came in, would your own knowledge about

3     economics prevent you from being fair to the

4     experts?

5                    JUROR:  I don't think so.  I don't

6     know if that made a difference.

7                    THE COURT:  You could be fair and

8     impartial to both sides?

9                    JUROR:  Sure.

10                   THE COURT:  Ms. Brooks.

11                   MS. BROOKS:  Thank you very much.

12                   THE COURT:  Mr. Cawley?

13                   MR. CAWLEY:  Ms. McKelvey, there

14    used to be a judge named McKelvie.

15                   JUROR:  No relation.  I think he's

16    V-I-E.  I get that question a lot.  I wish I

17    was.  No.

18                   MR. CAWLEY:  That's all the

19    questions I have.  Thanks.

20                   THE COURT:  Thanks so much,

21    Ms. McKelvey.

22                   Ms. Brooks.

23                   MS. BROOKS:  No applications.

24                   THE COURT:  Mr. Cawley.
```

```
 1                    MR. CAWLEY:  No, Your Honor.

 2                    THE COURT:  She stays in the pool.

 3                    Next person on that row, if any,

 4        who had a yes to any of my questions.

 5                    Hi.  Please come right up.  Can I

 6        ask your name for the record.

 7                    JUROR:  Alison flu heart I.

 8                    THE COURT:  Ms. Fluharty, do you

 9        remember your juror number?

10                    JUROR:  12.

11                    THE COURT:  You had a yes to one

12        or more of the things you I asked.

13                    JUROR:  My husband is a patent

14        owner.

15                    THE COURT:  He is a patent owner?

16                    JUROR:  Uh-huh.

17                    THE COURT:  Any other questions?

18        Let's talk about that.  Now, does your husband

19        work for a company?

20                    JUROR:  A bank.

21                    THE COURT:  Does he own the patent

22        in his own name?

23                    JUROR:  With others.

24                    THE COURT:  With others.
```

```
1                    Is it a patent about banking or

2       banking processes?

3                    JUROR:  No.

4                    THE COURT:  What's the patent

5       about.

6                    JUROR:  It's about antiballistic

7       wall systems.

8                    THE COURT:  To prevent bullets

9       from going through walls.  Does he have a

10      business that's built around that patent?

11                   JUROR:  He's partners with someone

12      else.

13                   THE COURT:  And they're trying to

14      make money?

15                   JUROR:  Market them, right.

16                   THE COURT:  Do they actually make

17      the antiballistic wall systems?

18                   JUROR:  Uh-huh.

19                   THE COURT:  Have they ever had a

20      dispute about their patent rights?

21                   JUROR:  No.

22                   THE COURT:  Now, in this case,

23      Parallel Networks owns a patent, some patents

24      that Microsoft says your patent is not a valid
```

```
1      patent, of course Parallel Networks says it is,

2      Parallel Networks says Microsoft infringes, you

3      invade our rights under the patent, Microsoft

4      says no, we don't, that's the nature of the

5      dispute.

6                   Does the fact that your husband

7      has a business that's built around a patent,

8      would that fact prevent you from being able to

9      listen to both sides' arguments and evidence and

10     be fair in this case?

11                  JUROR:  No.

12                  THE COURT:  So you wouldn't be

13     worried if you went home, and for example, you

14     found in favor of Microsoft that your husband

15     would say how can you find against the patent

16     owner, that wouldn't worry you?

17                  JUROR:  No.

18                  THE COURT:  In contrary, you

19     wouldn't be worried about favoring the other

20     side either?

21                  JUROR:  No.

22                  THE COURT:  Ms. Brooks, any

23     questions?

24                  MS. BROOKS:  As part of his
```

```
 1        startup business, did he have to seek any sort
 2        of like venture capital funding?
 3                     JUROR:  No.
 4                     MS. BROOKS:  So this is solely
 5        sort of self funded?
 6                     JUROR:  One of the other people on
 7        the patent funded it.
 8                     MS. BROOKS:  And has the business
 9        gotten off the ground yet or is it still in its
10        beginning stages.
11                     JUROR:  It's in the growing
12        stages.
13                     THE COURT:  Mr. Cawley.
14                     MR. CAWLEY:  Where do you work?
15                     JUROR:  I work for an engineer.
16                     MR. CAWLEY:  An engineering firm?
17                     JUROR:  Yeah.
18                     MR. CAWLEY:  And you're a CAD
19        operator?
20                     JUROR:  Yes.
21                     MR. CAWLEY:  That's all the
22        questions I have.
23                     THE COURT:  Thank you so much.
24                     JUROR:  Thank you.
```

```
 1                    THE COURT:  Ms. Brooks.
 2                    MS. BROOKS:  No, Your Honor.
 3       Thank you.
 4                    MR. CAWLEY:  Nothing, Your Honor.
 5                    THE COURT:  She's in the pool.
 6                    Is there anybody else on that row?
 7       No.  Okay.  I think we move to the last row.
 8       The first person on that row who had a yes of
 9       one or more of my questions.  Come right up.
10                    Can I have your name for the
11       record, ma'am?
12                    JUROR:  Stephanie Getz.
13                    THE COURT:  Ms. Getz, do you
14       remember your juror number?
15                    JUROR:  14.
16                    THE COURT:  You answered a yes to
17       one or more of my questions.
18                    JUROR:  Yes.
19                    THE COURT:  Tell us about that
20       please.
21                    JUROR:  I know you and Michelle
22       were neighbors.
23                    THE COURT:  Yes, we are.  We're in
24       the same neighborhood.
```

```
1                     JUROR:  My husband and two sons

2      are in IT.  And lastly, which is the most

3      important, I have a disabled son that gets off

4      the bus and comes home at 2:30.

5                     THE COURT:  Okay.  I'm sorry, I

6      don't see you outside the context of the

7      neighborhood.

8                     JUROR:  I see Michelle.  Out of

9      the context.

10                     THE COURT:  Beyond.  Well, let's

11      take each of those one at a time.

12                     And this might be awkward for you,

13      but I got to be completely honest, Ms. Getz,

14      does the fact that you know me, would you hold

15      that against either party in this case?

16                     JUROR:  I don't think so.

17                     THE COURT:  Could you be fair to

18      them?

19                     JUROR:  I think so.

20                     THE COURT:  I hope so.  I hope I

21      haven't done anything to upset you or your

22      family.  If I do, we'll go off the record.

23                     Second, you say your husband and

24      your two sons, they're all in IT?
```

```
1                    JUROR:  Yes.

2                    THE COURT:  Do they work with

3      Microsoft products, do you know what they do?

4                    JUROR:  They are in small

5      companies.  My husband is in a small consulting

6      firm for IT.  One son works for a small firm in

7      Philly.  My other son works for a small startup

8      firm in San Francisco.

9                    THE COURT:  Would their -- this is

10     a hypothetical.  If you were asked to serve on

11     this jury, could you be fair and impartial to

12     both sides and hear the evidence and decide the

13     case only on what the evidence was presented

14     here without worrying about what your sons or

15     your husband might think about the decision that

16     you might render?

17                    JUROR:  I have been sitting there

18     a long time, so I have been thinking about it.

19     They've always -- they built -- like their own

20     systems since high school.  They built their own

21     computer systems and they always try to use

22     small companies, no name brand, they didn't want

23     to get involved in giving money to I'll say, it,

24     monopolies.  That's the big computer companies.
```

```
 1      That's been in my head for years.

 2                      THE COURT:  That's very important.

 3      That's very important.  So would you be worried

 4      if you thought the evidence favored Microsoft,

 5      would you hesitate to give a verdict in front --

 6      for Microsoft because your sons or your husband

 7      might say how could you find for a big guy?

 8                      JUROR:  I have to be honest, I

 9      would give it a second thought, only because of

10      just -- not that I pay attention a lot at home,

11      but with all these IT people, but that's just

12      one thing that always stuck in my head, like,

13      the big boys.

14                      THE COURT:  Now, as for your

15      son --

16                      JUROR:  I'm it.  I'm it.  There is

17      no one else home.

18                      THE COURT:  Is there anyone else

19      who covers for you?

20                      JUROR:  No.  If something is a

21      problem, I have to leave work.

22                      THE COURT:  Thanks for your time.

23                      Wait, I got to give these guys a

24      chance.  I apologize.
```

```
 1                    MS. BROOKS:  Thank you.

 2                    THE COURT:  Mr. Cawley.

 3                    MR. CAWLEY:  Thank you for being

 4        here.

 5                    THE COURT:  Thank you so much.

 6                    Applications.

 7                    MS. BROOKS:  Yes.

 8                    MR. CAWLEY:  Strike for cause.

 9                    THE COURT:  Struck for cause.

10                    Anybody else in that row had a yes

11        to any one of my questions?  Okay.

12                    Thank you very much for your

13        patience.  We're going to have to just confer

14        here for another few minutes and then we'll move

15        to the next stage of this which is actually

16        picking the people who will be sitting in this

17        jury box.  So I ask for your indulgence and

18        patience for just a few more minutes while we

19        confer.

20                    How many do we have in the main

21        pool?

22                    THE CLERK:  Five.

23                    THE COURT:  Does that accord with

24        your notes and your notes?
```

```
 1                    MR. CAWLEY:  What was the

 2       question?

 3                    THE COURT:  How many in the main

 4       bucket?

 5                    MR. CAWLEY:  The main.

 6                    THE COURT:  Count it up again

 7       because I need to decide whether I'm going to

 8       let them all go or not.

 9                    MR. CAWLEY:  Yes, five is what I

10       have got.

11                    THE COURT:  If we take those five

12       out, and how many struck for cause?

13                    THE CLERK:  The ones for cause in

14       --

15                    THE COURT:  If the ones for cause

16       go, how many do we have?

17                    THE CLERK:  Eighteen.

18                    THE COURT:  I need to be able to

19       put fifteen in the pool.

20                    THE CLERK:  You have eighteen that

21       are being excused for cause, you started with a

22       total of thirty-nine.

23                    THE COURT:  I have thirty -- nine.

24       How many did we excuse for cause?
```

```
 1                   THE CLERK:  Six.

 2                   THE COURT:  You can let those five

 3    go.  The main bucket is now the struck bucket.

 4    All right.

 5                   Are there any applications,

 6    motions or concerns you want to put on the

 7    record right now before we move back to our

 8    various places and we start drawing the jury?

 9                   MR. CAWLEY:  Can I hear the struck

10    for cause.  I only come up with five, so I

11    probably forgot.

12                   THE COURT:  Can you just step down

13    here and give him the names and the numbers.

14                   MR. CAWLEY:  Just the numbers are

15    probably easiest.

16                   THE CLERK:  27.  20.

17                   MR. CAWLEY:  27 is the one I

18    didn't have.  So thank you.

19                   THE COURT:  Which one was that?

20                   MR. CAWLEY:  Herschel Moore, Tall

21    Pines Maintenance.

22                   THE COURT:  Tall Pines.  Okay.

23                   Anything else, Mr. Cawley?

24                   MR. CAWLEY:  No.
```

```
 1                    THE COURT:  Ms. Brooks, anything?

 2                    MS. BROOKS:  No, Your Honor.

 3                    THE COURT:  Everybody, so how

 4        we're going to do this, there will be no

 5        talking, they'll just walk back and forth with

 6        the list.  It's the silent structure method.

 7                    MS. BROOKS:  Your Honor, could we

 8        have a five-minute break to confer with our

 9        consultants plus to use the facilities?

10                    THE COURT:  Absolutely.  I

11        apologize.  I'm sort of on autopilot here.

12        That's certainly a fair request.  I'll tell

13        people that we're going to take a five-minute

14        break and then everybody has to be back.  Let's

15        head back.

16                    Okay.  Many thanks for your time.

17        Another step in this process we have to go

18        through but everybody has been sitting for quite

19        a while so we're going to take a five-minute

20        break.  If anybody needs to get up and go to the

21        restroom and get a drink of water, you're free

22        to do that but you need to be back in five

23        minutes.

24                    When we come back what's going to
```

```
 1     happen is the courtroom deputy is going to be

 2     drawing numbers associated with your juror

 3     number from this box at random and that way we

 4     will get people seated and 14 people in the box

 5     and a 15th person in that chair at the other

 6     end, and the attorneys will have a chance from

 7     that group of 15 to pick the final group of nine

 8     jurors who will be sworn to serve as the jury in

 9     this case.

10               Okay.  So we're going to take a

11     five-minute break right now.  See you in five

12     minutes.  The Court is in recess.

13                    (Brief Recess.)

14               THE COURT:  Thanks.  Please be

15     seated.

16               THE COURTROOM DEPUTY:  Joyce

17     Santiago, please take the seat in the front row

18     of the jury box.  Michael Griffith, please take

19     the next seat in the front row of the jury box.

20     William Beaven, please take the next seat in the

21     jury box.  John Crystal, would you please take

22     the next seat in the front row.  Cecilia

23     Seamans, would you please take the next seat in

24     the front row.  Allison Flouridy, would you
```

```
1    please take the next seat in the front row.

2    Karl Thomas, will you please take the remaining

3    seat in the front row.  Richard Bogg, would you

4    please take the first seat in the second row.

5    Timmy Bush, would you please take the next seat

6    in the second row.  Lauren Francis Hester, would

7    you please take the next seat in the second row.

8    Ronald Hollis, would you please take the next

9    seat in the second row.  Christopher Walrath,

10   please take the next seat in the second row.

11   Stephen Straneva, would you please take the next

12   seat in the second row.  Scott Thomas Passwater,

13   would you please take the remaining seat in the

14   second row.  Syreeta Munson, would you please

15   take the seat outside of the jury box, please.

16             For the following jurors, please

17   return to the back of the courtroom.  Joyce

18   Santiago, Michael Griffith, William Beaven, John

19   Crystal, Richard Boggs, Stephen Straneva.

20             Would you three take the first

21   three seats in the front row.  The first two

22   jurors in the second row, please take the

23   remaining two seats in the front row.

24             Would you three please slide all
```

```
 1      the way down to the end and would you please
 2      take the next seat after those three.  Thank
 3      you.
 4                  THE COURT:  All right.  Ladies and
 5      Gentlemen, for those of you who are sitting in
 6      the back of the courtroom, you may have already
 7      realized that your duty here today is done, so
 8      thank you very much for your service.  We'll
 9      take a moment and you folks can be excused.  I
10      will have a few words to say to the folks who
11      have been selected to serve on this jury.
12      Thanks again for your service.
13                  All right, Ladies and Gentlemen.
14      Thank you very much for being here.  We're going
15      to begin by first, in addition to saying thanks,
16      swear you in to serve as the jury in this case.
17      Is anyone concerned about using the bible?  You
18      don't have to, but if you would like to, we're
19      pleased to have you put your hand on the bible
20      and take the oath.
21                  THE COURTROOM DEPUTY:  Do each of
22      you solemnly swear, those of you who swear, and
23      you and each of you do affirm, where Parallel
24      Networks Licensing LLC is Plaintiff and
```

```
1     Microsoft Corporation is Defendant and you will

2     truly render according to the evidence so help

3     you God those of you who swear or you do so

4     affirm, those of you say I do.

5                    THE JURY:  I do.

6                    THE COURT:  Thanks very much.  Let

7     me explain what is about to happen.  I'm going

8     to give you some instructions about the case and

9     what your responsibilities are.  Now, you're

10    part of this dispute.  Now, you have special

11    responsibilities and I want to explain those to

12    you.

13                    Now, at the time of the break, you

14    can take a break and you have a chance to call

15    friends, family, coworkers to let them know

16    about the jury service you are now sworn to

17    render.  What I'm about to do is to introduce

18    the trial and principles that you will be asked

19    to apply the evidence that you are about to

20    hear.

21                    I will give you detailed

22    instructions about the law at the end of the

23    trial.  This is an action of patent infringement

24    arising out of the patent laws of United States.
```

1        The Plaintiff is Parallel Networks LLC which I

2        will refer to as Parallel Networks, and the

3        Defendant is Microsoft Corporation which I will

4        refer to as Microsoft.

5                    Parallel Networks is the owner of

6        the United States patents at issue in this case.

7        There are two patents at issue, U.S. Patent

8        number 5,894,554 which I will refer to as the

9        '554 patent.  The other patent is the U.S.

10       Patent 6,415,335 which I will refer to as the

11       '335 patent, and I may also refer to these

12       patents collectively as the patents-in-suit.

13                    Copies of the patents will be

14       given to you in the binders you're going to be

15       given with a copy of these preliminary

16       instructions and paper for taking notes.

17       Parallel Networks is related to at least two

18       other companies that may be referred to in this

19       case.  InfoSpinner Inc. And Epic Ground, Inc.

20                    Microsoft is a technology company

21       headquartered in Redmond, Washington.  Microsoft

22       makes and sells the accused Sharepoint and Azure

23       product, operates the accused Bing and MSN.com

24       website systems.  I will refer to those as the

```
1     accused products.  I will show you a videotape
2     that's going to give you some background, just
3     general background about the patent system.
4     Okay.  So do we have that teed up and ready to
5     play?
6                    MR. CAWLEY:  It does not appear
7     so.
8                    THE COURT:  If there are any
9     technology problems, I want you to hold them
10    against me and not against the parties.  Wait a
11    minute.  Put that on hold.  In order for this to
12    be best, I think we have a handout form; is that
13    true?
14                   MR. CAWLEY:  Yes, Your Honor.
15                   THE COURT:  Just hand it up to my
16    law clerk.  In the meantime, can I see counsel
17    at side bar?
18                   (Sidebar Discussion.)
19                   THE COURT:  I'm seeing concerned
20    looks from some people at counsel table.  What's
21    going on?
22                   MS. BROOKS:  Your Honor, it
23    sounded like the products that are no longer
24    accused, Sharepoint and Azure are still in the
```

```
1    preliminary instructions.  My apologies.

2               THE COURT:  I'm reading from the

3    last thing you guys gave me.

4               MS. BROOKS:  Exactly, Your Honor.

5    My apologies.

6               THE COURT:  Well, it would be a

7    good thing before that goes to the jury to get a

8    clean copy that they can have, right?

9               MS. BROOKS:  Yes, Your Honor.  My

10   understanding is the only accused product are

11   the Bing and MSN.com.

12              THE COURT:  Okay.

13              MS. BROOKS:  Our fault, Your

14   Honor.  We didn't catch it.

15              THE COURT:  Give me the right

16   thing because it's going to go to the jury with

17   their binder in it.

18        (Sidebar Discussion ended.)

19              THE COURT:  Let me correct

20   something I said.  Well, actually, Mr. Cawley,

21   would you state for me the accused products for

22   the jury.

23              MR. CAWLEY:  It's Bing and

24   MSN.com, Your Honor.
```

```
 1                    THE COURT:  Those are the two

 2       products which will be referred to as accused

 3       products.  Okay.  Let's run the video.

 4                    (Videotape being played:)

 5                    MR. FOGEL:  Hello.  I'm Jeremy

 6       Fogel and I'm now the director of the Federal

 7       Judicial Center.

 8                         As you probably know by now, this

 9       is a patent case.  So you may be wondering how

10       can I sit in judgment on a case like this when

11       I'm not entirely sure what a patent is.  We hope

12       to answer that concern with this brief video

13       which will give you some of the background

14       needed to do your job.

15                         This case will involve some

16       special issues that the judge and lawyers will

17       explain to you.  But all patent cases involve

18       some basics that you will learn about.

19                         This video will discuss what

20       patents are, why we have them, how people get

21       them, and why they're in disputes that require

22       us to call in a jury like you.  We'll also show

23       you what patents look like.

24                         The United States Constitution
```

1    gives congress the power to pass laws relating

2    to patents.  Article 1, Section 8 quasi allows

3    congress to promote the progress of science and

4    useful arts by securing for limited times to

5    authors and inventors the exclusive right to

6    their respective writings and discoveries.

7              A patent then is an official brand

8    by the United States government that gives its

9    owner certain rights to an invention.  Those

10   include the right to stop others from making,

11   using, selling or offering for sale the

12   invention that is claimed in the patent.

13             A patent last for a specific

14   period of time, usually twenty years from the

15   date that the application is filed by the

16   inventor.  But because it takes an average three

17   years for the Patent and Trademark Office to act

18   on the application, the effective life of a

19   patent is closer to seventeen years.

20             A patent represents a bargain made

21   between the government and the inventor.  In

22   return for the right to prevent others from

23   using the invention, the inventor must enhance

24   the public knowledge, what we sometimes call the

1   state of the art by adding something new and

2   useful to it.  A famous example is Thomas

3   Edison's invention of an light bulb.  Harnessing

4   electrical power for illumination transformed

5   society and led to many other important

6   breakthroughs.

7           During the lifetime of the patent

8   its disclosure may inspire new inventions and

9   after it expires the invention is free for

10  anyone to use.  It is this combination of

11  something new and valuable to the public that

12  justifies granting time limited patent

13  protection to the inventor.

14          A patent is in many ways like a

15  deed to a piece of property.  It grants the

16  owner the right to keep people off the property

17  or to charge them a fee like rent for using it.

18  And just as a deed indicates boundaries defining

19  a landowner's property, a patent claim defines

20  the patentee's domain.

21          The patent system works because

22  the inventor is required to describe the

23  invention in clear and specific terms so that

24  the public knows what the boundaries of the

```
 1    invention are.

