```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
 2

 3

     PARALLEL NETWORKS LICENSING, LLC,)
 4                                    ) VOLUME 4
                     Plaintiff,       )
 5                                    ) Civil Action
     v.                               ) 13-2073-KAJ
 6                                    )
     MICROSOFT CORPORATION,           )
 7                                    )
                     Defendant.       )
 8

 9                          ----

10                    Thursday, May 11, 2017
                      8:30 a.m.
11                    Courtroom 4A

12                    844 King Street
                      Wilmington, Delaware
13

14   BEFORE:  THE HONORABLE KENT A. JORDAN, U.S.C.C.J.

15

     APPEARANCES:
16
                     YOUNG CONAWAY STARGATT & TAYLOR
17
                     BY: ADAM POFF, ESQ.
18
                          -and-
19
                     McKOOL SMITH, P.C.
20                   BY: DOUGLAS A. CAWLEY, ESQ.
                     BY: CHRISTOPHER BOVENKAMP, ESQ.
21                   BY: JUSTIN ALLEN, ESQ.
                     BY: ANGELA VORPAHL, ESQ.
22                   BY: JOHN CAMPBELL, ESQ.
                     BY: KEVIN HESS, ESQ.
23                   BY: LEAH BURATTI, ESQ.

24                        Counsel for the Plaintiff
```

APPEARANCES CONTINUED:


                    FISH & RICHARDSON
                    BY: JUANITA BROOKS, ESQ.
                    BY: MARTINA TYREUS HUFNAL, ESQ.


                         Counsel for the Defendants

1     THE COURT:  Good morning.  Please

2  be seated.  We're here together because I

3  understand Parallel Networks wants to change the

4  claim construction.  Got that right?

5     MR. CAMPBELL:  Yes, Your Honor.

6     THE COURT:  Knock yourself out,

7  Mr. Campbell.

8     MR. CAMPBELL:  Your Honor, we

9  believe the Court should issue a supplemental

10  claim construction under the '02 Micro decision.

11  The Federal Circuit clearly stated the scope of

12  the claim in its decision in the Oracle case.

13  It stated that the releasing limitation can be

14  shown if the page server releases the hardware

15  resources, e.g., memory, microprocessor cycles

16  of the web server.  And Dr. Long yesterday

17  expressly disagreed with that scope of the claim

18  that releasing microprocessor cycles was

19  sufficient.  And based on his disagreement with

20  the Federal Circuit we believe the Court should

21  issue a supplemental claim construction to

22  clarify that that is within the scope of the

23  claim and it satisfies a releasing limitation.

24     THE COURT:  All right.  Thanks,

```
 1        Mr. Campbell.  Who is speaking for this on

 2        behalf of Microsoft?

 3                    MS. BROOKS:  I will, Your Honor.

 4        We did have an opportunity, albeit early this

 5        morning, to file a response.  I don't know if

 6        Your Honor got it.

 7                    THE COURT:  No.  I haven't seen

 8        it.

 9                    MS. BROOKS:  We tried to get it in

10        as soon as we could, Your Honor, but obviously

11        this came in at 10:40  r something last night.

12        So let me just summarize if I could.  First of

13        all, Dr. Long's testimony is not contradictory

14        to the Fed Circuit.  He was asked the question,

15        do you agree that we can show infringement as

16        long as either -- and then they read the '02

17        Micro language and he said no, I don't think so.

18        Well, what he was saying is just because you

19        don't meet one limitation,

20        you -- just because you might meet one

21        limitation, there's two others you don't meet,

22        so no, you still haven't shown infringement.  So

23        I didn't open any kind of a door that would

24        necessitate a new construction.  Also the Fed
```

```
 1          Circuit didn't actually construe the releasing
 2     limitation.  Neither party appealed that they --
 3     and they were simply in dicta having a
 4     discussion about it.  Parallel Networks was the
 5     party that sought and obtained the constructions
 6     in this case and still stands even after the
 7     '02 -- even after the Oracle case came down.
 8     They never asked the Court to change that
 9     construction.  Microsoft actually did.  Parallel
10     Networks said no and the Court agreed with
11     Parallel Networks.  They have no excuse for not
12     raising this issue earlier.  Dr. Long, in his
13     expert report, actually discussed how he and
14     Dr. Jones appeared to be interpreting what it
15     means to release, one in a more narrow fashion,
16     one in a broader fashion.  The prejudice
17     obviously to us would be very significant.
18               But probably more important, Your
19     Honor, is that this isn't a question of law,
20     this is a question of fact.  The term has been
21     construed.  '02 Micro, the term hadn't been
22     construed and the parties were disagreeing as to
23     what the construction should be and the Court
24     declined to give one.  Here the Court gave one,
```

1    Parallel Networks' proposed construction.  And

2    in denying our motion for JMOL, I pointed out

3    where Dr. Jones had said that that piece of

4    memory was not released and Your Honor pointed

5    out well, but he also said there was some sort

6    of a processor that was released and the jury

7    could decide that that was enough.  So it's a

8    question of fact as Your Honor has found, not a

9    question of law and so there was no dispute

10   about what the construction meant.  No need to

11   do a new construction.  Rather, it's now a

12   question of fact as to whether or not they agree

13   with Dr. Long that that construction -- that

14   that element isn't there or they agree with

15   Dr. Jones that that element is.

16              THE COURT:  All right.  Thanks.

17              MR. CAMPBELL:  Briefly, Your

18   Honor, to address Ms. Brooks' points.  The first

19   point, the question -- what led to that question

20   was Mr. Bovenkamp asking Dr. Long, I want to

21   touch on one last topic with you Dr. Long.  I

22   want to talk about intercepting which we have,

23   but I also want to talk about the releasing of

24   the web server to process other requests.  That

```
 1      was another non-infringement argument you made,

 2      correct?  That led into the question whether he

 3      agreed with the Federal Circuit and he said no.

 4      So it wasn't a saying no because I've got these

 5      two other arguments.  It was I don't agree with

 6      the Federal Circuit's interpretation here.  I

 7      think you've got do some more specific.

 8      Releasing microprocessor circles is not enough.

 9      So I think that's a mistake.  Ms. Brooks said

10      there's a disagreement about the interpretation

11      of the claim.  Dr. Jones was interpreting it one

12      way in accordance with the Federal Circuit and

13      Dr. Long is interpreting it a different way.

14      That's a claim construction dispute.

15                  THE COURT:  I thought Dr. Jones

16      offered the claim construction you asked for.

17      Are you telling me Dr. Jones changed his

18      interpretation that he testified he was

19      operating under?

20                  MR. CAMPBELL:  No, Your Honor.

21                  THE COURT:  That's what it sounds

22      like you just said.  Did Dr. Jones or did not

23      Dr. Jones from the stand say he was operating

24      under the claim construction as given by this
```

```
 1    Court which not incidentally is the claim

 2    construction suggested by Parallel Networks in

 3    this case?

 4              MR. CAMPBELL:  He did.

 5              THE COURT:  Okay.  So it sounds

 6    like your expert and the other side's expert

 7    both testified in accordance with the claim

 8    construction handed down by this Court which

 9    again happens to be the claim construction at

10    this point that you asked for.  Right?

11              MR. CAMPBELL:  In opposition to

12    Microsoft's request to change it, yes, that's

13    correct.

14              THE COURT:  So the only testimony

15    this jury has heard is testimony based on that

16    claim construction, including testimony from

17    your expert.  Right?

18              MR. CAMPBELL:  I'm sorry, Your

19    Honor, I did not follow that question.

20              THE COURT:  The only testimony

21    this jury has heard is testimony from your

22    expert in accordance with the claim construction

23    that this Court has been operating under since

24    it first issued it at your suggestion.  Right?
```

1         MR. CAMPBELL:  Yes, Your Honor.

2         THE COURT:  Right.  So what you're

3    really saying is in your rebuttal case you want

4    Dr. Jones to get on and introduce a new claim

5    construction.  Right?

6         MR. CAMPBELL:  No, Your Honor.

7         THE COURT:  You want me to give

8    the claim construction that he can then operate

9    under rebuttal?

10        MR. CAMPBELL:  I don't think he

11   needs to say anything about it in rebuttal.

12        THE COURT:  Then what testimony

13   would they have to deal with?  If everybody's

14   testimony in the case is solely and only on the

15   claim construction we have been operating under,

16   what would the jury have as a basis on which to

17   operate under a different claim construction

18   when all the testimony has been directed to the

19   claim construction as it has been throughout the

20   case?

21        MR. CAMPBELL:  The jury would have

22   the facts as to how the products work and Your

23   Honor's claim construction as a matter of law as

24   to those claim constructions which would be

```
 1    consistent with the Federal Circuit.
 2              THE COURT:  That won't be from any
 3    expert testimony because both experts gave
 4    testimony in accordance with the earlier claim
 5    construction.  Right?
 6              MR. CAMPBELL:  I don't believe so,
 7    no.
 8              THE COURT:  What do you got?  Who
 9    said anything about anything that's related to
10    this new claim construction?  You had
11    Mr. Bovenkamp attempt to introduce it in
12    cross-examination, that was shut down.  And you
13    got nothing else.  You got nothing else, do you?
14              MR. CAMPBELL:  Your Honor, what we
15    have is Dr. Long disagreeing with the Federal
16    Circuit's interpretation and scope of the
17    claims.  I think that's proper and supplemental
18    claim construction is appropriate.
19              THE COURT:  Anything else you
20    would like to say, Mr. Campbell?
21              MR. CAMPBELL:  No, I believe
22    that's it, Your Honor.  Thank you.
23              THE COURT:  Okay.  Well, there is
24    no lack of chutzpah here, I give you that.  It's
```

```
 1    denied.  You got your record.  If you get the

 2    Federal Circuit to agree with you, I guess I'll

 3    see you all back in court.  But we're going to

 4    court in front of the jury on the claim

 5    construction that we've had since the beginning

 6    of the case, suggested by you folks on the

 7    Parallel Network's side of the courtroom.

 8              Is there anything else we need to

 9    talk about when we're together?

10              MR. CAMPBELL:  There is, Your

11    Honor.

12              THE COURT:  What have you got?

13              MR. CAMPBELL:  Your Honor, we

14    would ask that the Court -- let me set this up a

15    little bit.  The jury has had the Court's

16    preliminary instruction, they heard the

17    preliminary instruction and they --

18              THE COURT:  I'm sorry, when you

19    say they have had the preliminary instructions,

20    they haven't been given a copy of the

21    preliminary instructions.

22              MR. CAMPBELL:  I thought they were

23    in their binders.

24              THE COURT:  No.
```

1        MR. CAMPBELL:  So they were not

2  given a copy of the preliminary instructions.  I

3  apologize Your Honor.

4            In those preliminary instructions

5  the Court referenced invalidity, part of the

6  jury's second step is determining whether the

7  patent is valid.  We believe the Court should

8  provide a supplemental, should provide an

9  instruction to the jury so that they're not

10  confused that that part of the case is out of

11  the case.

12        THE COURT:  Yes.  That's a good

13  idea.  And I think it's appropriate for the two

14  of you to sit down, both sides and say, just

15  read them this, you know, it actually shouldn't

16  take more than a sentence or two and I bet you

17  can agree on the language if you talk about it

18  and I'll be happy to provide that.

19        MR. CAMPBELL:  I'm happy to give

20  it to you.  We proposed three sentences, the

21  other side objected.

22        THE COURT:  Just talk to them

23  first, right, see what you can work out with

24  them.

```
 1                    MR. CAMPBELL:  I understand.  I'm
 2       saying we did.  We didn't bring this up without
 3       talking to them.
 4                    THE COURT:  So you guys have
 5       already talked about it, you can't agree, you
 6       can't agree how to say to the jury invalidity
 7       isn't in the case?
 8                    MS. BROOKS:  Actually we would
 9       agree on that, Your Honor, what you just said.
10       They are overemphasizing.  What Your Honor just
11       said, invalidity is not before you, perfect.
12                    THE COURT:  That's all it needs to
13       say.  All they need to know is the invalidity
14       reference made earlier in the case isn't in the
15       case.  I'm not saying Microsoft fell to its
16       knees and said no, no, we can't make this case,
17       I'm not saying anything that remotely implies
18       it.  We'll say invalidity isn't in this case.
19       If you can't agree to something as simple as
20       that -- I'll give it in your words if you can
21       come to an agreement -- that's what I'll say.
22       I'll give you another crack at it.  Is that
23       okay?
24                    MS. BROOKS:  Thank you, Your
```

```
 1    Honor.
 2                    THE COURT:  You're still there.
 3    Do you have something else?
 4                    MR. CAMPBELL:  He apologize.
 5                    THE COURT:  You don't need to
 6    apologize.  What have you got?
 7                    MR. CAMPBELL:  Just for the
 8    record, since Microsoft has rested its case, we
 9    would like to make a motion as a matter of law
10    on infringement, Microsoft has raised three
11    defenses, all three of which failed as a matter
12    of law.
13                    THE COURT:  Hold on just a second.
14    I'm sorry to interrupt, but that reminds me of
15    something else I want to ask real quickly.  In
16    the JMOL motion that was made last night, and
17    I'm taking this is a supplemental JMOL -- that's
18    okay, I'll let you do it.
19                    MR. CAMPBELL:  Thank you.
20                    THE COURT:  I had asked both sides
21    to come up with a list of things that actually
22    were in the case.  I apologize, that was
23    actually in Microsoft's JMOL.  Have you folks
24    had a chance to talk -- do you know what I'm
```

1    referencing?  Remember, there were things that

2    were in the complaint, products that had been

3    accused, and claims that had been asserted and I

4    said please get together and sort that out.

5    Have you had a chance to do that yet?

6              MS. BROOKS:  Apparently we

7    e-mailed them last night, but they didn't get a

8    chance to respond, so we're still waiting.

9              THE COURT:  You're still working

10   that out?  That would be a great thing to be

11   able to deal with before we all disperse to our

12   various corners.

13             Go ahead, Mr. Campbell.

14             MR. CAMPBELL:  So we would move

15   for judgment as a matter of law on infringement.

16   Microsoft made three arguments, all three of

17   which fail as a matter of law.

18             The first is that there is not a

19   request that satisfies the claim and claim

20   terms, claim construction for request is simply

21   a message that ask for a web page.  The

22   testimony has been unequivocal that we have all

23   used the pizza example, that request goes all

24   the way to the web server, response comes all

```
 1        the way back.

 2                    The argument that there is some

 3        sort of prosecution history estoppel is

 4        incorrect under the IPR description that the

 5        SWEB system is very different, so no reasonable

 6        jury can find that the request limitation is not

 7        satisfied.

 8                    The second is the intercepting,

 9        the claim construction, intercepting is

10        diverting the handling request before the

11        request is processed by the HTTP server.  There

12        has been -- the testimony has been that the

13        request is not processed, that request for

14        again, I'm keep using the example just because

15        it's illustrative of the pizza, there is no

16        processing of creating, getting the contents for

17        that web page until after the request is

18        diverted.  So for the handling of that request

19        to create the response to that.

20                    And as Your Honor noted in the

21        summary judgment ruling, it would be against the

22        preferred embodiment to apply that construction

23        in a way that doesn't allow some handling, some

24        processing of the request because that's exactly
```

```
 1        what's done in the preferred embodiment.

 2                     And then the final argument that

 3        Microsoft made is that releasing the web server,

 4        again, there's no -- testimony is unequivocal

 5        from everyone that cycles, microprocessor cycles

 6        are freed by the application server, processing

 7        this request as opposed to the web server.  And

 8        so for that reason the freeing the web server

 9        limitation is met as well.

10                     THE COURT:  Okay.  Thanks, Mr.

11        Campbell.  Who is speaking to this on behalf of

12        Microsoft, please?

13                     MS. BROOKS:  I apologize, Your

14        Honor.  I was totally distracted, so Ms. Hufnal

15        is going to.

16                     THE COURT:  Sure.  That's fine.

17                     MS. HUFNAL:  Thank you, Your

18        Honor.  I'll take the three limitations in

19        order.  Request, counsel said that the pizza

20        example is undisputed.  The jury has heard

21        extensive evidence about how that request is

22        interpreted and when it comes into the system it

23        is augmented, processed, handled.  There was

24        extensive testimony about that yesterday.  So
```

```
 1        there's at a minimum an issue for the jury to

 2        decide under the Court's claim construction.

 3                    Relatedly is the processing.  The

 4        jury heard at length how when the request comes

 5        in it is handled and processed through the IIS

 6        system, through the FrontDoor system.  So

 7        judgment as a matter of law is inappropriate

 8        there.

 9                    And on the freeing, as is

10        evidenced from their filing last night, there

11        was extensive evidence about how memory is used

12        and the connection is held in IIS for each

13        request and that is not freed until the response

14        is returned.

15                    THE COURT:  Okay.  Thanks, Ms.

16        Hufnal.  Mr. Campbell, anything you want to say

17        in addition?

18                    MR. CAMPBELL:  No, Your Honor.

19                    THE COURT:  Well, your motion is

20        of record and your arguments are of record.  I

21        deny it.  We'll be ready to go ahead and get the

22        jury in here at 9 o'clock.  You'll be ready with

23        your -- Mr. Bovenkamp, you'll put Dr. Long on,

24        is that the plan?
```

```
1              MR. BOVENKAMP:  Yes, we'll be

2    ready.  And yes, we'll be calling Dr. Long.

3              MS. BROOKS:  Jones.

4              THE COURT:  I'm sorry, I just

5    wanted to see -- just throwing it out there see

6    if you're paying attention.

7              MS. BROOKS:  I don't want Dr. Long

8    to have a heart attack.

9              THE COURT:  Dr. Jones, I

10   apologize.  And if Dr. Jones is in room, that's

11   the second time I've done that to you, sir.  I

12   apologize.

13             I did tell the jury I would give

14   them the preliminary instructions and that they

15   would have those with the final instructions, so

16   since the invalidity and this stuff is not in

17   there, can some member of each team please work

18   together and strip that out so I can hand a

19   copy, a corrected copy of that to them?  If

20   you'd do that, that would be great.  And I know

21   that kind of puts you on the short term because

22   I'm expecting to instruct them, depending on how

23   long arguments go and testimony goes from

24   Dr. Jones, I expect to do that this morning, all
```

```
 1    right?
 2                     MR. CAWLEY:  Your Honor, could I
 3    ask one super brief question?
 4                     THE COURT:  Sure.
 5                     MR. CAWLEY:  Since we're on the
 6    verge of closing arguments, does Your Honor
 7    follow the traditional format of Plaintiffs
 8    closing, Defendants closing, Plaintiffs
 9    rebuttal?
10                     THE COURT:  Yeah.  If we still had
11    invalidity in this case, they'd get to go last
12    on that.  We don't.  It's burden of proof, so
13    yeah, just like you said.
14                     MR. CAWLEY:  Thank you.
15                     (Short recess.)
16                     THE COURT:  All right.  Thanks.
17    Let's have the jury in.
18                     (Jury entering the courtroom at
19    9:02 a.m.)
20                     THE COURT:  Thanks, ladies and
21    gentlemen.  Please be seated.  Thanks for being
22    here.  We're ready to go.
23                     Mr. Bovenkamp.
24                     MR. BOVENKAMP:  Yes, Your Honor.
```

Case 1:13-cv-02073-KAJ-SRF   Document 445   Filed 05/26/17   Page 21 of 189 PageID #:
20232
Jones - rebuttal - direct            1102

```
1      The plaintiff, Parallel Networks, calls for its

2      rebuttal case, Dr. Mark Jones.

3                  THE COURT:  Dr. Jones, you may

4      take the stand.  You remain under oath, sir.

5                  Please proceed.

6                  MR. BOVENKAMP:  Thank you, Your

7      Honor.

8   BY MR. BOVENKAMP:

9             Q.   Dr. Jones, you're back.

10            A.   Yes.

11            Q.   What are you here to testify about

12     this time?

13            A.   I'm here to testify regarding

14     Microsoft's arguments they made for

15     noninfringement.

16            Q.   I want to start at least by

17     introducing your testimony with the two boards

18     that we see here setup in the courtroom.  Do you

19     see those okay?

20            A.   Yes.

21            Q.   Can you remind us what you did to

22     create these boards that show claim 20 and claim

23     43 colored in various weighs?

24            A.   I walked through the claims
```

Jones - rebuttal - direct          1103

1     element by element and indicated which evidence

2     supported those claims and explained my analysis

3     and reasoning for each one of the claim

4     elements, why they're met by Microsoft's Bing

5     and MSN products.

6              Q.   What did you find with regards to

7     claim 20 and claim 43 in the patents in trial?

8              A.   I found that Microsoft's Bing and

9     MSN products infringe both claims 20 and 43.

10             Q.   We also during your case talked

11    about some dependent claims, claims 78, 41 and

12    49; correct?

13             A.   Yes.

14             Q.   Did you hear anything during

15    Microsoft's case about those dependent claims at

16    least specifically with regard to the elements

17    in them?

18             A.   No, there were no noninfringement

19    arguments made with respect to the additional

20    limitations of claims 41, 49 and 78.

21             Q.   What does that mean to you?

22             A.   That means that if claims 20 and

23    43 are infringed, that under that argument,

24    claims 41, 49 and 78 would be infringed,

Jones - rebuttal - direct             1104

```
 1      Microsoft won't have a specific noninfringement
 2      argument for those.
 3              Q.  I want to talk about through each
 4      of the three reasons that Microsoft argued that
 5      it didn't infringe the '335 and '554 patents.
 6      You heard Microsoft put on its case on those?
 7              A.  Yes.
 8              Q.  So let's start with the first.
 9      What did you understand was Microsoft's first
10      noninfringement argument?
11              A.  This was that they have multiple
12      requests in their system.  In other words, it's
13      not the same request that travels through
14      FrontDoor to their application server endpoints.
15              Q.  Do you remember what the Court's
16      construction of request was?  And let me put up
17      so we're all on the same page, I'll put up on
18      the document camera the Court's claim
19      construction.
20              A.  A request is a message that ask
21      for a web page.
22              Q.  Do you agree, Dr. Jones, that the
23      claims that are being asserted require a single
24      request?
```

Jones - rebuttal - direct          1105

1           A.   Yes.

2           Q.   Why is that?

3           A.   That's because -- well, first of

4    all, that's how Mr. Lowery's system that he

5    designed worked.  But the claims have a

6    requirement for a request, each one of them, and

7    then throughout the claim there is a reference

8    to said request.