 2              Once a patent is issued by the

 3    government, it becomes available for public

 4    inspection.  In that way, anyone who learns of

 5    the patent can read it and understand exactly

 6    what the inventor invented and the limits of the

 7    patent set forth in the claims.

 8              Now that we understand what a

 9    patent is, let's take a closer look at the term

10    invention.  An invention is a new way of solving

11    a problem or a useful new machine, manufacture,

12    or composition of matter.  The patent process

13    begins in the mind of the inventor, and in

14    particular, when the invention is formulated in

15    the mind of the inventor.  Patent lawyers call

16    this conception.

17              This is when the idea occurs to

18    the inventor clearly enough that he or she can

19    write it down and explain it to someone.  To

20    qualify for a patent, the invention needs to be

21    new and useful.  Also, it must not be obvious to

22    one of ordinary skill in the field.

23              If the inventor believes these

24    requirements are met, he or she will prepare an
```

1    application for filing with the Patent and

2    Trademark Office whose headquarters are in

3    Alexandria, Virginia just outside of Washington

4    D.C.

5             The Patent and Trademark Office,

6    often called the PTO, is the agency of the

7    federal government whose job it is to examine

8    patent applications to make sure they are in

9    proper form and complied with the requirements

10   of the law.

11            The inventor can prepare an

12   application for filing with the PTO, but usually

13   it is drafted by a patent attorney or a patent

14   agent who specializes in what is called

15   prosecuting patent applications.  That is the

16   process by which they are evaluated.  The

17   attorney or agent works with the inventor to be

18   sure the invention is described and explained in

19   a way that complies with the law and the

20   regulations of the PTO.  Ninety-eight percent of

21   patent applications are made on line using the

22   PTO's electronic filing system, although a few

23   paper applications are still made.

24            When the PTO receives the

1      inventor's application, it is first checked to

2      see if it is complete and complies with all the

3      PTO patent requirements.  It is then assigned to

4      a patent examiner, a staff person with a

5      background in the field or the art the invention

6      falls within to evaluate the application and

7      decide whether a patent can be granted.

8              You have been given a sample

9      patent to refer to as you watch this video so

10     you already have a sense of what a patent looks

11     like, but now let's take a closer look at the

12     three main parts of the patent.

13             To begin with, there are some

14     basic identifying information on the first page.

15     This material is highlighted in your handout.

16     On the upper right side of the page is the

17     number assigned to the patent by the PTO.  And

18     on the left side is a title that describes the

19     invention and the names of the inventors and

20     sometimes the company to whom they have assigned

21     the patent.  Also on the left is the date when

22     the patent application was filed.  And back on

23     the right, the date when the patent was issued.

24             There are also is more detailed

```
 1      information on the first page, including a list

 2      of numbers following the caption field of

 3      search.  These numbers identify previously

 4      issued patents the examiner looked at or

 5      searched to make sure the applicant's claimed

 6      invention really is something new, not obvious,

 7      and thus patentable.

 8                  Also listed on the first page is

 9      what we call references, that is previous

10      patents or articles that describe the technology

11      or prior art known at the time the application

12      was filed.  It may seem strange to you that we

13      call this preexisting technology prior art even

14      though it has nothing to do with artist.  We use

15      the word art in its historical sense to include

16      inventions and other subject matter reasonably

17      related to the claimed invention.

18                  We also refers to the latest

19      technology as state of the art and we say of

20      someone who can understand and apply the

21      technology that he or she is skilled in the art.

22                  The second major part of the

23      patent is what we call the specification, or

24      written description.  As is in the case in your
```

```
1    sample, it is usually the longest part of the

2    patent.  It includes an abstract which is a

3    brief summary of the invention, a background

4    section describes the nature of the problem the

5    invention is supposed to solve.  One or more

6    drawings called figures that illustrates various

7    aspects of the application.  And a detailed

8    description of one or more embodiments of the

9    invention.

10                An embodiment is a specific device

11   or method that uses the invention such as a

12   particular form of light bulb.

13                The third and most important part

14   of the patent is the claims.  These are the

15   numbered paragraphs that appear at the end.  The

16   claims are what give the public notice of the

17   boundaries of the invention.  They are similar

18   to the description of property you may have seen

19   in a deed, referring to precise measurements

20   taken on the ground.

21                The judge will instruct you

22   further on how any technical or ambiguous terms

23   in the patent claims should be understood.

24                Now that we have discussed the
```

1    main parts of a patent, let's look at how the

2    PTO processes patent applications, what we

3    referred to earlier as prosecution of the patent

4    application.

5              This process begins when the

6    inventor's application arrives at the PTO.

7    There, it receives a filing date.  Under the

8    American Invents Act of 2011, filing dates will

9    determine who is awarded the patent if there are

10   competing valid applications.  In 2012, the PTO

11   received nearly 600,000 patent applications and

12   issued more than 270,000 patents.

13             After determining that the

14   application is complete, the receiving branch

15   also decides what field of technology an

16   application relates to and assigns it to the

17   appropriate examining.  In order to make that

18   decision the patent examiner usually looks at

19   patents that have been issued previously in the

20   same or closely related fields of art.  The

21   examiner has computer databases that contain

22   information used to accomplished this task.

23             Another part of the job is to

24   decide if the inventor's description of the

```
 1        invention is complete and clear enough to meet
 2        the requirements for a patent, including the
 3        requirement that the description enables someone
 4        of ordinary skill in the field to actually make
 5        and use it.  However, because the job of
 6        examining so many applications is challenging,
 7        the law requires the applicant to tell the
 8        examiner whatever he or she knows about the
 9        prior art that might be important to the
10        examiner's decision on whether to allow the
11        patent.  We call this the applicant's duty of
12        candor.  One way the applicant can satisfy this
13        duty is by bringing pertinent prior art to the
14        attention of the examiner either in the original
15        application or in other submissions called
16        information disclosure statements.  In this way
17        the decisions of the examiner are based on both
18        the information provided by the applicant and on
19        the information the examiner finds during his or
20        her prior art search.  Sometimes the examiner
21        concludes that the application meets all the
22        requirements we've discussed and allows the
23        patent to issue at this first stage.  But more
24        frequently the examiner will reject the
```

1        application as deficient in some respect.

2                        This decision will be communicated

3        by the examiner in what is called an office

4        action, which is a preliminary notice to the

5        applicant of what the examiner finds

6        insufficient or unpatentable.  For example, the

7        examiner may reject certain claims as being

8        unpatentable because a journal article written

9        and published by another person prior to the

10       effective filing date of the patent application

11       disclosed what the applicant was currently

12       claiming.  At that point the applicant prepares

13       a written response either agreeing or

14       disagreeing with the examiner.  An applicant who

15       agrees with the examiner can suggest amendments

16       to the application designed to overcome the

17       examiner's rejection.  Alternatively, an

18       applicant who disagrees with the examiner's

19       office action can explain the reasons for the

20       disagreement.

21                       This exchange of office action and

22       responses goes on until the examiner issues a

23       final office action, which may reject or allow

24       some or all of the applicant's claims.  The

1    overall process is referred to as the

2    prosecution history of the application.

3              The written incoming and outgoing

4    correspondence between the PTO examiner and the

5    applicant is also called the file wrapper.  In

6    the past these file wrappers were all in paper

7    form as were the submitted applications.  Now

8    they are most often electronic and may

9    occasionally be paper as well.  Most patent

10   applications filed on or after November 29th,

11   2000, are published by the PTO 18 months after

12   the inventor has filed his or her application so

13   that the public may inspect it.

14             Once a final PTO office action has

15   occurred and one or more claims have been

16   allowed, the applicant is required to pay an

17   issuance fee and the patent is printed.  Then on

18   the date shown on the upper right-hand corner of

19   the first page of the patent, it is issued by

20   the PTO and the inventor receives all the rights

21   of the patent.  That date is highlighted on your

22   sample.

23             Once a patent has issued, the

24   inventor or the person or company the inventor

1    has assigned a patent to can enforce the patent

2    against anyone who uses the invention without

3    permission.  We call such unlawful use

4    infringement.  But the PTO and its examiners

5    have no jurisdiction over questions relating to

6    infringement of patents.  If there is a dispute

7    about infringement, it is brought to the court

8    to decide.

9              Sometimes in a court case you are

10   also asked to decide about validity; that is

11   whether the patent should have been allowed at

12   all by the PTO.  A party accused of infringement

13   is entitled to challenge whether the asserted

14   patent claims are sufficiently new or nonobvious

15   in light of the prior art or whether other

16   requirements of patentability have been met.  In

17   other words, a defense to an infringement

18   lawsuit is that the patent in question is

19   invalid.

20             You may wonder why it is that you

21   would be asked to consider such things when the

22   patent has already been reviewed by a government

23   examiner.  There are several reasons for this.

24   First, there may be facts or arguments that the

1    examiner did not consider, such as prior art

2    that was not located by the PTO or provided by

3    the applicant.  In addition, there is of course

4    the possibility that mistakes were made or

5    important information overlooked.  Examiners

6    have a lot of work to do and no process is

7    perfect.

8              Also, unlike a court proceeding,

9    prosecution of a patent application takes place

10   without input from people who might later be

11   accused of infringement, so it is important that

12   we provide a chance for someone who is accused

13   of infringement to challenge the patent in

14   court.  In deciding issues of infringement and

15   validity, it is your job to decide the facts of

16   the case.  The judge will instruct you about the

17   law, which may include the meaning of certain

18   words or phrases contained in the patent.  So it

19   is your primary duty as jurors to resolve any

20   factual disputes and in some cases such as

21   infringement and validity, to apply the law to

22   those facts.  To prove infringement the patent

23   holder must persuade you by what is called a

24   preponderance of the evidence relating to the

1    facts of the case that the patent has been

2    infringed.  To prove invalidity, the alleged

3    infringer must persuade you by what is called

4    clear and convincing evidence that the patent is

5    invalid.  The judge in your case will explain

6    these and other terms and provide additional

7    specific instructions at the appropriate time.

8    Good luck with your task and thank you for your

9    service.

10                   (End of videotape.)

11                   THE COURT:  Now, you've heard some

12   general things on that video and I will give you

13   some information specific to this case.  The

14   patent case generally involves at least two

15   steps.  The first step is determining whether

16   the accused product method or system falls

17   within the scope of the patent claims, that is,

18   does the accused product, method or system

19   infringe the patent claims.

20                   The second step is determining

21   whether the patent is valid.  In this patent

22   case, you must determine whether Parallel

23   Networks has proven that Microsoft's accused

24   products directly infringe claims 20, 41 and 49

1          of the '554 patent and claims 43 and 78 of the

2          '335 patent.  These claims may be referred to as

3          the asserted claims of the '554 and '335

4          patents.

5                    Microsoft denies Parallel

6          Networks' allegations of the infringement and

7          Microsoft asserts that the '554 and '335 patents

8          are invalid.  You must decide these issues

9          according to the instructions I shall give you

10         at the end of the trial.  Those instructions I

11         will repeat and provide in more detail.

12                    This is a civil case.  Parallel

13         Networks has the burden of proving infringement

14         by what's called preponderance of the evidence.

15         For a preponderance of the evidence, if you were

16         to put the evidence of both parties on the

17         opposite side of a scale, the party with the

18         burden would have to make the scale tip somewhat

19         in its favors.

20                    So Parallel Networks has to

21         produce evidence which, when considered in the

22         light of all the facts, leads you to believe

23         that what Parallel Networks claims is more

24         likely true than not true.

```
1                    Microsoft has the burden of
2       proving that the '554 and '335 patents are
3       invalid by a different standard, clear and
4       convincing evidence.  Clear and convincing
5       evidence is evidence that produced an abiding
6       conviction that the truth of a factual
7       contention is highly probable.  Those of you who
8       are familiar with the criminal cases may have
9       heard the term proof beyond a reasonable doubt.
10      That burden does not apply in a civil case and
11      put it out of your minds in considering whether
12      the parties have met their burden of proof in
13      this case.
14                   It will be your duty to decide
15      what the facts are from the evidence presented
16      here at the trial.  You and you alone are the
17      judges of the facts.  You will have to apply
18      those facts to the law as I will instruct you at
19      the close of evidence.  You must follow that law
20      whether you agree with it or not.
21                   In addition to instructing you
22      about the law, I will provide you with
23      instructions as to what the claims of the patent
24      mean.  Of course, you are bound by your oath as
```

1    jurors to follow these and all the instructions

2    that I give you, even if you personally disagree

3    with them.  All of the instructions are

4    important and you should consider them together

5    as a whole.

6           You are, as I said, the judges of

7    the facts.  I will decide which rules of law

8    apply to this case, but you will decide the

9    facts, perform these duties fairly.  Do not let

10   any bias, sympathy or prejudice you may feel

11   toward one side or the other influence you in

12   any way.  Do not let anything that I say to you

13   during the course of the trial influence you,

14   except of course to the extent you have to

15   follow the instructions in this case.

16          The evidence from which you will

17   find the facts will consist of the testimony of

18   witnesses and documents and other things

19   admitted into evidence.  In addition to evidence

20   may include certain facts that are agreed to as

21   to the parties as I instruct you.

22          Certain things are not evidence.

23   Statements, arguments and questions by lawyers

24   are not evidence.  Objections to questions are

1     not evidence.  Lawyers have an obligation to

2     their clients to make an objection when they

3     believe testimony and exhibits are being offered

4     into evidence that are not admissible under the

5     rules of evidence.

6                    You should not be influenced by a

7     lawyer's objection or by my ruling on an

8     objection.  If I sustain or uphold the objection

9     and find that a matter is not admissible, you

10    should ignore the question.  Or if I overrule an

11    objection and allow it as evidence, you should

12    consider the testimony or other item as evidence

13    as you would any other evidence.

14                   If I instruct you that some item

15    of evidence is admitted for a limited purpose,

16    you must follow instructions and consider that

17    evidence for that purpose only.  I will instruct

18    you during the course of trial if that happens.

19    Anything you see or hear outside of the

20    courtroom must be disregarded.  You are to

21    decide this case solely on the evidence

22    presented here in the courtroom and in judging

23    the facts, it will be up to you to decide which

24    witnesses to believe, which witnesses not to

```
 1        believe and how much of any witness's testimony

 2        to accept or reject.

 3                        Now, a few words about your

 4        conduct as jurors.  First, I instruct you during

 5        the trial you are not to discuss the case with

 6        anyone or permit anyone to discuss it with you,

 7        even among yourselves.  So you can talk about a

 8        lot of stuff, just not what's going on in here

 9        until the time is right to deliberate.  Until

10        you retire to the jury room at the end of the

11        case to deliberate on your verdict, you are

12        simply not to talk about this case.

13                        If any lawyer, party or witness

14        does not speak to you when you pass in the hall

15        or ride the elevator or the like, remember it is

16        because they are not supposed to talk to you nor

17        you with them.  In this case, any unwarranted

18        and unnecessary suspicion about your fairness

19        can be avoided.  They are not trying to be rude.

20        They're trying to protect your role as jurors.

21                        If anyone should try to talk to

22        you about the case, please bring it to my

23        attention.  Second, do not read or listen to

24        anything touching on this case in in any way.
```

1    In addition, do not do any independent research

2    or investigation on your own on matters relating

3    to this case.  Don't be tempted to go on the

4    Internet.  Just listen to what goes on in here.

5              Finally, do not form any opinion

6    until all the evidence is in.  Keep an open mind

7    until your deliberations at the end of the case.

8    During the trial, you're not required to take

9    notes.  If you do take notes, you must leave

10    them in the jury deliberation room at the end of

11    each day.  Do not take them with you.

12              My courtroom deputy arranged for

13    pens, paper and pencils if you want to take

14    notes.  You will find there are pads and pens

15    already in the jury room.  However, a word of

16    caution is in order.  Some testimony that you

17    consider unimportant at the time presented, and

18    therefore did not write down, may take on

19    greater importance later in the trial in light

20    of all the evidence presented.  You are

21    instructed that your notes are only a tool to

22    aid your own individual memory.

23              You should not compare your notes

24    with other jurors in determining the content of

1    any testimony or evaluating the importance of

2    any evidence.  The notes are not evidence, and

3    by no means a complete outline of the

4    proceedings or a list of all the highlights of

5    the trial.

6              Keep in mind that you will not

7    have a transcript of the testimony to review.

8    So above all, your memory is what you should

9    rely on when it comes time to deliberate and

10   render your verdict in this case.  Now, as I

11   told you we're going to take a break.

12             Before we take the break, I just

13   want to tell you how the trial is going to

14   proceed.  Once we come back after lunch, when we

15   begin after lunch, the attorneys will have three

16   opportunities to talk to you during the trial.

17   The first opportunity is the opening statement.

18   During the opening statements, the attorneys

19   will introduce their respective cases to you.

20             As I've already instructed you,

21   however what the lawyers say is not evidence.

22   It will be up to you to determine whether the

23   evidence that is the testimony of the witnesses

24   and the admitted documents support what the

1    lawyers say in their opening statements.

2              The second opportunity that the

3    lawyers have to talk to you is during transition

4    statements.  Sometimes there will be a

5    transition from one thing to another at the

6    trial.  Lawyers are permitted to making a

7    transitional statement to identify that kind of

8    shifts from one topic to another.

9              Parallel Networks will be the one

10   to call witnesses and present evidence because

11   they bear the burden of proof as to

12   infringement.  Then Microsoft will have an

13   opportunity to call witnesses and present

14   evidence thereafter.  Parallel Networks Parallel

15   Networks is permitted to present rebuttal

16   evidence as to certain issues and Microsoft may

17   be permitted to present rebuttal as to other

18   issues.

19             Finally, after all of the evidence

20   is in, the lawyers will offer closing arguments

21   and to tie the evidence to their story.  I will

22   then give you instructions on the law and

23   describe for you the matters you must resolve.

24   You will then retire to the jury room to

```
 1      deliberate on your verdict.

 2                      You should generally expect that

 3      we will start trial each morning at 9:00 a.m.

 4      and finish at 4:30 p.m. with two 15-minute

 5      breaks.  One in the morning and one in the

 6      afternoon and the one-hour break for lunch.  As

 7      I said earlier, I time my civil trials.  Each

 8      party is given a certain number of hours to

 9      present its evidence.  This is to make sure the

10      trial will be completed on a timely basis.

11                      If you will, jurors will report to

12      the courtroom on a punctual basis as well, so

13      please be here on time so you are all gathered

14      and we can bring you in the jury box right at

15      9:00 a.m. and I promise we will have you out of

16      here at 4:30, even if we have to stop somebody

17      in the middle of a syllable and say stop.

18                      Now, something might happen which

19      may delay the time.  But if we're all serious

20      about punctuality, we will always make sure with

21      deliberate speed we will take care of the

22      business we need to take care of.  You're going

23      to have a copy of these preliminary

24      instructions.  I'm not going to read to you
```

```
 1        right now the glossary of terms, but I want you

 2        to know at the back of the preliminary

 3        instructions that I'm going to give you there's

 4        a glossary of terms.

 5                     So you may hear the word

 6        assignment, claims, disclosure or description,

 7        file, patent application, patent examiner prior

 8        art, et cetera and there's just a little

 9        definition for each of those so you can keep

10        track.  It's not comprehensive.  It won't cover

11        every term that you might hear or are unfamiliar

12        with, but we hope it will be of assistance to

13        you.

14                     Now, we're going to try to keep to

15        a minimum the number of times that I have you

16        sit there while I talk to the lawyers at side

17        bar.  I know that that can be a bit of an

18        imposition.  But please bear with me while I

19        speak to the lawyers at side bar.

20            (Sidebar Discussion.)

21                     THE COURT:  Okay.  Any objections

22        or concerns with the preliminary instructions as

23        provided?  Mr. Cawley?

24                     MR. CAWLEY:  No, Your Honor.
```

```
 1                    THE COURT:  Ms. Brooks?

 2                    MS. BROOKS:  No, Your Honor.

 3                    THE COURT:  I will send them to be

 4      back at 1:35 and I will ask that make sure folks

 5      are here and ready to call up your first

 6      witness.

 7                    MR. CAWLEY:  I will do opening.

 8                    THE COURT:  No.  What I mean is I

 9      want your witnesses here because we will go from

10      straight from opening.

11                    MS. BROOKS:  Is there a way to --

12                    THE COURT:  Dim the lights?

13                    MS. BROOKS:  The big one.

14                    THE COURT:  We were sort of

15      working on that question.  We will work on that

16      over lunch.

17                    MS. BROOKS:  Thank you, Your

18      Honor.

19           (Sidebar Discussion Ended.)

20                    THE COURT:  We will break and you

21      folks will be back at 1:35 and I will ask the

22      courtroom deputy to escort you back to the jury

23      room at this time.  Thank you very much.

24                    Ladies and Gentlemen, we're in
```

```
 1    recess.  See you at 1:35.

 2                   (Lunch Break.)