9           Q.   Based on the Court's claim

10   construction, what has to be asked about whether

11   something is a request or not?

12          A.   Well, it has to be asked whether

13   it's based on the construction, a message that

14   ask for a web page.

15          Q.   Is a message that ask for a web

16   page a specific thing?

17          A.   Yes, it is.  It's going to be that

18   HTTP request.

19          Q.   Is there anything in particular

20   within an HTTP request that identifies what's

21   being asked for?

22          A.   Yes.  In this case it's going to

23   be the burden of get the resource that's being

24   asked for.  For example, in that pizza example

Jones - rebuttal - direct          1106

1      in PTX-541, it's going to be the slash search

2      question mark pizza.

3                Q.   And I know you're pretty familiar

4      with the evidence and the jury probably is, too,

5      by this point, but if we could put up real

6      briefly Plaintiff's Exhibit 541.  This is this

7      FDv2 deep dive document?

8                A.   Yes.

9                Q.   If we could turn to page 12 of

10     this.  What you're referring to is this search

11     question mark Q equals pizza request that's

12     shown on this page; correct?

13               A.   That's correct.  That's part of

14     it.  And there is the get as well.

15               Q.   Is there a dispute between the

16     parties, to your knowledge at least, that a

17     message asking for a web page is sent from

18     FrontDoor to the application servers?

19               A.   No.

20               Q.   What does Microsoft dispute?

21               A.   Their position or their dispute is

22     they're saying that's a different request, that

23     the one that comes in to say FrontDoor is

24     different than the request that leaves

Jones - rebuttal - direct          1107

1    FrontDoor.

2              Q.   Is it?

3              A.   No, it's not a different request.

4    It's the same request and we can see that in the

5    evidence everything we have seen so far

6    indicates that in terms of the actual evidence

7    in the case.

8              Q.   What happens to the message that's

9    asking for, for example, for this pizza web page

10   when it gets to the application server?

11             A.   Well, when it gets to the

12   application server endpoint, it's going to

13   generate that search results, it's going to go

14   back and do the dynamic web page generation,

15   create those results and send them back as a

16   response.

17             Q.   Microsoft argues that because

18   certain things are added to the request, there

19   is no infringement.  Do you agree?

20             MS. BROOKS:  Excuse me, Your

21   Honor.  Objection.  Way outside the expert

22   report.  There is no discussion about get.

23             THE COURT:  All right.  I'll see

24   counsel at side-bar.

Jones - rebuttal - direct          1108

```
 1                (Discussion at side-bar:)
 2                THE COURT:  Mr. Bovenkamp, do you
 3      want to show me where you have got that in his
 4      expert report?
 5                MR. BOVENKAMP:  Sure, one example.
 6                THE COURT:  I'll need you to keep
 7      your voice down.
 8                MR. BOVENKAMP:  One example, Your
 9      Honor, is his discussion of the document that is
10      up on the screen with regards to HTTP and the
11      request that gets sent out.  And to Your Honor's
12      point, is the word --
13                THE COURT:  I don't have a point,
14      I'm asking, my question is based on the
15      objection, does he ever in his report talk about
16      this, is the word get, get does this, it is part
17      of the TCP protocol, it does X, Y, Z, is that in
18      there, because if it's not, move on.
19                MR. BOVENKAMP:  I'm not going to
20      intend to ask him anymore questions.  And the
21      question that was pending doesn't have anything
22      to do with the get.  But to answer Your Honor's
23      question, there is no specific reference to get
24      in the expert report.
```

Jones - rebuttal - direct          1109

```
 1                    THE COURT:  If it's not in there,
 2      don't ask about it.  Stick with what's in his
 3      expert report that you can legitimately use on
 4      rebuttal based on what Dr. Long or somebody else
 5      said.
 6                    MR. BOVENKAMP:  Understood, Your
 7      Honor.
 8                    THE COURT:  Thanks.
 9                    (End of side-bar.)
10                    THE COURT:  Okay.  Thanks, Mr.
11      Bovenkamp.  You may proceed, please.
12      BY MR. BOVENKAMP:
13                    Q.  We were talking, Mr. -- or
14      Dr. Jones, about the cooked versus raw issue,
15      correct?
16                    A.  Yes.
17                    Q.  Okay.  And you heard the testimony
18      with regards to Microsoft that because something
19      was added to that, that that changed the
20      request, correct?
21                    A.  Yes, I heard that.
22                    Q.  Do you agree with that?
23                    A.  The request is still the same
24      request that enters.  In other words, it's still
```

Case 1:13-cv-02073-KAJ-SRF   Document 445   Filed 05/26/17   Page 29 of 189 PageID #:
20240
Jones - rebuttal - direct          1110

 1      the same request that we see here up on the

 2      screen.  It's still the same request when it

 3      moves through FrontDoor.

 4              Q.   Just because you cook a potato --

 5              MS. BROOKS:  Excuse me, Your

 6      Honor.

 7              THE COURT:  Overruled.  Go ahead.

 8      You can ask that question.

 9  BY MR. BOVENKAMP:

10              Q.   Just because you cook a raw potato

11      doesn't change it?

12              A.   No, it's still a potato at that

13      point.  Just like in this case if I create

14      what's called a structured version, I think it's

15      called, has been referred to as a semantically

16      equivalent version of it that's been referred

17      to, it's still the same request that's passing

18      through.

19              Q.   Let me shift gears.  During

20      testimony of Dr. Long yesterday, which you were

21      here for, correct?

22              A.   Yes.

23              Q.   There was a discussion of some

24      affirmative statements made by Parallel Networks

```
 1      in some documents that were put up on the

 2      screen.  Do you remember those?

 3              A.   Yes, I do.

 4              Q.   Okay.  And that included reference

 5      to something called SWeb.  Do you remember that?

 6              A.   Yes.

 7                   THE COURT:  Hold on.

 8                   MS. BROOKS:  Hold on.  No mention

 9      of this at all in his expert report.

10                   THE COURT:  All right.  I'll see

11      counsel at side bar.

12                   (Side bar discussion.)

13                   MR. BOVENKAMP:  Your Honor, I'm

14      showing you a page from the rebuttal report of

15      Dr. Jones.  Title of this page starts SWeb.  I

16      intend to ask Dr. Jones about Figure 6.

17                   THE COURT:  I thought I had heard

18      there was no rebuttal report, but maybe I

19      misheard that.

20                   MR. WOLFF:  There was no rebuttal

21      and that was the IPR -- Microsoft asked for --

22                   MS. BROOKS:  Judge Robinson.

23                   MR. WOLFF:  Judge Robinson.  I'm

24      talking about the 2016 after the IPRs.  You were
```

Jones - rebuttal - direct          1112

```
 1    asking about the IPRs.  There's no discussion

 2    about the IPR in his report.  There's no

 3    discussion in the rebuttal report.

 4                THE COURT:  You have to speak to

 5    me.

 6                MR. WOLFF:  Microsoft asked for

 7    leave to submit.  We had an order for leave to

 8    submit supplemental reports.  There's no

 9    supplemental report by Dr. Jones addressing the

10    IPRs.

11                MR. BOVENKAMP:  And Your Honor --

12                THE COURT:  You can't talk to him.

13    You got to talk to me.  It's just that simple.

14    Okay.

15                MS. BROOKS:  He's learning, Your

16    Honor.

17                THE COURT:  Okay.

18                MR. BOVENKAMP:  I'm not talking

19    about IPRs.

20                THE COURT:  I know you're not

21    talking about IPRs, but I'm finding out was

22    there a rebuttal report submitted in this case,

23    because if a rebuttal report was submitted in

24    this case, then everybody had notice.  I'm being
```

Jones - rebuttal - direct          1113

1    told, no, it wasn't.  Now I'm looking at

2    something that says rebuttal expert report Mark

3    Jones.  Was there a rebuttal report submitted in

4    this case or not?

5              MS. BROOKS:  Only on invalidity,

6    Your Honor, not on infringement.  So in other

7    words -- there was the traditional exchange.  We

8    went with invalidity first and then Dr. Jones

9    rebutted that invalidity report.  No

10   infringement rebuttal report was ever filed.

11             THE COURT:  Oh, okay.  But this

12   report was in --

13             MR. BOVENKAMP:  Yes, Your Honor.

14             THE COURT:  -- in this case.

15             MR. BOVENKAMP:  Yes, Your Honor.

16             THE COURT:  Hmm.  Well, that's a

17   little bit -- a little bit of a challenge, isn't

18   it?  Well, here's what I'm going to do, because

19   Microsoft chose to get into this with Dr. Long

20   pretty specifically and because you had notice

21   at least of their position, albeit in an

22   invalidity report, I'll let him ask some

23   questions about it, limited to what they ask

24   about, which was very specific.  Now, I told

Jones - rebuttal - direct          1114

```
 1      them to stay away from SWeb, but if you get into

 2      this in your questioning, then those

 3      instructions I gave yesterday about don't get

 4      into it in closing, that's off the table.  You

 5      put it back on the table, it's on the table.  In

 6      other words, I've tried to keep the inter partes

 7      stuff down to just the barest minimum that what

 8      I thought was essential and fair given the what

 9      are in effect judicial admissions and otherwise

10      keep it out of the case.  I let you get into it

11      a little bit yesterday in your cross-examination

12      based on how far they went and I thought I've

13      been pretty clear about, you know, you ought to

14      be treading carefully.  Now, given how far she

15      went, she being Ms. Brooks, I'll let you ask the

16      question I heard being asked, which was about

17      SWeb.  But I'm telling you, you are marching

18      down this road and then I'm going to --

19      everything that got talked about, but only that

20      which was talked about in Court, is fair game

21      talking about in closing.  Understand what I'm

22      trying to say?

23                  MR. BOVENKAMP:  I think so, Your

24      Honor.  So I would request so we're not up here
```

Jones - rebuttal - direct           1115

```
 1    again and waste more of the jury's time, I

 2    intend very briefly to have Dr. Jones explain

 3    exactly how the multiple requests occur and

 4    that's it.

 5                 THE COURT:  Yeah.  No.  That's

 6    fine.  Thank you.  Thanks for clarifying.

 7    That's what I'm telling you, they got into

 8    single request, you can get into that since it's

 9    in that report.  They had notice of it, we're

10    done.

11                 (Side bar discussion ends.)

12                 THE COURT:  Okay.  Ladies and

13    gentlemen, just want to say something real

14    quick.  Counsel have been trying hard to make

15    sure that we don't have disputes, we could

16    handle them outside your presence and we have a

17    minimum of these interruptions where you sit

18    while we chat, where it's not the most efficient

19    use of your time, but even in the best of

20    circumstances sometimes these things pop up when

21    we can't just march you out, bring you back.

22    That would be even more disruptive.  Thanks for

23    your patience.  I think we're on the same page

24    now.  Mr. Bovenkamp, you may proceed.
```

1              MR. BOVENKAMP:  Let me reorient

2     us.

3  BY MR. BOVENKAMP:

4              Q.   I asked you if you heard some

5     testimony with regards to some affirmative

6     statements Parallel Networks made about SWeb

7     during Dr. Long's testimony.  Did you hear that?

8              A.   Yes.

9              Q.   Okay.  Are you familiar with the

10    SWeb reference?

11             A.   Yes, I am.

12             Q.   And I just want to ask you about

13    one statement that Dr. Long made.  Do you

14    remember Dr. Long saying that Parallel Networks

15    said, thus while the  '554 Patent involves a

16    single request, SWeb 95 requires multiple

17    requests from the web client for a single

18    dynamic web page?  Do you remember testimony to

19    that effect?

20             A.   Yes, I do.

21             Q.   What I want to ask you to do and

22    I'll try to follow along and draw is if you

23    could describe for me how SWeb works.  Before I

24    do that, first of all, do you agree that SWeb

Jones - redirect - direct          1117

```
 1    sends multiple requests?

 2            A.  Yes, I do.

 3            Q.  Okay.  Let's go through and you

 4    tell me what to draw and I will draw what SWeb

 5    does.

 6            A.  LET'S start with a client

 7    computer, which would be something with a

 8    browser on it.  And then draw a server, a web

 9    server on the other side.

10            Q.  Okay.

11            A.  In that case in SWeb 95 the client

12    will send a request for a web page to the web

13    server and the web server will return a response

14    to that and that response says essentially go

15    get the web page somewhere else.  Then draw

16    another web server and at that point if the

17    client chooses to, the client will send another

18    request to the web server and that web server

19    will also respond to the client to that request.

20            Q.  And so just to clarify, I think

21    it's clear, in SWeb client sends one request to

22    a web server, correct?

23            A.  Yes.

24            Q.  That web server decides not to
```

Jones - rebuttal - direct          1118

```
 1    respond with a web page, right?

 2           A.   Right.  Well, with that web page,

 3    it responds with a web page.  It doesn't respond

 4    with a web page that that web server -- it

 5    doesn't respond with a web page with content.

 6           Q.   It's not the requested web page?

 7           A.   That's right.

 8           Q.   Instead it sends back an

 9    instruction for the client to a -- send a second

10    request?

11           A.   If the client chooses to, it's a

12    recommendation.

13           Q.   Does Bing and MSN work like SWEB?

14           A.   No, not at all.  It's a completely

15    different architecture, but it's also an

16    architecture with one request from the client

17    for a web page.

18           Q.   Let's go to the second

19    noninfringement argument.  Do you remember what

20    that was?

21           A.   Yes.  This is an argument where

22    Microsoft says they don't do the intercepting

23    step.

24           Q.   And before we get to your views on
```

1    that, I want to show you a couple of things.

2    First is from your expert report on Exhibit A,

3    page 12.  Do you recognize that?

4              A.   Yes.  That's the Microsoft or one

5    of the expert's at Microsoft documents that I

6    discussed in the report.  This one is, I believe

7    it's DDX-205 that's been discussed at trial.

8              Q.   Is there anything you want to say

9    about the figure, the image that's shown on the

10   screen?

11             A.   Well, in my discussion of this,

12   we'll also see in other pages where I indicate

13   what the various steps of it are.  When you look

14   at this, you can see the clear diverting of the

15   handling that's occurring in this figure just as

16   I discussed earlier a couple of days ago during

17   my direct testimony.

18             Q.   Where specifically is there an

19   example of diverting that that occurs in this

20   figure?

21             A.   That happens during -- when it

22   becomes time to execute the handler or the

23   module, in the case of FrontDoor version 2,

24   that's when it begins to execute the FrontDoor

Jones - rebuttal - direct          1120

```
 1    version 2 module.

 2              Q.   Is that the fork in the road, so

 3    to speak?

 4              A.   Exactly.

 5              Q.   So another page from your expert

 6    report, this is page 14 from Exhibit A of your

 7    expert report.

 8              A.   Yes, we look at the bottom, that's

 9    describing some of the steps in the IIS

10    pipeline, again, from another Microsoft document

11    that is describing what the various steps do.

12    And when we're looking at them you see that none

13    of those steps are the dynamic web page

14    generation, these are handling the request, and

15    eventually it will come time to execute the

16    handler for a request that is for a dynamically

17    generated web page.

18              Q.   You, like the other experts in

19    this case, had to prepare these reports; right?

20              A.   Yes.

21              Q.   Did you include everything in your

22    report in the testimony that you presented

23    during the case in chief?

24              A.   No.  Many, many pages in here and
```

Jones - rebuttal - direct            1121

1     many documents, so no, when I'm describing

2     things in direct testimony, I'm describing

3     particular elements of evidence that I think

4     give good examples of my analysis.

5             Q.   So let's go to your analysis of

6     intercepting.  Let me put back up on the screen

7     the Court's claim constructions.  Where do we

8     need to start?

9             A.   We start with the claims and the

10    claim element.  In this case we have got a

11    construction for intercepting said request at

12    web server or at the HTTP-compliant device, and

13    that means diverting the handling of said

14    request before the request is processed by the

15    web server or in the case of claim 43 the

16    HTTP-compliant device.

17            Q.   Before we get to the specifics of

18    what your proof is connected with this

19    limitation, remind us what this intercepting

20    term relates to?

21            A.   Well, this relates to the idea in

22    the invention that instead of doing all of the

23    processing for the customers, instead of

24    generating the web pages at a single web server,

Case 1:13-cv-02073-KAJ-SRF   Document 445   Filed 05/26/17   Page 41 of 189 PageID #:
20252
Jones - rebuttal - direct          1122

1    the dynamic generation of the web pages can be

2    off-loaded to the page servers so that the web

3    server can handle more requests so it doesn't

4    get overloaded.

5          Q.   Can we bring up Plaintiff's

6    Exhibit 6, which is the '554 patent.  And let's

7    turn to figure 2.  Is this some of the prior art

8    that was discussed in the patent?

9          A.   Yes, this is describing

10   essentially the old way of doing things before

11   the invention, and what we see here are web

12   servers and those web servers actually there

13   directly generate or locate the web pages and

14   return them to the web client.  This is the old

15   architecture with web servers at the same level.

16         Q.   What was wrong with doing all of

17   the web server executable, the web page, and

18   everything that goes along with that on the web

19   server?

20         A.   As we'll see in the specification,

21   it will create too much load on that web server.

22   That web server can only handle so many

23   requests.

24         Q.   If we go to column four of the

Jones - rebuttal - direct          1123

1    patent, and look at lines 38 through 41.  What

2    is said in this portion of the specification?

3              A.  Well, this is indicating that a

4    large website could receive thousands of

5    requests or hits in a single day.  This is back

6    in 1996, '95 time frame.  And this indicates

7    that current web servers process each of these

8    requests on a single machine, namely the web

9    server machine, and then it will go on to

10   explain this is a disadvantage because it's

11   going to put a huge load on that one web server.

12             Q.  What was Mr. Lowery's solution?

13             A.  His solution was to divert

14   requests to page servers or off-load the request

15   to page servers that would do the work of

16   dynamic generating the web page.

17             Q.  Microsoft agrees, if I understand

18   their testimony of their witnesses correctly,

19   that handling can occur before interception;

20   correct?

21             A.  That's my understanding, yes.

22             Q.  What can't occur before

23   interception?

24             A.  You can't generate, dynamically

Jones - rebuttal - direct            1124

```
 1    generate the web page before the interception.

 2              Q.   What occurs in Bing and MSN?

 3              A.   In Bing and MSN, it's intercepted,

 4    the request, then it's forwarded on to the

 5    application server endpoints.  That's that big

 6    diagram we saw in PTX-763 where the work of

 7    dynamically generating the web page is done.

 8    And, in fact, that's far more work than it would

 9    be to simply divert the handling of the request.

10              Q.   Do you remember, Dr. Jones, my

11    discussion with Dr. Long about whether the claim

12    construction of the Court required significant

13    amounts of handling, or significant amounts of

14    processing, do you remember that?

15              A.   I do.

16              Q.   Is there any requirement in the

17    Court's claim construction relating to the

18    amount of handling that can occur before the

19    request is diverted?

20              A.   No, it's just a plain language is

21    diverting the handling of said requests before

22    the request is processed.

23              Q.   So even if Microsoft shows that

24    there is significant amounts of handling that
```

Jones - rebuttal - direct          1125

```
 1      occurs before the diversion, does that matter?
 2              A.   No, the handling is diverted and
 3      the purpose of the diverting is so that it can
 4      be dynamically generated on a page server which
 5      will release the web server to handle other
 6      requests.
 7              Q.   So we have gone through number one
 8      noninfringement argument relating to the request
 9      limitation; correct?
10              A.   Yes.
11              Q.   We have gone through now number
12      two noninfringement argument relating to the
13      intercepting limitation; correct?
14              A.   Yes.
15              Q.   Is there a third?
16              A.   Yes.  The one related to
17      releasing.
18              Q.   Am I correct that what Microsoft
19      argues is it does not release the HTTP-compliant
20      device or web server to process other requests?
21              A.   Yes.
22              Q.   Where do we need to start to
23      determine whether or not that's true?
24              A.   Well, start with the claim
```

Jones - rebuttal - direct          1126

```
 1     construction from the claim at the bottom of

 2     this, or element the bottom of the page which

 3     says freeing the web server to process other

 4     requests.

 5             Q.  And so in order to determine what

 6     it means to free a web server, or what it means

 7     to free a HTTP-compliant device, what should we

 8     look at?

 9             A.  We can look at the operation of

10     the system.  We can look at the construction of

11     web server.  We can also look at what an

12     HTTP-compliant device is.  So in other words,

13     what we're freeing is either the web server to

14     process the other requests or the HTTP-compliant

15     device to process other requests, so we need to

16     look at those two constructions.

17             Q.  The Court's construction, let's

18     take those two in turn.  I want to focus on the

19     part of the web server and the HTTP-compliant

20     device because that's what's being freed; right?

21             A.  That's correct.

22             Q.  For the web server, that can be

23     software; right?

24             A.  Yes.
```

Jones - rebuttal - direct             1127

1          Q.   And for a web server it can also

2     be a machine having software; correct?

3          A.   That's correct.

4          Q.   And for an HTTP-compliant device,

5     it's a device; right?

6          A.   Yes.

7          Q.   Another word for machine?

8          A.   Yes.

9          Q.   And that machine is running

10    software; right?

11         A.   That's correct.

12         Q.   What is the significance with

13    regard to freeing of it being a device versus

14    software?

15         A.   Well, in the case of a device,

16    we're talking about hardware, so we can be

17    freeing hardware resources.  We can also refer

18    to software resources.  So in both cases for

19    what's being accused, it's going to be the

20    computer running FrontDoor in version 1 or 2,

21    along with the software on that computer, so it

22    can be freeing hardware resources or software

23    resources.

24         Q.   Let's focus on the computer

Case 1:13-cv-02073-KAJ-SRF   Document 445   Filed 05/26/17   Page 47 of 189 PageID #:
20258
Jones - rebuttal - direct            1128

1    because I think that's what you're accusing of

2    infringing the claims in this case; right?

3          A.   That's correct.  And what I

4    identified as being freed are the CPU or

5    processor cycles.  If the CPU is being freed to

6    process other requests because that CPU does not

7    have to spend its time on the very costly, from

8    a CPU point of view, time associated with

9    generating a dynamic web page.