 3                   THE COURT:  Please be seated.

 4    Ready to proceed?

 5                   MR. CAWLEY:  Yes, Your Honor.

 6                   THE COURT:  Very good.  Bring the

 7    jury in.  Dim the lights.

 8                   Is that better.

 9                   MS. BROOKS:  Yes, Your Honor.

10                   THE COURT:  Is that all right,

11    Mr. Cawley?

12                   MR. CAWLEY:  I will feel my way

13    through the darkness, but that's all right.

14                   THE COURT:  Well, we want to make

15    it right for you because it's your opening.

16                   MR. CAWLEY:  It's fine like this.

17             (Jury enters.)

18                   THE COURT:  Please be seated.  You

19    will notice we have dimmed the lights a little

20    bit.  It's not because we want anybody napping

21    after lunch.  We are hoping it will prevent a

22    wash-out of the lights so you will see on the

23    screen.  So we can go ahead and hear opening

24    statements from the parties.
```

 1              Mr. Cawley.

 2              MR. CAWLEY:  Thank you, Your

 3     Honor.  This is a case about man who invented a

 4     way to help the Internet work better.  He

 5     applied for a patent, actually two patents on

 6     his invention.  And after years of study, the

 7     United States Patent Office awarded him two

 8     patents, the Patent Office concluding that his

 9     invention was new, was not obvious and was

10     useful.

11              Microsoft uses his invention and

12     makes a lot of money from using it, despite that

13     Microsoft refuses to pay fair value for their

14     use of the patents.  That, Ladies and Gentlemen,

15     is why we're here today.

16              The owner of the patents has filed

17     this lawsuit asking you or jurors like you to

18     come here to hear the evidence and at the end of

19     the trial to conclude that it's a good patent,

20     that Microsoft infringes it and to determine the

21     amount of money that Microsoft should be

22     required to pay as a reasonable royalty for

23     using the patents over many years.

24              I'd like to introduce to you Mr.

```
1        Keith Lowery.  If you will stand up, please.
2        You will meet Mr. Lowery because he will be the
3        first witness in the trial.  Mr. Lowery actually
4        grew up most of his childhood here in Delaware.
5        His father worked for Dow -- Dupont, excuse me.
6        No offense to the good folks at Dow or Dupont.
7        Eventually his father was transferred to New
8        Mexico and Texas.
9                   When he got out of high school,
10       Mr. Lowery went to college or started college in
11       Arkansas.  While he was there, he met his wife,
12       a woman who he's still married to.  And a few
13       months later they had their first child.  Things
14       were going well for Keith, but as we all know
15       life has a way sometimes of throwing us a curve
16       ball and unfortunately, that's what happened to
17       Keith.
18                   When he had finished about two
19       years of college, he was diagnosed with a
20       potentially fatal heart defect.  He had to have
21       open heart surgery and fortunately it was
22       successful, although he had to drop out of
23       school.  He couldn't afford to go on.  And he
24       and his wife and baby moved to Corpus Christi,
```

```
 1        Texas so they could be near Keith's parents.
 2                    He looked around Corpus Christi to
 3        find a job to support his family and the best
 4        thing he could find was making it in a business
 5        called Minuteman Oil Change.  I'm sure you've
 6        seen places like this.  They are like Jiffy
 7        Lube, quick oil changes where you drive in and
 8        they swarm over your car and change your oil.
 9                    The job Mr. Lowery got was working
10        in the pit.  The pit is the hole under your car
11        in the concrete where somebody is running around
12        down there who drains the oil and transmission
13        fluid.  One day he was working in the pit.  He
14        was trying to move a 55 gallon barrel of lube
15        and he had a hernia and he had to have surgery
16        to correct that.
17                    The surgeon, although it was
18        successful in correcting the hernia, told him he
19        couldn't do manual labor for several months.
20        Keith's boss didn't like the sounds of that
21        because he didn't want Keith sitting at home
22        collecting Workers' Comp. Insurance and causing
23        the boss's premium to go up, so he told Keith
24        instead to report to the Minuteman office where
```

1    he wouldn't have to do manual labor.

2              The boss wasn't sure what he was

3    doing but it would be better as far as the boss

4    was concerned than sitting at home.  After

5    looking around the office, the boss remembered

6    that not long before he had bought a radio shack

7    computer.  Now, this is the early 1980s and if

8    any of you can remember, those computers were

9    not much like they are now.

10             It was a very simple piece of

11   machinery, but Keith's boss had no idea how to

12   use it really and Keith didn't either.  So what

13   the boss decided is that every day when the

14   pieces of paper came in from the different

15   Minuteman locations to the office, it would be

16   Keith's job, at least until he recovered from

17   the hernia, to type into the computer what was

18   on the paper, so that's what he started to do.

19             What he discovered was that some

20   days if they were really busy, it took him most

21   of the day to type in the day's papers into the

22   computer.  But if they weren't very busy,

23   sometimes he would go through that job in an

24   hour and his boss wouldn't let him go home.  So

1     here is Keith Lowery, he's bored, he's in a dead

2     end job.  He's killing time until he's able to

3     go back into the pit.

4                    One afternoon looking for

5     something to do, he picked up the manual for the

6     radio shack computer and the first few pages of

7     this manual with its instructions about how to

8     operate a computer.  But in the back of the

9     manual is a thick volume was the actual computer

10    code that the machine ran on.

11                   Now, as you probably know computer

12    code is frequently referred to as the language

13    because it's like a foreign language.  If you

14    don't know how to read it, it means nothing to

15    you.  I don't know how to read it.  It would

16    certainly mean nothing to me, but Keith Lowery

17    made a remarkable discovery.  He could

18    understand it.  Page after page he realized that

19    if he followed it carefully he was able to

20    understand the computer code for that Radio

21    Shack computer.  He didn't understand it all at

22    once but in his spare time, he went all the way

23    through that manual and taught himself not only

24    to read but to write that computer language.

1              That was a turning point in his

2      life and led to his involvement in computer

3      programming, in software and in computer systems

4      that 30 some-odd years later goes on is still

5      his career to this very day.

6              The first thing he did in his

7      office hours again when there was nothing else

8      to do in the office was to actually rewrite the

9      software that he had been using on the Radio

10     Shack computer to make it work better for

11     Minuteman's needs.  It worked and it was better.

12     And when his boss found out about it and saw

13     what it could do, he promoted Keith to

14     comptroller of the entire company.

15             Keith stayed there just a few

16     years until he decided he had outgrown

17     Minuteman.  He went to work for some of the

18     largest software companies first in the

19     Southwest and then in the entire nation.

20     Fast-forward ten years, Keith has become an

21     experienced, not just programmer but an

22     experienced designer of computer systems and

23     networks.  That puts us to just about the early

24     1990s.

```
 1                    And in the early 1990s, some
 2        people were beginning to talk about something
 3        called the Internet.  It is hard to believe in
 4        the world we live in that lots of people hadn't
 5        never heard of the Internet if your memory goes
 6        back that far.  No Google, no Amazon.com, no
 7        eBay, certainly no Facebook.  None of that even
 8        existed and a lot of people were skeptical that
 9        the Internet would ever amount to anything.
10                    And Keith honestly was originally
11        one of those people.  He didn't really see what
12        the point of the Internet was.  Basically, all
13        it was at that time was pretty brochures for
14        companies, except for being printed on paper
15        they were available on the computer screen.
16                    What is the big deal.  But on the
17        trip out of the country where he was invited to
18        go to Australia to speak about computer systems
19        in an economic event occurred that he will tell
20        us about that made him reconsider the
21        possibility that the Internet might be real,
22        might be something that could really be valuable
23        and that people could make money off of it.
24                    To figure out if that was true
```

1    once he got back to the United States, he did

2    what Keith does as you've heard.  He decided

3    that to really understand the Internet he needed

4    to personally read about it, he needed to become

5    fluent in the specification that controlled the

6    Internet and he needed to write his own

7    experimental website to see if it would work and

8    it did.

9            That work convinced Keith Lowery

10   that he had been wrong about the Internet, that

11   there was a huge future in it and he saw a

12   future in which that would be pretty much the

13   rest of his career, but he also saw a problem.

14   A problem with the way the Internet worked way

15   back in those early days in the middle 90's.

16   And it was something that scientists, that you

17   will hear, called scalability, whether a system

18   can scale and that word you will learn simply in

19   that context means can it get bigger.

20           Sure, it may work on a small scale

21   but will it also work on a big scale.  It may

22   work if Keith is the one who's doing his little

23   experiment.  It may work if a handful of people

24   are going on a website for Sears just to see the

```
 1    page and get the phone number.

 2                   But what's going to happen when

 3    thousands, when millions of people want to

 4    access that same site and Keith based on his

 5    experiments could see the way people were doing

 6    it, then wasn't going to work.

 7                   He will show you this when he

 8    testifies.  He will show you that the computer

 9    like the computer in your home, the client, he

10    will explain to you that's what it's called, has

11    to communicate with a web server, a computer

12    service else connected by wire or connected by

13    Wi-fi and that web server can easily be

14    overloaded by too many people wanting

15    information at the same time.

16                   Now, Keith wasn't the first person

17    to have seen this problem.  Lots of people in

18    the computer industry had seen it.  And the way

19    that they proposed to fix it back then was to

20    build bigger and bigger computers for the web

21    server so if the web servers they had now got

22    overwhelmed, they would build a bigger computer.

23                   Keith didn't think that would

24    work.  He knew that there eventually would come
```

1      a limit on computers, the size of this desk, the

2      size of this courtroom.  There's going to be a

3      limit and it wouldn't be a long-term solution

4      for millions of people to come to a site just

5      because the computer got bigger.

6                  The solution that Keith saw

7      because he was working mostly in a home office

8      in his bedroom, he didn't have a big computer

9      the size of a refrigerator.  He had a little

10     computer.  But it occurred to him that instead

11     of making bigger and bigger computers, you could

12     take relatively small computers and link them

13     together into a network and that would do the

14     same thing.  Not on that, but it had the

15     advantage of essentially being infinitely

16     scalable.  As long as you prepared to add a new

17     computer to the network, it could get bigger and

18     bigger and as big as you need for as many people

19     that you want to accommodate for your website.

20     But that created another problem, sort of the

21     fly in the ointment of Keith's solution.

22                  As we all know, computers are not

23     completely reliable.  Sometimes they break down.

24     Sometimes computers get busy and get slow.  On

1     the other hand, sometimes computers in a network

2     like that has spare time.  They are available

3     and sometimes computers in the network might

4     even have done what is being requested, gotten

5     that information so recently that that computer

6     still has in its memory and is able to supply it

7     instantly.

8              The problem is that the web server

9     doesn't know anything about all of those

10    computers in the network.  So Keith conceived of

11    an invention where he would put together

12    software that was intelligent.  It was a brain

13    for the system.  He called it in the patent a

14    dispatcher.  You will see it in the drawings of

15    the patent and Keith will show you on a white

16    board how he thought of it and how it worked.

17    But basically the dispatcher or the brain knows

18    what's going on with the computers in the

19    network.  It shows who's down.  It know who's

20    too busy.  It knows who has capacity available.

21    It may know who already has the needed

22    information in its memory and the brain,

23    dispatcher, because it is also able to mail

24    intelligent discussions, where to send the

1    request for information.  It doesn't just go out

2    randomly.

3              Instead the dispatcher says

4    Computer No. 1, broken, don't do it.  Computer

5    No. 2, too busy.  Computer 3 has time and that's

6    where I'm going to send the request.  This was

7    something that had never been done before.  And

8    that formed the basis of Keith Lowery's

9    invention.  And Keith believed in his invention.

10             At the time again in the

11   mid-1990's, he was working for a software

12   company in Silicon Valley in California.  And

13   when his invention worked out, he took it to

14   that company and explained it to him and he said

15   I think this is the future of the World Wide

16   Web.  On the Internet this is the way it's going

17   to work.  And I think we should do it -- we

18   should form a business like this and go after

19   that future.

20             The people who ran his company

21   said, no, the Internet is just a toy.  It's not

22   going anywhere.  We're not interested.  So Keith

23   had a decision to make.  Did he believe in his

24   invention deeply enough to take a risk or would

1    he play it safe and keep going to his good

2    paying job and basically -- well, you probably

3    know the answer to what he did or we wouldn't be

4    sitting here today.  He decided to leave his

5    paying job with the software company in

6    California and to start his own business selling

7    software that would provide people who run

8    websites with his invention.  And that's what he

9    did.

10            He already knew some other people

11   who could help him.  He raised a hundred

12   thousand dollars from his uncle, and they

13   proceeded to build a product that used his

14   invention.  Before you know it, they had

15   customers.  A major software company in Germany

16   gave them almost a million dollars.  Other

17   companies entered into agreements to sell their

18   product in the United States, their product, I

19   mean Keith's product, in the United States and

20   to sell it abroad.

21            Before too many years, the

22   product, the software that Keith and others put

23   together using his invention was in 800

24   different installations in twenty-two different

1    countries around the globe.

2                    Eventually companies from Japan

3    and other companies invested millions of

4    dollars.  As the market began to change, Keith

5    and his business, which was rapidly growing,

6    changed with the market, still using his

7    invention to try and be as current as he could

8    and compete with the giants of the industry.

9                    Eventually by the year 2000 or so,

10   Keith's company had grown from about twenty

11   employees to about 300 and he raised $90 million

12   in investments.

13                   He was using that $90 million to

14   build a computer system, literally around the

15   globe using his invention.

16                   As you've already heard, he

17   applied for a patent on his invention.  Now, we

18   don't really have time in this opening statement

19   to get deeply into the patent, so I'll just tell

20   you, here is one of the important figures or

21   drawings that you will hear testimony about in

22   this case from the patents.  This is a figure

23   that depicts the prior art, and you remember

24   from the video this morning, prior art is a

```
1    patent law word that means what people were

2    already doing before the invention.

3              And you will hear witnesses who

4    will take you through this figure and explain to

5    you what it means and what people were already

6    doing before Keith had his idea.

7              This figure from the patent will

8    explain or help to Keith's invention.  And

9    again, we don't really have time to get into

10   detail about it in this statement, but what

11   you'll hear testimony about is the web client,

12   remember that, that's a computer that you might

13   have in your home or office or business or

14   wherever it is, that it communicates with the

15   web server, you'll remember that, and there is

16   the dispatcher.  The dispatcher that is the

17   brain of the invention that knows what's going

18   on with these smaller computers called page

19   servers, and can make intelligent decisions

20   about where it wants to send requests for

21   information to the page servers to more

22   efficiently get that information back to the web

23   client.

24              The patent office studied these
```

197

```
 1        ideas for three years, three years of studying

 2        in the US patent office before they issued Keith

 3        and his co-inventors who had helped him write

 4        the patents and come up with parts of the

 5        invention, their first patents.

 6                    Then they studied again for

 7        another three years before they issued the

 8        second patent.

 9                    So that brings us to about the

10        year 2000.  The business is going great.

11        They're all over the world.  They're on the

12        verge of raising another hundred million dollars

13        that it's going to take to complete that global

14        network of computers, they have gotten one US

15        patent and another is on the way.  Life raises

16        its ugly head again, and some of you may

17        remember, but if you don't, you will from the

18        testimony in this case.  In the year 2000-2001,

19        something happened in the economy called the

20        .com crash.  The .com crash meant that a lot of

21        little companies and some not so little that had

22        gotten started as internet companies in the boom

23        discovered eventually that they ran out of

24        money.  Keith's business wasn't one of those.
```

1    He didn't run out of money, but he ran out of

2    customers because the customers for his software

3    were those usually smaller internet companies

4    that frequently went out of business in the .com

5    bust.

6              That put a lot of stress on the

7    business.  And to adapt to that, they made

8    decisions to downsize, first of all, and it soon

9    became obvious that they weren't going to be

10   able to raise the additional investment to build

11   the global network, so they had to scale way

12   down.

13             At that point, since the company

14   was no longer involved in making new software

15   products, and that's Keith's specialty, that's

16   what he does is make software products, he

17   decided and they decided on friendly terms that

18   he would leave the company.  They still owned

19   his patents, but that's okay, that's the deal

20   that they made, and he went off to do other

21   things.

22             Around this time, though, partly

23   as the influence of the .com boom and bust,

24   Keith began thinking that as he looked at

```
 1    websites of some other major companies, that it
 2    sure appeared as though they were using his
 3    idea.  It wasn't immediately easy to see that.
 4    But Keith knows enough about it to sort of see
 5    the tracks in the sand from the performance of
 6    websites to know that it sure looks like they're
 7    doing what he invented and had a patent on.
 8              Around this time, 2002 or 3,
 9    another person comes on the scene.  His name is
10    Terry Fokas.  You'll meet him when he testifies
11    in the trial.  Mr. Fokas was a lawyer and he
12    represented the company that Keith's patents
13    were in that Keith worked for trying to build
14    out the global network.  The name of that
15    company was Epic Realm.  Terry Fokas gave legal
16    advice to Epic Realm as it was downsizing after
17    Keith left and eventually when they decided it
18    was hopeless and closed the company altogether.
19              But in that process, Terry got to
20    know Keith.  And he got to know Keith's patents.
21    And he believed in Keith and believed in his
22    patents.
23              So Terry Fokas eventually came up
24    with a way to buy the patents out of Epic Realm
```

1     as it was going out of business.

2                     Terry Fokas with Keith's help

3     formed a new company to put the patents in that

4     eventually became Parallel Networks, the

5     plaintiff in this lawsuit.

6                     Now, as I said, Keith had been

7     suspicious for some time that big companies who

8     ran big websites were using his invention.

9                     After Terry Fokas started Parallel

10    Networks, Keith and Terry and others decided

11    that they needed to do a more rigorous study to

12    find out if that was true or not.  And that

13    brings us to Microsoft.

14                    You know Microsoft.  Microsoft was

15    back then the biggest software company in the

16    world, and still is today.

17                    Terry Fokas arranged for a

18    detailed study of all of the information he

19    could obtain publicly about how Microsoft

20    operates its website or operated back then.  And

21    he discovered, after substantial work, that

22    Keith Lowery's instinct was right, they were

23    using the invention.

24                    So, on behalf of the company,

```
 1    Parallel Networks, Terry Fokas contacted
 2    Microsoft.  He did what you would expect someone
 3    to do who wants to negotiate a fair license
 4    deal.  He contacted Microsoft, he told them
 5    about the patents.  He sent them copies of the
 6    patents.  He negotiated with them.  Eventually
 7    he sent them detailed reports that show on a
 8    line-by-line basis exactly how --
 9                   MS. BROOKS:  Objection, Your
10    Honor.
11                   THE COURT:  All right.  I'll hear
12    counsel at side-bar.
13                   (Side-bar discussion:)
14                   THE COURT:  Your objection.
15                   MS. BROOKS:  Your Honor, this was
16    the subject of the motion in limine where
17    Mr. Fokas sent the claim charts to Ms. Quan and
18    Your Honor granted that motion, this should not
19    be discussed before the jury.
20                   THE COURT:  Mr. Cawley.
21                   ME.  CAWLEY:  Your Honor, that was
22    that the document which was marked 408 was
23    inadmissible and shouldn't be raised, but we're
24    free to talk about the fact that we sent them
```

```
1    claim charts.
2              THE COURT:  Well, you have the
3    advantage on me because I don't have the
4    transcript in front of me.  So I'm going to ask
5    you to do this, skip it in your opening.
6              MR. CAWLEY:  Okay.
7              THE COURT:  I'll look at it and
8    see what I can find before you get on that,
9    before you get into it with them during your
10   testimony.
11             MS. BROOKS:  And just very
12   quickly, may I note that the claim charts were
13   marked 408, and the E-mail was the cover of
14   that, that was the basis of Your Honor's ruling.
15             THE COURT:  I'll take a look at
16   the transcript.
17             (End of side-bar.)
18             MR. CAWLEY:  So Mr. Fokas
19   negotiated with Microsoft and they responded by
20   asking questions and having dialogue for a year,
21   and two years, and longer than two years until
22   finally it became obvious that Microsoft had no
23   intention of paying fair value for the use of
24   this invention.
```

1              So at that point, Parallel

2    Networks had no choice but to file this lawsuit

3    to recover fair value.

4              During the course of the trial, we

5    will call four witnesses.  The first you've

6    already met, it will be Keith Lowery.  He will

7    explain how he got into the business of

8    software, how he invented what eventually became

9    patented and why it's important.

10             The second witness is named

11   Dr. Mark Jones.  Professor Jones is a professor

12   of computer science at Virginia Tech University.

13   He has been for many years.  In this case, Keith

14   Lowery, Terry Fokas, other people who were

15   working for Parallel Networks, were not allowed

16   to see Microsoft's secret computer code or

17   secret documents, Microsoft is not going to show

18   it to them voluntarily.  But the judge in the

19   case required Microsoft to give that secret

20   information --

21             MS. BROOKS:  Objection, Your

22   Honor.

23             MR. CAWLEY:  -- to this expert --

24             MS. BROOKS:  Argumentative.