10         Q.   Okay.  Is there any dispute that

11   sending the request to the page server frees

12   processor cycles on FrontDoor web server?

13         A.   No, there is no dispute on that.

14         Q.   What effect does the dynamic

15   processing of web pages have on a processor?

16         A.   It takes a lot of processor time.

17   In other words, you think of the processor as

18   the brains of the computer.  It takes lots of

19   processor time to generate a dynamic web page,

20   and so instead of having say FrontDoor do that,

21   it's handed off to this back end where there are

22   many more computers to handle that request, that

23   frees FrontDoor to handle new incoming requests.

24         Q.   So that concludes your rebuttal of

Jones - rebuttal - cross          1129

1     the third noninfringement argument that

2     Microsoft made; is that correct?

3          A.   That's correct.

4          Q.   We have gone through their first,

5     second and third noninfringing points.  What is

6     your conclusion, what are you telling the jury

7     today?

8          A.   My conclusion remains the same,

9     that claims 20, 43, 78, 41 and 49 are all

10    infringed by Bing and MSN.

11              MR. BOVENKAMP:  Pass the witness,

12    Your Honor.

13              THE COURT:  Thank you.

14              Ms. Brooks.

15              MS. BROOKS:  Yes, thank you, Your

16    Honor.

17                   CROSS-EXAMINATION

18    BY MS. BROOKS:

19          Q.   Dr. Jones, you're back here

20    because Parallel Networks has the burden of

21    proof in this case; is that right?

22          A.   That's my understanding.

23          Q.   And so as the plaintiff with the

24    burden of proof, they get the last word on the

Jones - rebuttal - cross          1130

```
 1    subject; is that right?

 2              A.   That's my understanding, yes.

 3              Q.   All right.  Now, just to be clear,

 4    you're the same Dr. Jones who testified earlier

 5    in the case; right?

 6              A.   Yes.

 7              Q.   And the same gentleman that has

 8    worked five times, all for plaintiffs, for this

 9    law firm of McKool Smith; is that right?

10              A.   I have worked for defendants for

11    them as well.

12              Q.   Oh, really?

13              A.   Yes.

14              Q.   Okay.  I thought you told us the

15    first time you were here that it was all for

16    Plaintiffs?

17              A.   At trial, but I've worked for

18    defendants at well.

19              Q.   Okay.  Thank You.  So let's be

20    specific here.  At trial on multiple occasions

21    you sat before a jury like this jury and said

22    that there was infringement and you said it on

23    behalf of the same law firm, right?

24              A.   Yes.
```

Jones - rebuttal - cross                    1131

```
 1                    Q.   All right.  Now, in this case
 2       there's been a lot of talk about expert reports
 3       and you know the purpose of expert reports,
 4       don't you, sir?
 5                    A.   Yes.
 6                    Q.   That's to give the party, both
 7       parties, especially the opposing party notice of
 8       what you're going to say, right?
 9                    A.   Yes.
10                    Q.   So we're not surprised by it, is
11       that fair?
12                    A.   That's fair.
13                    Q.   Now, in this case, because
14       Parallel Networks has the burden of proof, you
15       filed the first report on infringement, did you
16       not?
17                    A.   Yes.
18                    Q.   And then Dr. Long filed a
19       non-infringement report, correct?
20                    A.   Yes.
21                    Q.   And you received that report, did
22       you not, sir?
23                    A.   Yes.
24                    Q.   And you reviewed it, correct?
```

Jones - rebuttal - cross                1132

```
 1                A.  Yes.
 2                Q.  And you were free to file a
 3      rebuttal report to Dr. Long's non-infringement
 4      report, weren't you, sir?
 5                A.  I may have been.  I don't know one
 6      way or the other.
 7                Q.  But you didn't, did you?
 8                A.  No.
 9                Q.  So the first time that we get to
10      hear what you had to say in rebuttal to
11      Dr. Long's report is today from the witness
12      stand; is that right?
13                A.  No.
14                Q.  Well, you never filed a report on
15      it, did you, sir?
16                A.  That's correct.
17                Q.  Now, you mentioned -- well, just
18      tick off everything very quickly if we could.
19      You said that Microsoft made no arguments
20      regarding non-infringement as to the dependent
21      claims, starting with the '554 Patent, Claims 41
22      and 49.  Do you remember saying that, sir?
23                A.  I -- to that effect, yes.  What I
24      said was no argument specific to those
```

Jones - rebuttal - cross          1133

```
 1    limitations.

 2              Q.   But you understand, sir, that the

 3    law says if there's no infringement of the

 4    independent claims, as a matter of law, one does

 5    not infringe the dependent claims, correct?

 6              A.   Absolutely.

 7              Q.   So that would apply to Claims 41

 8    and 49 of the '554, correct?

 9              A.   Yes.

10              Q.   And it would apply to dependent

11    Claim 78 of the '335, correct?

12              A.   Yes.

13              Q.   You said that in rebuttal you

14    believe that the claims do require a single

15    request.  Did I hear that right, sir?

16              A.   Yes.

17              Q.   You concede that?

18              A.   I said that all along.

19              Q.   And you were here in court when

20    Mr. Alam, who worked for years on the IIS

21    Pipeline, he and his team worked for years, was

22    asked, so at this point in -- point in the

23    client transaction, and we were talking about

24    the request in the Pipeline, do you have a
```

Jones - rebuttal - cross          1134

```
 1          single request going on or do you have multiple

 2          requests?  His answer was, we clearly have

 3          multiple requests.  You heard him say that under

 4          oath from the witness stand, correct, sir?

 5                    A.   Yes.

 6                    Q.   And then you were here when

 7          Dr. David Maltz testified, correct?

 8                    A.   I was.

 9                    Q.   And you heard Dr. Maltz, how he

10          and his team who did FrontDoor version 1 and

11          FrontDoor version 2, which are part of the

12          structure of Microsoft and Bing, he was asked

13          this question, and the request that comes out of

14          FrontDoor version 2 -- is the request that comes

15          out of FrontDoor version 2 the same as the

16          request that came into FrontDoor version 2?

17          Answer, no, it is not.  Question, and you can

18          tell that just by comparing pages 26 and 27 of

19          DX 139?  And his answer was yes, I can.

20          Correct, sir?

21                    A.   Yes.

22                    Q.   Now, let's move on to your

23          argument about intercepting.  You said you

24          followed the Court's claim construction on
```

```
 1        intercepting and the Court's constructions --

 2        let's put it in the context of the language in

 3        the claim.  It says intercepting said request at

 4        said web server, routing said request from said

 5        web server to a dispatcher.  Do I read that

 6        right, sir?

 7                  A.   Yes.

 8                  Q.   That's the claim term.  And the

 9        definition is that means to divert the handling

10        of the request before the request is processed

11        by the web server or the HTTP-compliant device,

12        correct?

13                  A.   Yes.

14                  Q.   And in the case of intercepting,

15        sir, I asked you, in the IIS Pipeline what the

16        map handler did, and that's before it was

17        intercepted, the request was intercepted, right,

18        and you didn't know, correct?

19                  A.   That's right, yes.

20                  Q.   And then I asked you what the

21        pre-execute handler in the Pipeline, the IIS

22        Pipeline did, and that's before the request was

23        intercepted and you said you didn't know,

24        correct?
```

1           A.   That's correct.

2           Q.   And the word, they have the word

3      handler in their module, correct?

4           A.   Yes.

5           Q.   And the Court's construction says

6      that you have to divert the request before it's

7      handled, correct?

8           A.   No.  That's not what it says at

9      all.

10          Q.   I'm sorry.  I thought it said

11     diverting the handling of said request before --

12     does the word before appear in the Court's

13     construction?

14          A.   Absolutely.

15          Q.   Before the request is processed by

16     the web server slash HTTP-compliant device.  Is

17     that the Court's construction, sir?

18          A.   Yes.

19          Q.   And you heard Dr. Alam talk about

20     all the handling that went on, even though you

21     didn't know what the handlers did, you heard him

22     talk at length about all of the handling of the

23     requests that went on and the processing of the

24     requests that went on in the IIS Pipeline before

Jones - rebuttal - cross                1137

```
 1        that request was diverted, did you not, sir?

 2              A.   Yes.

 3              Q.   And you heard Dr. Maltz talk about

 4        all of the handling and processing of the

 5        request that was -- that went on in FrontDoor

 6        version 1 and 2 before that request was

 7        diverted, correct, sir?

 8              A.   Yes.

 9              Q.   And lastly, let's talk about

10        releasing.  So releasing talks about releasing

11        the web server to process another request,

12        correct?

13              A.   Yes.

14              Q.   And the way that occurs in the

15        claim is that the page server receives the

16        request.  So now the request has gotten all the

17        way to the page server and once that happens

18        releasing said web server to process another

19        request; is that right, sir?

20              A.   Yes.

21              Q.   And you were here again when Mr.

22        Alam testified?

23                   MR. BOVENKAMP:  Objection, Your

24        Honor.  Argument in this slide.
```

Jones - rebuttal - cross            1138

```
 1                    THE COURT:  Just a moment.

 2                    MS. BROOKS:  Let me take off the

 3        title.  There we go.  This is for closing, so

 4        I'll keep it non argumentative for now.

 5   BY MS. BROOKS:

 6             Q.   So you were here when Mr. Alam

 7        testified that that first request that came in,

 8        what he called the original raw request, that it

 9        stayed at HTTP.sys, correct?

10             A.   Yes.

11             Q.   And you were also here when he

12        testified that that second request, what he

13        called the cooked request, stayed at the execute

14        handler, correct?

15             A.   Yes.

16             Q.   And he said that it was not freed

17        from the execute handler until the response --

18        it meaning that part of the web server, was not

19        free to process another request until the

20        response had been received to free up that

21        memory and make it available again, correct,

22        sir?

23             A.   I don't think that's a correct

24        interpretation of what he said, no.
```

Jones - rebuttal - cross                    1139

1              Q.   He said what the ladies and

2       gentlemen can see on the screen, correct, sir?

3              A.   Yes.

4              Q.   And you, sir, were also asked this

5       series of questions and answers.  Question, and

6       while it, meaning the request, is sitting in the

7       execute handler, it is actually taking up

8       memory, correct?  And you said correct?

9              A.   Yes.

10             Q.   And so the memory is not released

11      or freed until after the response comes back,

12      correct?  And you answered correct?

13             A.   Yes.

14             Q.   And as a result of that, is it

15      true, sir, that that memory or a resource that

16      is being held up or taken up until the client

17      transaction is fully processed and the response

18      comes back?  And your answer was yes, correct,

19      sir?

20             A.   Yes.

21             Q.   Now, lastly, sir, if the jury

22      decides they agree with you, it's a single

23      request, but that there is no releasing, is

24      there still no infringement?

Jones - rebuttal - cross            1140

```
 1                A.   That's correct.

 2                Q.   If the jury decides they agree

 3      with you that it's a single request and there is

 4      releasing, but there's no intercepting, is there

 5      still no infringement?

 6                A.   That's correct.

 7                Q.   And so in other words, we don't

 8      have to show that there are three limitations

 9      that are not met in the accused products, all we

10      have to show is that just one limitation is not

11      met for there to be no infringement; is that

12      right, sir?

13                A.   Yeah.

14                MS. BROOKS:   Thank you.  No

15      further questions, Your Honor.

16                THE COURT:   All right.  Any

17      redirect, Mr. Bovenkamp?

18                MR. BOVENKAMP:   Briefly, Your

19      Honor.

20      BY MR. BOVENKAMP:

21                Q.   How many limitations for Claim 20

22      have you shown are met?

23                A.   Each and every limitation.

24                Q.   How many limitations of Claim 43
```

1     have you shown are met?

2              A.   Each and every limitation.

3              Q.   You were asked about not knowing

4     certain things about some of the handlers

5     letters in the IIS Pipeline.  Why is that?

6              A.   Well, I certainly covered them in

7     my report, but those handlers are not

8     dynamically generated at the web page.  What

9     happens is the handling gets diverted and that

10    handling, the specifics of it don't matter, it's

11    being diverted to the page server for the

12    dynamic generation of the web page.

13             Q.   Even if Mr. Alam is correct about

14    memory being held, even if Microsoft's counsel

15    is correct in her characterization of your

16    testimony with regards to memory being held,

17    does that matter?

18             A.   No.  The web server, just because

19    a connection is held, Mr. Long says that even if

20    a connection is held, the web server is still

21    free to process other requests.  What's being

22    freed is the hardware resources.  Any web server

23    is going to hold the connection to the client.

24    That's true for web servers back in the early

```
 1        1990s through today.  What's being freed in this

 2        architecture in these claims and in the

 3        Microsoft Bing and MSN systems is the processor,

 4        the processor is being freed up of the load,

 5        which the vast majority of the load is

 6        generating a dynamic web page.  That's

 7        happening at the page server, so we have a page

 8        server end point freeing up the web server or

 9        the computer with FrontDoor on it to process

10        other requests.

11                     MR. BOVENKAMP:  Thank you,

12        Dr. Jones.  I have no further questions.

13                     THE COURT:  All right.  Thank you

14        Dr. Jones.  You can step down.  Mr. Cawley or

15        Mr. Bovenkamp, any other witnesses?

16                     MR. BOVENKAMP:  Your Honor, we

17        have no other witnesses to call.  We rest.

18                     THE COURT:  All right.  As I

19        mentioned to you before, ladies and gentlemen of

20        the jury, those words have legal significance

21        and I have to talk to the lawyers now for a few

22        minutes.  So we'll go ahead and ask you to step

23        out.  Bring you right back in as soon as we can.

24        Thanks.
```

```
 1                    (Jury exits.)

 2                    THE COURT:  Okay.  Please be

 3      seated.

 4                    Any applications?

 5                    MS. BROOKS:  Your Honor, we would

 6      once again renew our motion for judgment as a

 7      matter of law on the same grounds that we made

 8      at the end of plaintiff's case and the end of

 9      our case.

10                    THE COURT:  All right.  I presume

11      the arguments in rebuttal would be the same.

12                    MR. BOVENKAMP:  The arguments in

13      rebuttal are the same.

14                    THE COURT:  All right.  Everyone

15      has made their record.  The motion is denied.

16                    MR. BOVENKAMP:  We would also

17      urge, for the same reasons that Mr. Campbell

18      expressed, our motions with regard to judgment

19      as a matter of law.

20                    THE COURT:  I presume the rebuttal

21      would be the same on that front?

22                    MS. BROOKS:  Yes, Your Honor.

23                    THE COURT:  Everybody has made

24      their record.  The motion is denied.
```

```
 1                 Okay.  Housekeeping.  What do we
 2    need to do before we, if anything, before we're
 3    ready to get going with closings, because my
 4    intention is to sort of run it straight through
 5    if we can, depending on how long things take.
 6                 Mr. Cawley.
 7                 MR. CAWLEY:  We have to set up a
 8    separate monitor here, Your Honor.  That will
 9    take about two minutes.  That's the only
10    mechanical thing we need to do.
11                 I would estimate for the Court's
12    timing purposes, the total of our first session
13    of closing and our rebuttal of closing is
14    probably forty-five to fifty minutes.
15                 THE COURT:  That's good, because
16    based on your timing today, you're pretty close.
17    I appreciate that estimate.  I think it will be
18    okay to stay within that.
19                 Ms. Brooks.
20                 MS. BROOKS:  We have I think -- we
21    probably have about seven hours in, so we
22    probably have two hours.  The good news, Your
23    Honor, I'll be surprised if I go an hour.  I
24    would say at least an hour, though.
```

```
 1                    THE COURT:  All right.  Then the

 2      only thing I think I need from you folks is, at

 3      some point I had asked for the corrected

 4      preliminary instructions.  I see Ms. Fiorelli

 5      for Microsoft nodding, Mr. Campbell is nodding

 6      his head on the Parallel Networks side.

 7                    If I could ask you folks to do

 8      this for me, to produce the copy that you're

 9      comfortable with, I'm just going to send one

10      copy of both the preliminary and the final

11      instructions back to the jury when I'm done, so

12      if you will produce for me what based on the

13      rulings we have had, what you both sides are

14      comfortable, that's the right copy, that's the

15      clean copy of both, that's what I'll make sure

16      that the courtroom deputy hands to them when I

17      finish.  Okay?

18                    And just for everybody's

19      information, when I instruct the jury, I close

20      the courtroom.  This doesn't mean I throw people

21      out, it means if you want to leave, you leave

22      before I start the instructions, because once I

23      start, nobody is coming in and nobody is going

24      out.
```

```
 1                    Okay.  Thanks very much.  If I
 2      give you folks ten minutes, is that going to be
 3      sufficient?
 4                    MR. CAWLEY:  Yes, Your Honor.
 5      Thank you.
 6                    MS. BROOKS:  Thank you.
 7                    THE COURT:  I'll see you back here
 8      in ten.
 9                    (A brief recess was taken.)
10                    THE COURT:  Thanks.  Be seated.
11                    Mr. Cawley, are you ready?
12                    MR. CAWLEY:  Yes, Your Honor.
13                    THE COURT:  All right.  Go ahead
14      and we'll have the jury in.
15                    Counsel, may I ask you a question.
16      The only difference in the jury instructions,
17      the two versions that we were dealing with this
18      morning was the inclusion of the different claim
19      construction, am I right about that,
20      Mr. Campbell?
21                    MR. CAMPBELL:  I believe that is
22      correct, Your Honor.
23                    THE COURT:  Thanks.
24                    Ms. Hufnal?
```

1             MS. HUFNAL:  Yes.

2             THE COURT:  Okay.

3             (Jury entering the courtroom at

4  10:00 a.m.)

5             THE COURT:  Let's be seated.

6  Ladies and gentlemen of the jury, both sides

7  have had an opportunity to present their

8  evidence, both sides have represented.  Let me

9  give you a quick overview of what's going to

10  happen now.

11             We have reached the point where

12  there will be closing arguments.  Because the

13  plaintiff, Parallel Networks, has the burden of

14  proof, they'll have an opportunity to speak

15  first, and the opportunity to speak last.  And

16  in between, Microsoft will have the opportunity

17  to present its closing argument.

18             When the arguments are done,

19  depending on how long they take, we'll take just

20  a really short break, because the expectation

21  from speaking with the lawyers, and everybody is

22  trying to be as efficient as possible with your

23  time, but it will probably take both arguments

24  together all said and done approximately two

```
 1    hours, maybe a little less, maybe a little more,
 2    but everybody is ballparking here.
 3                  Take a short break, and then I
 4    will instruct you on the law, and then the case
 5    will be yours.
 6                  This isn't really the most
 7    generous offer you'll ever hear, but we're going
 8    to give you lunch for your several days here.
 9    But we'll have lunch ready for you so that
10    you'll be able to -- you won't need to go out
11    while you're deliberating.  And that's how
12    things will proceed from this point.  Okay?
13                  So, without further adeo,
14    Mr. Cawley, your closing.
15                  MR. CAWLEY:  Thank you, Your
16    Honor.
17                  This is a case of a man who
18    invented a way to help the internet work better.
19    He got a patent on his invention, and Microsoft
20    uses those patents without permission and
21    refuses to pay fair value.
22                  Three days ago you met Mr. Keith
23    Lowery.  You learned about how Mr. Lowery came
24    through a series of unfortunate accidents to
```

1    discover that he had a natural talent for

2    programing computers.  He used that talent over

3    the next ten years or so to get better and

4    better jobs and contribute more and more to the

5    field of computer networking.

6              It's interesting, and you may have

7    noticed it that of all of the people you heard

8    testify in this trial, all of the computer

9    scientists, all of the people who were experts,

10   Mr. Lowery is the only one who doesn't have a

11   formal education.

12             And you may wonder, as well as I

13   have over the time that I have known him, I

14   wonder if it was really his lack of formal

15   education that enabled him to see ideas and

16   solutions to problems that the so-called experts

17   in the field who had the Ph.D.s and had the

18   master degrees didn't see, at least not as early

19   as Mr. Lowery did.

20             You heard him explain when he

21   stepped down to the whiteboard and built this

22   high-level diagram what he saw when he

23   downloaded in his home office back in the early

24   '90s the specification for how the internet

```
 1    works.  And remember he said that he did a

 2    little experiment himself, just a single web

 3    page that when it was delivered would say Hello

 4    World, but once he got it to work and saw Hello

 5    World, he was confident that his reading had put

 6    him in a position to understand how the internet

 7    worked.  And he as a result of some companies

 8    raising large amounts of money in the stock

 9    market based on their internet presence, he

10    changed his initial skepticism and came to

11    believe that there would be a huge future for

12    doing business on the internet.

13              But you'll remember that almost as

14    soon as he finished the little experiment in his

15    home office, he saw a problem.  And the problem

16    was here in the web server.  Remember he

17    explained that the way the internet worked was

18    that the web client, like a computer in

19    someone's home, would make a request to the web

20    server and the web server would find the right

21    page and send it back.

22              You'll also remember him

23    testifying, though, that this put tremendous

24    demands on the web server.  It wasn't that bad
```

1        in the mid '90s when there was only a handful of

2        people on the internet, but the future that

3        Mr. Lowery saw is it wouldn't be a few people,

4        it would be thousands and even for some websites

5        millions of people all making demands on the web

6        server.

7                So he conceived of the idea of

8        instead of relying for all of that work to be

9        done here, to assemble a whole network of

10       smaller computers that he called the page server

11       to handle the load.

12               But that wasn't a complete

13       solution.  Because as this network of smaller

14       computers grew to more and more, then the

15       likelihood that some of those computers would be

16       down, broken, have other technical problems

17       would get greater and greater, and there would

18       be a lot of inefficiency from not knowing what

19       was going on with these computers and not

20       knowing which one of them could most efficiently

21       handle requests from the web server.  So the

22       next part of the invention was to create what he

23       called a dispatcher, the brain of his system.