```
 1                    THE COURT:  Yes.  I'm going to
 2       sustain the objection.  Let's stay away from
 3       editorializing about secret and just talk about
 4       what happened.  All right, Mr. Cawley?
 5                    MR. CAWLEY:  Sure.
 6                    Microsoft gave its computer code
 7       and its documents to Mr. Jones for him to
 8       review.  You will hear him testify that he spent
 9       many hours studying the patents, studying
10       Microsoft's code and documents, and concluded
11       that Microsoft infringes the patents.
12                    He will come here, either later
13       today or tomorrow morning, to testify to you and
14       to actually show you the infringement.
15                    One of the tools he'll use to do
16       this will look like this.  You remember that the
17       Judge explained to you that what's covered by
18       the patent is set forth as the claims of the
19       patent, numbered paragraphs.  And that to make
20       sure there is infringement of a claim, in this
21       case it's claim 43 as you can see, you have to
22       go through every line, and sometimes every word
23       of that claim and ask, okay, does Microsoft do
24       that?  And if they do it all, there is
```

```
 1      infringement.

 2                  The charts that you will see

 3      during Dr. Jones' testimony that look like this

 4      will be his method of showing you on a

 5      color-coded basis where the evidence is in

 6      Microsoft's own code or documents and then

 7      matching it up with the words of the patents,

 8      and showing you at the end of that work, it's

 9      all colored in, it's all there, and they

10      infringe.

11                  The next witness that you will

12      hear from, the fourth one is John Bone.

13      Mr. Bone is a professional in the licensing

14      business.  What he does for a living, among

15      other things, is to determine the amount of a

16      reasonable royalty for using a patent.

17      Sometimes that's important because companies are

18      negotiating and they want to reach an agreement

19      and they want an opinion about what a reasonable

20      royalty would be to agree to.

21                  But it's also relevant in an

22      instance like this where someone has refused to

23      pay a reasonable royalty, and instead a jury has

24      to determine the amount of a reasonable royalty.
```

```
 1                    Now, at the end of the case, Judge

 2       Jordan will give you some very detailed

 3       information about the things you should consider

 4       in determining the amount of a reasonable

 5       royalty in this case.

 6                    Mr. Bone will take those factors,

 7       will apply them to this case, and will express

 8       to you the opinion that a reasonable royalty for

 9       Microsoft's infringement in this case is

10       $10,800,000.  That's $10.8 million, and he will

11       explain to you the basis for that conclusion.

12       And at the end of the trial after you've heard

13       all of the evidence about infringement, about

14       the validity of the patent, Parallel Networks

15       will ask you to award $10.8 million as damages.

16                    Now, of course, you'll also hear

17       from Microsoft.  And I won't attempt to try to

18       cover what I'm sure Microsoft's lawyers will

19       cover with you in some detail.  But what I

20       believe will happen is that Microsoft will

21       basically offer you or try to offer you evidence

22       that shows that they'll essentially say anything

23       about the patents to try and avoid paying fair

24       value.
```

```
 1                    MS. BROOKS:  Objection.

 2     Argumentative.

 3                    THE COURT:  Sustained.

 4                    Please, Mr. Cawley, go ahead.

 5                    MR. CAWLEY:  Sure.

 6                    Now, ladies and gentlemen, let me

 7     conclude.

 8                    The last thing I want to tell you

 9     is that I want to make you two promises.  The

10     first promise is we won't waste your time.

11     We're only going to call four witnesses.

12     They're not going to repeat each other.  With

13     some of them like Dr. Jones, we have the

14     responsibility for proving to you that there is

15     infringement, so we have to do that carefully

16     and thoroughly, but we'll make it go as fast as

17     we can.

18                    And the second promise is this,

19     some of you may be saying to yourself along

20     about now, why am I on this jury?  I thought

21     maybe I was coming to hear something about a car

22     wreck, instead I'm hearing about software and

23     computer systems.  I don't really know much

24     about those things.  How is it that I'm going to
```

```
 1        be asked to make a decision?

 2                      And what I would tell you about

 3        that, ladies and gentlemen, is that this is an

 4        important case.  And that Parallel Networks has

 5        spent a lot of time and frankly a lot of money

 6        to bring to the courtroom experts who not only

 7        are expert in their field, but are expert

 8        teachers.  And my second promise to you is when

 9        the evidence is over and Judge Jordan ask you to

10        go back to the jury room to begin your

11        deliberations, you will understand everything

12        you need to know to make a decision in this

13        case.

14                      I thank you for your time.  And we

15        look forward to beginning the evidence.

16                      THE COURT:  Thank you, Mr. Cawley.

17                      Ms. Brooks.

18                      MS. BROOKS:  Thank you, Your

19        Honor.

20                      Good afternoon, ladies and

21        gentlemen.  As I introduced myself to you

22        earlier, my name is Juanita Brooks and along

23        with my colleague, Martina Hufnal, over the

24        course of this week we are going to have the
```

1    pleasure and privilege of speaking to you on

2    behalf of Microsoft.

3              Let me start by making one thing

4    perfectly clear, Microsoft is not refusing to

5    pay Parallel Networks $10.8 million for

6    technology it is allegedly using.  Microsoft is

7    refusing to pay Parallel Networks anything for

8    technology it is not using.  The technology that

9    Parallel Networks is saying is their invention

10   is not.  It is Microsoft's invention and was, in

11   fact, invented well before Parallel Networks

12   ever even applied for their first patent.

13             And over the years, Microsoft has

14   improved upon and innovated upon that

15   technology.  And that technology is

16   substantially different than the invention that

17   Mr. Lowery came up with all those many years

18   ago.

19             Now, I can't expect you to just

20   take my word for it, and I'm not going to ask

21   you to, you're going to hear witnesses who

22   actually will come in who did the actual writing

23   of the code that created our technology.  And

24   they're here in court today and I'll introduce

1      them to you as I go through my opening

2      statement.

3                  But before I get into the details,

4      and unlike Parallel Networks' attorney, I am

5      going to go into the patent, because at the end

6      of the day, what you're going to be asked, the

7      question you're going to be asked when you go

8      into the jury room is, did Parallel Networks

9      prove that Microsoft is infringing their patent?

10     And the only way you can answer that is to

11     understand the patent and understand the

12     technology.

13                 So let's step through it if we

14     could.  We'll go back in time, the early

15     internet.  So this is way back when, even before

16     Parallel Networks.  It was very basic.  I don't

17     know if any of you remember, I am definitely old

18     enough to remember where you have the person,

19     the person is called the client, that would be

20     you, the user, and you make a request to a

21     server.

22                 And by the way, the reason it's

23     called a server, it's there to serve you.  You

24     make a request, and it will get the information,

1        gather the information you have asked for and

2        send it back to you.  And that's called client

3        server systems.  Those were the early days of

4        the internet.

5                    So what happened?  What happened

6        was it was great when there was just a few

7        users.  But the more users you got, the servers,

8        we put -- they don't actually emit blue and red

9        and green smoke, but this is trying show you,

10       they would crash.  Too many requests and

11       inability to be able to handle and answer all

12       those requests, so the server would crash.  So

13       what was the solution?  The solution was add

14       more servers.  That's easy; right?

15                   But then the dilemma was if you

16       added more servers, how would you know which

17       requests should go to which server?  Right?

18       Because it wouldn't do you any good if you added

19       more servers and then all three of those

20       requests still went to the same server while the

21       other two servers sat idle.  So what was the

22       solution?

23                   Microsoft's solution was something

24       called a gateway server.  And it sits between

```
1    the client whose making the request, and what we

2    call the back end servers who will respond to

3    the requests.

4              And what the gateway server does

5    is it will reach out to those back end servers

6    and basically say hey, how busy are you?  What

7    are you guys handling?

8              I know I'm talking about this like

9    they're human beings, but I don't know any other

10   ways to talk about ones and zeros.  It reaches

11   out, the gateway servers and inquires of the

12   back end servers basically what their bandwidth

13   is, and then will determine which server to

14   route which request to.  And this was

15   Microsoft's solution well before Parallel

16   Networks ever entered the scene.

17             And then, I mentioned you won't

18   have to take my word for it, you're going to

19   hear from Bill Griffin who is hear standing in

20   the front row.  And Mr. Griffin is still to this

21   day a principal software engineer at Microsoft.

22   He's been there for twenty-three years.  And he

23   was one of the original developers of what

24   you're going to hear about, the MSN system.  And
```

```
 1     he's going to tell you about how he developed it

 2     and the kind of work he did on it.

 3                   Mr. Griffin has a bachelor of

 4     science in computer engineering from the

 5     University of Alaska in Anchorage, and that's

 6     where he has lived his whole life until he began

 7     working at Microsoft.  He will be our first

 8     witness, but we have to go second so you'll hear

 9     from him later in the trial.

10                   But what Mr. Griffin is going to

11     tell you about is his work on this project

12     called Marvel.  And it was named after the

13     Marvel comics.  And the various components of it

14     were actually named after the super heros in the

15     Marvel comics.  So when you're looking at the

16     document, you'll see various names that may

17     remind you of super heros of Marvel comics.

18     That that's not an accident, that's what the

19     engineers, who have a particular sense of humor,

20     thought was a cool way to name the various

21     software components they were doing.

22                   If you look right here, it's

23     highlighted, that's the gateway that I just told

24     you the Marvel gateway.  This is an actual
```

 1      document you can see.  It's about this big, and

 2      in there Mr. Griffin will show you where they

 3      identified this problem that's supposedly

 4      Mr. Lowery had recognized it, but he recognized

 5      it a couple of years later.  They identified

 6      this problem of the need to do what's called

 7      load balancing.  That is take the various client

 8      requests and balance the load of answering those

 9      requests between the various back end servers.

10              And as a result of his work,

11      Mr. Griffin was actually awarded a United States

12      patent, along with his co-inventors.  And this

13      is a timeline of the invention of MSN.

14              So to walk through this, as early

15      as 1993, so these dates are important so you can

16      put into perspective, Parallel's invention

17      versus Microsoft's.  In 1993, the MSN, which

18      stands for Microsoft System Network -- did I get

19      that right, Mr. Griffin?  Microsoft Network

20      begins 1993.

21              In October of 1994, the

22      specification I just talked about is created,

23      and in it, this issue of load balancing is

24      identified as early as October of 1994.

215

```
1              And then in June of 1995, the

2    patent I just showed you was filed.  And in that

3    patent contained the solution to the load

4    balancing problem.

5              So that was in June of 1995.  And

6    then in August of 1995, yet more patents were

7    filed by Mr. Griffin's team dealing with the MSN

8    system.

9              And then on August 24, 1995, MSN

10   1.0 with the load balancing solution that I just

11   described, the gateway was actually released to

12   the public inside Windows 95.  So it was out

13   there in the public as early as August, August

14   24 of 1995.

15              Now, where does Parallel Networks

16   fit into this?  Parallel Networks did not file

17   for the patent at issue until April 24th, 1996,

18   almost two years after the MSN project began,

19   and several months after MSN 1.0 with the load

20   balancing solution inside Windows 95 was

21   released to the public.

22              Now, to be fair, you will hear MSN

23   was an internet solution and not a worldwide web

24   solution, because back in those days, the
```

```
 1        worldwide web was just getting started.
 2        Worldwide was probably a very complimentary term
 3        for what the web was like back then, it was just
 4        beginning.  Eventually, indeed not that long
 5        after, this same solution would be deployed by
 6        Microsoft on the worldwide web.
 7                    So this is the history of
 8        Microsoft solution and the history of where
 9        Parallel Networks' licensing enters the scene.
10                    Now, again to be clear, we're
11        talking now about technology that Microsoft
12        created back in 1995.  So what's happened since
13        then?  What's happened since then is that
14        Microsoft has continuously innovated.  You may
15        some of you recall Windows 95, followed by
16        Windows 2001, followed by Windows Vista, which
17        some may not think was a great innovation, but
18        some may, followed by Windows 7 which some of us
19        still love, followed by Windows 8, followed by
20        Windows 10.
21                    Now, why is it that Microsoft,
22        other than to perhaps sometimes annoy people,
23        why is it Microsoft is constantly innovating,
24        and that is because technology is constantly
```

1    changing.  If you don't constantly innovate,

2    technology will leave you behind and you will go

3    the way of some other companies that did during

4    the .com bust.

5              So Microsoft is constantly

6    innovating to keep up with the needs of the

7    users.

8              So let's look at what it looked

9    like back in '95, which is when Parallel

10   Networks began working on the issue.  On the

11   left here we see what computers looked like back

12   in '95.  We have come quite a long ways since

13   then and it hasn't been that long.  In the

14   middle, that's what cell phones looked like back

15   in '95, and sadly, that's what the Sony Discman

16   looked like back in '95 and doesn't look like

17   anymore paragraph but that was the technology

18   that existed back in 1995.  Now, what about the

19   worldwide web, what was it like back in 1995?

20             Well, in 1995 the very first sale,

21   E commerce sale occurred on the worldwide web.

22   And believe it or not, it was someone ordering a

23   pizza from Pizza Hut.  And they're very proud of

24   that by the way that they made the first E

1    commerce sale in 1995 and it was for a pizza

2    with mushrooms and extra cheese.

3              Fast forward to 2012, which is

4    Parallel Networks' asking for damages on our

5    products going back from 2012 to the time the

6    patent expired, so what was the web like in

7    2012?  In 2012, there was one trillion dollars

8    of E commerce conducted on the web, from that

9    pizza back in 1995 to one trillion dollars.

10             And so let me stop right there,

11   because that is truly the key to this case.

12   These are the current accused products,

13   Microsoft's MSN, our current version or the

14   version existing since 2012 and Bing, your

15   website.  So these products deal with today's

16   issues, a worldwide web in 2012 had twelve --

17   sorry, one trillion dollars in sales.

18             Mr. Lowery's invention, once he

19   filed that patent, became frozen in time.  That

20   invention can be no more than what was claimed

21   when that application was filed in the patent

22   office.

23             And so as much as technology may

24   advance, and have more demand and more change,

```
 1        the patent can't, it's frozen in time.

 2                    But Microsoft's technology can, we

 3        can continue to innovate and change our products

 4        to be able to keep up with what the current

 5        issues are.

 6                    So these are the two products,

 7        they're called accused products.  These are the

 8        products that Parallel Networks is accusing of

 9        infringement of trespassing on their 1995

10        patent.  So let's look at the patent now.  I

11        think -- I don't know if you have your notebooks

12        yet, but you'll be getting them and in there

13        will be the two patents at issue.

14                    And you saw the video, the title

15        of the patent in this case, I'll just use the

16        '554 patent -- by the way, patent numbers are

17        really long, so we just use the last three

18        digits to refer to the patents.

19                    Looking at the '554 patent, the

20        title kind of tells it all.  When you look at

21        the claim, you'll see that the title is actually

22        a very nice summary of the solution that

23        Mr. Lowery came up with.  It's a system for

24        managing dynamic web page generation requests,
```

1    so that's just asking for content that might

2    change.  Dynamic web page generation requests by

3    intercepting the request at the web server and

4    routing it to the page server thereby releasing

5    the web server to process other requests.

6              What does that mean?  What it

7    means, and I'll walk you through the claim to

8    show you, is that in Mr. Lowery's invention,

9    that request that goes from the client to the

10   web server needs to get out of the web server as

11   expeditiously as possible to get to the page

12   server, the servers that are going to gather up

13   the information so that that web server can now

14   process a new request.

15             You will see that Microsoft's

16   system is just the opposite, we hang on to the

17   request at the web server, and a large amount of

18   what we do with that request takes place at the

19   web server.

20             And there is a reason for that

21   that I'm going to get to in a minute, and there

22   is a reason why Mr. Lowery did it essentially

23   the opposite.

24             So rather than just read words,

1    let's dive a little bit deeper in the patent to

2    see how it works.  This is figure 4 in the

3    patent.  When I say the patent, I'm talking

4    about Mr. Lowery's patent.  Here is figure 4.

5    I'm not going to read the blocks to you.  We

6    have actually done an animation and there is no

7    disagreement by Parallel Networks, this is an

8    accurate animation of how the claims would work.

9    So what we have, here comes the request.

10   They're asking for FDI.gov database.  It goes

11   into the web server.  It goes into what they

12   call the intercepter and it says this is asking

13   for dynamic content.  I'm going to send it onto

14   the dispatcher.

15            The dispatcher will decide this

16   page server is the one I'm going to send it to,

17   to create the web page.  The web page comes back

18   and goes back to the client.  It's a nice simple

19   solution back in 1995.  And this is how that is

20   translated in the form of the actual asserted

21   claims.

22            So what's a claim?  When you get

23   patents, you will see the claims are in the back

24   of the patent.  And as the video said, the

```
1    claims are -- it's like a deed to a property.

2    So if you have a property deed, it defines your

3    boundaries to the northwest corner of 100

4    degrees to the southeast corner at 150 degrees,

5    so that you and all your neighbors can know

6    what's your property and what isn't so that you

7    can say you're trespassing and you neighbors can

8    look at your deed and say actually I'm not.

9    Read your deed, and that's what the claim is.

10                The claim is like that, only it's

11   to intellectual property versus real property.

12   And you will see that this claim, it's very,

13   very long, but our expert Dr. Long is going to

14   take you through every step of the claim.  And

15   in order for Microsoft to be infringing or

16   technology has to practiced or actually do every

17   single thing the claim requires.

18                And what you're going to see is we

19   don't do the vast majority that the claim

20   requires.  And again -- oh, there's one more

21   thing I need to tell you about.  In addition to

22   this language in the claim, and this will also

23   be in your binder, the Court has also given some

24   definitions to some of the words in the claim.
```

1           And here is one, the definition of

2     intercepting, because the claim requires that

3     the request gets intercepted from the web server

4     and sent over to the page server.  And that

5     means according to the Court's construction that

6     that request is diverting, the diverting of the

7     handling of the request before the request is

8     processed by the web server or the HTTP

9     compliant device.  What does that mean?  That

10    means just what it says.

11          What the evidence is going to show

12    you is that that doesn't happen in the Microsoft

13    system.  In fact, the request is never diverted.

14    The request actually sits in the web server and

15    new requests are generated that go out to the

16    page servers, and the original client request

17    sits in the web server and something called the

18    cooks(ph) request sits in the web server.

19          The web server hangs onto -- it

20    never intercepts it or diverts it.  We do the

21    opposite of Mr. Lowery's idea.  Why, because we

22    can.  We have the technology to do it.  And if

23    you look at the solution in the '554 patent,

24    another part of the patent is what's called the

1    specification and there will be all these words

2    leading up to the claim.

3              And counsel for Parallel Networks

4    said that the problem Mr. Lowery was trying to

5    solve is scalability so it can work on a small

6    scale, but you need it to work on a large scale

7    and Mr. Lowery was trying to make that happen.

8    So according to the patent what was his

9    solution?  It wasn't just to solve scalability.

10   It was just to increase performance, security

11   and extensibility which means being able to

12   extend or have more things of the back-end.

13             So what does the patent tell us

14   how Mr. Lowery solved that?  Performance, he

15   solved it by having the page server be

16   configured in a certain way.  Microsoft doesn't

17   do it that way.  We do it at the web server.  He

18   solved the security problem by having the page

19   server be configured in a certain way.

20   Microsoft doesn't do it that way.  We do it at

21   the web server.

22             What about extensibility?  He

23   solved it by having the page server be

24   configured in a certain way.  You know what I'm

```
 1    going to say, we don't do it that way.  We do it

 2    at the web server.  And finally, scalability,

 3    again the solution was back at the page server

 4    with Mr. Lowery, and with Microsoft it all

 5    happens at the web server, so substantially

 6    different.

 7              So Mr. Lowery thought it's not a

 8    good idea to do it at the web server because

 9    according to the patent doing it at the web

10    server will slow down the device and make it

11    become highly sufficient.

12              Mr. Lowery believed it would

13    increase efficiency.  But there's another reason

14    why Parallel Networks didn't do it at the web

15    server level, the way we do it.  And that reason

16    is they didn't have a web server.