24               The way it would work then would

```
 1        be that the web client would send the request to

 2        the web server, the dispatcher would know what

 3        was going on in terms of who was -- which one of

 4        these computers was online, who was busy, who

 5        was broken, who had time available, then the

 6        dispatcher would send the request to the page

 7        server that could most efficiently handle it,

 8        and the page server if it needed to go outside

 9        to get a data source, the page server after it

10        built the web page would deliver it back to the

11        web server which would deliver it to the web

12        client.  This was an efficient new idea to make

13        web servers and the internet work better.

14                    This primitive diagram that

15        Mr. Lowery put together was put into more formal

16        and more organized form in this drawing, figure

17        4 of the patents.

18                    You see here the web client, the

19        web server, the dispatcher, the page servers,

20        and the data source.  Remarkably enough, the

21        witnesses who testified in this case on behalf

22        of Microsoft, once you piece together their

23        testimony, have testified that the system that

24        they use works just like this.  They take a
```

1    request from the web client, it goes to a web

2    server, it gets forwarded to not -- they don't

3    call it a dispatcher, instead they call it an

4    application server load balancer.  But guess

5    what it does?  It takes what Microsoft calls the

6    health of these smaller computers in a network,

7    in other words, it determines who is down, who

8    is busy, what's going on, it knows that, and the

9    Microsoft system, it ranks these by numbering

10   system according to how busy and available they

11   are and their load balancer, their application

12   server load balancer choses which is the most

13   efficient application server to send the request

14   to.  It's the same thing that Mr. Lowery's

15   invention does.

16              You have heard that the patent

17   office spent several years studying Mr. Lowery's

18   invention and concluded after that time that it

19   was new, that it was not obvious, and that it

20   was useful.  Therefore, they awarded Mr. Lowery

21   the two patents in this lawsuit.

22              You know, I had an opportunity

23   personally a few years ago to serve on a jury.

24   It wasn't a case nearly as complicated as this

```
 1     one, but it was a wonderful experience and I

 2     hope your experience will be the same.  In fact,

 3     some of us still keep up with each other who met

 4     on that jury years ago.

 5               But one of the things we

 6     discovered was that it was a little odd during

 7     the course of the trial when we were around

 8     other jurors and the only thing we had in common

 9     with them, the judge had told us we couldn't

10     talk about.

11               So once the time came that the

12     deliberations began and the judge told us we

13     were free to discuss the case, we had a lot of

14     things we wanted to discuss.  We wanted to talk

15     about the evidence.  We wanted to talk about the

16     exhibits.  We wanted to talk about the lawyers.

17     And it was kind of exciting to do that after all

18     that time had gone by when the judge had told us

19     we shouldn't be doing that.

20               But as we had those discussions,

21     what we eventually discovered was that even

22     though there was a lot of evidence and a lot of

23     pieces of paper, it really all boiled down to a

24     few simple questions.  And once we were able to
```

1        identify those questions, we were then able to

2        go fairly quickly through the evidence and

3        answer those key questions.

4                Ladies and gentlemen, I think

5        after you have an opportunity to discuss this

6        case, you may find that the key questions that

7        you have to answer in this deliberation are does

8        Microsoft infringe?  Was Microsoft's

9        infringement willful?  And what are the damages?

10               The first one we'll turn our

11       attention to is does Microsoft infringe?  And

12       now, let me emphasize something at this point.

13       The discussion that I have had with you so far

14       where I showed you diagram 4, remember, and

15       showed you how Microsoft's own witnesses

16       testified that they use the same thing as

17       Mr. Lowery's invention as his idea, but we

18       freely admit, Parallel Networks freely admits,

19       that's not good enough to prove this case to

20       you.  We can't simply say at a high level that

21       Microsoft uses the idea.  We have to get down

22       into the details, the details you remember that

23       are the paragraphs, the numbered paragraphs in

24       the patents called claims.  And we must show you

 1    proof that Microsoft does everything that is

 2    written in the paragraphs that we're talking

 3    about in this case.

 4              That's why we put Dr. Jones on the

 5    stand.  That's why he spent more than an hour

 6    going in detail piece by piece through those

 7    paragraphs and showing you the evidence that

 8    proved that what Microsoft does is what's

 9    described in those paragraphs.

10              What we would like to do now is to

11    drill down into that level of detail, to remind

12    you of the evidence that you have heard that

13    shows that Microsoft infringes.  And to do that,

14    I would like to turn this argument over to

15    Mr. Chris Bovenkamp.

16              MR. BOVENKAMP:  Thank you.  And

17    thank you for being here.  The question as

18    Mr. Cawley said that we're first going to

19    address is whether or not Microsoft infringes.

20    And who did you hear from?  You heard from

21    Dr. Mark Jones, a professor at Virginia Tech.

22    You heard about what Dr. Jones did when he was

23    hired early in the case, the work he performed,

24    the analysis he went through, his careful study

1    of the patents.

2                        You heard that Dr. Jones was the

3    only expert that traveled to Microsoft's

4    lawyer's offices to look at the source code used

5    by the FrontDoor systems.  Source code, if you

6    remember, is what specifically defines how the

7    system works.  Dr. Long didn't do so.  No one

8    did so but Dr. Jones in this case.

9                        Dr. Jones outlined for you right

10   at the start kind of like Mr. Lowery did an

11   overview of how the Bing and MSN system

12   architectures worked.

13                       He focused his analysis like

14   Mr. Lowery on that important component,

15   application server load balancer.  This as you

16   heard was the brains, the intelligence of the

17   Microsoft system.

18                       Now, I find it interesting that

19   even though Mr. Lowery talked a lot about the

20   dispatcher and its importance in distributing

21   things to the page servers, that Dr. Jones

22   talked about the application server load

23   balancer and its importance in distributing

24   requests to Microsoft application servers,

1    Microsoft didn't talk about it as much.  They

2    wanted to talk about other things.

3                   You saw no evidence that

4    Microsoft's application load balancer doesn't

5    intelligently do exactly what the patent

6    describes because it does.

7                   Dr. Jones didn't stop at an

8    overview of their system.  He described exactly

9    how Bing and MSN work.  He first went through

10   claim 43 element by element, highlighted them

11   when they were met, step by step, provided for

12   you some of the evidence that he relied upon.

13                  He next went through claim 20 and

14   did the same thing, highlighting the elements

15   that were met, detailing exactly where each one

16   of these things was present.

17                  I think of the road in this trial

18   as a road, and as Mr. Cawley stated, part of

19   that for Parallel Networks, part of that for

20   Mr. Lowery is fair value for the patents.  And

21   this trial is part of the road that he and

22   Mr. Fokas and Parallel Networks and its

23   investors and everyone associated with that

24   company from its start back in 1995 have worked

1    on.  And part of that road is our proof of

2    infringement that Dr. Jones provided.  Part of

3    that road you'll hear a little bit later is the

4    benefits that the technology brought to the

5    internet and what its value is.

6              But on that road, Microsoft has

7    put some stop signs, some impediments, some

8    excuses that have been raised here in court.

9    One is that they don't infringe, and it's not

10   just one, it's multiple.  We heard that there is

11   not, but one excuse that they have, there is no

12   request, there is not two, just two, they also

13   say there is no intercepting.

14             They also say there is a third

15   reason, there is no releasing.  In the course of

16   this trial there may have been more things that

17   they threw out there.

18             It's an excuse.  And it's your job

19   to look at the evidence and figure out what the

20   merit of that excuse is.  And we'll submit to

21   you that there isn't much.

22             Now, I know that coming into this

23   case none of you were patent law experts and

24   probably hadn't built the systems that the

1    Microsoft engineers or Mr. Lowery had built.

2    But I think that's okay, because you have

3    something that's more important, you have common

4    sense.  You have your experience and background.

5    And you'll hear an instruction from the Court

6    after we're all done here today after the

7    lawyers are all done talking that you as the

8    expression goes don't have to leave that at the

9    door.

10              I think that's why juries are so

11   valuable.  You have been able to listen to the

12   witnesses.  You have been able to look at the

13   evidence.  And you're going to be able to do

14   that in more detail when you retire, when you go

15   back to the jury room and look at the evidence

16   and talk amongst yourselves about what this case

17   is all about.

18              I think in this case common sense

19   is particularly important because Microsoft has

20   raised a lot of issues.  There is a lot of

21   technical things they have thrown at you.  I

22   think when it gets down to it, there is some

23   pretty simple explanations for what's going on,

24   and pretty simple reasons why the claims that

```
 1        Dr. Jones went through are met.

 2                    Let me talk about one right up

 3        front.  Ravikumar Arunachalam, you heard from

 4        Dr. Jones that the person that was most

 5        knowledgeable about the FrontDoor system is

 6        Mr. Arunachalam.  His name, his documents, his

 7        testimony was everywhere in this case.  You

 8        listened to a video, it was a little long, it

 9        was a little slow perhaps, but Parallel Networks

10        is the one that played that for you because he

11        couldn't be here.  I wish he could have been

12        here so we could have heard from him directly,

13        but he wasn't.  Instead, Microsoft brought other

14        witnesses whose depth of knowledge about what

15        was important in this case was nowhere near what

16        his was.

17                    You heard from Mr. Griffin.  He

18        had some knowledge back in 1996 about Bing and

19        MSN, but he wasn't involved with it today and

20        hasn't been for a long time.

21                    You heard from Dr. Maltz,

22        certainly highly intelligent, but his depth of

23        knowledge was not that of Mr. Arunachalam, who

24        was the project lead for application server load
```

```
 1        balancers, the intelligent brains of the system.
 2                     You heard from Mr. Alam.  When
 3        Mr. Campbell questioned Mr. Alam, he repeatedly
 4        backed off and disclaimed any specific knowledge
 5        about how Bing and MSN worked.  If you carefully
 6        listened to his testimony, much of it was
 7        theoretical.  Well, this is how IIS may have
 8        worked if it was implemented like it may have
 9        been in FrontDoor or Bing.  He didn't work on
10        FrontDoor or Bing.  Mr. Arunachalam did.
11                     It's common sense.  Who was the
12        important witness, that's part of your job as a
13        jury, who should you listen to.
14                     Let's turn now to the three
15        noninfringement arguments, the three excuses
16        Microsoft has made in this case for why it
17        doesn't infringe.
18                     First involves requests.  You
19        heard Dr. Jones today say he agrees, there has
20        got to be a single request, this is where one of
21        these common sense decisions comes into play.
22                     Look at what the Court's claim
23        construction is for that term.  And that's going
24        to be important throughout, because the Court
```

 1    has provided you, has provided the lawyers

 2    explanation for what these terms mean.

 3              Request is defined as a message

 4    that ask for a web page.  What generates that

 5    message?  It's the client.  What did

 6    Mr. Arunachalam say about the request?  He said

 7    that it comes to the front of V2, that the

 8    request is then forwarded to V1 of FrontDoor,

 9    then FrontDoor version 1 forwards it to Bing in

10    its partner endpoints.

11              Now, if you're keeping track of

12    the times that forward was used in this case,

13    you would have lost count.  You would have given

14    up.  It was used everywhere.  Used in the

15    documents that Microsoft used to describe how

16    its system worked.  It was used by its witnesses

17    in testimony that was taken before this trial

18    started.

19              And what's the significance of

20    forward?  We know how e-mail works.  When you

21    forward an e-mail, you don't start from scratch,

22    you take what was received and you send that on.

23    There may be some things added, but it doesn't

24    change the fact that what's included in that

 1     original e-mail, or what's included in the

 2     forwarded e-mail was the original e-mail.

 3                     Another point of common sense.

 4     You probably heard enough about pizza.  In some

 5     sense we didn't choose that, that happened to be

 6     the example that Microsoft used in its own

 7     documents as the query, but again, think about

 8     the testimony.  A user sends a request, a search

 9     for pizza.  That message doesn't change.  It

10     doesn't change into a request for hamburgers, it

11     doesn't change into a request for chocolates, it

12     doesn't change into anything else.

13                     Is there things added to it?

14     Sure.  But that doesn't change the fact that

15     it's a pizza request.

16                     You heard testimony about raw

17     versus cooked.  If you have a raw potato and you

18     cook it, it's still a potato.  You have raw

19     tomatoes, you cook them, they're still tomatoes.

20     It doesn't change the fact, the essence of what

21     it is.  That's what happens in the Bing and MSN

22     system, they take the user request and they do

23     exactly what the claim requires.  They intercept

24     it, they route it or transfer it, they process

1  it, they use it to return a web page.  It's

2  common sense.

3           Dr. Maltz said exactly that.  I

4  asked him, and we have it again, correct,

5  search? Q=pizza.  If you remember, that was the

6  specific thing, or at least one of the specific

7  things that was included both from the client to

8  FrontDoor and FrontDoor to the application

9  servers.

10           I asked him, that was exactly what

11  was in the original request; correct?  His

12  answer, yes.

13           Microsoft's first excuse has no

14  merit.  Their second excuse, we don't intercept.

15  There has been a lot of talk about diverting and

16  handling and processing.  Again, the Court's

17  claim construction is very simple, the language

18  is very simple, if you just read through it in

19  the order that the Court provided to you.

20           The first part of it is diverting

21  the handling.  It doesn't say diverting before

22  handling.  It says diverting the handling.

23           Where does it take place?  At the

24  web server.  Where does it have to be diverted

1    before?  This is the key, think about what

2    Mr. Lowery said was the problem he was solving,

3    the problem he was solving is everything was

4    being done in the web server.  The key was

5    off-loading that request, intercepting, sending

6    it somewhere before that web server dynamically

7    generated a web page.

8              This is exactly what Microsoft

9    does.  Mr. Arunachalam testified clearly that

10   what happens is the request comes in, once it

11   receives a request, FDV2, it forwards it, the

12   request, to the module.

13             You heard from Dr. Long when he

14   testified, that it was his opinion that there --

15   that there can be handling before the request.

16   He referenced a -- when I asked him and followed

17   up, he mentioned that, well, there is this issue

18   about whether there is a little processing or a

19   significant amount of processing or a little

20   handling or a significant amount of handling,

21   and there was a little back and forth about

22   that.  And there has been a lot of back and

23   forth about that between all of the witnesses.

24             When it came down it to, and I

```
 1    asked him the question, Dr. Long, is there any
 2    reference to a little amount of handling or a
 3    significant amount of handling explicitly in
 4    that construction, the construction I was given
 5    by the Court?  What did he say, in that
 6    construction, that is correct, there is not.
 7    There is not.  There is no requirement present.
 8              Another piece of evidence that I
 9    think is relevant to this are two numbers taken
10    from Plaintiff's Exhibit 642, this was a
11    scorecard giving kind of an overview of what's
12    happening in Bing and Plaintiff's Exhibit 654,
13    this is a document that Mr. Bone relied upon in
14    doing his damages analysis.  The first is the
15    amount of page load time overall for a Bing
16    request.
17              Now, Microsoft wants to suggest
18    that what's done at FrontDoor, what's done at
19    the web servers is significant and an amazing
20    amount of work, but look at what their own
21    documents show the time is that's taken in
22    FrontDoor compared to the whole page load time.
23    Look at what it says.  1,043, this was in
24    milliseconds, those are thousands of a second.
```

1    That's a little over one second on average

2    during that month for a page to load.

3                     Look at what Microsoft has said

4    about the time it takes FrontDoor to do its

5    processing, processing that Dr. Bone identified

6    as related to load balancing.  These are various

7    measurements and goals, but they're all the

8    same, 43, 45, 44 milliseconds.  Compare those

9    two numbers.  There is a lot of processing

10   that's taking place somewhere else.

11                    And we would submit to you where

12   that processing is taking place is not at

13   FrontDoor, the numbers don't lie, it's at the

14   page server.

15                    Again, common sense, look at

16   Plaintiff's Exhibit 763, it's undisputed that

17   this is for search a description of all of the

18   computers that are at these application server

19   endpoints.  There is a lot of processing that's

20   going on in there.

21                    If you had a question, let's talk

22   to Mr. Arunachalam.  Where does the request go

23   for the dynamic content, the thing that you

24   heard Dr. Jones talk about takes the most

```
 1          processing time.  Where does it go?  It goes to

 2          the Bing endpoints.  Microsoft's second excuse

 3          has no merit.

 4                     Let's to go their third excuse.

 5          They say there is no releasing of the web

 6          server.  The Court construed this term very

 7          specifically, releasing said web server to

 8          process other requests or releasing HTTP to

 9          process other requests, it means freeing the web

10          server to process other requests.

11                     It's pretty simple when it comes

12          down to it.  What was the point of this?  Well,

13          the point was that you can't do everything at

14          the web server.  And so let's send the work from

15          the web server, off-load it to something else.

16          So we have a little depiction of what was going

17          on.

18                     If you have a web server that's

19          handling requests, the question is when you send

20          the request to a page server, when a page server

21          receives a request, does it free resources?

22                     Now, there is a lot of debate

23          about memory.  You're going to hear Microsoft's

24          counsel talk about memory being held and threads
```

1170

```
1    being held and connections being held, and we

2    may disagree about their characterizations of

3    that, but you don't even have to go there.

4    Because there is something even more important

5    of a resource that's freed by sending the

6    request from the web server to the page server,

7    it's processor cycles.  Think about when you're

8    going to buy a computer which is accused of

9    being the web server in this case, what are the

10   resources that are advertised?  Processor speed.

11   It's the number of gigahertz or it's memory,

12   it's processor speed.  Those are the things.

13              Processor speed is just as much a

14   resource of the web server as memory as

15   connection.

16              So what happens when the web

17   server decides to send a request to the page

18   server?  Well, the page server receives it, and

19   common sense, the web server is going to be free

20   to do more.

21              The next one gets sent, the same

22   thing happens.  We now have a second server

23   handling some of the requests, the dynamic

24   processing, the web server can handle more.
```

1    Another one is off-loaded.  What happens?  The

2    web server can handle more.  It's not that

3    complicated, freeing the web server to process

4    other requests is just what the Court said it

5    means.  If processor cycles are freed, which

6    it's undisputed they are, no one contradicted

7    that fact, then this limitation is met.

8              This about the number of requests

9    that are going to Microsoft's FrontDoor servers

10   every month.  Plaintiff's Exhibit 642 showed you

11   the number for a month that that system has to

12   process.  Three billion plus.  This wasn't

13   something odd, it wasn't because it had to be a

14   Super Bowl or some big event or something, this

15   is a regular occurrence.  Every month Bing has

16   to process at least, maybe more, three billion

17   requests.

18             If that was being done by one

19   server, what would happen to that system?  Well,

20   we know what Microsoft did, they created

21   FrontDoor to be a server that intelligently

22   routed things to back end processing like what's

23   shown in Plaintiff's 763.  That's why they have

24   all these computers.  They're not there because

1    they look pretty, they're not there because

2    Microsoft just, you know, well maybe we should

3    put a whole bunch of computers together, they're

4    there to serve a purpose.  They're there to

5    off-load processing from the web servers so the

6    web servers can do more.

7              Those are the three arguments, the

8    three excuses that Microsoft is making.  Each of

9    those we believe has no merit.

10             When you go back to deliberate,

11   you are going to be provided something like

12   this.  You are going to be asked to consider the

13   evidence, and we hope you do so carefully, take

14   your time, think about it.

15             Ultimately you're going to be

16   asked to decide whether there is infringement

17   and the very first question is just that.  Is

18   there infringement?  We believe that if you

19   consider all of the evidence -- and that's what

20   we want you to do, we want you to consider

21   everything.  If you consider the evidence and

22   you find that we have proven by preponderance of

23   the evidence that Microsoft directly infringes

24   these claims, that Bing and MSN do what

1    Dr. Jones says it does, that you should check

2    yes for Claim 20, Claim 2 21 and Claim 49 of the

3    '554 Patent and Claim 34 and 78 of the '335

4    Patent.  So that's a first step in this road

5    that we're walking down.  It's the first that

6    Mr. Cawley said that you're going to need to

7    talk about when you go back to the jury room.

8              What's the second question?  The

9    second question that you need to answer if you

10   find that Microsoft infringes is was Microsoft's

11   infringement willful?  Who did we here from on

12   this topic?  Well, we heard from Terry Fokas and

13   Terry Fokas has been involved with Parallel

14   Networks and its predecessors epicRealm and

15   InfoSpinner for a long time.  And I remember a

16   lot of things about Terry Fokas' testimony.

17   Most important thing that I remember is that he

18   believe in Keith Lowery.  He met Keith, he got

19   to know him, became a friend with him and he

20   believed that not only was Keith a good guy, he

21   was a genius.  And he followed his vision and he

22   put his own money on the line for that vision.

23              Now, you also heard from Mr. Fokas

24   that he's a lawyer.  I I hope you don't hold

1    that against him.  You heard a lot back and

2    forth about what happened in all these lawsuits

3    that were filed and there's argument about when

4    this was filed and when that was filed.  And

5    largely that doesn't have relevance frankly to

6    this case, but what does have relevant to this

7    case is that Mr. Fokas told Microsoft that they

8    infringed.  And he told them why they infringed.

9    And Mr. Fokas, before this lawsuit was even

10   filed, wanted to enter into a deal with

11   Microsoft so that they could make use of Mr.

12   Lowery's invention, to help the internet run

13   better, to help their systems run better.  And

14   unfortunately he was unsuccessful and

15   unfortunately we're here today, but that's what

16   happened.

17            Now, Microsoft has an excuse here

18   too.  You haven't heard much from Microsoft on

19   this, but it's still there.  You may hear that

20   there's principles involved or this or that.

21   You're going to hear argument that they were not

22   willful, but what you didn't hear was any

23   Microsoft witness tell you what they were

24   thinking after Mr. Fokas told them that they

1    were infringing.  And why?  They brought

2    engineers to testify, Mr. Griffin, Mr. Alam,

3    Dr. Maltz.  They didn't say anything about what

4    Microsoft was thinking in 2012 when Mr. Fokas

5    told them they were infringing.  You heard from

6    no one.  Why?  The only evidence that was put on

7    was what Mr. Fokas did and a lack of response

8    from Microsoft.

9              The second question you're going

10   to be asked to answer is whether there's willful

11   infringement.  And if you consider the evidence

12   and we think there's Mr. Fokas on our side and

13   little, if any, on Microsoft's side, then you

14   should write into this space, yes.  Parallel

15   Networks has proven by a preponderance of the

16   evidence that Microsoft's infringement of the

17   Patents-in-Suit was willful.  That concludes the

18   first two steps on this road.  And hopefully

19   I've addressed the excuses that Microsoft has

20   provided.

21              I'm now going to hand the clicker

22   to Ms. Leah Buratti to talk about the last step.