17                   So there is a document, and

18    I'm going to need my reading glasses for a

19    second.  This is an internal document from a

20    company called InfoSpinner, so you're going to

21    see a lot of the documents in the case with a

22    lot of different names.  So just to give you a

23    general idea, Parallel Networks Licensing, the

24    Plaintiff, wasn't always Parallel Networks
```

1    Licensing.

2              So as you see certain documents

3    that we're going to show you from the Plaintiff,

4    they are going to have different companies'

5    names on them so you can know that when you're

6    seeing the documents and not get confused.

7              The company started as InfoSpinner

8    and then it became Epic Realm Inc., so you might

9    hear that name and then it became Epic Realm

10   Operating, Inc.  So you might hear that name and

11   then it became Epic Realm Licensing.  So you

12   might hear that name, and then it became

13   Parallel Networks, LLC and then eventually the

14   name of the current Plaintiff, Parallel Networks

15   Licensing.  So if you see any of those names,

16   they are essentially a previous iteration of the

17   Plaintiff.

18             So what do they say way back when?

19   When Mr. Lowery was first coming up with this

20   project, this document says that they weren't

21   going to really get into the business of being

22   web server and they were working on a little web

23   server that was going to shift with their

24   product.  It was about 80 percent complete but

1        they decided to halt work on it.

2                        Way back when Parallel Networks,

3        then InfoSpinner decided not to create a web

4        server because it wasn't critical to moving the

5        technology forward, meaning they're in the most

6        immediate future.  And why wasn't it critical,

7        because they were doing everything at the page

8        server and you will see from Microsoft engineers

9        that our web server isn't just critical.

10                       It's mission critical, because the

11       vast majority of the processing of the request

12       happens at the web server.

13                       I'm sorry.  I doubt you can read

14       this so I'm going to read it to you off of this.

15       This is the testimony of Mr. Lowery under oath

16       at his deposition.

17                       He was asked this question:

18                       "Question:  Were there ideas that

19       you just jettisoned along the way" -- meaning as

20       he was working on his project that we've heard

21       about.  "Were there ideas that you jettisoned

22       along the way, things that didn't pan out"

23                       He said, "You know, when we

24       originally started, we thought we were going to

```
 1    ship, you know, a fully functional commercial
 2    web server.
 3              We ended up shipping a web server
 4    with our product but more as the testing a
 5    development tool because it was a lot of people.
 6    There were a number of companies in the market
 7    with commercial web servers that offered an
 8    ability to sort of hook out functionality in
 9    those web servers."
10              One of those companies was
11    Microsoft.  We already had our fully functional
12    commercial web server out there and we did
13    everything in our web server and Parallel
14    Networks did virtually nothing in their web
15    server.  So I showed you how the patented
16    invention worked back in 1995.  Now, let's look
17    at how Microsoft's accused product works.
18              We will go with Bing.  So imagine
19    that you put a request into Bing and one day
20    maybe some people will say I Binged, rather than
21    I Googled it, but imagine you decided to use
22    Bing as your search engine or tool and you put a
23    request in.  Here comes the request.  It's not
24    all of this is in the web server.  It gets
```

1     parsed out.

2                 The original request stays right

3     there and a new request with information and yet

4     more requests are created and those requests go

5     out to the application servers and gather the

6     requested information, create the web page and

7     then sends it back to the client.  I know that

8     went a little fast but the witnesses will walk

9     you through it much slower.  But the bottom line

10    is the original request never leaves the web

11    server.

12                Until the whole thing is

13    processed, the response is returned, and then

14    and only then is that piece of memory in the web

15    server freed up to process other requests.  The

16    exact opposite of what the claim requires in

17    this case.  And you're going to hear from by Mr.

18    Alam who is here.  There's Mr. Alam.  He is a

19    distinguished engineer at Microsoft.

20                He's been there for two decades.

21    He started as an intern in 1996 and then came on

22    full- time.  And he joined what's called the IIS

23    team.  Your will hear what IIS is.  It sits in

24    the web server and it processes the client

```
 1      requests.  He helped write the code along with

 2      his team.

 3                  He has extensive knowledge of all

 4      of the IIS systems in the case and he has a

 5      Bachelor's of Science in Computer Engineering

 6      from the University of Waterloo, Canada where he

 7      was born and spent his whole life until he came

 8      down to Microsoft.  It was the first time he

 9      left home and since then, he's been at Microsoft

10      since two decades.  He will walk you through

11      what he and his team did to create the IIS

12      pipeline.

13                  I see some of you starting to get

14      the after-lunch look and I don't blame you, but

15      I will make this short.  This is all part of the

16      web server.  Now, the page server.  The request

17      comes in, the client requests and the first

18      thing that happens is it goes down here to this

19      thing called HTTP.sys and that's where the

20      original client request is going to sit keeping

21      the connection open with the client through the

22      entire client transaction until the response

23      comes back and goes back to the client.  It

24      never leaves the web server.  The exact opposite
```

1     of Mr. Lowery's invention.

2                    And then what happens is that sits

3     there and a new request is made.  The one comes

4     in is called a raw request and a new request

5     where information is extracted from it critical

6     information is called a cooks request.  We will

7     call that request No. 2.

8                    Request No. 2 will then go through

9     the pipeline and then their called handlers here

10    and here and here.  And remember the Court's

11    construction is for the invention you've got to

12    intercept that request before it is handled in

13    the web server.

14                   Microsoft handles it repeatedly

15    and this is now Request No. 2.  And by the way,

16    the claim also requires one request so we don't

17    do that either.  We have multiple requests so

18    Request No. 1 is sitting down here, the raw

19    request.  Request No. 2, the cooks request,

20    works its way up to this handling in the

21    pipeline until it gets to execute handler and

22    then a determination is made.

23                   You see the arrows going into two

24    directions, which way is that request now going

1    to be because it sits there.  It doesn't leave

2    either.  Yet more and more new requests are

3    created and they then get distributed to the

4    page server to create the information to come

5    back.  I know this is a lot at this late hour,

6    but this is to give you a high-level view of all

7    the ways we don't infringe.

8              This is a better blow-up.  So this

9    shows you the pipeline.  This is HTTP.sys where

10   Request No. 1 sits.  Here is the pipeline that

11   handles the request and all these requests and

12   then execute handler.  Then even more requests

13   are dispersed back to the page server.  There's

14   one other way we don't infringe and you will

15   hear David Maltz, he's not here but he's taking

16   a Red Eye because he had to take his kids to

17   school.  He will be here tomorrow.

18             Mr. Maltz, who is also an engineer

19   at Microsoft, is responsible for the network

20   infrastructure of the two accused products.

21   He's been at Microsoft for over a decade and has

22   a Ph.D. in computer science from Carnegie Mellon

23   and he's going to tell you about yet this other

24   layer that sits in the web server called

1        FrontDoor and how it does even more handling of

2        the requests and yet creating even more

3        requests, yet an entire other level and layer

4        for what we do at the web server and why we

5        don't infringe the claimed invention.  And he'll

6        walk you through some schematics that show you.

7        And again, you can't see it.  I apologize.

8                    So this top line says, user.

9    requests/response and then there's an arrow coming

10   down and now it's going into FrontDoor.  And down

11   here at the bottom you can visually -- you can't

12   because the screen is not dark enough but I will make

13   sure you will see it, but the new requests are named

14   differently.

15                    One is called Experiences and

16   API's request/response.  That's the first arrow

17   and Legacy API's request/response so that shows

18   you that the claimed invention requires only one

19   request.

20                    And here when we get you a better

21   copy, you can read for yourself that there are

22   yet more requests with even different names so

23   we don't come close to what the claimed

24   invention requires.  So just to finish, let's

1      say you did a search for pizza on Bing.  This is

2      what the web page could come back looking like.

3              Have you ever wondered how it is

4      they know where you are?  You put in pizza and

5      you get back a list of pizza parlors where you

6      are.  This is an actual search.  We did it for

7      you.  You cannot do any searches.  This is an

8      actual screenshot.  We put in the word pizza

9      here in Wilmington and we got images of pizza

10     and the list of restaurants, a map where pizza

11     parlors are in Wilmington and even further

12     suggestions of other searches we might do.  The

13     only way that we can send something back like

14     this to the client request is because of all the

15     stuff that's done in the web server.  The exact

16     opposite of the idea that Mr. Lowery had back in

17     1995.

18              Now, I want to clear one other

19     thing up.  Counsel for Parallel Networks said

20     that we're refusing to pay them the $10.8

21     million and that's why they sued us.  Well,

22     first of all, that's not the whole story.  What

23     really happened is that Parallel Networks

24     actually sued a client of Microsoft's called

 1      QuinStreet for infringement accusing QuinStreet

 2      of infringing for using our software and

 3      Microsoft came in and filed what's called a

 4      declaratory judgment action.

 5                   This is the actual document,

 6      Third-party Defendant Microsoft Corporation

 7      claim for declaratory judgment against Parallel

 8      Networks.  We actually sued Parallel Networks

 9      for a declaration from the court that we don't

10      infringe.  But what happened is when we did

11      that, Parallel Networks had that case

12      transferred to Texas so we filed here in

13      Delaware.

14                   Parallel Networks had that case

15      transferred to Texas and also then sued

16      Microsoft in Texas.  And then eventually what

17      happened there is that Parallel Networks and

18      Microsoft entered into a joint stipulation that

19      that case in Texas would be dismissed and then

20      Parallel Networks sued Microsoft in Delaware so

21      we were in Delaware, Texas, Delaware.

22                   And the testimony of Mr. Fokas,

23      the lawyer who has an interest in Parallel

24      Networks, at his deposition he was asked about

```
1       the Texas case and the top part is actually his

2       first answer.  Remember, I told you how the

3       court defined certain terms in the claims.

4                      And he says, "The Texas court

5       defined dispatching, and I'm paraphrasing here,

6       of course the order exists but the -- my memory

7       is the District Court" -- he was talking about

8       the Texas court -- "defined dispatching as

9       routing a request to a page server based on

10      static or dynamic information."

11                     And the question to him was:  "And

12      the issue as you testified yesterday was that it

13      created a validity issue for the patent; is

14      that correct?"

15                     Answer:  Yes."

16                     And so after that the Texas case

17      is dismissed and then Parallel Networks sues

18      Microsoft here in Delaware and that's this

19      lawsuit.  And indeed it is true we, Microsoft,

20      are not willing to pay Parallel Networks

21      anything because we're not using their

22      technology.  It is as if Parallel Networks is

23      asking us to pay them rent for the home we built

24      on our property.
```

```
 1                  We're standing on principle.  We
 2      won't do it.  It's our invention.  It's our
 3      technology.  It's our land and we are not
 4      infringing and we will ask you at the end of the
 5      day when we come -- not at the end of today, but
 6      at the end of the week when we come back, for
 7      you to find for Microsoft based on that.  Thank
 8      you very much.
 9                  THE COURT:  All right.  Thank you,
10      Ladies and Gentlemen.  This is probably a good
11      time for us to take our afternoon break.  I told
12      you we would take a break in the morning and a
13      break in the afternoon, 15 minutes.  So we will
14      now take a break until five minutes after 3:00.
15                       (Jury exited.)
16                  THE COURT:  Please be seated.
17      There's some things I'd like to cover with you
18      really quickly.  One is I will remind people I
19      expect both sides to take care of the
20      sequestration of their witnesses.  The second is
21      do we have a corrected set of preliminary jury
22      instructions yet because we've told them we're
23      going to give them those.
24                  I'd like to give them those so I
```

```
 1      will ask you to show up with them and make sure

 2      both sides are comfortable that it's got the

 3      correction in it that we made.

 4                  MS. BROOKS:  It's in the works.

 5      We will get them here right away.

 6                  THE COURT:  Okay.  And as we take

 7      a break, I will go up and try to find a copy of

 8      the transcript.  I'd appreciate it if while I'm

 9      doing that, counsel would get together and see

10      if they can come to a meeting of the minds

11      looking at the transcripts yourselves about what

12      is and isn't in bounds and out of bounds.  And

13      if you've got a disagreement, I want to be able

14      to hear about it outside of the hearing of the

15      jury.

16                  Will we be hitting that with the

17      first witness, Mr. Cawley?

18                  MR. CAWLEY:  No, Your Honor, and

19      not the second witness.

20                  THE COURT:  Okay.  That gives you

21      a chance to talk about it tonight.  So if you

22      need to come in here at 9 o'clock to cover it, I

23      can be here.  Give a call to chambers.  Although

24      I have other things to do, you have me at your
```

```
 1    disposal.

 2                MR. CAWLEY:  Just as a

 3    clarification, the parties are in agreement that

 4    the fact witnesses will be sequestered and the

 5    expert witnesses are exempt from the

 6    sequestration and of course, one court

 7    representative per side is exempt.

 8                THE COURT:  So you're exactly

 9    right, Mr. Cawley.  Anything from you, Ms.

10    Brooks?

11                MS. BROOKS:  No, Your Honor.  Just

12    for the record we have identified Mr. Alam as

13    our corporate representative.

14                THE COURT:  Okay.  Thank you.  The

15    court is in recess.

16        (Brief break.)

17                THE COURT:  Thank you.  Please

18    bring the jury in.  You can be seated until they

19    arrive.  Who is going to be doing the first

20    witness, Mr. Cawley?

21                MR. CAWLEY:  Mr. Lowery.

22                THE COURT:  Who will be doing the

23    examination?

24                MR. CAWLEY:  I will.
```

```
 1                    THE COURT:  Thank you.  We'll hand

 2        out the binders as soon as the jury comes in.

 3                    MR. CAWLEY:  The jury binders?

 4                    THE COURT:  We have them here.  No

 5        objection that we can hand them out.

 6                    MR. CAWLEY:  Not at all.  You want

 7        us to bring somebody up to hand them out.

 8                    THE COURT:  No, we'll have the

 9        clerks do it.

10                    (Jury entering the courtroom at

11        3:05 p.m.)

12                    THE COURT:  Okay.  Ladies and

13        gentlemen, thank you.  You may be seated.  I ask

14        the courtroom deputy to hand out to you now

15        binders with the information relative to the

16        first witness you're going to be hearing.

17        They'll just hand them to the folks there at

18        this end and ask you to pass one down to each of

19        your colleagues.

20                    Mr. Cawley, would you please call

21        your first witness.

22                    MR. CAWLEY:  Thank you, Your

23        Honor.  Parallel Networks calls Mr. Keith

24        Lowery.
```

```
 1                    THE COURT:  Mr. Lowery, you may

 2    take the stand.

 3                    THE CLERK:  Place your right hand

 4    on the bible.  Please state and spell your

 5    entire name for the record.

 6                    THE WITNESS:  Keith Lowery,

 7    K-E-I-T-H.  L-O-W-E-R-Y.

 8

 9                    KEITH LOWERY,

10            the deponent herein, having first

11            been duly sworn on oath, was

12            examined and testified as follows:

13                    THE COURT:  All right.

14    Mr. Cawley, you may proceed.

15                    MR. CAWLEY:  Thank you, Your

16    Honor.  Your Honor, pursuant to our earlier

17    discussion, I have a list of exhibits which are

18    unobjected to.  May I read those to the jury and

19    move their admission.

20                    THE COURT:  Please.

21                    MR. CAWLEY:  There are about

22    twenty of them.

23                    THE COURT:  Let me just say

24    something real quickly to the jury.  To save
```

```
 1    time, where the parties have been able to agree

 2    that a piece of evidence can come in, rather

 3    than having them laying the foundation through

 4    question and answer, we have just agreed that if

 5    they read those exhibit numbers into the record,

 6    that will be sufficient because the exhibits are

 7    not objected to, and so that will take place

 8    now.  And those exhibits I believe are in the

 9    binders that are in your hands right now.

10               So go ahead, Mr. Cawley, if you

11    wouldn't mind reading that into the record.  Not

12    all of them are --

13               MR. CAWLEY:  I'm sorry, Your

14    Honor.  I don't think the binders of exhibits.

15    We do have binders of exhibits for the witness

16    and the Court and other side.

17               THE COURT:  My bad.  I apologize,

18    ladies and gentlemen.  These exhibits that

19    you're going to hear the witness testifying

20    about are the exhibits that have the numbers

21    that you're going to hear read in just so you

22    know and I know that they're all legitimately in

23    evidence.

24               Go ahead, Mr. Cawley, if you
```

```
 1       would.
 2                    MR. CAWLEY:  Thank you, Your
 3       Honor.
 4                    At this time we would move into
 5       evidence the following plaintiff's exhibits:  6,
 6       14, 20, 59, 60, 68, 71, 76, 79, 90, 110, 126,
 7       150, 167, 173, 186, 193, 896, 910 and 911.
 8                    THE COURT:  All right.  And we're
 9       agreed that those are all unobjected to;
10       correct, Ms. Brooks?
11                    MS. BROOKS:  That's right.  That's
12       right, Your Honor.
13                    THE COURT:  Thank you.
14                    All right.  Mr. Cawley, you may
15       proceed.
16                    MR. CAWLEY:  Thank you, Your Honor
17                    DIRECT EXAMINATION
18       BY MR. CAWLEY:
19                    Q.  Would you please state your name
20       and introduce yourself to the jury and explain
21       why you're here, sir?
22                    A.  My name is Keith Lowery.  I'm one
23       of the inventors of the patent in the suit and
24       I'm here to testify about that.
```

Lowery - Direct                    244

1          Q.   What did you invent?

2          A.   Basically a way, a technique or an

3     invention that makes the internet work better.

4          Q.   How did you make the internet work

5     better?

6          A.   Essentially by making it possible

7     to harness together the computing capacity of

8     many computers so that you can serve many, many

9     requests for pages that are dynamically

10    generated.

11         Q.   Is your invention important?

12         A.   I think it's fundamental to the

13    way big websites scale and work today.

14         Q.   Who benefits from your invention?

15         A.   I think website owners I know

16    benefit because we can accommodate gigantic

17    users, a billion Facebook users, those are

18    challenges, I think the users themselves

19    probably benefit because they have

20    responsiveness and they're not sitting around

21    being irritated by websites unnecessarily.

22         Q.   In this case, what are you asking

23    the jury for?

24         A.   I'm hoping the jury will find that

```
 1        Microsoft uses this invention, that they
 2        infringe on the patent and then award a fair
 3        value for the use of those invention.
 4                    THE COURT:  Just a moment.
 5                    MS. BROOKS:  Objection, Your
 6        Honor, as far as calling for an opinion
 7        regarding infringement.
 8                    THE COURT:  Overruled.  Go ahead.
 9   BY MR. CAWLEY:
10             Q.  Now, at the end of the case,
11        Mr. Lowery, if the jury decides that the owner
12        of the patents, Parallel Networks, is entitled
13        to money damages, would you get a part of that
14        money?
15             A.  I sure hope so.
16             Q.  Why do you say you hope so instead
17        of you know so?
18             A.  Well, I'm a shareholder in
19        Parallel Networks.  I have a percentage of
20        ownership in that company, but there is a lot of
21        expenses that go into bringing a case like this.
22        There is a lot of people that have to be paid.
23        And only if Parallel Networks after paying their
24        operating expenses and all the costs of this get
```

 1        to the point where they do a distribution to

 2        shareholders would I see some part of that.

 3                 Q.   Before we learn more about your

 4        invention, I would like for the jury to hear a

 5        little bit of background about you.

 6                      Have you always been involved in

 7        software?

 8                 A.   Since the early '80s, just since

 9        then.

10                 Q.   Where did you grow up?

11                 A.   My earliest memories of a child

12        are in Carlsbad, New Mexico.  I moved up here

13        after I finished first grade.  I moved to Newark

14        right down the road and went to grade school and

15        junior high and moved away when I was going into

16        high school.

17                 Q.   Did you go to college?

18                 A.   I did for a while.

19                 Q.   Where?

20                 A.   I went to the university in

21        Searcy, Arkansas called Harding University.

22                 Q.   Where what did you study?

23                 A.   I studied biblical languages and

24        theology.

1        Q.   Did anything of personal
2   importance happen during your years at Searcy?
3        A.   Yeah.  I met my wife in school
4   there.  And about ten days before our first
5   anniversary our first son was born.
6        Q.   Were you able to graduate from
7   Harding University?
8        A.   I was not.
9        Q.   Why not?
10        A.   About six weeks after my son was
11   born, a doctor discovered a birth defect in my
12   aorta, part of my vascular system near my heart
13   and I had to have open heart surgery.
14        Q.   Were you able to continue in
15   college after that?
16        A.   Not at all, certainly not then.
17   Financially I needed to take a break and work
18   for a while.
19        Q.   What did you do to support your
20   family?
21        A.   When we moved to Corpus Christi
22   where my family lived and I got a job working in
23   a fast oil change place called Minuteman Oil
24   Change.

```
 1                 Q.   What was your job at Minuteman?

 2                 A.   I worked underneath the cars in

 3        the pit, pulling transmission pans off and

 4        dumping the fluid and draining the oil out of

 5        the crankcase and replacing oil filters and that

 6        kind of thing.

 7                 Q.   Were you able to support your

 8        family during that?

 9                 A.   I did.  I had to work sixty hours

10        a week, but I was able to do it.

11                 Q.   How long did you work in the pit?

12                 A.   Maybe nine months or a year,

13        something like that.

14                 Q.   And then did anything else happen

15        that threatened that job?

16                 A.   Yeah.  I was moving a barrel of

17        gear lube, a big 55 gallon drum of really thick

18        oil and popped a hernia, ended up in the

19        hospital having hernia surgery.

20                 Q.   What did your doctors tell you

21        about your recovery from that surgery?