23              MS. BURATTI:  Thank you.  Good

24   morning.  The last question you'll have to

1    address, what are the damages?  You've heard

2    from just one damages expert in this case,

3    Parallel Networks' damages expert, Mr. John

4    Bone.  He came to court, he took the stand, he

5    took the oath, and he told you about his careful

6    meticulous analysis to calculate what a

7    reasonable royalty should be in this case that

8    would fairly compensate Parallel Networks for

9    Microsoft's infringements.  Mr. Bone also told

10   you about how as part of his analysis he

11   considered the important benefits of the

12   Patents-in-Suit.  He considered its reduction in

13   page load time, he considered that it provides

14   better availability and reliability, he told you

15   that he considered that the Patents-in-Suit

16   helped scale and that they bring cost savings.

17   He didn't just tell you about this, he showed

18   you and told you about some examples in

19   Microsoft's own documents that show how

20   Microsoft appreciated these benefits of the

21   Patents-in-Suit.  He showed you one of

22   Microsoft's technical documents that discusses

23   the implementation of ASLB, which is the

24   patented -- Parallel Networks' patented

1    technology implemented into FrontDoor and he

2    talked about how, as part of that technical

3    document, Microsoft said that it wanted to

4    improve overall system latency or page load

5    time, and he talked about three other benefits

6    that relate directly to reliability and

7    availability.

8              He also showed you another

9    example, the Bing score card.  That's the second

10   one we see here.  And the Bing score card Mr.

11   Bone explained that Microsoft thinks that page

12   load time is so important that it focuses on

13   every millisecond of page load time savings.

14             Now, Mr. Bone also told you that

15   these benefits are of particular importance to

16   Microsoft because its web pages are so big and

17   busy.  In fact, Bing in 2015 was the sixth

18   busiest website out there.  And MSN was the 17th

19   busiest website out there.  Now, Mr. Bone told

20   you about all of these benefits and then he

21   explained to you that as part of his calculation

22   of damages in this case he was only able to

23   quantify a minimum amount of those benefits, a

24   minimum amount of damages that related to just

1    one of those benefits and that was the page load

2    time.  And so there's still all of these other

3    benefits out there that Microsoft gets that are

4    not included in this calculation that Mr. Bone

5    has made.

6              Mr. Bone explained to you that he

7    used a cost approach to calculating that amount

8    of benefit that Microsoft is receiving and he

9    based his damages calculation on that amount.

10   And he explained that it would be irrational for

11   a company to incur a cost between an

12   infrastructure like this without an expectation

13   of achieving at least that amount in benefits.

14   And he explained that that amount was $10.8

15   million.  He also explained that that $10.8

16   million is the bare minimum that Microsoft

17   should pay to Parallel Networks as a reasonable

18   royalty in this case.

19             Now, Microsoft's lawyers are going

20   to come up after me and they're going to tell

21   you, I'm sure a lot of things, but I'm guessing

22   they're going to tell you Microsoft doesn't

23   infringe.  I'm guessing they're going to tell

24   you if we infringe, it wasn't willful.  And I'm

1   guessing they're going to tell you that if we

2   infringe, $10.8 million is too much or Mr. Bone

3   got it wrong or there should be no damages here.

4   But here's the thing.  Microsoft's lawyers are

5   not damages experts.  Microsoft's lawyers did

6   not come into court and take the stand, take the

7   oath and tell you that they as experts had

8   calculated the amount of a reasonable royalty in

9   this case.  In fact, no one from Microsoft did

10  that.  They could have.  Microsoft could have

11  brought its own damages expert to come and tell

12  you an amount.  They chose not to do that.

13            So when you all go back and begin

14  your deliberations, we ask if you conclude that

15  Microsoft infringes that when you complete the

16  amount of damages to be awarded to Parallel

17  Networks that you award $10.8 million.

18            Now, Microsoft is going to come

19  talk to you again and then after that you'll

20  hear from Mr. Bovenkamp.  Thank you.

21            THE COURT:  All right.  Ms.

22  Brooks, closing.

23            MS. BROOKS:  Thank you, Your

24  Honor.

1    Good morning.  Just to make one

2    thing very clear right up front, I am not here

3    to tell you that -- I am here to tell you we

4    don't infringe.  I am not here to tell you if we

5    do infringe it's not willful.  I'm here to tell

6    you we don't infringe.  I'm not here to tell you

7    if we do infringe and even if it's willful $10.8

8    million is too much money.  I'm not here to tell

9    you that because we don't infringe.

10    What I am here to tell you is why

11    we are here.  You may have been asking yourself

12    throughout this whole trial, $10.8 million, yes,

13    that's a lot of money, but to be honest,

14    Microsoft is a highly successful company and

15    $10.8 million, while still a lot of money, could

16    frankly fairly easily be paid by Microsoft to

17    Parallel Networks.  And in fact, you heard Mr.

18    Lowery and Mr. Fokas talk about how expensive it

19    is to bring these kind of cases.  It's equally,

20    if not more, expensive to defend them.

21    So why are we here?  It isn't

22    about the money.  It is about the principle.  We

23    are not willing to pay Parallel Networks one

24    dime for our invention that we spent years on.

1    We started it in 1993.  We laid the ground,

2    literally the property, ourselves, started in

3    1993 and began building on that property, our

4    property since then.  That was when the MSN

5    project first began and you heard from Mr.

6    Griffin.  We identified the problem of load

7    balancing.  And intelligent load balancing as

8    early in our documentation, earlier than this,

9    but in our documentation in October of 1994, a

10   year before Mr. Lowery had his epiphany on the

11   airplane coming back from Australia.  And we

12   applied for a patent in June of 1995, slightly

13   less than a year before Mr. Lowery applied for

14   his patent and we had an actual product in the

15   market MSN 1.0 that did dynamic load balancing,

16   months before Mr. Lowery applied for his patent.

17            So we are here on principle and we

18   are here on principle on behalf of Bill Griffin.

19   We are not going to go tell him that we paid

20   some other company money for his pioneering

21   invention.  This was his testimony.  By August

22   25th, 1995 Windows 95 had shipped and in Windows

23   95 was MSN 1.0 with load balancing.  And he told

24   us -- I'm going to get emotional about this, but

```
 1     it was really a fairly emotional moment.

 2     Remember he hold us how proud he was, how many

 3     years he worked, that e-mail where everybody had

 4     signed it.  How proud must they have been when

 5     it launched in midnight of August 1995, months

 6     before Mr. Lowery applied for his patent?  They

 7     had spent so many many hours fixing last minute

 8     bugs, getting everything ready and he's so proud

 9     have it to this day he's got the signed e-mail

10     and he's got his T-shirt, which he didn't bring

11     to court.  That would have been a bit hokey, but

12     that's how proud he is.

13                   We're standing on principle that

14     we're not going to go back to Bill Griffin and

15     tell him that we paid another company for his

16     pioneering invention.

17                   And here it is, right out of his

18     specification, there is the intelligent load

19     balancer, the Marvel Gateway right there.  From

20     1995.  It's so faded the document is so old that

21     it's faded.  And I portrayed it in opening

22     statement this way.  Now, when I gave my opening

23     statement I had no idea what Mr. Lowery was

24     going to do to come up and explain to you his
```

```
 1    invention.  But look what I showed in opening

 2    statement right here, I showed the client here,

 3    the requests going in, the Gateway server, the

 4    intelligent load balancer right there in the

 5    middle figuring out which request to route to

 6    which application server.  Mr. Lowery came in

 7    later that day and drew this on the white board.

 8    Look at what I showed in opening and look at

 9    what Mr. Lowery said his invention was that came

10    a year later.  Virtually identical.  And I

11    didn't know that he was going to draw that.

12              But what's interesting is that we

13    have to be fair.  Mr. Lowery's invention is

14    slightly different than Mr. Griffin's.  Mr.

15    Griffin got a patent on his and Mr. Lowery got a

16    patent on his.  And I don't know if you remember

17    this in Plaintiff's case, where they put up the

18    1999 application for the '335 Patent and they

19    showed that Mr. Griffin's patent was cited on

20    the front of it.  Unfortunately I should have

21    put it in my slide deck, but they showed that

22    Mr. Griffin's patent was cited on the front of

23    the '335 Patent and they showed it I guess to

24    show that we had notice of Mr. Griffin's patent
```

1    because our patent was cited on the front of it.

2    But what that also shows is that actually what

3    we were doing was different enough, even though

4    it came first, was different enough from what

5    Mr. Griffin was claiming that he could get his

6    patent in addition to us having our patent that

7    came earlier.

8              And now they're doing a 180 and

9    saying that actually what we're doing is the

10   same.  You can't have it both ways.  You can't

11   get your patent, saying well, what Microsoft

12   does is different, and then try to get your

13   money by saying what Microsoft does is the same.

14   And counsel asked you to use your common sense.

15   I ask you to use it too.  You cannot have it

16   both ways.  What's interesting, though, with all

17   credit to Bill Griffin and his team, I mean, it

18   was really pioneering what they did.  And all

19   credit to Mr. Lowery and his group, it was very

20   pioneering what they did.  Neither Mr. Griffin

21   nor Mr. Lowery back in the mid '90s could see

22   what was coming because, and this is what

23   actually Dr. Jones told us, he said when you

24   file a patent, it becomes frozen in time.

1    Remember that.  You can't change it.  So that's

2    your invention, you can't later say, oh, I

3    didn't really mean it, it's bigger than that, it

4    does more than that, that's it.  And so because

5    it's frozen in time and you don't have a crystal

6    ball to see what's coming, then what happens?

7    What happens --

8                    Oh, I'm sorry, I want to show you

9    the difference.  1995, if you wanted to order a

10   pizza on the internet and the only reason I was

11   able to get this is because Pizza Hut on the

12   20th anniversary of the first purchase of a

13   pizza online, which happened to be in 1995, they

14   put back on their original website called

15   PizzaNet, where you could order right here.

16   Look at the difference between then and now as

17   to how you go about ordering something.  But

18   this is what it looked like in black and white,

19   no color, the PizzaNet from 1995.

20                   Fast forward to 2012, this is an

21   actual article, E Commerce sales topped $1

22   Trillion for the first time in 2012.  And that's

23   the time period of the technology they're

24   accusing of infringing this 1995 invention.  Use

1     your common sense.  Can really that technology

2     from 1995 really be dealing with $1 trillion in

3     E commerce?  No.

4                    But Mr. Griffin really couldn't

5     see what was coming.  Mr. Lowery couldn't see

6     really what was coming.  But David Maltz did.

7     This is some of the testimony David Maltz -- and

8     obviously you took notes.  I just wanted to

9     highlight a couple things.  He talked about the

10    handling of the request and this goes correctly

11    to whether there's infringement.  Do we handle

12    the request before they're diverted?  And the

13    answer is yes, we handle the living daylights

14    out of them.  And why do we?  Because times have

15    changed.  Frankly until Dr. Maltz told us about

16    that lizard group, I don't -- who would do that?

17    Who would want to stop kids from playing with

18    their Xbox and their Sony Playstation that they

19    got for Christmas?  I don't know, but Dr. Maltz

20    knew they were out there and a scientist at

21    Microsoft knew they were out there and so as a

22    result here's what they have to do to the

23    requests.

24                    What they do is they look for

1187

```
1    requests that actually cause Microsoft services

2    to crash.  We see requests that correlate with

3    crashes on our system and we'll actually block

4    those requests from going further into our

5    services.  And does that protection occur --

6    this is Mr. Barnes asking -- Mr. Wolff asking

7    this question.  Does that protection occur after

8    the request is received?  Yes, it does.  In

9    FrontDoor version 2.  And then he's talking

10   about Dr. Maltz, how it is processed?

11   Processing refers to a bunch of steps we do to

12   gather more information about the request.  That

13   is handling.  Under Mr. Lowery's system, that

14   request that comes in and is hidden, it's a

15   request that's going to crash the system,

16   request that's going to steal your information,

17   it's a request that's going to make it

18   impossible for kids to play their Xbox.  That

19   request would get intercepted right at the web

20   server before there's any of this handling going

21   on and it would get diverted to the page server

22   and those page servers are back end servers over

23   which some of them are third party servers over

24   which Microsoft has no control.
```

1    Can you imagine if we used Mr.

2    Lowery's invention today.  We could end up with

3    the entire system around the world crashing.

4    And I'm not -- this is no disrespect for Mr.

5    Lowery.  He couldn't see, nor did Mr. Griffin

6    see what was to come.  But David Maltz saw what

7    was to come and that's why built into FrontDoor

8    is all of this handling of the request at the

9    web server before it ever goes to the page

10   server to keep us all safe.

11   And here's just some of the stuff

12   they do.  All the protection stuff they do and

13   all the request processing stuff they do to try

14   to keep all of us safe and the system working.

15   And it would never happen if we were using Mr.

16   Lowery's invention.

17   Who else saw the tidal wave

18   coming?  Mr. Alam.  He tended to give very long

19   answers, so I'll try to -- but I didn't want to

20   take them out of context, so I put the whole

21   answer up here, but he was giving here, again,

22   why is there so much handling of the request in

23   IIS?  For example, in real life example of this

24   is security.  In this case we want one place --

1    he was talking about the web server -- where you

2    do security.  You want one place that basically

3    validates the requests and makes sure yeah, are

4    these actually secure sites, are these attack

5    requests, do they look like shady requests in

6    the system.  You want one place to do that.  And

7    yes, we do, our web server.  The last thing we

8    want is for that request that is an attack

9    request or a shady request to get diverted at

10   the web server, sent to the page servers and

11   crash the whole system.  And that's what would

12   have happened if we had actually been using Mr.

13   Lowery's invention.

14             And this is how Mr. Alam and his

15   team spent years creating software that would

16   make sure that we kept those kind of systems and

17   security checks safe in our web server.  And

18   this is a blow up of the IIS Pipeline.

19             Why else are we here?  So I said

20   it's not about the money.  But I'm going to talk

21   for a moment about the money, not because I'm

22   going to tell you we shouldn't owe $10.8 million

23   if we're infringing.  If we're infringing $10.8

24   million, fine, but we're not.  What I did want

1    to do, though, is stop for a moment and walk you

2    through what Ms. Hufnal was trying to show here,

3    because I'm not sure, maybe all of you did get

4    it, but I'm not sure and I'll take a moment and

5    say it.

6              Here's the damages calculation of

7    Parallel Networks.  They had such difficulty

8    being able to point to a document that would say

9    this is the value of Mr. Lowery and Parallel

10   Networks' invention.  They couldn't find one,

11   couldn't find a document they could point to.

12   So instead they did the most counterintuitive

13   argument.  Remember how supposedly the invention

14   makes things faster and you just saw that in

15   closing how oh, you have the web server and it's

16   all in red, but you divert part of it and now

17   it's partly in red and then you divert another

18   and then it's lesser in red and so on and that

19   makes the whole system faster?  Their damages

20   argument is that allegedly because we're using

21   Parallel Networks invention our system is 45

22   milliseconds slower.  They are literally saying

23   that.  They're saying that by using the

24   invention that's supposed to make things faster

1    our system is slower and that that 45

2    milliseconds has value to Microsoft and

3    therefore if you monetize that, that 45

4    milliseconds of slowness equates to $10.8

5    million.  I know -- I can't explain it to you,

6    because it's inexplicable, but that's their

7    damages theory.

8                    And so what Ms. Hufnal did was she

9    showed, okay, so if we had less -- and this is

10   his number right here.  This was his column of

11   well, you take the 45 milliseconds and you times

12   it by these various things, multiply it by these

13   various things and you come up with this number.

14   So Ms. Hufnal said, okay, so if we had less

15   delay by not using your invention, let's say we

16   only had a 35 milliseconds delay, it's called

17   latency, then she did the math and that came out

18   to 8.9 million.

19                   And then she said, so what if it

20   turned out by using your invention we had even

21   bigger delay.  And over here then she used 55

22   milliseconds and did the math and it came out to

23   14 million.

24                   And so what Parallel Networks is

```
 1    literally saying to you, ladies and gentlemen of

 2    the jury, is that by using their invention, the

 3    slower you go, the more you owe.  And by using

 4    their invention, the greater the delay, the more

 5    you pay.

 6              Use your common sense.  That makes

 7    utterly no sense.  But it makes utterly no sense

 8    because frankly they have no case.

 9              And there is no dispute, Mr. Bone

10    agreed, Ms. Hufnal asked him:

11              "Question:  In other words, the

12    slower the Microsoft's system goes, the more

13    they would owe Parallel?"

14              I guess if we use their invention

15    and it brought us to a screeching halt, we would

16    owe them a billion dollars.

17              He said, "Yes, based on this

18    analysis, that is correct."

19              I can't explain it, I can only say

20    to you that if they would play that fast and

21    loose with the figures, they'll play that fast

22    and loose with the facts.

23              So now let's go to the other

24    reason we stand on principle, Terry Fokas.  From
```

```
 1    the beginning of the case, Mr. Lowery told us
 2    about how he came up with this invention and to
 3    his credit, he got $90 million in funding when
 4    he was -- this is Mr. Lowery over here,
 5    InfoSpinner in 1995, and then they had a
 6    different business model in 2000, Epic Realm,
 7    and this is Mr. Lowery, and investors invested
 8    $90 million in their company.
 9              But then came the .com crash and
10    enter Terry Fokas.  And Mr. Fokas chastised me
11    for not being able to keep the names of his
12    company straight.  And he's right, I could not.
13    I could keep a complicated data path straight,
14    but I could not keep all of Mr. Fokas' companies
15    straight.
16              But apparently according to him,
17    it turned into Epic Realm Licensing, LC, that
18    turned into Epic Realm Licensing, LP, that
19    turned into Parallel Networks, LLC, that turned
20    into Parallel Networks Licensing, LLC.
21              And counsel just got up here and
22    said that we didn't bring a witness to tell what
23    you, Microsoft, was thinking when Terry Fokas
24    told us he believed we were infringing.  We
```

```
1    didn't need to bring a witness, we showed you
2    what we were thinking, we sued.  We sued
3    Parallel Networks for a declaratory judgment
4    that those patents.  They were accusing us of
5    infringing, were not infringed, and/or they
6    invalid.  And what we got for that was
7    Mr. Fokas, we were right here in Delaware,
8    dragging us to Texas and then ending up
9    dismissing the case in Texas and then rebringing
10   suit again here in Delaware.  You know what we
11   were thinking, we showed you what we were
12   thinking.
13              And this is what Mr. Fokas told us
14   about what he was thinking.  Now, I only put
15   this up here, it has nothing to do with
16   infringement, but there was so much testimony
17   from the witness stand about how much money, and
18   Mr. Lowery is right, he put a lot of money into
19   his company, but he did get 90 million in
20   investments out of it.
21              Mr. Fokas told you he took a
22   second mortgage out on his house.  But he did
23   get according to him I think he said almost 32
24   million in licensing revenue.  So we got a lot
```

```
 1      of tens of millions of dollars floating around
 2      there.  And who gets that?  Well, we got the
 3      Parallel Networks Licensing which is owned 75
 4      percent by Parallel Networks, and then the other
 5      20 -- this is the breakdown of Parallel
 6      Networks, which is 65 percent of that goes to
 7      Terry Fokas, 15 percent to Mr. Lowery, and 20
 8      percent to other investors.  And then, talking
 9      about Parallel Networks Licensing, 75 percent is
10      owned by Parallel Networks and the other 25
11      percent is held by a patent funding company
12      called Parabellum.
13              So when Mr. Fokas is up there
14      pleading poverty, he's got a partner called
15      Parabellum who is in the line of work of funding
16      litigation, of helping companies like his sue
17      other companies.  So I just wanted to get that
18      out of the way in case we were feeling sympathy
19      for poor Mr. Fokas that he had to take a second
20      mortgage on his home.  He admitted that
21      Parabellum is indeed a litigation funding
22      company.
23              Let's just talk a moment also
24      about witnesses and the credibility of
```

1   witnesses.  You're going to have a jury

2   instruction, and it's going to be up to you to

3   judge the credibility of witnesses.  What was

4   their demeanor like?  What was their testimony

5   like?  Were they believable?

6                 And Mr. Fokas sat on that witness

7   stand under oath and told you that any recovery

8   they got, it was going to go to pay off the

9   investors.  Of course he forgot to tell you that

10  he was one of the investors.  And to hire

11  engineers.  And I don't know if you remember, I

12  said, "Really, Mr. Fokas?"

13                "Yes, we're going to use it to

14  hire engineers."

15                Then I asked him, "When was the

16  last time there were engineers at Parallel

17  Networks Licensing?"

18                "Answer:  There has never been any

19  engineers."

20                It's up to you to decide if Terry

21  Fokas was telling you the truth.

22                So let's get down to business.

23  This is a patent case, as I'm sure you were all

24  so excited to learn when you got picked for this

1    jury.  And so let's get to what the issue is all

2    about.

3              In opening statement, even though

4    this was a patent case, counsel for Parallel

5    Networks stood before you, and there is

6    transcripts that we see these people here doing.

7    He talked for twenty-seven pages, two pages were

8    devoted to talking about the patent and the

9    accused products.  And one of those pages was

10   about how there really wasn't time to talk about

11   the patent.  We got to hear about the life of

12   Mr. Lowery, and he's to be commended for all the

13   obstacles that he's overcome and there have been

14   tremendous amounts of them, but that frankly has

15   nothing to do with the question that you are

16   being asked to answer.

17             We heard all kinds of things that

18   have nothing do with what's going to be on the

19   verdict form.  I spoke, two pages longer than

20   counsel for Parallel Networks did, but I spoke

21   for twenty-six out of twenty-nine pages about

22   the patent and the accused products, even though

23   we're not the plaintiff and we don't have the

24   burden of proof, and we're not -- and we have

```
 1        lots and lots of patents, including on the

 2        accused products, but we're not the patentholder

 3        in this case asserting a patent.

 4                   So let's get down to it.  The

 5        question you're going to be asked is did

 6        Parallel Networks prove that the accused

 7        products, MSN and Bing infringe the asserted

 8        claims.  I have the verdict form here, and I was

 9        going to ask to put it on the Elmo, but counsel

10        already put it up there, and I'm not going to

11        presume in any way to tell you how to fill it

12        out.  It's a fairly simple verdict form, so I'm

13        sure you're going to be able to follow it pretty

14        easily.  But I did want to point out that the

15        question is, has Parallel Networks proven by a

16        preponderance of the evidence that MSN and Bing

17        infringe.

18                   Let's see in a summary form what I

19        did with these boards?  Dr. Long as you may

20        recall went through every single element.  Now,

21        let me stop right there.  Remember if only one

22        is missing, we don't infringe, just one.  We

23        pointed out three.

24                   Now, you may decide oh, I think
```

1  there was only a single request.  Well, then,

2  we're down to two.  You may decide oh, maybe

3  there is releasing.  Then we're down to one.