22                 A.   Well, I wasn't allowed to do

23        manual labor for quite a number of weeks, and so

24        I couldn't go back to work in the store, the oil
```

Lowery - direct                            249

```
 1        change stores for a while.
 2                  Q.   What did your boss say about that?
 3                  A.   He didn't want me collecting a
 4        bunch of workers' comp so he offered me a job in
 5        the office and I took that opportunity to do
 6        that so that he wouldn't have his workmans' comp
 7        rates go up.
 8                  Q.   What job or task did he assign to
 9        you in the office?
10                  A.   It was a data entry job, basically
11        keeping up with all the inventory data about all
12        the oil change stores.
13                  Q.   And what were you supposed to do
14        with that data?
15                  A.   I was supposed to take the paper
16        invoices that came in from the stores, and read
17        down through there and update the inventory
18        information for each oil change or transmission
19        fluid change that had taken place that day.
20                  Q.   Were you putting this into a
21        computer?
22                  A.   I was.  There was a little Radio
23        Shack computer that he had just bought and
24        bought an inventory program and I was entering
```

1    it in the inventory program.

2              Q.   Orient us to what time this is?

3              A.   This is probably 1981, actually.

4              Q.   Do you have a picture of the

5    computer or the type of computer that you were

6    working on?

7              A.   I mean, I think there is a picture

8    of one.

9              Q.   Let me show you demonstrative

10   Exhibit A.  What's that?

11             A.   That's a TRS 80.  That's just the

12   kind of computer I used to work on.

13             Q.   Now, Mr. Lowery, up until this

14   time, your work on this Radio Shack computer,

15   did you know much about the inside of computers?

16             A.   No, I did not.

17             Q.   On an average day at the office

18   for Minuteman, how long did it take you to type

19   in the papers that you were supposed to be

20   typing in?

21             A.   It varied, but probably on average

22   I was done by lunch every day.

23             Q.   And did you get to go home after

24   that?

          1              A.   No.  No.  I had to stay at work.

          2              Q.   How did you like this job?

          3              A.   It was boring.

          4              Q.   What did you do while you were

          5    sitting around many days bored?

          6              A.   Well, I sort of cast about looking

          7    for something to engage my mind and I found all

          8    the manuals that came with the TRS 80 and I

          9    started reading them.

         10              Q.   And is that something that changed

         11    your life?

         12              A.   It did in a huge way, certainly.

         13              Q.   Would you tell the jury about

         14    that?

         15              A.   So I got to reading these manuals

         16    and just out of shear boredom, really, and what

         17    ended up happening was I found that if I read

         18    them enough, I could start to understand what

         19    they were talking about, and I began to sort of

         20    have ideas about improving the systems we were

         21    working on at that time.

         22              Q.   Did you teach yourself the

         23    language of that computer?

         24              A.   Sure.  In that case, the inventor

1    program was written in a language called basic.

2    And I learned basic and learned to make changes

3    to that piece of software.

4              Q.   Did you make the changes?

5              A.   I did.

6              Q.   How did it work?

7              A.   It worked great.  The problem was,

8    it's a generalized inventor program.  It wasn't

9    really oriented toward oil changes, so I made

10   the changes to reporting to do more interesting

11   to reporting for our purposes in oil changes.

12             Q.   What was your boss's reaction to

13   this new software that you had written?

14             A.   He liked it.  He offered me a

15   permanent job in the office at a liveable wage

16   and offered to make me comptroller, keeping all

17   the books which were manual books, but also to

18   do some more automation in the office.

19             Q.   From that point forward, have you

20   worked in various capacities at various

21   companies in the field of computer software?

22             A.   I have been involved in computer

23   software continuously since about that time.

24             Q.   So, how long were you working as

Lowery - Direct                          253

```
 1        comptroller of Minuteman before you moved on to

 2        other software companies?

 3                A.   It was a couple of years, two

 4        years, maybe.

 5                Q.   So let's fast forward, something

 6        like ten years from the time you first taught

 7        yourself to read basic computer code, that would

 8        put us in what general time frame?

 9                A.   '91, '92.

10                Q.   Early '90s.  When did you first

11        hear about the internet?

12                A.   Probably you know, '93, maybe,

13        '94.

14                Q.   And what was your view of the

15        internet at that time?

16                A.   I was a skeptic.

17                Q.   What do you mean by that?

18                A.   Well, I felt like, I think I wrote

19        in the memo somewhere that I think I referred to

20        it as CB radio, but with more typing.  It was

21        just a way to kind of chat and look up, you

22        know, addresses and marketing information, but

23        it wasn't particularly useful beyond that.

24                Q.   We're talking about a time that's
```

Lowery - Direct                    254

```
 1        pretty long in regular people years and really

 2        long in computer years.  Help us remember what

 3        the internet was like in '93, could you search

 4        for things on Google?

 5              A.   No.

 6              Q.   Could you buy or sell anything on

 7        Ebay?

 8              A.   No.

 9              Q.   Could you watch anything on

10        Netflix?

11              A.   No.

12              Q.   How about Facebook?

13              A.   Didn't exist.

14              Q.   What was the internet mostly used

15        for in the early '90s?

16              A.   Mostly it was used for E-mail.  It

17        was used for a websites that had largely

18        contents that prepared in advance, things like

19        marketing brochures and corporate address

20        information, things that weren't really changing

21        or needing to be updated very often.

22              Q.   Did you find that very

23        interesting?

24              A.   I thought it was minimally useful.
```

Lowery - Direct                          255

1          Q.   Did anything happen that caused

2    you to change your opinion about the future of

3    the internet?

4          A.   So, I was on a trip to Australia,

5    speaking at a technology conference there, and

6    during that time, an internet company called

7    Netscape went public, did their initial public

8    offering on the stock market.

9          Q.   Why was that significant to you?

10         A.   It was a record setting thing.  It

11   was huge buzz in the industry.  I think they had

12   record setting valuations, raised a huge amount

13   of money.  It was a big deal to me because it

14   made me second guess my own skepticism because I

15   always believed that markets can know things

16   that individuals can't sometimes, so it got me

17   to rethinking my skepticism.

18         Q.   When you got back from your trip

19   to Australia, what did you do to investigate?

20         A.   Well, I kept reading about the

21   internet.  And I like to learn about the details

22   of the way technology works, so I downloaded the

23   specification for how servers and clients

24   communicate on the worldwide web and I read the

```
 1    specification.
 2              Q.   What is a specification?
 3              A.   It's a detail description of what
 4    each participant in a communication on a network
 5    have to send and receive in order to be
 6    functioning in a way that works for both sides.
 7              Q.   After you read the specification,
 8    did you do anything to help yourself understand
 9    or to be sure you understood what you were
10    reading?
11              A.   I never really read anything like
12    that before, so like that, in that format in
13    particular, so to test my understanding, I
14    decided I would write a web page and if I could
15    make it work with some existing browser, then I
16    would sort of assume that my understand of the
17    spec was correct.
18              Q.   Where were you when you wrote this
19    test server?
20              A.   It was over a weekend in a little
21    room off of my living room, there is a bedroom
22    that I converted to an office and did a lot of
23    my programing there.
24              Q.   Let's take a look at demonstrative
```

Lowery - Direct                    257

```
 1    exhibit B.  What is that?
 2            A.   That's a picture of me sitting at
 3    the desk where I did some of the early work
 4    related to these patents.  That's my dad looking
 5    over my shoulder.  I definitely had more hair
 6    then.
 7            Q.   Now, for those of us who don't
 8    know much about software, or computer networks,
 9    take us into this room and tell us what we would
10    have seen as you were conducting your experiment
11    on the website that you built, if instead of
12    your dad it was us looking over your shoulder?
13            A.   Well, when you program computers,
14    you type in instructions to the computer.  You
15    type in a long series of instructions to tell
16    the computer all the steps you want it to go
17    through, all the things you want it to do.
18    Invariably the first time you type any
19    instructions, things don't work right, you
20    didn't do something right, bugs, things are
21    broken, so there is kind of a process of
22    multiple efforts and fixes and iterations to get
23    to something that actually works.
24                 So I kind of had the specification
```

Lowery - Direct                          258

```
 1     spread out on one side and my keyboard in front

 2     of me, and I worked, you know, for quite a while

 3     over a weekend just to get things kind of up and

 4     running, and you know, implemented a version of

 5     a web server that I hoped conformed to the

 6     protocol specification I read.

 7            Q.   What did you physically do to make

 8     it work?

 9            A.   Well, so I had just -- I wanted to

10     see if a browser -- there was a browser at the

11     time called Mosaic.  I wanted to see if Mosaic

12     could talk to my web server.  I created a little

13     web page that I typed in the address of the web

14     server on my computer and I think the page I had

15     written, this is common with programers, said

16     "Hello World".  Up on Mosaic popped my document

17     that I created that said "Hello World."

18            Q.   What did that tell you?

19            A.   It told me it worked.

20            Q.   How did you feel about that?

21            A.   I was very excited.  I was really

22     pumped.  I called my wife and showed her, and

23     she was a little underwelmed that I had spent

24     the whole weekend and that's what I had to show
```

 1    for it.

 2              Q.   After you did this experiment, did

 3    you feel as though you now had a good

 4    understanding of how the internet worked?

 5              A.   I felt like I proved that I got

 6    it, and I, you know, kind of ultimately as a

 7    result of that, I had some opinions.

 8              Q.   I'll ask you about that.  So as a

 9    result of reading this specification that you

10    told us about and building this experimental web

11    page that you just described to us, did you see

12    a problem with the way the internet worked?

13              A.   My first reaction, I actually had

14    the reaction when I read the spec, but I wasn't

15    sure I understood the spec, that's why I wrote

16    the server.  When I had the server written, I

17    understood what I was reading.  My initial

18    reaction was this will never scale.

19              Q.   You used an expression there, it's

20    not the first time we have heard it in the

21    courtroom, but it's the first time we heard it

22    from a witness.  Explain to us what you mean by

23    that expression, it will never scale?

24              A.   Well, I had concluded that the web

1       pages that were going to be really interesting

2       and valuable were the ones that had not just

3       been pre-created for everybody that comes there,

4       but were pages that had current and interesting

5       information that would have to be created on the

6       fly in response to the request.

7                   So I didn't feel like the way the

8       web protocol was defined that any web server was

9       going to be able to handle as many requests as

10      it would need to handle for these kind of

11      dynamically generated pages.

12              Q.   Now, you referred just then to

13      some interesting information.  Give us some

14      examples specifically what you're talking about?

15              A.   So the same slide, you know, it's

16      fine to go out to the Weather Channel and get

17      their corporate address, but what's more

18      interesting is to go out to the Weather Channel

19      and find out the current temperature and wind

20      speed right now in my location.

21                  So being able to go get that kind

22      of information, it's not information that's

23      amenable to someone typing up a document and

24      storing it on the web server in advance, it's

Lowery - Direct                                        261

1       something that has to be computed to produce the

2       web page that you want to have, it's that kind

3       of information.

4              Q.   Why did you think that the

5       specifications that you read and the system that

6       you saw working in your experiment would have

7       difficulty scaling?

8              A.   Because no one computer -- if the

9       predictions about the internet were true, it was

10      going to be millions and maybe billions of

11      people and not dozens and hundreds that systems

12      had been built to accommodate mostly up to that

13      point, or even thousands.  And so I felt like

14      that there is no web server that could grow big

15      enough on its own to handle that many requests.

16             Q.   Had people, other people besides

17      you recognized this issue of scaling?

18             A.   You know, scaling was something

19      that, you know, people building, you know,

20      server systems concerned themselves with for

21      sure.

22             Q.   And what was the conventional

23      approach at this time to solving the problem of

24      scaling?

Lowery - Direct                    262

1              A.    At this time companies like IBM

2        and DEC had a whole business building gigantic

3        bigger and bigger servers, everything from

4        mainframes to mini, you know, kind of file

5        system size servers, filing cabinet size servers

6        to other kind of servers, so they tried to build

7        bigger and bigger individual hardware

8        components.

9              Q.    What did you think about that

10       solution?

11             A.    I thought this was an upper bound

12       to how long they could keep doing that and

13       ultimately they wouldn't be able to handle the

14       number of users that were going to come.

15             Q.    Did you sitting there in your

16       office by your bedroom think of a better idea?

17             A.    I decided that a better approach

18       might be to gang together the computing capacity

19       of smaller computers, when combined together

20       would more than exceed the cast of much larger

21       single computers.

22             Q.    What do you think triggered that

23       kernel of an idea of using small computers?

24             A.    Well, I was sitting there, I only

```
 1       had small computers, I couldn't afford real big

 2       ones, I was thinking in terms -- I also kind of

 3       come out of the client server world where lots

 4       of people were building systems for these

 5       smaller computers, and so I was thinking a lot

 6       in those days about how to use these smaller

 7       systems.

 8              Q.   Would there be an upper limit on

 9       the number of these smaller computers that you

10       could link together?

11              A.   It would only be limited by the

12       bandwidth, interconnect bandwidth between these

13       systems in terms of your ability to move the

14       data around.

15              Q.   Once you conceived of this idea of

16       the small computers linked together instead of

17       the big massive computer, did you still see a

18       problem in making the network efficient?

19              A.   Yeah.   So these smaller computers

20       are pretty unreliable, they break.   And so I

21       decided that in order to really make this where

22       the user experience would be really good, you

23       would have to have something that chose which

24       computer did the work that had an awareness of
```

```
 1        the operating state of all the systems around

 2        there.

 3                    Q.   And what idea did you come up

 4        with?

 5                    A.   So, we ended up coming up with

 6        something we called an intelligent load

 7        balancer.  We called it a dispatcher in our

 8        particular implementation.  But it basically

 9        knew how to take web requests and pick the

10        server that had the most availability, the most

11        capacity in the moment to actually generate the

12        response that was required for that request.

13                    MR. CAWLEY:  Your Honor, at this

14        time I would like permission to ask Mr. Lowery

15        to step down to a small white board to

16        illustrate his invention for the jury.

17                    THE COURT:  All right.  Where is

18        the small white board?

19                    MR. CAWLEY:  The small white board

20        is back here.  This will take no more than five

21        minutes, but I either want to put it here facing

22        the jury, or we can put it there.

23                    THE COURT:  Why don't we leave it

24        there until you can set it up right out where
```

```
 1        you're standing.

 2                    MR. CAWLEY:  Sure.  Okay.

 3                    MS. BROOKS:  Your Honor, might I

 4        move over there to see the board?

 5                    THE COURT:  Yes, you may.

 6                    MS. BROOKS:  Thank you.

 7                    MR. CAWLEY:  We're ready to put it

 8        up.  Can we put it right here, Your Honor?

 9                    THE COURT:  If it will fit.  It's

10        probably better if you keep it right there,

11        because I need to be able to see it, too.

12                    Mr. Lowery, if you want to step

13        down.

14     BY MR. CAWLEY:

15                 Q.   You ready, Mr. Lowery?

16                 A.   Sure.

17                 Q.   The first question I want to ask

18        you here is could you illustrate for the jury

19        and explain at a high level, how the internet

20        worked before your invention?

21                 A.   Every web interface, every web

22        communication that takes place always takes

23        place between a web client and a web server.

24        That web client can be a number of different
```

Lowery - Direct                     266

```
 1        things today.  It may be a computer.  It's
 2        always a computer sitting in your house, maybe.
 3        Back in the early days, it might have been a
 4        desktop computer, now it might be a tablet, it
 5        might be a smart phone with running a browser on
 6        it.
 7                    That web client sends a request to
 8        a web server.  Now, in the early days that
 9        request might have been done over a dial up
10        connection over your phone line, it might have
11        become a wire connected to a networking device,
12        now it might be some wireless connection that
13        you got of some kind.
14                    That web server upon receiving
15        that request has responsibility for sending a
16        response to that client.  The reason I was
17        concerned is because for those responses that
18        had the most interesting data, the data that
19        didn't exist as a web page but existed in some
20        other form, the web server would have to pull
21        the data from some other data source and turn
22        that into a web page.
23             Q.   Let me interrupt you.
24                    What's a data source?  You put
```

1    something on the white board that looks like a

2    cylinder of some kind?

3              A.   This is where information is

4    stored that is -- it's meant to be sort of

5    abstract.  It's where information that is stored

6    that is updatable being updated but not in a

7    form that can be consumed by a web client.  So

8    the web server has the challenge of getting that

9    data and turning it into a web page.  It didn't

10   exist as a web page in advance, it has to do

11   that once the request arrives.  And that puts

12   load on this web server.

13             Q.   Tell us again before I interrupted

14   you, you were explaining, what's the problem?

15             A.   The problem is that it's one thing

16   for me to sit there on my browser and ask for

17   the hello world page.  It's another thing if

18   thousands or millions of people are doing that

19   to the web server I just wrote because that web

20   server will never keep up.

21             Q.   How did the computer engineers and

22   scientists at the time think, what was their

23   idea of the best solution to that problem?

24             A.   People had a notion of what they

Lowery - Direct                    268

```
 1        called vertical scaling, where they tried to

 2        build bigger and bigger computers, mainframes,

 3        and minis, and other kinds of systems that they

 4        build them as big as they could get them.

 5               Q.   What did you think of that

 6        solution?

 7               A.   I thought that the internet kind

 8        of changed the rules and was going to require a

 9        different approach.

10               Q.   Did you think of and invent a

11        different approach?

12               A.   I did.

13               Q.   Can you show the jury what that

14        approach was?

15               A.   Sure.  I decided to add multiple

16        other computers to the mix here.  Each of these,

17        what I call page servers, would be able to

18        expand the capacity of the web server to do more

19        work than the web server could do on its own.

20               Q.   Were there any complications of

21        adding these additional page servers?  And you

22        have shown three there.  How many could there

23        be?

24               A.   There could be any number.  It
```

1    could grow to hundreds or thousands.

2             Q.   Add three for convenience.  Was

3    there any complications of adding these page

4    servers?

5             A.   If the web had different page

6    servers do work on its behalf, the problem you

7    ran into, one of these guys could be down, he

8    could be dead at the moment, or he could be

9    completely swamped with really complicated

10   requests that are using up all of his resources.

11   The challenge is if you just blindly send these

12   requests without an awareness of what each

13   server is doing, you run the risk of sending it

14   to a server that is not responsive to doing the

15   work.

16            Q.   What did you invent to take care

17   of that issue?

18            A.   We decided that there needed to be

19   some intelligence here that governed or drove

20   the selection of these servers in terms of

21   assigning the work that needed to be done, and

22   we called it a dispatcher.  It had a brain in it

23   that made the choice based on a continuous

24   awareness of what was up with all these other

1    servers.

2              Q.   Now, what you have just put on the

3    magnetic board looks like a person cut in two.

4    The dispatcher isn't a person, is it?

5              A.   It's a piece of software.  It can

6    be running on any machine or on the same

7    machine.  It doesn't matter where it runs.

8              Q.   Now, if you would, please, having

9    now built your invention on this board, start

10   from the beginning with the request and take us

11   all the way through the architecture?

12             A.   So, I guess one example is every

13   morning my wife will call out and say what's the

14   high temperature going to be today, she wants to

15   figure out what she wants to wear.  I can get on

16   my smart phone and look up The Weather Channel,

17   my smart phone gets a request, asks the high

18   temperature for the day in our neighborhood.  In

19   this particular case if they were using our

20   technology, the web server that receives the

21   request wouldn't have the web page sitting

22   there, it would have to create the web page that

23   my smart phone wants, and it would have to do

24   that by asking for some of the weather feeds

1    that are constantly flowing into in The Weather

2    Channel.

3              So when the web servers gets the

4    request in our invention it would let the

5    dispatcher choose which of the servers, which of

6    the other servers in a big pool of servers were

7    going to generate the response that it would

8    then deliver to my smart phone and I could tell

9    my wife what the temperature was going to be.

10             Q.   Thank you, Mr. Lowery.  You can

11   resume the stand now.

12             Can your invention that you just

13   showed us help companies that rely heavily on

14   the internet to make more money?

15             A.   I believe so, yes.

16             Q.   How is that?

17             A.   Well, it can allow them to

18   accommodate user community sizes that are much

19   larger than they could without technology like

20   that.

21             Q.   Can page load times help owners of

22   websites make money?

23             A.   This is a well-known facit in the

24   industry that slow page load times have a

Lowery - direct                                        272

```
 1    negative effect on user's interest in a website
 2    and desire to stay there.
 3              Q.  Does your invention also affect
 4    reliability?
 5              A.  It does.  Because in addition to
 6    all the capacity you get with it, because of the
 7    awareness about which machines are down, it
 8    provides more resilient website because even
 9    though some hardware goes down, hard disk crash
10    or whatever, the request the users are making to
11    that site don't go to those down machines, they
12    go to only the machines that are known to be
13    working and responding well.
14              Q.  Can increased reliability help
15    owners of websites make money or save money?
16              A.  Absolutely, because you know,
17    they're going to lose business either in the
18    form of lost advertising or lost commerce if
19    people can't get on there and do what they're
20    wanting to do.
21              Q.  Mr. Lowery, when you had the idea
22    for this invention, where were you working?
23              A.  I was working for silicon valley
24    for a company called Gupta Technology.
```

Lowery - Direct                          273

1            Q.   Did you propose your invention to

2      people at Gupta?

3            A.   I did, some facits of it, sure.

4            Q.   What were you proposing to them?

5            A.   We were in a business at the time

6      that was not an internet business per se, we

7      were selling software to enterprises, and I was

8      suggesting to them that we need to sort of

9      internet enable our products and part of that

10     was learning to do this kind of dynamic content

11     or dynamic web page creation.  And our

12     particular data sources that we were selling to

13     customers.

14           Q.   Let me show you Plaintiff's

15     Exhibit 76.  Can you tell us what this is?

16           A.   Yeah.  So that is an E-mail that I

17     wrote to my supervisor at the time, another

18     engineer, a good friend of mine, and the founder

19     of the company that I was working for, and CEO

20     there.

21           Q.   What was the date of this E-mail?

22           A.   It's September 1st of '95.

23           Q.   And did you describe some of the

24     features of your invention to Gupta in this

Lowery - direct                    274