4  They have to prove to you all three of them we

5  are performing.

6         So this is the said request one.

7  And Dr. Long walked us through very carefully

8  before I crossed out and showed you all the

9  reasons why we are not performing, the accused

10  products performing that limitation.

11         Then I underlined the releasing,

12  and he walked you through the evidence on that.

13  I'm going to touch very lightly on it in a

14  minute, but we're not doing it, either.  Then we

15  looked at the intercepting.  And again, Dr. Long

16  walked you through and explained in detail how

17  we're not doing that limitation, either.

18         So these are all, everything that

19  is lined out here is what is not happening in

20  MSN and Bing and, therefore, there can be no

21  infringement if you find one of them.

22         The '335 claim, we went through

23  the same exercise, said request, no.  Releasing

24  no.  Intercepting, no.

```
 1                   And this is Dr. Long's summary.

 2       He was up there for I think well over an hour,

 3       at the end he would sum up on each one, single

 4       request, do we meet that requirement, no.

 5       Releasing, no.  Intercepting, no.

 6                   And again, in judging witnesses,

 7       you can judge -- there is an instruction on

 8       expert witnesses.  You can judge them based on

 9       their credentials, their background, their

10       experience, what kind of things they looked at.

11                   Now, Dr. Long has been criticized

12       for not looking at source code and how Dr. Jones

13       did.  And you remember Dr. Jones had some source

14       code up there and then they handed you a page so

15       you could see what it looked like.

16                   Dr. Jones never showed you one

17       line of source code to support his opinions.  He

18       never said now if you look right here, this

19       shows a single request.  If you look right here,

20       this line of software code or source code, this

21       shows there is an intercepting.  If you look

22       right here, this shows that the web server is

23       being released, not one that would show that he

24       looked at source code.  He didn't use any of it
```

1    to support his opinion.

2              On the other hand, Dr. Long talked

3    to the very engineers who wrote the source code

4    to support his opinion.

5              So let's get down to it.  What is

6    the invention?  It's been a while, the first

7    witness we had was Mr. Lowery, and so what did

8    he say was the invention?  He admitted he didn't

9    invent web servers.  He admitted he didn't

10   invent web pages.  He admitted he didn't -- I

11   guess I repeated myself twice, the web pages.

12   He admitted he didn't invent the idea of a

13   server that receives and processes a web page

14   request.  He admitted he didn't even invent

15   dynamically creating web pages.  He admitted he

16   didn't invent the HTML language we have been

17   talking about.  And, in fact, he admitted that

18   he didn't even invent the concept of load

19   balancing that others had done that before which

20   is key.  They're trying to tell you without his

21   invention the internet won't work.  That wasn't

22   his invention.

23             His invention is a very narrow and

24   specific way of doing this load balancing that

```
 1     frankly has been frozen in time back in 1995 and

 2     is archaic and is being used by no one anymore.

 3               They may get up in rebuttal, and I

 4     don't get to respond and say well, then, why did

 5     all these companies take a license.  You saw the

 6     name of those companies.  Most of them were

 7     pretty small.  And you see how expensive it is

 8     here to have to challenge these lawsuits.  We

 9     are lucky, Microsoft does have the benefit of

10     having the resources to be able to stand on our

11     principles and not have to capitulate.  Those

12     other companies may not have.

13               But you also saw the one clause in

14     the one license you actually did see that said

15     that this settlement agreement shall not be used

16     as an admission of liability anywhere at any

17     time.

18               So if they get back up and argue

19     that all these other companies acknowledge they

20     were infringing, that's simply not true.

21               So what is the invention?  This is

22     the essence of the invention.  My question to

23     Mr. Lowery, "Sir, is it true that the adapters

24     were built to intercept the functionality of the
```

```
 1     web server and off-load it from the web server's

 2     obligation to process the dynamic content

 3     generation request?  Is that true, sir?

 4                 "Answer:  Yes."

 5                 He was very truthful.  That's his

 6     request.  That is his invention, get that

 7     request and leave the web server not to have to

 8     process it.  And you saw, we processed the

 9     living day lights out of the request to keep us

10     all from having the whole thing crash.

11                 His invention is the opposite of

12     what we do, literally the opposite.  And the

13     patent tells us that in the '554 patent, all the

14     benefits, performance, security, extensibility

15     and scalability are each to be done not by the

16     web server the way we do, but by the page server

17     which is not what we do.  Because half the time

18     the page servers aren't even under our control.

19     A completely different invention than our

20     invention.

21                 And we also know that from the

22     facts.  InfoSpinner, this is when it was still

23     InfoSpinner, halted work on the web server

24     because the technology wasn't critical for them.
```

1204

```
 1              Mr. Alam said that in our
 2     technology, the web server is absolutely
 3     critical.  In fact, it is.  Look at all the
 4     stuff that it does.  And so that's the general
 5     global.  Now let's drill down to the individual
 6     claim limitations that we don't meet.
 7              Number one, is there a single
 8     request or a multiple request?  With all due
 9     respect to Dr. Jones, it's up to you if you're
10     going to put your weight behind Dr. Jones or the
11     man who actually wrote the soft -- the source
12     code with his team for the IIS pipeline, which
13     is where those requests get processed.  Do we
14     have a single request or do we have multiple
15     requests?  Answer, we clearly have multiple
16     requests.
17              Dr. Maltz, and is the request that
18     comes out of FrontDoor version 2 the same
19     request that came in?  No, it's not.  And you
20     can tell that just by looking at these two
21     pages.  I don't know if you remember, you're
22     going to end up reading software code, you can
23     look at the original request and what it looked
24     like and it's in evidence, and then you could
```

```
 1        look at the request that came out, and it is
 2        different.  It is simply a different request.
 3        So that whether we have multiple or single
 4        requests.
 5                    Let's look at releasing of the web
 6        server.  So again, Mr. Alam gave some long
 7        answers.  So what happens in releasing, it has
 8        to release the web server to process another
 9        request.  So the request comes in to HTTP.sys,
10        and Mr. Alam tells us, what HTTP.sys, what
11        happens is this request will stay here.  It
12        doesn't go anywhere, it stays.  That's his
13        testimony under oath and nobody contradicted it.
14                    And then he talks about all the
15        things that happen because it's the raw request
16        and eventually there becomes a cooked request
17        right there, we call that a cooked request.
18                    Now, it's interesting because
19        counsel said well, like that's if you have a raw
20        potato and I cook it, you still have a potato,
21        but here because we have multiple requests
22        sitting in HTTP.sys is the raw potato.  What
23        goes up the pipeline is a cooked potato.  You
24        actually have two different potatoes.  And
```

1       that's why we have multiple requests.  And

2       that's why we also don't release the web server

3       because we got one potato -- image this is an

4       oven, we got one potato still sitting in the

5       oven, then we got another one that is fully

6       baked and now is working its way up to have it

7       scooped up to have some sour cream added and

8       some butter and some cheese added, that's the

9       cooked potato, we have two.

10                      In the meantime that raw potato

11      that is sitting in that oven, that oven has not

12      been released to bake another potato.  I know

13      this is a ridiculous analogy because the

14      software is so much more complicated than that,

15      but I started down the road so I'll finish it

16      up.

17                      The cocked potato goes up to the

18      handler, it stays there.  Let's say that's the

19      warmer, and it stays there until the other third

20      leg of this comes back and then and only then is

21      the oven released to cook another potato, the

22      warmer released to warm another cooked potato.

23                      And he specifically was -- so just

24      to be clear, this is now the cooked one, it's

```
 1      sitting up here in the execute handler, while

 2      the cooked request is sitting there waiting for

 3      the whole back end of the process to take place,

 4      that's the application servers, who get yet new

 5      requests, these new raw requests get to gather,

 6      what happens, he says the execute handler has

 7      not been released.  The cooked request has also

 8      not been released.

 9                  And so once the client finally

10      gets back the response, is that when the web

11      server is released to process -- this part of

12      the web server is released to process a new

13      request, that's the key, that the Court's claim

14      construction.  It doesn't get released to

15      process a new request until the response comes

16      back.  That's the opposite of what the invention

17      is.  The invention is get that request out of

18      there, out of the web server so that that piece

19      of memory where that request would have been

20      stored is free to process a new request.

21                  We don't have to do that, because

22      we've got so many different -- we can process a

23      thousand requests simultaneously.  What Mr.

24      Lowery was thinking about was a very small
```

1    primitive system where if you had one request in

2    the web server, you couldn't process the next

3    request until that request moved onto the page

4    server, then the new request would come in.

5    That's not what we have, because the capacity to

6    process thousands of requests simultaneously, so

7    we can hang on and do take up memory.

8              Now, eventually, it will probably

9    get to a point where there's so many users we

10   might have -- we might fill our capacity and

11   then you know what happens, you know that little

12   thing that goes like this on your screen, that's

13   what you are going to see.  So then our

14   scientists are going to get to work figuring out

15   yet a more efficient way to do this.  And guess

16   who also said he didn't literally agree with me

17   that there was no releasing, but he agreed with

18   me that the request sat up in the execute

19   handler, he agreed, Dr. Jones, that the memory

20   would not be released then until the response

21   came back and the result of that was that that

22   memory, which is a resource, is being held up

23   and taken up until the client transaction is

24   fully processed.  He agreed that we do it

```
 1      fundamentally differently than the patented
 2      invention.
 3                  I don't mean to be pointing at
 4      you, Mr. Lowery.  I'm just generally looking
 5      over here for the representative of the patented
 6      invention.  I recognized I was doing that.  I'm
 7      sorry.  It was really rude.  I'm sorry.  I
 8      didn't mean it that way.
 9                  So let's go to the last one.
10      Intercepting.  Now, this has been a very
11      interesting turn of events just this morning.
12      The Court's construction is diverting the
13      handling of said request before the request is
14      processed by the web server slash HTTP-compliant
15      device.  Counsel said in his opening closing,
16      there's no requirement in here about what it
17      means or how much the handling is that our
18      witnesses said well, we do a significant amount
19      of handling.  This is slight on that.  If that's
20      the case and he's right, one could read this and
21      say there should be no handling, right?  It says
22      divert before there's handling.  Now, logically
23      there has to be some handling, even in the
24      Parallel Networks system because the request
```

1    does have to get passed through the web server

2    to the application server.  So of course there's

3    some handling, but not the kind -- I mean, this

4    would make it sound like we can't handle it at

5    all, but I don't know if a system would work if

6    you did that.  So logically you know you can do

7    a little bit of handling to be able to get it

8    from the web server to the application server or

9    the patented invention, the page server, but in

10   our case you saw over and over again we handle

11   truly the living daylights out of these requests

12   at the web server before they're diverted.

13            Now, I asked Dr. Jones to help us

14   out here, because they have the burden of proof.

15   They have to prove to you that there isn't

16   handling that goes on on the request while it's

17   at the web server before it's diverted.  And I

18   was walking him up the Pipeline, the IIS

19   Pipeline and I figured I'll keep it simple, I'll

20   just talk about the modules that use the word

21   handler, because you would think if you're

22   called a handler, you're probably doing some

23   handling.  And so I asked him, all right.  We're

24   going up through the IIS Pipeline, let's go to

1    map handler.  Now, again, just to make it really

2    clear, I asked him at this point the request has

3    not been intercepted, correct?  Yes.  And do

4    you, Dr. Jones, who represents the party with

5    the burden of proof, do you know what the map

6    handler does?  Answer, I don't recall.

7              So how can he tell you ladies and

8    gentlemen of the jury that the map handler

9    doesn't handle the request in a way that is

10   prohibited by the Court's claim construction.

11   He can't tell you that because he doesn't

12   recall.  And then I asked him about the

13   pre-execute handler.  Do you know what that

14   does?  I don't recall.  So he failed right there

15   in his burden and obligation to you to prove to

16   you that that request didn't get handled in a

17   way that the Court's construction doesn't allow

18   before it was diverted.

19             And of course Mr. Alam told us

20   about all the handling that was going on, when

21   in computer terminology when he says that's a

22   lot of code happening here, that means handling.

23   And he gave -- I put all these pages here

24   because you have a really, really long answer

1    when he stood up here and he walked you through

2    the IIS Pipeline and described to you in detail.

3    I mean that Pipeline almost looked like a

4    gauntlet.  I mean all that handling that was

5    going on with the request all before it was

6    diverted.  And Dr. Maltz told you that FrontDoor

7    2 runs on IIS, so that means everything that IIS

8    does to the request FrontDoor is doing since

9    it's running on IIS.

10            And so there's no intercepting,

11   according to David Maltz, no intercepting

12   according to Mr. Alam, and of course no

13   intercepting according to Dr. Long.  And of

14   course we don't know according to Dr. Jones, he

15   doesn't know.  And so that is intercepting.

16            So at the end of the day you're

17   going to be asked -- the burden of proof is more

18   likely than not.  It's not a big burden, 51

19   percent, but it goes both ways.  Is it more

20   likely than not that we are infringing, that

21   Bing and MSN are infringing or is it more likely

22   than not that we aren't?  And if you believe Mr.

23   Alam, Dr. Long, Dr. Maltz, clearly they've

24   tipped the scale in our favor.  Now, if you

```
 1        think outweighing them all is Dr. Jones, then
 2        that's certainly a decision you could make, but
 3        he would have to outweigh all of these gentlemen
 4        and you would have to disbelieve all of their
 5        testimony and only accredit his.
 6                    And so let me leave you with this.
 7        Are you going to accredit an expert who put this
 8        up in front of you when the whole claim is about
 9        what does and doesn't happen at the web server
10        and he left off the web server.  You know why he
11        left off the web server?  And this is my --
12        remember I got up there and I drew this box?
13        You know why he left off the web server and only
14        talked about FrontDoor?  Because in the web
15        server is IIS and in the web server is HTTP.sys
16        that creates one request sits here, another
17        request sits there.  He didn't want to talk
18        about it.  He didn't want to talk about them,
19        because he had no explanation for how it is that
20        those limitations are met when you start talking
21        about HTTP.sys and IIS.  I had to bring them up.
22                    So, I will end with this.  You are
23        the ultimate judges and I said I'm not going to
24        presume to tell you how to fill out the verdict
```

```
 1        form.  You've been unbelievably conscientious.
 2        I know -- I'm sure when you first heard about
 3        the technology I doubt you thought oh, I can't
 4        wait to tell my loved once about this case, but
 5        I hope you learned something during the case.  I
 6        hope that you ended up finding it interesting.
 7        I hope some of our witnesses were able to kind
 8        of explain to you.  I didn't know before I
 9        handled this case, because you know what's
10        interesting?  As much as this does, as much as
11        what the inventors at Microsoft have
12        accomplished nobody gets to see it because it's
13        not the cool stuff that's out there that you can
14        see, but it's the stuff that without it the
15        whole thing would fall apart.  And so I'm so
16        happy for them that they finally got to come and
17        tell people about what they did starting in 1993
18        with Bill Griffin and to this day with Mr. Alam
19        and Dr. Maltz.  I'm really very proud to be
20        speaking on their behalf and I ask you to take
21        all of that into consideration when you go into
22        the jury room and render your verdict.  Thank
23        you very much.
24                    THE COURT:  Okay.  Mr. Bovenkamp.
```

```
 1      Rebuttal.

 2                  MR. BOVENKAMP:  Yes, Your Honor.

 3      Thank you.

 4                  Microsoft's counsel started, Ms.

 5      Brooks started her argument by saying that this

 6      case is, for them, all about non infringement.

 7      There was then a lot of talk about a lot of

 8      stuff other than infringement.  Don't let them

 9      kid you.  There was a lot of discussion about

10      damages, there was a lot of discussion about

11      their allegation that they infringe first -- or

12      they came out with their product first.  There's

13      a lot of discussion about many things unrelated

14      to infringement and a lot of her closing

15      statements touched on those things.

16                  There's questions on the verdict

17      form for something other than infringement, for

18      willfulness, for damages, because Microsoft has

19      kept those things in the case.  They could have

20      chosen not to.  If it's truly about the

21      principle of the thing, they could have chosen

22      to eliminate those issues so that all we were

23      here talking about was infringement.  They

24      didn't.
```

```
 1                  You heard Ms. Brooks, on behalf of
 2       Microsoft, argue that they believe they came
 3       first.  Well, the law provides a remedy for
 4       that.  They could have challenged Mr. Lowery's
 5       patent.  They could have alleged in this case
 6       that his patent was invalid.  You're not going
 7       to be asked -- when you go back to the jury
 8       room, look on that verdict form.  There's no
 9       question about whether Mr. Lowery's patent is
10       valid.  It is.  I showed you where on Mr.
11       Lowery's patents, one of them, their alleged
12       system, this '668 patent that Mr. Griffin talked
13       about, was on the list of things that the patent
14       office considered.  And Microsoft's counsel
15       discussed what the significance of that was, but
16       here's what's of significant.  The significance
17       was that the Patent and Trademark Office, in
18       their three-year examination, looked at that MSN
19       1.0 system, they looked at that patent and what
20       they concluded was that what Mr. Lowery came up
21       with, what he invented, was different.  That's
22       the only reason he got a patent.  They look at
23       all the art, including Microsoft's system and
24       they issued Mr. Lowery a patent.  So don't let
```

1    Microsoft kid you, what they had in MSN 1.0

2    wasn't the same as what he came up with.

3            You heard evidence that what they

4    used in MSN 1.0 is different than what they're

5    doing today.  And there's a reason for that.

6    MSN 1.0.  I don't dispute that that was a

7    significant undertaking in that it took a lot of

8    time and a lot of effort and a lot of work, but

9    they changed what they did from MSN 1.0 from

10   what they're doing today in MSN and Bing.  And

11   what they changed to is a system that Mr. Lowery

12   invented.  That's what they changed to.

13           Now, at the beginning of

14   Microsoft's counsel's argument there was -- and

15   I'll briefly touch on, because I want to get to

16   infringement.  I want to address the three

17   excuses they have of why they don't infringe.

18   Before I do that I want to touch on two other

19   things.  First they say it's counterintuitive

20   that because our load times are greater it's

21   counterintuitive that we should get more money.

22   Well, here's the thing.  The reason why the load

23   times are greater, the reason why there's this

24   45 milliseconds is not chance.  So there's a lot

1    of things that in page load time are chance.  It

2    has to go all the way from a client, it takes a

3    bunch of different hops through the internet to

4    servers that Microsoft doesn't control.  It has

5    to go through a number of different systems that

6    Microsoft has, but Microsoft can control those.

7    Microsoft can control its own servers.  And so

8    Microsoft and it's engineers, smart folks, we

9    don't dispute that, they built FrontDoor to be

10   exactly that 45 milliseconds.  They could have

11   chosen to make it faster, they could have chosen

12   to make it slower.  They chose for FrontDoor to

13   be that particular speed.  So it wasn't chance

14   that it was that amount.  And so the only

15   rational conclusion is if they designed it, they

16   built into the system this additional delay,

17   there had to be a reason for that.

18          And that's what Mr. Bone

19   explained.  The reason for it.  Because as

20   Dr. Jones explained, as Mr. Lowery explained,

21   the benefit of the patent is not necessarily for

22   a specific request.  Think of the traffic

23   signal.  For you sitting at a red light may

24   suck, but on the whole for all those cars

```
 1     sitting in traffic because there is a red light,

 2     because there is traffic signals, good things

 3     happen.  You can get to the place that you want

 4     to go more quickly.  That's the same thing that

 5     happens in their system.  There may be for a

 6     specific request a little slow down that's 45

 7     milliseconds, but because of that additional

 8     processing, because of that additional thinking,

 9     because of that additional determination of

10     where it can go, the whole system is not going

11     to crash.  Think about the slow down if there

12     wasn't the 45 milliseconds, if there was just a

13     quicker routing, but it was done in a dumber

14     way, one of those systems went down and the

15     whole Bing system went down, the slow down then,

16     it would be incredible.  That's what we're

17     talking about with overall benefit.  And that's

18     what we're talking about, this designed 45

19     second increase and that's what there's at least

20     the value of to Microsoft.

21               Now, last thing I want to talk

22     about before I get to the three infringement

23     excuses is Terry Fokas.  There was a suggestion

24     by Microsoft's counsel that Terry Fokas somehow
```

```
 1    profited on the order of $90 million from these
 2    deals with the company.  I want to set the
 3    record straight.  Investors did invest in
 4    epicRealm when Terry Fokas was with them, but
 5    they invested in epicRealm, they weren't paying
 6    this money to Mr. Fokas.  Mr. Fokas didn't make
 7    this amount of money.  What that money was used
 8    for ultimately, and unfortunately because of the
 9    customers going away, was paying off the debts
10    of epicRealm.  Mr. Fokas came in here and he was
11    very clear about the companies and the
12    organization and, you know, maybe it was simple
13    for him to work all that out.  I'm a trial
14    lawyer, I'm not a corporate lawyer, so it was a
15    little Greek to me as well, but the fact of the
16    matter is is that Mr. Fokas took out a second
17    mortgage on his house.  I mean, you're not doing
18    that if you choose to.  Mr. Fokas put a lot of
19    time and a lot of his own money into this and a
20    lot of other investors did too.
21              Mr. Lowery is still around, he's
22    still with the company, they still want to do
23    things with his patents.  They still want to do
24    things with their intellectual property.  And
```

```
 1      that's a part of what we're asking for here, a

 2      small part.  We're asking for a fair value for

 3      Mr. Lowery's patents from Microsoft.  We think

 4      10.8 is imminently fair.

 5                  Now, let me briefly address,

 6      before I sit down, the non infringement

 7      arguments that Microsoft went through and just

 8      as we expected, they said they raised the

 9      request issue, they raised the intercepted

10      issue, they raised the releasing issue.  And I

11      want to observe something up front.  There was a

12      slide they put up that I thought was pretty

13      interesting.  They had Jones on one side and

14      they had Mr. Alam, they had Mr. Maltz and they

15      had Dr. Long.  Dr. Maltz, I'm sorry.  And

16      Dr. Long on the other side.  And they said look

17      at this battle, Dr. Jones versus these three

18      folks.  But you know Dr. Jones had someone else

19      on his side, someone that Microsoft didn't bring

20      to trial.  He had Mr. Arunachalam, the guy that

21      knew this application server load balancer best,

22      the guy who knew about how the intelligent

23      system worked.  He was on Dr. Jones' side.  He

24      was someone that Dr. Jones relied upon.  And
```

1      Dr. Jones went further than that.  He traveled

2      across the country to California to look at

3      Microsoft source code.  Dr. Long, he teaches at

4      Santa Cruz.  Santa Cruz is in California, at

5      least the last I've heard.  That's pretty close,

6      but yet he was too busy.  He had taken

7      shortcuts, decided he didn't need to go look at

8      the source code.  Why?  Why wasn't Mr.