```
 1        E-mail?
 2               A.   Yeah, I described particularly the
 3        notion of generating dynamic web pages from HTML
 4        template.
 5                    THE COURT:  I apologize,
 6        Mr. Cawley.  If you're going to have something
 7        on the board, what's the exhibit number again?
 8                    MR. CAWLEY:  I'm sorry.  76, Your
 9        Honor.
10                    THE COURT:  Thank you.
11    BY MR. CAWLEY:
12               Q.   What was Gupta's reaction to your
13        proposal to use the internet in their products?
14               A.   Well, the company's reaction was
15        the CEO's reaction, and he wasn't in favor of
16        doing this.
17               Q.   What did he have to say about it?
18               A.   I remember what he said, he said
19        there is no future in the wild, wild web.
20               Q.   The wild wild web.  Did he turn
21        out to be wrong about that?
22               A.   I think spectacularly wrong.
23               Q.   When you had pitched your
24        invention to Gupta, and they said they weren't
```

1    interested, what position did that put you in?

2              A.   It was kind of gut check time.  I

3    had -- you know, I really believed that I was

4    right about what was coming, and that there was

5    an opportunity there, and yet I really didn't

6    want to leave per se, but I felt like if -- when

7    they turned me down, I really had no choice, I

8    had to make a decision about going off and doing

9    this on my own.

10             Q.   What did you decide?

11             A.   I decided to do that.  I decided

12   to leave and do it myself.

13             Q.   What were your first steps in

14   forming your new company?

15             A.   I did two things.  I raised a

16   little investment money from an uncle who was an

17   investor in silicone valley, and I hired two

18   guys I knew as contractors to extend some of the

19   work I had been doing over the last couple of

20   months on this.

21             Q.   Who were they?

22             A.   The other two co-inventors on

23   these patents, a guy named Ronny Howell and Andy

24   Levine.

1              Q.   Why did they become co-inventors

2      on the patents?

3              A.   Because there is a bunch of claims

4      of inventing, and we were all working on this

5      together, and there was no way really to

6      decipher and differentiate between what we were

7      all contributing, so we all -- we were advised

8      by counsel that we needed to include everyone

9      who contributed anything to these claims, and so

10     we did.

11             Q.   How much was the investment that

12     your uncle made to get you started in this

13     business?

14             A.   It was about a hundred thousand

15     dollars.

16             Q.   Can you tell us what plaintiff's

17     exhibit 90 is, please?

18             A.   This is a copy of a cover sheet, a

19     fax cover sheet related to an update I sent my

20     uncle with some projections of cost about, you

21     know, kind of a product description of what I

22     wanted to build and what we were going to build.

23             Q.   What's the date of this fax?

24             A.   It's September 15th.

Lowery - Direct                      277

```
1                  Q.   And tell us now what plaintiff's
2       Exhibit 60 is?
3                  A.   It is a product description of
4       some of the early work we were doing from a
5       product standpoint along with a table outlining
6       what, you know, I anticipate costs to develop
7       this technology.
8                  Q.   Is this what was attached to the
9       previous exhibit, 90?
10                 A.   I believe so, yes.
11                 Q.   What did you call your new
12      company?
13                 A.   We ended up calling it
14      InfoSpinner.  We started out calling it
15      WebSpinner because of spiders and worldwide web
16      and all that stuff.  But my uncle didn't like
17      that name so we ended up kind of compromising
18      and changing it to InfoSpinner.
19                 Q.   When you left your employer,
20      Gupta, to start your new company, InfoSpinner,
21      did you stay on good terms with Gupta?
22                 A.   Definitely.  They asked me to help
23      choreograph my departure because they didn't
24      want it to be a morale factor with the rest of
```

Lowery - Direct                              278

```
 1      the engineering, so we parted on good terms and

 2      it was very amicable.

 3             Q.   Did you enter into a letter

 4      agreement with them about your departure?

 5             A.   I did, yes.

 6             Q.   Take a look at Exhibit 896 and

 7      tell us what that is?

 8             A.   That is a copy of the termination

 9      agreement that I had with Gupta when I left

10      there to go start my own business.

11             Q.   What did the agreement provide

12      about your ownership of the invention?

13             A.   Well, I wanted to get clarity that

14      they weren't going to come back at me later and

15      say we own this.  I had done all this on my own

16      systems and whatnot.  They had sort of expressed

17      no interest in it.  I wanted to get clarity, so

18      they agreed they didn't have a claim of

19      ownership on this technology.

20             Q.   Once you had your company, were

21      you and Andy and Ronald working on developing a

22      product that you could actually sell?

23             A.   Well, at first I was modeling and

24      playing around with ideas.  We shifted into
```

Lowery - Direct                    279

```
 1       product development mode working on a real

 2       production quality code, you know, things like

 3       support for putting multiple languages.  You

 4       know, we had an early Japanese version for

 5       instance, so we really went into product

 6       development mode.

 7                 Q.   What would this product do?

 8                 A.   It would do dynamic websites with

 9       dynamic page generation with the ability to do

10       intelligent load balancing, all these claims of

11       invention that are in the '554 and '335 patent.

12                 Q.   Would it allow companies who run

13       websites who want to use your invention to do

14       it?

15                 A.   Oh, certainly, yeah.  In fact,

16       when we finally got around to filing the patent,

17       it was a -- the spec that sort of drove what

18       went into the patent was the actual product we

19       had been working on.

20                 Q.   Tell us what plaintiff's Exhibit

21       59 is?

22                 A.   This is a status report sent I

23       believe to my uncle who was obviously the

24       primary investor at this point about kind of
```

Lowery - Direct                    280

```
 1     what we had gotten done and what we were working

 2     on.

 3              Q.   What's the date of this status

 4     report?

 5              A.   November 15th of '95.

 6              Q.   Did you have success in finding

 7     any clients who were interested in your product

 8     early on?

 9              A.   We did.  Right away we found some

10     people.

11              Q.   Who was that?

12              A.   Well, the first big partner was a

13     company called Software AG.

14              Q.   Tell us what Software AG was?

15              A.   Software AG was a big

16     multinational company based in Germany, but they

17     had a big North American division that we were

18     working with.

19              Q.   What did they want?

20              A.   They wanted a license to

21     distribute the technology with their mainframe

22     and middle-mainframe and mini systems which is

23     what they primarily sold software into it, they

24     wanted to distribute it, and include it with
```

1    some of their other products.

2              Q.   How did you demonstrate your

3    product to them?

4              A.   I went at least twice.  I went up

5    early January and demonstrated it for the first

6    time, and then I went up again and actually

7    closed a contract with them to actually include

8    there and distribute it.  It was very exciting.

9              Q.   Did you do anything on that trip

10   to actually demonstrate to them how your product

11   could make a difference for a company like them?

12             A.   Yeah.  It was interesting because

13   they really wanted to do it, but they were a

14   little nervous.  We were a little bitty company

15   and we were telling them we were able to

16   integrate it with their software and stuff.  I

17   went into their research lab and sat down and

18   their engineers looked over my shoulder and I

19   did a code to integrate with their middle ware

20   software product and showed data from the

21   mainframe system in their database showing up on

22   the web, and that kind of clinched the deal, and

23   they signed the contract.

24             Q.   Tell us what plaintiff's Exhibit

```
 1    893 is, please?

 2              A.   This is a copy of presentation I

 3    made to Software AG about what we were proposing

 4    and as well as information about the company and

 5    the participants.

 6              Q.   And you say you eventually signed

 7    an agreement with Software AG?

 8              A.   We did.

 9              Q.   Tell us what plaintiff's Exhibit

10    20 is?

11              A.   This is a copy of the

12    distributorship agreement we signed end of

13    February 1996 with Software AG.

14              Q.   And at the time of that agreement,

15    had you demonstrated to them a fully functional

16    product?

17              A.   It was working, and we were able

18    to, you know, make, you know, evident to them

19    that it could do what we were saying it could

20    do.

21              Q.   Was the product built out of your

22    invention?

23              A.   It was.

24              Q.   Was signing this agreement with
```

```
 1        Software AG a big deal for you and your company?

 2              A.   It was huge.  It was gigantic for

 3        us.

 4              Q.   Why do you say that?

 5              A.   Well, we were a little bitty

 6        company.  I mean, it was really me and two

 7        contractors, and it was, you know, all of a

 8        sudden we had this huge multinational company

 9        that believed in it, committed themselves to it,

10        and actually sent us a million and a quarter

11        advance against royalties to help us push the

12        business forward.

13              Q.   What did the million and quarter

14        dollars enable you to do?

15              A.   It enabled us to become a real

16        company.  We went from, you know, we would meet

17        at the local breakfast place and trade disks to

18        each other with code.  We didn't have an office.

19        We were all working out of our houses and

20        squeezing in the hours, and it allowed us to

21        rent office space and hire people.  We really

22        become a real business.

23              Q.   Now, did you continue to develop

24        your product even after you signed this
```

Lowery - Direct                    284

```
 1    agreement with Software AG?

 2              A.   Definitely, yeah.

 3              Q.   Tell us what plaintiff's Exhibit

 4    150 is?

 5              A.   This is a -- it's a product

 6    overview to describing sort of a white paper,

 7    it's describing some of the value proposition

 8    and the technology that we had.

 9              Q.   I see there is no dates on this

10    agreement -- or excuse me, this document.  Are

11    you able to date it?

12              A.   I think this is sometime before

13    the first of March.

14              Q.   Of what year?

15              A.   Of 1996.

16              Q.   Why do you say that?

17              A.   Well, it has my old home address

18    on it, where the picture where my dad was

19    standing looking over my shoulder, that was my

20    old home address.  And we didn't use that as a

21    corporate address after we signed this Software

22    AG agreement, we moved out of my house and into

23    an office we had sort of identified, we didn't

24    do that anymore.
```

Lowery - direct                    285

1            Q.   In addition to Software AG, were

2       others in the industry becoming interested in

3       your product?

4            A.   They were.

5            Q.   In fact, was your former employer

6       Gupta one of them?

7            A.   They were.

8            Q.   Take a look at plaintiff's exhibit

9       71 and tell us what that is.

10           A.   This is a letter I wrote to my old

11      supervisor.  Actually I think I faxed it to him

12      based on what's at the top, and describing how

13      to proposing a business relationship.  This is

14      -- this isn't out of the blue, it's based on

15      some discussion we had been having about how we

16      might work together.

17           Q.   Was your old employer, Gupta,

18      having second thoughts about the internet?

19           A.   Yeah, they had changed their mind

20      and were looking for a way to fast forward some

21      of their work in that area.

22           Q.   Now, you have given us a lot of

23      information here about what was going on with

24      you and your invention and the company in the

```
 1      early days.  I want to change the subject

 2      slightly.

 3                During this time when you were

 4      demonstrating your invention to potential

 5      clients and moving into your new office space

 6      and building up your business, did you think it

 7      was important to protect your invention?

 8                A.   Well, we learned it was important,

 9      is probably a better way to put it.  We didn't

10      know anything about patents back then.  And it

11      was really our Software AG relationship where

12      the general counsel there kind of urged us to go

13      get patent protection for the technology we

14      built because we were completely clueless at

15      that time.  We didn't know anything about it.

16                Q.   What did you do to protect your

17      invention?

18                A.   We found a law firm that was a

19      credible law firm in the patent intellectual

20      patent space and we hired them to represent us

21      and help us put a patent application in with the

22      US patent office.

23                Q.   Did you play a role in preparing

24      that patent application?
```

```
1              A.   Of course.  So I was the point guy
2       of the company.  We didn't want to distract
3       other engineers so I did most of the engagements
4       with the law firm in getting the application.
5              Q.   When did you file your application
6       for your first patent.
7              A.   It was in April '96.
8              Q.   And you've already told us that
9       there were other inventors listed on the
10      application?
11             A.   Yes.
12             Q.   Who were they again?
13             A.   Ronny Howell and Andy Levine.
14             Q.   Now, all of you by this time are
15      working for the company InfoSpinner, right?
16             A.   Right, we're all employees with
17      this company.
18             Q.   Did you, you and your two
19      co-inventors, assign your rights of the patent
20      to InfoSpinner?
21             A.   Absolutely, certainly.
22             Q.   For those of us who may not have
23      actually had a reason to do that, what does that
24      actually mean?
```

1          A.   When you're a technology person

2     working for an actual company, very often when

3     you develop stuff that's germane to the

4     company's business, they have you assign your

5     rights to that intellectual property of that

6     company so that you can't just use them and

7     develop stuff and the company doesn't get the

8     benefit, so it's very typical in the software

9     industry for software engineers to have that as

10    a requirement for their employment.

11         Q.   Is it accurate to say that while

12    you and your two co-inventors worked at

13    InfoSpinner, that it was actually InfoSpinner

14    that would own your patent if it eventually came

15    out of the Patent Office?

16         A.   Yes, that's the case.

17         Q.   Take a look at Exhibit 167 and

18    tell us what that is.

19         A.   This looks like the assignment,

20    the original assignment that Ronny and Andy and

21    I signed to assign ownership of the patent to

22    InfoSpinner.

23         Q.   Let's take a look at the next

24    page.  So no one has to take the time to read

Lowery - Direct                     289

```
 1       all of this, is it your understanding that

 2       that's the document that assigned your patent

 3       and application to InfoSpinner?

 4              A.   Right.

 5              Q.   After the application was filed,

 6       did you finish developing the product for

 7       Software AG?

 8              A.   We did, yes, definitely.

 9              Q.   And when did you release that?

10              A.   I think originally we were going

11       to release it in the summer bu it ended up being

12       a little later than that, maybe fall of '96,

13       because we ended up having to do some of the

14       software engineering that they were supposed to

15       do and couldn't get done, so we did the work for

16       them.

17              Q.   Did you start to get interest from

18       other major software companies?

19              A.    We did.  Late summer maybe a

20       company called Beacon IT in Japan, one of the

21       largest data mining companies in Japan at that

22       time expressed some interest in a

23       distributorship agreement and we signed that and

24       they made an investment in the company.
```

Lowery - Direct                    290

1              Q.   How much?

2              A.   A little over $1 million.

3              Q.   Any other companies?

4              A.   Of course, we had this

5    conversation going with Gupta.  And they

6    actually ended up coming back and trying to buy

7    us at a certain point.

8              Q.   How about Software AG, they

9    already sent you $1 million and a quarter.  Did

10   they invest further in your company?

11             A.   Well, they re-upped and actually

12   expanded the scope beyond North America for the

13   distributorship agreement.

14             Q.   Did InfoSpinner have business

15   relationships with other company clients

16   following its agreement with AG and Beacom?

17             A.   We did.  We had both direct and

18   indirect customers, particularly in Software AG

19   we had to have a direct relationship because we

20   were supporting the product with Software AG and

21   Beacom.

22             Q.   Anybody we can recognize?

23             A.   U.S. Navy, Seiko Watches.

24             Q.   How much installations were there

Lowery - Direct                        291

```
1    eventually for the InfoSpinner product?

2             A.   Ultimately, I think there were 800

3    installations in 2200 different company.

4             Q.   If you take a look at Plaintiff's

5    Exhibit 68, specifically on Page 30 of that

6    document.  It's Bates label 450.

7             A.   Right.

8             Q.   Is this a business plan for in no

9    spinner?

10            A.   It is.

11            Q.   And does it list a number of

12   clients?

13            A.   It does.

14            Q.   Just so, and we certainly don't

15   want to take the time to go through all of them,

16   just so the jury can get a flavor of what your

17   invention this product enabled, what did your

18   product do for the City of San Antonio Police

19   Department?

20            A.   They had built a website that let

21   people get on and see what kind of traffic and

22   accident information was going in the city at

23   the moment or in the moment, so you kind of knew

24   if there were going to be traffic problems.
```

Lowery - Direct                    292

```
 1              Q.    What about the state of Alaska and

 2     California?

 3              A.    Alaska had a vanity license plate

 4     system where you get on and design a license

 5     plate and then buy a vanity license plate.

 6     California had kind of a fraud related website

 7     where you could look up remodelers and building

 8     contractors and see if they had legal issues

 9     that you need to be aware of.

10              Q.    I noticed that one of your

11     customers is the U.S. Navy.  How did they use

12     your invention?

13              A.    Those guys, their procurement

14     systems.  When people on the ships needed

15     requisition, things on board, they had a system

16     where they could use their browser from the ship

17     and order parts from on shore and have it

18     shipped out to the ship.

19              Q.    How was your technology in general

20     received by the industry?

21              A.    Well, people liked it.  We got

22     lots of kudos.

23              Q.    In addition to this financial

24     success that you're describing, was there
```

Lowery - Direct                    293

```
 1        anything that happened in April '99 that sort of
 2        put the cherry on top of everything?
 3                 A.   Yes.   In April of 1999 we received
 4        a patent that we're talking about in this case,
 5        the '554.
 6                 Q.   How long had the Patent Office
 7        been studying your patent application?
 8                 A.   At that point almost exactly three
 9        years.
10                 Q.   How did you find out after those
11        three years of studying your patent that it was
12        going to be granted?
13                 A.   We were probably notified by our
14        lawyers.   Typically, the patent office sends a
15        Notice of Allowance that lets you know they're
16        going to allow some claimed invention, and then
17        some weeks after that you actually get the
18        patent granted.   So probably there was some
19        combination of our lawyers and the Patent Office
20        notified us.
21                 Q.   If you would please identify
22        Plaintiff's Exhibit 6.
23                 A.   This is a copy of the '554 patent.
24                 Q.   What did you do when you and your
```

Lowery - Direct                               294

```
 1    co-inventors learned that your patent was going

 2    to be approved and issued?

 3             A.   We were really excited.  A lot

 4    high-fives, calling people.  We immediately

 5    ordered these plaques, got one for all of the

 6    inventors and one to hang on the wall in the

 7    office.

 8             Q.   Did you tell anybody else about

 9    the patent?

10             A.   Yes, friends and family.  I told

11    my wife.  She was more expressed with that than

12    she was my web career.

13             Q.   Did you start marking your product

14    with your patent number?

15             A.   We did.  We were excited to do

16    that.  We felt it was a competitive advantage

17    for us to have that.

18             Q.   Take a look at Plaintiffs Exhibit

19    110.  What is is this document?

20             A.   This is a press release related to

21    the award that we received from the Patent

22    Office.

23             Q.   Mr. Lowery, after you got

24    notification that you were going to be issued
```

1      this U.S patent and you've described excitement

2      and so forth, when the dust settled how did you

3      fool about that?

4              A.    Well, on a personal level it was

5      kind of a big deal for me because if you're

6      somebody that's self- taught and found your way

7      through this, you haven't had along the way a

8      lot of ways to sort of measure the significance

9      of your work, the significance of what you're

10     doing.  So getting a patent like this is a

11     really big deal.  To me personally, it kind of

12     validated all of the stuff I've done was legit

13     and useful.

14              Q.    Following the issuance of your

15     first patent, the '554, were there changes going

16     on in the Internet marketplace, and we're

17     talking about 1999 and the 2000 time frame?

18              A.    There were huge changes.  Any time

19     new technology like what we were doing, and some

20     of our competitors comes out, there's a lot of

21     consolidations and mergers and different things.

22     The market kind of changes.  Big players decide

23     to get in, so that's the kind of situation we

24     were facing.

Lowery - direct                    296

1          Q.   You've told us that you had a

2     business InfoSpinner selling the software

3     product.  Did you decide to make any changes in

4     your business model to stay competitive?

5          A.   Yes.  We had a CEO at the time who

6     really wanted to instead of kind of looking at

7     some of the growth path we were on, he wanted to

8     put us on a more aggressive growth path so he

9     had us consider changes to our business model

10    and altering the business strategy to something

11    else.

12         Q.   To what?

13         A.   Well, we became a service

14    provider.  We built what's called a contract

15    distribution network.  We took a lot of the

16    ideas and learnings from our original technology

17    and we decided to putting them on the software

18    and we layered them on the whole Internet.

19         Q.   Were you in favor of transitioning

20    to this new business model?

21         A.   Absolutely.  I was instrumental in

22    that.  The CEO assigned me the task of

23    recommending some changes in strategy so this

24    was my recommendation to him.

1          Q.   At the same time the company

2     changed its business model did you change the

3     name?

4          A.   We did.  We changed the name to a

5     company called Epic Realm.

6          Q.   Did you move the ownership of the

7     patents into epic Realm.

8          A.   We did, certainly.

9          Q.   Why don't we call up on the screen

10    Plaintiffs Exhibit 186.  What is this document?

11         A.   This is a notice from the Patent

12    Office that they recorded the assignment of the

13    patents from InfoSpinner to Epic Realm.

14         Q.   I don't think we need to take the

15    time to put the following documents on the

16    screen, but you just tell us what they are,

17    Plaintiff's Exhibit 910, 173 and 911?

18         A.   910 is an assignment -- I need to

19    read here.

20    I'm sorry.  I'm not seeing what I'm looking for here.

21         Q.   Well, let's not spend too much

22    time on it.  Are these three documents that I've

23    asked you to look at all assignments that moved

24    ownership of the patent to various --

1              A.   Yes, these are assignments from

2       InfoSpinner to Epic Realm.

3              Q.   How was InfoSpinner transition to

4       becoming Epic Realm received by the business

5       community?

6              A.   It was received well both in the

7       press and in the investment community.

8              Q.   Were you able to raise significant

9       amounts of money in investments?

10             A.   We did.   We raised about $90

11      million at this time.

12             Q.   What did this influx of investment

13      money of $90 million allow you to do in terms of

14      growth?

15             A.   Well, our business plan entailed

16      building out a whole global infrastructure on

17      the Internet to client servers and networking

18      gear and software all over the word so it

19      allowed us to get a big start in building out

20      that global infrastructure.

21             Q.   Did the company grow quickly we

22      did?

23             A.   We did.   We grew very rapidly from

24      34 to 200 or 300 people in a very short month.