9      Arunachalam here?

10                  They talked about request.  It's

11     simple.  There's one message that asks for a web

12     page.  There's only one.  Dr. Maltz said that

13     it's exactly the same what comes out of

14     FrontDoor than what went in.  Mr. Alam, who they

15     rely upon for this issue, Mr. Campbell stood up

16     and asked him repeatedly what do you know about

17     FrontDoor, what do you know about FrontDoor,

18     what do you know about FrontDoor?  I don't

19     really know anything, I know about IIS, but

20     FrontDoor I'm not sure.  FrontDoor is what's at

21     issue in this case.  Bing and MSN are what's at

22     issue in this case.

23                  You heard the excuse of releasing.

24     But what you didn't hear, they brought up memory

1223

1    again, they brought up connections again, but

2    what you didn't hear Ms. Brooks address was what

3    I told you they didn't address, processing

4    cycles.  That's just as much a resource of the

5    web server and the HTTP-compliant device as

6    memory, as connections.

7                    And lastly, intercepting.  Don't

8    let them fool you.  Don't fall for the smoke and

9    mirrors.  Read the construction for yourself.

10   Diverting the handling, it's not diverting

11   before handling, it's diverting handling before

12   processing.  That's what the Court is going to

13   tell you.  Don't fall for it.  What's

14   processing?

15                    Well, when you process something,

16   it was the whole point of the invention, that

17   you don't do the generation of the web page at

18   the web server, you do it somewhere else.  You

19   off-load.

20                    It's straightforward.  It's

21   simple.  It's not as complicated as Microsoft

22   wants to suggest.  You divert the handling,

23   there can be handling before, even a whole

24   bunch.  But as long as before you dynamically

```
 1    generate that web page it gets sent to a page

 2    server, that limitation is met.

 3              Ladies and gentlemen of the jury,

 4    the lawyers who presented the case to you on

 5    behalf of Keith Lowery and Parallel Networks, we

 6    thank you for your time and attention.  I know

 7    it's been a long process.  And we look forward

 8    to your verdict.

 9              THE COURT:  Thank you, counsel.

10              Ladies and gentlemen of the jury,

11    as I said to you, I'm going to need to instruct

12    you on the law.  That's going to take a few

13    minutes, so I think it probably would be wise if

14    we took a short break, shorter than usual.

15    We'll take a five, ten-minute break and then

16    I'll have you back in and instruct you on the

17    law and then the case will be yours.

18              Let's take the jury out.

19              (Jury leaving the courtroom at

20    11:43).

21              THE COURT:  All right.  I'll be

22    back and ready to roll in ten minutes.  Okay.

23              (A brief recess was taken.)

24              THE COURT:  All right.  Thanks.
```

```
 1     Please be seated for just a moment.  Do we have
 2     final versions?  I asked that there would be for
 3     sure a final version on the jury instruction and
 4     verdict form.  Do I have that?
 5                   MR. CAMPBELL:  The verdict form I
 6     don't because I don't think there were any
 7     changes to it.  We can get it quickly if you
 8     need it.
 9                   THE COURT:  I'll pass this back to
10     you folks to look at because I'm pretty darn
11     sure that's it, but I don't want any mistakes.
12                   MR. CAMPBELL:  If I can hand out
13     what I understand is a agreed revised
14     preliminary instruction for the invalidity,
15     agreed final jury instructions and then an
16     agreed supplemental instruction, they were
17     originally instructed on invalidity and that is
18     no longer part of the case.
19                   THE COURT:  That's great.  If you
20     could hand that to the courtroom deputy.
21                   Ms. Hufnal and Mr. Campbell, take
22     a look at that together and tell me if that
23     verdict sheet is right.
24                   MS. HUFNAL:  Your Honor, we have
```

```
 1        one issue on the juror notebooks.  They have the

 2        claims in the juror notebooks.  Those were

 3        submitted I think before the narrowing of the

 4        claims that happened right before trial started,

 5        so they right now have claims in their juror

 6        notebooks that are no longer at issue in the

 7        case.

 8                    We have printed out pages that

 9        just have the asserted claims, if the Court

10        would like to replace those.

11                    THE COURT:  No, I wouldn't.  But

12        I'll tell them.

13                    MS. HUFNAL:  Okay.

14                    THE COURT:  I'm not going to try

15        to gather up nine notebooks that might have been

16        written in and start swapping pages.  That would

17        be a good thing to know about before now.  I

18        wasn't screening what you guys agreed to put in

19        there.  So I'll just tell them, the claims that

20        are at issue, the only claims that are at issue

21        are the ones that you have heard about and that

22        are on the verdict sheet.

23                    MS. HUFNAL:  Thank you, Your

24        Honor.
```

```
 1                    THE COURT:  All right.

 2                    MR. CAMPBELL:  There is no change

 3       from the preliminary instructions.  Your Honor,

 4       we have confirmed this is the correct verdict

 5       form.

 6                    THE COURT:  Great.  That's the one

 7       I'll send back.  So please hand that back to the

 8       courtroom deputy.

 9                    MR. CAMPBELL:  Lastly, Your Honor,

10       housekeeping, and we can do this later or

11       however Your Honor wishes.  You asked the

12       parties to confer on which portions of the

13       transcript from Tuesday need to be sealed.

14                    THE COURT:  Let's hold on now.

15       Let's get the jury in, I'll instruct them, I can

16       give them the case and then we can do whatever

17       clean up we have to do.

18                    MR. CAMPBELL:  Thank you, Your

19       Honor.

20                    THE COURT:  Let's get the jury in.

21                    (Jury entering the courtroom at

22       11:50 a.m.)

23                    THE COURT:  All right.  Thank you.

24       Please be seated, ladies and gentlemen.
```

```
 1                    We're at the last step before the
 2         cases all yours.
 3                    As I told you, I'm going -- please
 4         secure the courtroom.  I need to read to you a
 5         set of instructions, but don't worry, I'm going
 6         to send this copy back with you as well.  I'll
 7         also send back with you a copy of the
 8         preliminary jury instructions.  They have been
 9         slightly amended because at the beginning of the
10         case I instructed you that you need to determine
11         whether the patents-in-suit are valid or
12         invalid.  Invalidity is no longer an issue in
13         the case, so that's been stripped out of these
14         preliminary instructions.
15                    So that will give you one copy of
16         all the instructions that I have given you along
17         the way, preliminarily and the final set.  I'll
18         also send back with you a copy of this verdict
19         form that you will be asked to fill out.  I'll
20         tell you more about that.
21                    Finally one other point.
22         Preliminarily you have been given juror
23         notebooks which listed some things that may or
24         may not have some claims that are mentioned in
```

```
 1      there, but the only claims that are at issue in
 2      the case are the ones that you have heard about
 3      repeatedly and the ones that are listed on the
 4      verdict form.  Those are the only ones you need
 5      to pay attention to.  You'll see them listed out
 6      in the verdict form, the claims that you have
 7      been hearing about and which are listed here the
 8      form.
 9                   All right.  Members of the jury,
10      now it is time for me to instruct you about the
11      law that you must follow in deciding this case.
12                   I will start by explaining your
13      duties and the general rules that apply in every
14      civil case.  I will explain some rules that you
15      must use in evaluating particular testimony and
16      evidence.  I will explain the positions of the
17      parties and the law you will apply in this case.
18      Last I will explain the rules that you must
19      follow during your deliberations in the jury
20      room.  Please listen very carefully to
21      everything I say.
22                   You will have a written copy of
23      these instructions with you in the jury room for
24      your reference during your deliberations.  You
```

1   will also have a verdict formally, which will

2   list the interrogatories, or questions, that you

3   must answer to decide this case.

4           You have two main duties as

5   jurors.  The first one is to decide what the

6   facts are from the evidence that you saw and

7   heard here in the court.  Deciding what the

8   facts are is your job, not mine, and nothing

9   that I have said or done during this trial was

10   meant to influence your decisions about the

11   facts in any way.

12           Your second duty is to take the

13   law that I give you, apply it to the facts, and

14   decide which party should prevail on the issues

15   presented.  I will instruct you about the burden

16   of proof shortly.  It is my job to instruct you

17   about the law and you are bound by the oath that

18   you took at the beginning of the trial to follow

19   the instructions that I give you, even if you

20   personally disagree with them.  This includes

21   the instructions that I gave you before and

22   during the trial, and these instructions.  All

23   the instructions are important, and you should

24   consider them together as a whole.

```
 1                Perform these duties fairly.  Do

 2       not let any bias, sympathy or prejudice that you

 3       may feel towards one side or the other influence

 4       your decision in any way.

 5                You must make your decision based

 6       only on the evidence that you saw and heard here

 7       in the courtroom.  Do not let rumors,

 8       suspicions, or anything else that you may have

 9       seen or heard outside of court influence your

10       decision in any way.  The evidence in this case

11       includes only what the witnesses said while they

12       were testifying under oath, including deposition

13       testimony that has been played or read to you,

14       the exhibits that I allowed into evidence, and

15       any facts that the parties agreed to by

16       stipulation.

17                Nothing else is evidence.  The

18       lawyers' statements and arguments are not

19       evidence.  Their questions and objections are

20       not evidence.  My legal rulings are not

21       evidence.  None of my comments or questions are

22       evidence.  The notes taken by any of you as

23       jurors are not evidence.

24                Certain charts and graphics have
```

1    been used to illustrates testimony from

2    witnesses.  Unless I have specifically admitted

3    them into evidence, these charts and graphics

4    are not themselves evidence even if they refer

5    to, identify, or summarize the evidence.

6              During the trial I may have not

7    let you hear the answers to some of the

8    questions that the lawyers asked.  I'm trying to

9    think, I'm not sure whether that happened or

10   not.  I also may have ruled that you could not

11   see some of the exhibits that the lawyers wanted

12   you to see.  And sometimes I may have ordered

13   you to disregard things that you saw or heard.

14   If that happened, you must completely ignore all

15   of those things.  Do not speculate about what a

16   witness may have said or what an exhibit might

17   have shown.  These things are not evidence, and

18   you are bound by your oath not to let them

19   influence your decision in any way.

20             Make your decision based only on

21   the evidence, as I have defined it here, and

22   nothing else.

23             Some of you may have heard terms

24   "direct evidence" and "circumstantial evidence."

1    Direct evidence is simply evidence

2    like the testimony of an eyewitness which, if

3    you believe it, directly proves a fact.  If a

4    witness testified that he saw it raining

5    outside, and you believed him, that would be

6    direct evidence that it was raining.

7    Circumstantial evidence is simply

8    a chain of circumstances that indirectly proves

9    a fact.  If someone walks into the courtroom

10   right now wearing a raincoat covered with drops

11   of water and carrying a wet umbrella, that would

12   be circumstantial evidence from which you could

13   conclude that it was raining.

14   It is your job to decide how much

15   weight to give the direct and circumstantial

16   evidence.  The law makes no distinction between

17   the weights that you should give to either one,

18   nor does it say that one is any better evidence

19   than the other.  You should consider all the

20   evidence, both direct and circumstantial, and

21   give it whatever weight you believe it deserves.

22   You should use your common sense

23   in weighing the evidence.  Consider it in light

24   of your everyday experience with people and

1    events, and give it whatever weight you believe

2    it deserves.  If your experience tells you that

3    certain evidence reasonably leads to a

4    conclusion, you are free to reach that

5    conclusion.

6              You may use notes taken during the

7    trial to assist your memory.  Remember that your

8    notes are for your personal use.  They may not

9    be given or read to anyone else.  Do not use

10   your notes, or any other juror's notes, as

11   authority to persuade fellow jurors.  Your notes

12   are not evidence, and they are by no means a

13   complete outline of the proceedings or a list of

14   the highlights of the trial.

15             Some testimony that is considered

16   unimportant at the time presented, and thus, not

17   written down, may take on greater importance

18   later on in the trial in light of all the other

19   evidence presented.  Your notes are valuable

20   only as a way to refresh your memory.  Your

21   memory is what you should be relying on when it

22   comes time to deliberate and render your verdict

23   in this case.

24             You, the jurors, are the sole

1    judges of the credibility, or the believability,

2    of the witnesses you have seen during the trial

3    and the weight their testimony deserves.

4              You should carefully scrutinize

5    all the testimony each witness has given and

6    every manner of evidence that tends to show

7    whether he or she is worthy of belief.  Consider

8    each witness's intelligence, motive, and state

9    of mind, as well as his or her demeanor while on

10   the stand.  Consider the witness's ability to

11   observe the matter as to which he or she has

12   testified and whether he or she impresses you as

13   having an accurate recollection of these

14   matters.  Consider also any relation each

15   witness may bear to each side of the case, the

16   manner in which each witness might be affected

17   by the verdict, the interest any witness may

18   have in the verdict, and the extent to which, if

19   at all, each witness is either supported or

20   contradicted by other evidence in the case.

21             Discrepancies in the testimony of

22   different witnesses may, or may not, cause you

23   to discredit such testimony.  Two or more

24   persons witnessing an incident or transaction

```
 1    may see or hear it differently.  Likewise, in

 2    determining the weight to give to the testimony

 3    of a witness, you should ask yourself whether

 4    there was evidence tending to prove that the

 5    witness testified falsely about some important

 6    fact, or whether there was evidence that at some

 7    other time the witness said or did something, or

 8    failed to say or do something, that was

 9    different, or inconsistent, from the testimony

10    that was given here during the trial.  It is the

11    province of the jury to determine whether a

12    false statement or a prior inconsistent

13    statement discredits the witness's testimony.

14              You should remember that a simple

15    mistake by a witness does not mean that the

16    witness was not telling the truth.  People may

17    tend to forget some things or remember other

18    things inaccurately.  If a witness has made a

19    misstatement, you must consider whether it was

20    simply an innocent lapse of memory or an

21    intentional falsehood, and that may depend upon

22    whether it concerns an important fact or an

23    unimportant detail.

24              When knowledge of technical
```

1    subject matter might be helpful to the jury, a

2    person who has special training or experience in

3    that technical field -- we call such a person an

4    expert witness -- is permitted to state his or

5    her opinion on those technical matters.

6    However, you are not required to accept that

7    opinion.  As with any other witness, it is up to

8    you to judge the credentials and the credibility

9    of the expert witnesses that have testified in

10   this case and decide whether to rely on their

11   testimony.

12            You should consider each expert

13   opinion received in evidence in this case, and

14   give it such weight as you think it deserves.

15   If you decide that the opinion of an expert

16   witness is not based upon sufficient education

17   and experience, or if you conclude that the

18   reasons given in support of the opinion are not

19   sound, or if you feel that the opinion is

20   outweighed by other evidence, you may disregard

21   the opinion in whole or in part.

22            During the trial, certain

23   testimony was presented to you through

24   depositions that were read into evidence or

 1   played by video.  This testimony must be given

 2   the same consideration you would give it had the

 3   witness personally appeared in court.  Like the

 4   testimony of a live witness, the statements made

 5   in a deposition are made under oath and are

 6   considered evidence that may be used to prove

 7   particular facts.

 8             I will now review for you the

 9   parties in this action and the positions of the

10   parties that you will have to consider in

11   reaching your verdict.

12             The plaintiff, as you know, is

13   Parallel Networks Licensing, LLC, which we have

14   been referring to as Parallel Networks.

15             Defendant is Microsoft Corporation

16   which we have been referring to as Microsoft.

17             Parallel Networks is the owner of

18   U.S. Patent No. 5,894,554, which I have referred

19   to and the parties referred to as the '554

20   patent, and the U.S. Patent No. 6,415,335, which

21   I will be referring to in these instructions and

22   have referred to and you heard the parties refer

23   to it as the '335 patent.  I may also refer to

24   these patents collectively as the

1 patents-in-suit.

2 Microsoft made, used, and operated

3 the Bing and MSN website systems during the

4 relevant time frame. I may refer to these

5 website systems collectively as the accused

6 products.

7 Parallel Networks contends that

8 Microsoft's accused products directly infringe

9 claims 20, 41 and 49 of the '554 patent, and

10 claims 43 and 78 of the '335 patent.

11 And you'll know that, not just

12 from what's been said, and what I said, but it's

13 in the verdict form.

14 These claims may be referred to as

15 the asserted claims. Parallel Networks further

16 contends that Microsoft's infringement was

17 willful.

18 Microsoft contends it does not

19 infringe the asserted claims of the '554 or the

20 '335 patent.

21 You will be asked to determine the

22 issue of infringement according to the

23 instructions I will give you in a moment.

24 First let me tell about the burden

1   of proof.  In any legal action, facts must be

2   proven by a required standard of evidence, known

3   as the burden of proof.  In a patent case such

4   as this, Parallel Networks must prove its claims

5   of patent infringement by a preponderance of the

6   evidence.  When a party has the burden of proof

7   by a preponderance of the evidence, it means

8   that you must be persuaded that what the party

9   seeks to prove is more probably true than not

10   true.

11               To put it differently, if you were

12   to put Parallel Networks' and Microsofts'

13   evidence of infringement on opposite sides of a

14   scale, the evidence supporting Parallel

15   Networks' assertions would have to make the

16   scale tip somewhat to Parallel Networks' side.

17               If it is determined that Microsoft

18   infringes the asserted claims, Parallel Networks

19   also has the burden to establish the appropriate

20   amount of damages it should receive by a

21   preponderance of the evidence.

22               Those of you who are familiar with

23   criminal cases may have heard the terms proof

24   beyond a reasonable doubt.  That burden does not

1    apply in a civil case and you, therefore, should

2    put it out of your mind in considering whether

3    or not Parallel Networks has met its burden of

4    proving infringement by a preponderance of the

5    evidence, that is more likely than not is the

6    scale.

7              Before you can decide many of the

8    issues in this case, you will need to understand

9    the role of patent claims.  The patent claims

10   are the numbered sentences at the end of each

11   patent.  And you've seen exhibits that show you

12   that repeatedly.  The claims are important

13   because it is the words of the claims that

14   define what a patent covers.  The claims are

15   intended to define, in words, the boundaries of

16   the invention described and illustrated in

17   patents.

18             Claims are usually divided into

19   parts, called limitations.  For example, a claim

20   that covers the invention of a table may recite

21   the tabletop, four legs, and the glue that

22   secures the legs to the tabletop.  The tabletop,

23   legs and glue are each a separate limitation of

24   the claim.  A claim covering the invention of a

1    table is called an apparatus claim.  The claim

2    describing the steps required to make a table is

3    call a method claim.

4              There are two different types of

5    claims in a patent.  The first type is called an

6    independent claim and you've heard that word

7    used.  An independent claim does not refer to

8    any other claim of the patent.  An independent

9    claim is read alone to determine its scope.

10             For example, Claim 43 of the '335

11   Patent is an independent claim.  You know this

12   because Claim 43 does not refer to any other

13   claims.  Accordingly, the words of this claim

14   are read by themselves in order to determine

15   what the claim covers.  Every limitation

16   relevant to the claim is in that claim.

17             The second type, a dependent

18   claim, refers to at least one other claim in the

19   patent and thus, incorporates whatever that

20   other claim says.  Accordingly, to determine

21   what a dependent claim covers you must read both

22   the dependent claim and the claim or claims to

23   which it refers, because those referred to

24   claims have limitations in them.

1            For example, Claim 78 of the '335

2     Patent is a dependent claim.  If you look at

3     Claim 78, it refers to Claim 43.  Therefore, to

4     determine what Claim 78 covers, you must

5     consider the limitations of claims 78 and 43

6     together.

7            Several claims of the '554 and the

8     '335 patents use the transitional term

9     comprising.  Comprising is interpreted the same

10     as the words including or containing.  In patent

11     claims comprising means that the claims are

12     open-ended, that is, the claims are not limited

13     to products or methods that include only what is

14     in the claim and nothing else.

15            If you find that the accused

16     product or method includes all of the

17     limitations in any of the asserted claims that

18     use the term comprising, the fact that that

19     accused product may also include additional

20     elements or components is irrelevant.  The

21     presence of additional elements or components

22     does not mean that the method or product does

23     not infringe a patent claim.

24            You will first need to understand

```
1     what each claim covers in order to decide

2     whether or not there is infringement of the

3     claim.  The law says that it is my role to

4     define the terms of the claims and it is your

5     role to apply my definitions to the issues that

6     you are to decide in this case.  You must accept

7     my definitions of these words in the claims as

8     being correct.  It is your job to take these

9     definitions and apply them to the issues that

10    you are deciding, including the issue of

11    infringement.  You must ignore any different

12    interpretation given to these terms by the

13    witnesses or by attorneys if that happened.

14                I instruct you that the following

15    claim terms have the following definitions:

16    Now, this is on page 16 of the instructions.

17    First, web page: Web content on the worldwide

18    web displayable by a web browser; second,

19    request, a message that asks for a web page;

20    third, web server, software or a machine having

21    software that receives web page requests and

22    returns web pages in response to the requests;

23    four, page server, page generating software that

24    generates a dynamic web page; fifth, dynamic web
```

1245

1   page, a web page that is created in response to

2   a request; sixth, intercepting said request at

3   said web server slash HTTP-compliant device,

4   that means diverting the handling of said

5   request before the request is processed by the

6   web server slash HTTP-compliant device; seventh,

7   releasing said web server to process other

8   requests, that means freeing the web server to

9   process other requests; eight, HTTP-compliant

10  device meaning a device running software that

11  implements the communication protocol known as

12  hyper text transport protocol, HTTP; and last,

13  machine readable medium, meaning nontransitory

14  medium readable by a machine.