```
 1                    Q.   Tell us very quickly what

 2      Plaintiff's Exhibit 126.

 3                    A.   That is a press release talking

 4      about the number of the companies we were

 5      working with to build out our global

 6      infrastructure.

 7                    Q.   Does it name some of the companies

 8      that you were partnering with?

 9                    A.   Right, so IBM, Intel.  Foundry

10      Networks was a network computer company at the

11      time, a number of big Internet service

12      providers, Red Hat.

13                    Q.   You told us your company had

14      raised $90 million in investments to build out a

15      global network.  Was that enough money to do it?

16                    A.   It was only part of the money we

17      needed to do it.  The plan was to raise the rest

18      in the public market.

19                    Q.   What does that mean?

20                    A.   It means we wanted to take the

21      company public to raise the additional capital.

22                    Q.   So you sell stock to the public to

23      raise money to put back into the company?

24                    A.   Right.
```

Lowery - direct                          300

```
 1                Q.   And remind us, please, what time

 2      period we are in now?

 3                A.   This is around 2000.

 4                Q.   Now, at this point in 2000, maybe

 5      early 2001 you've raised $90 million in venture

 6      capital, you had the clients and partners that

 7      you've described to us.  Your employees have

 8      grown from I think you said 34 to more than 200.

 9                Was that all about to change?

10                A.   Yes, really rapidly.

11                Q.   What happened?

12                A.   The Internet bubble popped.  A

13      bunch of our customers died, and it became

14      apparent we were not going to be able to raise

15      the additional money we needed around the

16      markets.

17                Q.   Did Epic Realm collapse int he.com

18      bubble or.com crash?

19                A.   No, but we had to seriously adjust

20      our whole business plan.

21                Q.   Tell us about that.

22                A.   Well, we couldn't raise additional

23      capital we needed to finish building our

24      infrastructure so we had to take a different
```

1    path entirely, so we decided to become a product

2    company again and shut down that portion of that

3    we had just finished building up.

4          Q.   In the midst of this new business

5    strategy, did anything happen in July 2002?

6          A.   So in July of 2002 we suddenly

7    received the second of the two patents issued in

8    this suit, the '335 patent that was granted be

9    the Patent Office.

10         Q.   Identify Plaintiff's Exhibit 14

11   for us, please.  What is this?

12         A.   This is a copy of the '335 patent.

13         Q.   How is this patent, the second

14   one, related to the first patent that you got?

15         A.   This is what's called a

16   continuation and what that means is you take the

17   same description of what you built and you just

18   change the claims or you add additional claims

19   and it's like a whole new patent in one way, but

20   the specification itself is all the same.  It's

21   just a follow-on or child or sister, however,

22   you want to put it to the original patent.

23         Q.   Mr. Lowery, around this time the

24   early 2000's, did it ever dawn on you that there

Lowery - Direct                          302

 1      might be other companies that were using your

 2      patented inventions?

 3                  A.   Definitely, yes.

 4                  Q.   Tell us about that.

 5                  A.   Well, technology companies who

 6      want to tell you about what they're working on

 7      and the value of what they're delivering will

 8      very often describe the features and functions

 9      of what they have to offer.  And and it seemed

10      to me from several different companies, they

11      were advertising features and functions that

12      sounded remarkably similar to our patents.

13                  Q.   So that time frame, again we're

14      talking about the early 2000's, if you believed

15      that was a possibility why didn't you do

16      anything about it?

17                  A.   Well, we were relatively a very

18      small company and had limited resources.  We

19      didn't even have at that time enough resources

20      to finish building out our network, much less

21      taking a licensing program.  So we really didn't

22      have the latitude to just go off and do a

23      licensing program.

24                  Q.   Was Epic Realm's new plan to

Lowery - Direct                                303

```
 1    downsize, become a smaller products company,

 2    successful?

 3           A.   Ultimately, we went through

 4    downsizing successfully.  Ultimately, the

 5    company did not succeed.

 6           Q.   Did it eventually decide to wind

 7    down and dissolve?

 8           A.   It did.

 9           Q.   As it dissolved and ceased it

10    operations, did it pay off its creditors?

11           A.   It did.

12           Q.   What did you personally decide to

13    do as this was going on?

14           A.   My thing was new product

15    development and there was not going to be new

16    product development.  Because I was not going to

17    do that, I found it was a drain on the resources

18    and value so by mutual agreement I rolled out of

19    the company.

20           Q.   What do you mean you rolled out?

21           A.   I left the company, ceased my

22    employment there and went on to do other things.

23           Q.   Did you stay on good terms with

24    the people who were left at Epic Realm?
```

1          A.   Very much so.  I was still a

2    shareholder and they were still operating at

3    that time.

4          Q.   Before you left Epic Realm, did

5    you have any discussions with anyone at the

6    company about the future of your patents that of

7    course were owned by Epic Realm?

8          A.   So the CEO at the time was someone

9    I had known for a long time and we talked about

10   the opportunity to do a licensing business

11   around the patents.  In fact, when we downsized

12   I had spoken with the Board about it, that is

13   something I felt they ought to consider.  So

14   there had been numerous discussions with the

15   company about pursuing that business model.

16         Q.   Did they ask you to put your

17   thoughts in writing about that?

18         A.   Ken did, the CEO of the company

19   did.

20         Q.   Let me ask you to identify

21   Plaintiff's Exhibit 79.  What is that?

22         A.   This is a copy of the e-mail from

23   me to the then CEO of Epic Realm, Ken Hill,

24   regarding he had asked me to write up a summary

Lowery - direct                                   305

```
 1        of my thoughts of furthering the opportunity to

 2        pursue licensing agreements.

 3                    Q.   Were there any companies in

 4        particular that you suspected were using your

 5        patented technology?

 6                    A.   Yes.  There were really many

 7        companies but there were four big companies.

 8                    Q.   Was Microsoft one of them?

 9                    A.   It was.

10                    Q.   Why did you suspect that Microsoft

11        was infringing your patents?

12                    A.   Based on public information they

13        had out, that they were doing things at the

14        time.

15                    Q.   What kind of information?

16                    A.   Well, technical features,

17        descriptions of the way their products worked

18        and that kind of thing.

19                    Q.   What could you tell from that

20        publicly available information?

21                    A.   You could tell whether the

22        functionality they were claiming kind of matched

23        similarly to the functionality in the patent.

24                    Q.   So you say that you suspected that
```

Lowery - Direct                306

```
 1     Microsoft might be using your invention.  Why
 2     didn't you know that that was the case?
 3              A.  Well, because I didn't have access
 4     to the internal clinical data or code that would
 5     allow me to really know for sure how these
 6     things were working.  I could only go by
 7     information that was public.
 8              Q.  Over the course of this case or
 9     since that time to the present, have you ever
10     had access to Microsoft's code?
11              A.  No.
12              Q.  And is there an expert witness in
13     this case who has?
14              A.  Yeah, Dr. Jones has had access to
15     that.
16              Q.  And will he testify, if not this
17     afternoon, tomorrow about that?
18              A.  What I'm told, yes.
19              Q.  What did you do after you left
20     Epic Realm?
21              A.  I did a little consulting for a
22     while.  I worked on another little start-up, a
23     product idea that I had and I ended up at
24     Amazon.com in Seattle where I ran a chunk of the
```

1      retail website there.

2                  Q.   Have you around that time period

3      done some work for the U.S. government?

4                  A.   I did.  I did some consulting that

5      related to the second Iraq war and top secret

6      clearance and advised some issues related to

7      that.

8                  Q.   Around the time you left Epic

9      Realm was around 2003?

10                 A.   Yes.

11                 Q.   Was there anyone connected with

12     the company that shared your views that Epic

13     Realm should consider recovering fair value for

14     other companies' use of your patents?

15                 A.   Yeah.  We had outside counsel that

16     was working with us at the time, Terry Fokas,

17     who was a big proponent of looking at an

18     opportunity to license the patents.

19                 Q.   And after Epic Realm wound down

20     its operations, did Mr. Fokas take any steps to

21     pursue fair value for the patents?

22                 A.   He did.  He actually made an

23     arrangement with the Epic Realm shareholders to

24     buy the patents leaving an opportunity open to

```
 1        go license those patents for kind of a few

 2        businesses that he was starting.

 3                    Q.   Did you help him do that?

 4                    A.   Eventually I did.  I kind of got

 5        involved early on, but not involved for a long

 6        time.

 7                    Q.   Did you help Mr. Fokas seek

 8        additional patent protection for your ideas?

 9                    A.   I did.  Anytime you have a

10        portfolio of these patents and things, there's

11        an ongoing sort of engagement with the Patent

12        Office and I kind of helped with that as an

13        inventor and somebody who knew about the patents

14        themselves.

15                    Q.   Did Mr. Fokas eventually

16        transition ownership of the patents from Epic

17        Realm Licensing to the Plaintiff in this lawsuit

18        Parallel Networks?

19                    A.   Yes, he did.

20                    Q.   Are you a shareholder of Parallel

21        Networks?

22                    A.   I am.

23                    Q.   What percentage of Parallel

24        Networks do you own?
```

Lowery-cross                        309

```
 1              A.   Right at 15 percent, I think.

 2              Q.   Have you worked with Mr. Fokas on

 3      any other projects?

 4              A.   We've done some preliminary

 5      planning on some additional sort of business and

 6      technology development.

 7              Q.   What kind of work is that?

 8              A.   Well, we've talked about doing

 9      some work in the area of cloud computing and

10      applying some of the patents currently owned by

11      Parallel Networks to some of the challenges in

12      doing reliable cloud computing network

13      infrastructures.

14              Q.   Would that project use your

15      patented invention?

16              A.   It would definitely use it and

17      take advantage of it to do interesting things.

18              MR. CAWLEY:  Thank you, Mr.

19      Lowery.  I will pass the witness.

20              THE COURT:  Ms. Brooks?

21                      -  -  -

22              CROSS- EXAMINATION

23                      -  -  -

24      BY MS. BROOKS:
```

Lowery - cross                    310

```
 1                  Q.   Good afternoon, Mr. Lowery?

 2                  A.   I'm going to talk to you about

 3        that white board tomorrow rather than take the

 4        time to move it.  We will talk about the other

 5        subject until we break 4:30.

 6                       Can you go to the last document you

 7      talked about PTX-79.  Mr. Lowery, this is you writing

 8      to someone named K. Hill at Epic Realm; is that

 9      right?

10                  A.   Yes.

11                  Q.   And the date is September 12,

12        2003; is that correct?

13                  A.   Yes.

14                  Q.   If we can go to the second page of

15        the document, so I have highlighted the last

16        paragraph.

17      You say at the end of this e-mail to Mr. Hill, So to

18      sum up, the potential infringers in the software

19      market are IBM, BEA, Sun and Microsoft.  Also Apache

20      Tomcat but I'm not sure they're worth the trouble.

21      On the network device side, Cisco, Foundry, Nortel

22      and any other layer 7 load balancing solutions; is

23      that right?

24                  A.   Yes, you read that correctly.
```

```
 1              Q.   Thank you.  At this point in time

 2       you had not seen -- let's just focus on

 3       Microsoft.  You had not seen any software as to

 4       how Microsoft's web server functioned; is that

 5       correct?

 6              A.   I had used IIS in my work but I'm

 7       not sure what you're asking.

 8              Q.   Let me try my question again.  My

 9       question was at this point you had not seen any

10       software code as to how Microsoft web server

11       functioned; is that fair, sir?

12              A.   I have no access to the source

13       code for Microsoft web server, that's correct.

14              Q.   And am I correct that source code

15       is highly proprietary?

16              A.   It can be.  There are open source

17       solutions.

18  In fact, Apache Tomcat is one of them.  You can see

19       the source code of that.  And even Microsoft to a

20       certain extent is an open source business, but

21       certainly some source code is held proprietary.

22              Q.   And you would agree that some

23       source code is certainly held as proprietary

24       within the company that created the source code,
```

```
 1    correct?

 2             A.   Certainly.

 3             Q.   And at this point in time you

 4    haven't seen any source code regarding how

 5    Microsoft web server functions, and I take it to

 6    this day you have not been privy to the source

 7    code that would show you how Microsoft's web

 8    server actually functions; is that fair?

 9             A.   That's correct.

10             Q.   Am I correct that you have not

11    spoken, for example, to Mr. Alam regarding how

12    the IIS pipeline actually functions from a

13    source code level in the web server; is that

14    correct?

15             A.   I'm sure I have not.  I've talked

16    to a lot of engineers at Microsoft through the

17    years, but I don't recall talking to him.

18             Q.   And you have not talked to Dr.

19    David Maltz regarding how Frontdoor Version 1

20    and FrontDoor Version 2 from a source code level

21    functions within Microsoft's web server; is that

22    correct?

23             A.   That's correct.

24             Q.   Now, let's talk briefly that will
```

Lower - cross                          313

```
 1       get us to the ends of the day.  You told us

 2       earlier what you invented.  Let's talk a little

 3       bit about what you didn't invent so the Ladies

 4       and Gentlemen understand.

 5                  Is it fair to say that you did not

 6       invent web servers?

 7                  A.   Certainly, we called them out as

 8       existing art in the patent.

 9                  Q.   And is it fair to say you didn't

10       invent web pages?

11                  A.   No, certainly not.

12                  Q.   You did not also invent web pages;

13       is that correct?

14                  A.   That's correct.

15                  Q.   And you also did not invent the

16       idea of a server that receives and processes a

17       web page request; is that correct?

18                  A.   No, we didn't invent that.

19                  Q.   And you did not invent dynamically

20       generating web pages; is that correct?

21                  A.   That's correct.

22                  Q.   And in turn you also did not

23       invent HTML, the language we've been talking

24       about?
```

```
 1              A.   That's correct.

 2              Q.   In fact, you told us a little bit

 3     about the dispatcher, this intelligent

 4     dispatcher that does load balancing, but isn't

 5     it true, sir, you also did not invent the idea

 6     of low balancing itself; is that correct?

 7              A.   That's correct.

 8              Q.   In fact, even before you came up

 9     with your intelligent load balance, it would not

10     surprise you to know that people had written

11     Ph.D.s on load balancing prior to your

12     conceiving of your invention?

13              A.   I will take you at your word.

14              Q.   Well, did you not say exactly

15     those words at your deposition, sir?

16              A.   I don't recall whether people had

17     written whole Ph.D.s.  They may have.  That's

18     entirely possible.  I can't cite a Ph.D. thesis

19     on load balancing as we sit here.

20              Q.   Would it surprise you in the least

21     to learn that people had written Ph.D.s on load

22     balancing prior to your invention?

23              A.   I agree with you.

24              Q.   Now, let's turn to what you did
```

Lowery - cross                    315

```
 1        invent.  Let's go to your binder to the patent
 2        which is the first tab in your binder, and that
 3        should be PTX-0006 and that's going to be the
 4        '554 patent.  Let me know when you're there, Mr.
 5        Lowery?
 6                   A.   I'm there.
 7                   Q.   You talked about the patent, but
 8        you didn't really show us any of the figures or
 9        any of the claims.  You are a listed inventor on
10        this patent, correct?
11                   A.   I am.
12                   Q.   And this patent was filed with the
13        United States Patent and Trademark Office on
14        April 23, 1996; is that right?
15                   A.   Right.
16                   Q.   Now, if we could turn, Mr. Lowery,
17        to Figure 4 in the patent which is going to be
18        at Page 133507.
19                   Now, I showed the Ladies and
20        Gentlemen in my opening statement.  Is this one
21        of the figures in your '554 patent?
22                   A.   It looks to be, yes.
23                   Q.   Is this similar to what you were
24        trying to show us on the white board?
```

```
 1              A.   Not anything like this detail.  It
 2      was a much simpler explanation, but many of the
 3      parts of this I talked about on my board.
 4              Q.   Now, so next to Figure 4 is Figure
 5      5; is that right?
 6              A.   Yes.
 7              Q.   What do you call this sort of flow
 8      thing we're looking at in Figure 5?  What is
 9      that called?
10              A.   I guess you could call it a data
11      flow.
12              Q.   Since I went through Figure 4 in
13      opening, let's go through Figure 5 right now,
14      unless --
15              MS. BROOKS:  Your Honor, it's
16      4:29.
17              THE COURT:  It is indeed.
18              MS. BROOKS:  If this is a good
19      place to stop, it is for me, Your Honor.
20              THE COURT:  Ladies and Gentlemen,
21      I remind you again you're not to talk about the
22      case with anybody even including amongst
23      yourself.
24              Thank you for being there.  I look
```

```
 1    forward to seeing you tomorrow morning in the

 2    jury box.  You're free to go.

 3                    (Jury exited.)

 4              THE COURT:  Mr. Lowery, you can

 5    step down.   Counsel, I will tell you, you're

 6    not supposed to talk  to anybody about the case

 7    while your on cross-examination.

 8              Is there anything we need to talk

 9    about counsel before we break for the evening?

10              MR. CAWLEY:  If the Court will

11    indulge me for a minute, and I hope I'm not

12    standing out of bounds here but recently and I'm

13    sure Ms. Brooks will agree with this, there's

14    been a number of articles and studies about the

15    shocking incidents about jurors ignoring the

16    Court's admonition and doing research on  the

17    Internet.

18              I will request on behalf of the

19    parties if Your Honor would consider giving

20    occasional reminder to the jury of your

21    instructions not to do that.

22              THE COURT:  Okay.  Anything in

23    response, Ms. Brooks?  Do you have anything you

24    want to say about that?  You don't have to.
```

```
 1                    MS. BROOKS:  I defer to the Court,

 2      Your Honor.

 3                    THE COURT:  I will be happy to --

 4      in fact, if it looks like I'm going to forget,

 5      remind me after  the last break, but I will make

 6      sure I tell them that  tomorrow evening, but I

 7      will tell them don't talk to  anybody and do any

 8      research.

 9                    MR. CAWLEY:  Thank you, Your

10      Honor.  I  appreciate it.

11                    MS. BROOKS:  Your Honor, we have

12      corrected copies of the preliminary

13      instructions.  Before we give them to your

14      clerk, may we double check to make sure they're

15      correct at this time?

16                    THE COURT:  That's fine.  They

17      were promised that they would have these with

18      them at some  point.  Make sure before -- I

19      don't know at what point  the parties want to

20      make sure that they have these.

21                    They will have them for sure at

22      the very end so take the time you need, but I

23      don't want somebody saying,  hey, this was

24      supposed to be in such and such  submission to
```

```
1    the jury before I was intending to do it  at the

2    very end and have it scrambled.  Am I making

3    sense?

4                    MS. BROOKS:  Yes, Your Honor.

5                    THE COURT:  Okay.  Go back and

6    make sure it's corrected.  All right then.

7    Thanks very much, and I will see you all

8    tomorrow morning just before five  minutes to

9    9:00 unless I hear from you before that.  In

10   other words, I will be in the office by 8:30 if

11   there's a problem.  So is there a problem?

12                   MR. BOVENKAMP:  No, Your Honor.

13   What is the best way to advise the Court that

14   there may be an issue that we require assistance

15   on?

16                   THE COURT:  Call chambers at

17   302-573-6001.  If you can't reach chambers, the

18   next step is to call the clerk's office and

19   reach somebody in the clerk's  office.  Okay.

20   Thanks very much.  We stand in recess.

21                   (Court recessed at 4:34 p.m.)

22

23

24
```

```
1    State of Delaware )
                       )
2    New Castle County )

3

4

5                  CERTIFICATE OF REPORTER

6

7         I, Dale C. Hawkins, Registered Merit

8    Reporter, Certified Shorthand Reporter, and Notary

9    Public, do hereby certify that the foregoing record,

10   Pages 1 to 320 inclusive, is a true and accurate

11   transcript of my stenographic notes taken on May 8,

12   2017, in the above-captioned matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 8th day of May 2017, at

16   Wilmington.

17

18

19              /s/ Dale C. Hawkins

20            Dale C. Hawkins, RMR

21

22

23

24
```