15          If I have not provided a specific

16  definition for a given term, you are to use the

17  ordinary meaning of that term.  I'll repeat,

18  that set of definitions is on page 16 going over

19  to page 17 of the written instructions.

20          Now, let's talk about the law of

21  patent infringement.  Parallel Networks has the

22  right to stop others from using the invention

23  covered by its patent claims during the life of

24  the patent.  If any person makes or uses, within

1    the United States, or sells or offers to sell,

2    within the United States, what is covered by the

3    patent claims without Parallel Networks'

4    permission, that person is said to infringe the

5    patent.

6              In this case Parallel Networks

7    alleges that Microsoft directly infringes claims

8    20, 41 and 49 of the  '554 Patent and claims 43

9    and 78 of the '335 Patent.

10             You must decide whether or not

11   Parallel Networks has proven by a preponderance

12   of the evidence that Microsoft has made or used,

13   within the United States, or sold or offered for

14   sale, within the United States, products or

15   services covered by any of the claims at issue

16   in this case.

17             If Microsoft infringes one claim

18   of the '554 or '335 patents, then Microsoft

19   infringes that patent, even if, in good faith,

20   Microsoft believed that it did not infringe.

21   Microsoft's knowledge or intent to infringe is

22   not relevant.  You may have heard evidence that

23   Microsoft has its own patents.  However,

24   ownership of patents is not a defense to patent

1    infringement and Microsoft can still infringe

2    even if it has its own patents in the same area.

3              In order to prove direct

4    infringement, Parallel Networks must prove that

5    each limitation of the asserted claims is

6    present in the accused products and services.

7              A claim limitation is literally

8    present if it exists in the accused product or

9    service just as it is described in the claim

10   language, either as I have explained that

11   language to you or, if I did not explain it, as

12   you understand its ordinary meaning.

13             Literal infringement must be

14   determined with respect to each asserted claim

15   individually by comparing the elements of the

16   accused product or service to each of that

17   claim's limitations.  If the accused product or

18   service omits any single limitation recited in a

19   given claim, then you must have find that

20   Microsoft has not infringed that claim.  You

21   must determine infringement with respect to each

22   asserted claim and each accused product or

23   method individually.

24             In determining whether any accused

1       product or service literally infringes any of

2       the asserted claims, you should take the

3       following steps:

4                   First, you should determine the

5       scope of the asserted claim by reading the claim

6       language, limitation by limitation, as those

7       limitations have been construed by the court or,

8       if they have not been specifically construed,

9       according to their ordinary meaning.  When I

10      said construed, I meant those definitions I read

11      to you.

12                  And second, you should compare the

13      accused product or service, element by element,

14      to each of the limitations of the asserted

15      claim.

16                  If you find each and every

17      limitation of the asserted claim in the accused

18      product or service, you must return a verdict of

19      infringement as to that claim.

20                  If you do not find each and every

21      limitation of the asserted claim in the accused

22      product or service, you must return a verdict of

23      no infringement as to that claim.

24                  You must repeat the above analysis

1    with every asserted claim.  There is one

2    exception to this rule.  If you find that an

3    independent claim is not infringed, there cannot

4    be infringement of any dependent claim that

5    refers directly or indirectly to that

6    independent claim.

7            On the other hand, if you find

8    that an independent claim has been infringed,

9    you must still decide, separately, whether the

10   product or method meets the additional

11   requirements of any claims that depend from that

12   independent claim, thus, whether those dependent

13   claims have also been infringed.

14           In this case, Parallel Networks

15   argues both that Microsoft infringed and,

16   further, that Microsoft infringed willfully.  If

17   you have decided that Microsoft has infringed,

18   you must go on and address the additional issue

19   of whether or not this infringement was willful.

20   Willfulness requires you to determine whether

21   Parallel Networks proved by a preponderance of

22   the evidence that the infringement by Microsoft

23   was especially worthy of punishment, for

24   instance if Microsoft's infringement is wanton,

1    malicious, deliberate, consciously wrongful,

2    flagrant, or done in bad faith.  If you conclude

3    that Microsoft infringed one or more of the

4    asserted claims of the patents-in-suit, then you

5    should consider Microsoft's knowledge and intent

6    at the time of the infringement of the '554 and

7    '335 patents in determining whether the

8    infringement was willful.

9              Let's turn to the topic of

10   damages.  If you find that Microsoft infringed

11   any claim of either patent-in-suit, you must

12   then consider what amount of damages to award to

13   Parallel Networks.  On the other hand, if you

14   find that each of the asserted patent claims is

15   not infringed, then you do not need to consider

16   damages in your deliberations.  I will now

17   instruct you about the measure of damages.  By

18   instructing you on damages, I am not suggesting

19   which party should win this case, on any issue.

20             The damages you award must be

21   adequate to compensate Parallel Networks for

22   infringement, if you find infringement.  Your

23   damages award should put Parallel Networks in

24   approximately the same financial position that

1    it would have been in had the infringement not

2    occurred.  You should not add anything to the

3    amount of damages to punish Microsoft or to set

4    an example.

5              Parallel Networks has the burden

6    to establish the amount of its damages by a

7    preponderance of the evidence.  While Parallel

8    Networks is not required to prove the amount of

9    its damages with mathematical precision, it must

10   prove them with reasonable certainty.  You may

11   not award damages that are speculative, damages

12   that are only possible, or damages that are

13   based on guesswork.

14             In this case, Parallel Networks

15   seeks a reasonable royalty.  A reasonable

16   royalty is defined as the money amount Parallel

17   Networks and Microsoft would have agreed upon as

18   a fee for use of the invention at the time prior

19   to when the infringement began.  Parallel

20   Networks is entitled to recover no less than a

21   reasonable royalty for each infringing sale

22   and/or use of Parallel Network's invention.

23             A royalty is a payment made to a

24   patent holder in exchange for the right make,

1   use, or sell the claimed invention.  A

2   reasonable royalty is the amount of royalty

3   payment that a patent holder and infringer would

4   have agreed to in a hypothetical negotiation, as

5   I just mentioned, taking place at a time prior

6   to when the infringement first began.  In

7   considering this hypothetical negotiation, you

8   should focus on what the expectations of the

9   patent holder and the infringer would have been

10   had they entered into an agreement at that time,

11   and had they acted reasonably in their

12   negotiations.

13            In determining this, you must

14   assume that both parties believed the patent was

15   valid and infringed and that both parties were

16   willing to enter into an agreement.  The

17   reasonable royalty you determine must be a

18   royalty that would have resulted in a

19   hypothetical negotiation, and not simply a

20   royalty either party would have preferred.

21   Evidence of things that happened after the

22   infringement first began can be considered in

23   evaluating the reasonable royalty only to the

24   extent that the evidence aids in assessing what

1   royalty would have resulted from a hypothetical

2   negotiation.

3          Although evidence of the actual

4   profits Microsoft made may be used to determine

5   the anticipated profits at the time of the

6   hypothetical negotiation, the royalty may not be

7   limited or increased based on the actual profits

8   that Microsoft may have made.

9          In determining the reasonable

10  royalty, you should consider all the facts known

11  and available to the parties at the time the

12  infringement began.  Some of the kind of factors

13  that you may consider in making your

14  determination are:

15         The royalties received by the

16  patentee for the licensing of the

17  patent-in-suit, proving or tending to prove an

18  established royalty.

19         The rates paid by the licensee for

20  the use of other patents comparable to the

21  patents-in-suit.

22         The nature and scope of the

23  license, as exclusive or nonexclusive, or as

24  restrict or nonrestricted in terms of territory

```
 1    or with respect to whom the manufactured product

 2    may be sold.

 3                    The licensor's established policy

 4    and marketing program to maintain his or her

 5    patent monopoly by not licensing others to use

 6    the invention or by granting licenses under

 7    special conditions designed to preserve the

 8    monopoly.

 9                    The commercial relationship

10    between the licensor and licensee, such as

11    whether they are competitors in the same

12    territory in the same line of business, or

13    whether they are inventor and promoter.

14                    The effect of selling the patented

15    specialty in promoting sales of other products

16    of the license, the existing value of the

17    invention to the licensor as a generator of

18    sales of his nonpatented items, and the extent

19    of such derivative or convoyed sales.

20                    Derivative or convoyed sales

21    haven't been mentioned here, so I think you can

22    probably ignore that.

23                    The duration of the

24    patents-in-suit and the term of the license.
```

1255

1          The established profitability of

2     the product made under the patents, its

3     commercial success, and its current popularity.

4          The utility and advantages of the

5     patented property over the old modes or devices,

6     if any, that had been used for working out

7     similar results.

8          The nature of the patented

9     invention, the character of the commercial

10    embodiment of it as owned and produced by the

11    licensor, and the benefits to those who have

12    used the invention.

13         The extent to which Microsoft has

14    made use of the invention and any evidence

15    probative of the value of that use.

16         The portion of the profit or of

17    the selling price that may be customary in the

18    particular business or in comparable business to

19    allow use of the invention or analogous

20    inventions.

21         The portion of the realizable

22    profits that should be credited to the invention

23    as distinguished from nonpatented elements, the

24    manufacturing process, business risks, or

1    significant features or improvements added by

2    Microsoft.

3              The opinion and testimony of

4    qualified experts.

5              The amount that a licensor, such

6    as the patentee, and a licensee, such as

7    Microsoft, would have agreed upon at the time

8    the infringement began if both had been

9    reasonably and voluntarily trying to reach an

10   agreement; that is, the amount which a prudent

11   licensee -- who desired, as a business

12   proposition, to obtain a license to manufacture

13   and sell a particular article embodying the

14   patented invention -- would have been willing to

15   pay as a royalty and yet be able to make a

16   reasonable profit and which amount would have

17   been acceptable by a prudent patentee who was

18   willing to grant a license.

19             No one factor is dispositive and

20   you can and should consider the evidence that

21   has been presented to you in this case on each

22   of these factors.  You may consider any other

23   factors which in your mind would have increased

24   or decreased the royalty Microsoft would have

1    been willing to pay and Parallel Networks would

2    have been willing to accept, acting as normally

3    prudent business people.

4              The damages for infringement of

5    patents-in-suit should be calculated beginning

6    on September 11, 2012.

7              Let me finish up by explaining

8    some things about your deliberations in the jury

9    room, and your possible verdicts.

10             Once you start deliberating, do

11   not talk to the jury officer, or to me, or to

12   anyone else except each other about the case.

13   When I say the jury officer, we'll swear one of

14   the courtroom security personnel to be outside

15   the jury room to make sure you're not disturbed

16   or interfered with in any way, but you don't

17   talk to that jury officer or me or anyone else

18   except each other about the case.  If you have

19   any questions or messages, you must write them

20   down on a piece of paper, sign them, and then

21   give them to the jury officer.  The officer will

22   give them to me and I will respond as soon as I

23   can.  I will have to talk to the lawyers about

24   what you've asked, so it may take me some time

1    to get back to you if you have a question.  Any

2    questions or messages normally should be sent to

3    me through your foreperson, who by custom of

4    this Court is the juror seated in the first row

5    in the first seat.

6              One more thing about messages.  Do

7    not ever write down or tell anyone how you stand

8    on your votes.  For example, do not write down

9    or tell anyone that you are split 4 to 5 or 6 to

10   3 or whatever your vote happens to be.  That

11   should stay secret until you're finished.

12             Your verdict must represent the

13   considered judgment of each juror.  In order for

14   you as a jury to return a verdict, it is

15   necessary that each juror agree to the verdict.

16   Your verdict must be unanimous.

17             It is your duty, as jurors, to

18   consult with one another and to deliberate with

19   a view towards reach an agreement, if you can do

20   so without violence to your individual judgment.

21   Each of you must decide the case for yourself,

22   but do so only after an impartial consideration

23   of the evidence with your fellow jurors.  In the

24   course of your deliberations, do not hesitate to

```
 1      reexamine your own views and change your

 2      opinion, if convinced it is erroneous.  But do

 3      not surrender your honest conviction as to the

 4      weight or effect of evidence solely because of

 5      the opinion of your fellow jurors, or for the

 6      purpose of returning a verdict.  Remember at all

 7      times that you are judges -- judges of the

 8      facts.  Your sole interest is to seek the truth

 9      from the evidence in the case.

10                  A form of verdict has, as I've

11      mentioned, been prepared for you.  The verdict

12      form asks you a series of questions about the

13      parties' claims.  Unless your directed otherwise

14      in the form of the verdict, you must answer all

15      of the questions posed, and you must agree on

16      each answer.  Now, I'll repeat, you do that in

17      accordance with the way the verdict form is

18      structured and it will tell you how to proceed

19      if you've answered in a certain way.  Okay.

20      When you have reached a unanimous verdict or

21      agreement as to the verdict, you will return

22      your verdict to the courtroom deputy.

23                  It is proper to add the caution

24      that nothing said in these instructions and
```

1260

1    nothing in the form of verdict is meant to

2    suggest or convey in any way or manner what

3    verdict I think you should find.  What the

4    verdict shall be is the sole and exclusive duty

5    and responsibility of you, the jury.

6              Now that all the evidence is in

7    and the arguments are completed, you are free to

8    talk about the case in the jury room.  In fact,

9    it's your duty to talk with each other about the

10   evidence and to make every reasonable effort you

11   can to reach a unanimous agreement.  Talk with

12   each other, listen to each other carefully and

13   respectfully, hear each other's views and keep

14   an open mind as you listen to what your fellow

15   jurors have say.

16             Try your best to work out your

17   differences.  Do no hesitate to change your

18   mind, again, if you are convinced that the

19   other, jurors are right and your original

20   position was wrong.  But, again, do not ever

21   change your mind just because other jurors see

22   things differently, or just to get the case over

23   with.  In the end your vote must be exactly

24   that -- your own vote.  It is important for you

```
1      to reach unanimous agreement, but only if you

2      can do so honestly and in good conscience.

3                  If any member of the jury took

4      notes, let me remind you the notes are not to be

5      given any greater weight than the memory or

6      impression of each juror as to what the

7      testimony may have been.  Whether you took notes

8      or not, each of you must form and express your

9      own opinion as to the facts of the case.

10                 No one will be allowed to hear

11     your discussions in the jury room, and no record

12     will be made of what you say.  So you should all

13     feel free to speak your minds.

14                 Listen carefully to what the other

15     jurors have to say, and then decide for

16     yourself.

17                 Now, as you know, we generally end

18     our business each day at 4:30.  If we do not

19     hear from you by 4:30, I will be sending you a

20     note to see whether you are close enough to a

21     verdict that you want to deliberate after 4:30

22     or whether you can going to recess for the

23     evening and resume your deliberations tomorrow.

24     You will need to respond in writing to that
```

```
1     question if you reach that point.

2                  I am going to remind you now, if

3     you do go home this evening and resume your

4     deliberations tomorrow, you are not to talk

5     about the case among yourselves or with anyone

6     else during the evening recess.  You are not to

7     read or listen to any news about the case, any

8     newspaper, online, or on television or radio.

9     I'm pretty sure it's not going to be there, but

10    you are not to go on the internet, you're not to

11    do anything like that if we end up having an

12    evening recess.

13                  You may talk about the case only

14    while you are in the jury room and everyone on

15    the jury is present.  Unless I hear from you

16    that you have a different schedule in mind, I

17    will expect you all to come back tomorrow at 9

18    o'clock so that you can start your deliberations

19    then.  You are not to start deliberating until

20    you are all present in the jury room and

21    participating together.  And again, these things

22    are all in the event that there's an evening

23    recess.

24                  Because the lawyers have to make
```

```
 1        themselves available to respond to questions or

 2        receive the verdict, I generally will give them

 3        between, you know, during a lunch hour, which

 4        we're going to take right now, to step away from

 5        the phone.  So whenever you are deliberating

 6        during lunch hour, let me remind you, if you ask

 7        a question during this time, you probably are

 8        not going to get an answer right away because

 9        people will not be at their phones.  Let me

10        finish up by repeating something I said to you

11        earlier.  Nothing that I have said or done

12        during this trial was meant to influence your

13        decision in any way.  You must decide the case

14        yourselves based on the evidence presented.

15                    And finally, if I have read any of

16        these instructions inconsistently with the

17        written text you are to rely on the instructions

18        that I'm going to send back with you, okay?  But

19        I think I did a pretty good job.

20                    And before I ask the courtroom

21        deputy to swear you, I want to thank you for the

22        careful attention and patience and the

23        seriousness with which you've taken this.  I

24        know the parties appreciate it.  I do too.  I'll
```

```
 1      ask that the jury officer now be sworn.

 2                      (Jury officer sworn.)

 3                      THE COURT:  Give me one moment

 4      with the lawyers at side bar.

 5                      (Side bar discussion.)

 6                      THE COURT:  Any issue with the

 7      instructions I just read?

 8                      MR. CAWLEY:  Not from Plaintiff.

 9                      MS. BROOKS:  No, Your Honor.

10                      THE COURT:  Okay.  Let's send them

11      back.

12                      (Recess at 12:33 p.m.)

13                      THE COURT:  All right.  Ladies and

14      gentlemen, the case is now yours.  Thank you.

15      Please take the jury out.

16                      (Jury leaving the courtroom at

17      12:35 p.m.)

18                      THE COURT:  Okay.  Please be

19      seated.  I'm going to send these packets to the

20      jury now.  I made one mark on it to note if

21      there is a recess, they start their

22      deliberations at 9:00 and not 9:30 tomorrow

23      morning.  That's the only change.  I don't see

24      that that will cause anybody any difficulty.  I
```

```
1    see by the head shaking that is not a problem
2    with anybody.
3              I'm sending the verdict form, the
4    revised jury instructions and the verdict
5    instructions that were given to me by the
6    parties.  I'll give it to the courtroom deputy
7    to hand it to the jury at this time.
8              I'll ask counsel, you know, you
9    get your lunch break, but I do hope you have got
10   your cell phones with you and that you give the
11   courtroom deputy the number or numbers that you
12   want to be used sort of in order of priority in
13   the event that there are any questions and I
14   need to get ahold of you for some reason.
15             All right.  And with that, I'll
16   say let's go off the record.  I just would like
17   to shake your hands.
18             (Court recessed at 12:38 p.m.)
19             THE COURT:  Let's have a seat
20   please.  I've been waiting to get a call and
21   haven't gotten one, but I don't want to keep the
22   jury waiting, so I'm not sure -- who are we
23   still waiting for?
24             MS. BROOKS:  Your Honor, it was
```

```
1     our client representative, Ms. Kwan.  We

2     actually ran out of the office and forgot to

3     tell her and she's running here in the rain.

4                 THE COURT:  She's going to have to

5     run in the rain.  So we have nine people waiting

6     who have put their lives on hold and I don't

7     think we should be keeping them any longer.

8     Let's go ahead and have the jury in.

9                 (Jury enters.)

10                THE COURT:  Thanks.  Please be

11    seated, ladies and gentlemen.  I received your

12    note signed by your foreperson saying, we have a

13    verdict.  Please tell me what to do.  And what

14    to do is if you would at this time hand the

15    verdict form to the courtroom deputy.

16                All right.  This is your verdict?

17    I'll ask the foreperson.

18                THE JUROR:  I'm sorry?

19                THE COURT:  This is your verdict?

20                THE JUROR:  Yes.

21                THE COURT:  Okay.  I'll ask the

22    deputy to read it.

23                COURTROOM DEPUTY:  Okay.

24    Infringement as to Question Number 1, has
```

```
 1        Parallel Networks proven by a preponderance of

 2        the evidence that Microsoft directly infringed

 3        the following claims of the patents-in-suit by

 4        making or using Bing and/or MSN?

 5                     And the jury has marked for the

 6        '554 patent claims as to Claim 20, the answer is

 7        no.  Claim 41, no.  Claim 49, no.  As to the

 8        '335 Patent claims, Claim #43, the jury has

 9        marked no.  Claim 78 is no.

10                     THE COURT:  And the remainder of

11        the verdict form, as instructed, remains blank.

12                     Are there any applications from

13        the parties?

14                     All right.  I'll see counsel at

15        side bar.

16                     (Side bar discussion.)

17                     THE COURT:  Polling of the jury or

18        anything else before I release them?

19                     MR. CAWLEY:  I don't think we need

20        jury polling.

21                     THE COURT:  Then I'll release

22        them.  We'll be ready to wrap up then.

23                     MS. BROOKS:  Thank you.

24                     (Side bar discussion ends.)
```

```
 1                    THE COURT:  All right.  Ladies and

 2      gentlemen of the jury, thank you very much for

 3      your service.  That concludes your service on

 4      this case.  On behalf of the parties and on

 5      behalf of the United States, I thank you very,

 6      very much.  You're free to return the jury room,

 7      obtain your things and exit.  The courtroom

 8      deputy will help you with that.

 9                    (Jury exits.)

10                    THE COURT:  Okay.  Please have a

11      seat.  I don't know whether there's -- as far as

12      post trial motions, et cetera, like that go, you

13      each have local counsel and will advise, let me

14      know about that.

15                    Is there anything else that needs

16      to be addressed before we conclude here in the

17      courtroom today?

18                    MR. CAWLEY:  Not from the

19      Plaintiff, Your Honor.

20                    THE COURT:  All right.

21                    MS. BROOKS:  Nothing from the

22      defense.  Thank you, Your Honor.

23                    THE COURT:  All right.  Thank you

24      very much.
```

1               (End at 2:44 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1   State of Delaware )
                      )
2   New Castle County )

3

4

5                  CERTIFICATE OF REPORTER

6

7          I, Dale C. Hawkins, Registered Merit

8   Reporter, Certified Shorthand Reporter, and Notary

9   Public, do hereby certify that the foregoing record,

10  Pages 1,082 to 1,270 inclusive, is a true and

11  accurate transcript of my stenographic notes taken on

12  May 11, 2017, in the above-captioned matter.

13

14         IN WITNESS WHEREOF, I have hereunto set my

15  hand and seal this 11th day of May 2017, at

16  Wilmington.

17

18

19              /s/ Dale C. Hawkins

20              Dale C. Hawkins, RMR

21

22

23

24
```